**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph A. Pettigrew (CA 236933)
jpettigrew@scott-scott.com
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jing-Li Yu (CA 342985)
jyu@scott-scott.com
The Helmsley Building, 230 Park Avenue, 24th Floor
New York, New York 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff City of Hollywood Police Officers' Retirement System*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| CITY OF HOLLYWOOD POLICE OFFICERS' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant APPLE, INC., <br><br> Plaintiff, <br><br> v. <br><br> TIMOTHY D. COOK, ARTHUR LEVINSON, RONALD SUGAR, ANDREA JUNG, SUSAN WAGNER, ALEX GORSKY, MONICA LOZANO, WANDA AUSTIN, LUCA MAESTRI, and PHILIP W. SCHILLER, <br><br> Defendants, <br><br> – and – <br><br> APPLE, INC., <br><br> Nominal Defendant. | Case No.  _____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

# <u>TABLE OF CONTENTS</u>

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ...............................................................3

III.  PARTIES ..................................................................................................4

     A.    Plaintiff ...........................................................................................4

     B.    Nominal Defendant.........................................................................4

     C.    Director Defendants .......................................................................5

     D.    Officer Defendants .........................................................................6

IV.  SUBSTANTIVE ALLEGATIONS .........................................................6

     A.    Apple Built Up a Monopoly in Performance Smartphones and iOS App Distribution ...............................................................................6

     B.    Apple Was Subject to Two Federal Government Antitrust Actions that Put the Board and Apple Officers on Notice to Improve Compliance.........................18

     C.    Recent Congressional Investigations Put the Board and Apple Officers on Notice of Their Anticompetitive Practices ...........................................30

     D.    This Court Has Invalidated Apple's Anti-Steering Provisions...........................72

     E.    Apple Has Locked Up iOS Through a Variety of Anticompetitive Conduct ......112

     F.    Apple Has Also Been Fined Billions of Euros for Anti-Steering and Other Anticompetitive Conduct ...........................................................143

     G.    The United Kingdom Competition and Markets Authority Found that Apple Is Dominant in Its Mobile Ecosystem.................................................152

     H.    The United Kingdom Competition Appeal Tribunal Found Apple to Be Liable for Anticompetitive Conduct ..................................................176

     I.    Apple Is Using Its Dominance in Smartphones and iOS to Also Gain Dominance in Gen AI ...............................................................190

V.   THE INDIVIDUAL DEFENDANTS VIOLATED THEIR FIDUCIARY DUTY OF LOYALTY BY FAILING TO OVERSEE COMPLIANCE OR ENGAGING IN MISCONDUCT..................................................................196

     A.    Duties of All Individual Defendants ..............................................196

     B.    Additional Duties of Board Committees........................................202

     C.    The Board Directors Violated Their Fiduciary Duties Under California Law ...........................................................................................203

     D.    The Officers Violated Their Fiduciary Duties Under California Law................206

VI.    APPLE FIDUCIARIES HAVE CAUSED APPLE TO VIOLATE THE EXCHANGE ACT................................................................................................208

VII.    DAMAGES TO THE COMPANY..................................................................222

VIII.    DERIVATIVE ALLEGATIONS....................................................................223

IX.    DEMAND FUTILITY ALLEGATIONS ........................................................223

X.    CLAIMS FOR RELIEF................................................................................227

COUNT I Breach of Fiduciary Duty ................................................................227

COUNT II Corporate Waste ............................................................................227

COUNT III Unjust Enrichment ........................................................................228

COUNT IV Violation of §14(a) of the Exchange Act.......................................228

COUNT V Violation of §29(b) of the Exchange Act........................................230

COUNT VI Violation of §10(b) of the Exchange Act and SEC Rule 10b-5.................230

COUNT VII Violation of §20(a) of the Exchange Act.......................................232

XI.    PRAYER FOR RELIEF................................................................................233

XII.    JURY DEMAND...........................................................................................234

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

Plaintiff City of Hollywood Police Officers' Retirement System ("Hollywood" or "Plaintiff"), by and through its undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Apple, Inc. ("Apple" or the "Company"), against certain current and former members of Apple's Board of Directors (the "Board" or "Director Defendants") and executive officers ("Officer Defendants," together with the Board or Director Defendants, "Individual Defendants" or "Defendants"), seeking to remedy breaches of fiduciary duties, unjust enrichment, corporate waste, and violation of the federal securities laws from at least 2023 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to the facts of its ownership of Apple stock and upon information and belief as to all other matters, based upon an in-depth review by its counsel of: (a) public filings made by Apple and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by the Company and other related non-parties; (c) news articles, shareholder communications, and postings on Apple's website concerning the Company's public statements; (d) the proceedings in past and ongoing litigation and regulatory actions concerning Apple's alleged anticompetitive practices in violation of federal, state, and international antitrust statutes and regulations; and (e) other publicly available information concerning Apple and the Defendants.

## I.    NATURE OF THE ACTION

1.    Ever since the introduction of the iPhone in 2007, Apple has been building and entrenching a monopoly in high-end, or "performance," smartphones, through using its exclusive control of its operating system (the iPhone Operating System or "iOS"), and through contractual and technical restrictions.  In March 2024, the U.S. Department of Justice ("DOJ") filed a blockbuster enforcement action that detailed Apple's systematic anticompetitive conduct that blocked potential routes of competition to its smartphone monopoly by: (1) blocking the development of smart apps in iOS; (2) making it impractical for cloud streaming platforms to launch in iOS; (3) using technical restrictions to degrade alternatives to Apple Messages; (4) preventing third-party smartwatches from being compatible with iPhones; and (5) preventing financial institutions and other organizations from creating alternatives to Apple Wallet as digital

1  wallets for iOS.  In addition, Apple has been building a web of subscription services to entrench
2  its monopoly.

3  2.  As part of building and then entrenching its smartphone monopoly, Apple invited
4  third-party developers into its ecosystem, creating a symbiotic relationship where Apple attracted
5  customers through having a wide selection of apps, while attracting app developers who wanted
6  and needed the huge customer base that Apple gave access to.  Because Apple has a closed
7  operating system, the only way to access Apple customers is to develop for Apple's operating
8  systems (iOS for iPhone and iPadOS for iPad).  Google's Android platform, the primary alternative
9  mobile operating system to Apple, offers at best a limited competitive constraint because apps
10  developed for Android are not compatible with Apple devices, and therefore cannot reach Apple
11  customers.

12  3.  As Apple developed a two-sided network with entrenched indirect network effects,
13  where app developers need Apple for its customers, and Apple's customers stayed in Apple to
14  have access to apps, Apple built and entrenched a monopoly in iOS app distribution, as well.  Apple
15  set a supracompetitive 30% commission rate for in-app purchases (as well as a $99 annual
16  developer fee for apps), which it has never changed for the whole duration it has had the App
17  Store, and Apple forces app developers to use Apple's proprietary own in-app-purchasing or in-
18  app-payment ("IAP") platform for all such in-app purchases.

19  4.  Apple has also forbidden app developers from so much as informing their users of
20  alternative purchasing or payment options (Apple's "anti-steering provisions"), which has stifled
21  innovation in IAP and increased prices or decreased efficiency for customers.  Apple has been
22  fined the equivalent of billions of dollars in Europe for its anti-steering provisions and similar anti-
23  competitive conduct.  Since 2023, through an order in this District Court, Apple has been
24  prohibited from enacting anti-steering provisions, but for more than a year afterwards, Apple
25  openly defied the Court's order and instead chose, in this Court's words, "the most
26  anticompetitive" means to nominally "comply" with the Court's order.  In April 2025, the Court
27  found Apple is in contempt of its anti-steering prohibition order, referred to the United States
28  Attorney for the Northern District of California to investigate potential criminal contempt by an

1    Apple executive for perjury, and ordered Apple to immediately stop preventing steering.

2        5.      Apple's anticompetitive playbook in performance smartphones and iOS app

3    distribution now also threatens to repeat in the nascent and rapidly developing generative artificial

4    intelligence ("gen AI") market.  Apple threatens to use its existing market power to either partner

5    with artificial intelligence ("AI") players to mutually reinforce their respective market powers, or

6    to stifle rivals by entrenching artificial intelligence into its own products.

7        6.      Apple's anticompetitive misconduct has and will cause billions of dollars of

8    damages to the Company.  Apple fiduciaries have either failed to oversee compliance, allowing

9    this anticompetitive conduct to fester, or have actively engaged in this anticompetitive conduct.

10   As a result, Plaintiff brings this shareholder derivative action on behalf of Apple to recover

11   damages and seek other appropriate relief from these disloyal fiduciaries.

12   **II.    JURISDICTION AND VENUE**

13       7.      Jurisdiction lies pursuant to Article III, Section 2, of the U.S. Constitution and 28

14   U.S.C. §1331.  The claims asserted herein arise under §§10(b), 20(a), 14(a), and 29(b) of the

15   Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b), and Rules

16   10(b)-5, 14a-9, 17 C.F.R. §§240.10(b)-5, 240.14a-9, promulgated thereunder.  This Court has

17   supplemental jurisdiction pursuant to 28 U.S.C. §1367 as to the state law claims alleged, as they

18   arise out of the same transactions and occurrences as the federal claims.  In connection with the

19   wrongdoing complained of herein, Defendants used the means and instrumentalities of interstate

20   commerce, the U.S. mail, and the facilities of the national securities markets.  This action is not a

21   collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

22       8.      This Court also has original jurisdiction under 28 U.S.C. §1332(a)(1) because the

23   matter in controversy, exclusive of interest and costs, exceeds the sum value of $75,000 and is

24   between citizens of different states.

25       9.      This Court has personal jurisdiction over each of the defendants named herein

26   because each defendant is either a corporation incorporated, maintaining its principal executive

27   offices, and operating in this District, or is an individual who maintains a place of business in this

28   District or has sufficient minimum contacts with this District so as to render the exercise of

1  jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

2  Further, the Individual Defendants conducted much of the wrongdoing complained of herein

3  within this District.

4      10.    Venue is proper in this jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C.

5  §78aa, as well as 28 U.S.C. §1391(b).  Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)

6  because: (i) Apple is headquartered in, and therefore, is a resident of, the State of California; (ii)

7  one or more of the Individual Defendants either resides or maintains executive offices in this

8  District; (iii) a substantial portion of the transactions and wrongs complained of herein, including

9  the Individual Defendants' primary participation in the wrongful acts detailed herein in violation

10  of fiduciary duties owed to Apple and its shareholders, occurred in this District; and (iv) the

11  Individual Defendants have received substantial compensation in this District by doing business

12  here and engaging in numerous activities that had an effect in this District.

13      11.    **Divisional Assignment**: Under Local Rule 3-2(e), this action should be assigned

14  to the San Jose Division of this Court, as the Company is headquartered in Santa Clara County,

15  California.

16  **III.    PARTIES**

17      **A.    Plaintiff**

18      12.    Plaintiff Hollywood is a substantial and institutional holder of Apple common stock

19  and has continuously held since its initial acquisition of Apple common stock.  Plaintiff will

20  continue to hold Apple shares throughout the pendency of this action.  Plaintiff will fairly and

21  adequately represent the interests in enforcing the rights of the Company.  Plaintiff Hollywood is

22  an instrumentality of the State of Florida, and is therefore a citizen of the State of Florida.

23      **B.    Nominal Defendant**

24      13.    Nominal Defendant Apple is a California corporation with its principal executive

25  offices located at One Apple Park Way, Cupertino, California 95014.  Apple is one of the world's

26  leading technology companies, designing and manufacturing internet technology devices used by

27  consumers worldwide, and providing related services.    Apple designs (in California),

28  manufactures, and sells software and computer technology such as laptops (MacBook), desktop

computers (iMac), smartphones (iPhone), tablet computers (iPad), smart speakers (HomePod), music devices (iPod Touch), headphones (AirPods), wearable devices (Apple Watch), and home entertainment devices (Apple TV). Apple also designs and produces software. Apple's iOS is the most popular of Apple's operating systems, and is pre-installed on iPhones, iPads, and iPod Touches. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AAPL." Apple is a citizen of California.

### C. Director Defendants

14. Defendant Timothy D. Cook ("Cook") is the Chief Executive Officer ("CEO") of Apple and has been CEO, as well as a Board director since 2011. Formerly, he was the Chief Operating Officer ("COO") of Apple. Cook is a citizen of California.

15. Defendant Arthur Levinson ("Levinson") is the Chair of Apple and has been a Board director since 2000. Levinson is the largest individual shareholder of Apple, and the third largest shareholder overall, owning over 4 million shares. Levinson is a citizen of California.

16. Defendant Ronald Sugar ("Sugar") is the Chair of the Audit Committee and has been a Board director since 2010. Sugar is a citizen of California.

17. Defendant Andrea Jung ("Jung") is the Chair of the People and Compensation Committee and has been a Board director since 2008. Jung is a citizen of New York.

18. Defendant Susan Wagner ("Wagner") is the Chair of the Nominating Committee and has been a Board director since 2014. Wagner is a co-founder of BlackRock, Inc., which is the second largest shareholder of Apple, at over 1 billion shares. Wagner is a citizen of New York.

19. Defendant Alex Gorsky ("Gorsky") has been a Board director since 2021. Gorsky is a citizen of New Jersey.

20. Defendant Monica Lozano ("Lozano") has been a Board director since 2021. Lozano is a citizen of California.

21. Defendant Wanda Austin ("Austin") has been a Board director since 2024. Austin is a citizen of California.

22. Defendants Cook, Levinson, Sugar, Jung, Wagner, Gorsky, Lozano, and Austin constitute all of the current members of Apple's Board and are collectively referred to herein as

the previously defined Director Defendants.

### D.    Officer Defendants

23.    Defendant Luca Maestri ("Maestri") was the Chief Financial Officer ("CFO") of Apple until January 2025, and reported directly to Cook.  Maestri is a citizen of California.

24.    Defendant Philip W. Schiller ("Schiller") is an Apple Fellow, former Senior Vice President of Worldwide Product Marketing, and reports directly to Cook.  Schiller is a citizen of California.

25.    Defendants Cook, Maestri, and Schiller are sometimes referred to collectively herein as the previously defined Officer Defendants.

26.    The Director and Officer Defendants are collectively referred to herein as the previously defined Individual Defendants.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Apple Built Up a Monopoly in Performance Smartphones and iOS App Distribution

27.    Apple was founded in 1976 to make and sell what was then a revolutionary new product: the personal computer ("PC").  Under its co-founder, Steve Jobs ("Jobs"), Apple initially found great success, and its Apple II personal computer was the best-selling PC of its time.  However, as the 1980s wore on, Apple's PC sales were overtaken by IBM clones, which used Microsoft's operating system ("OS") and were generally cheaper than Apple's higher-end products.  Jobs was fired in 1985, and for a while, Apple drifted in focus and tried its hand at many different products, none of which found success.

28.    Jobs came back to head Apple in 1997, and immediately refocused its product line.  Initially, Jobs helped pull Apple back from the brink of bankruptcy with the iMac, a colorful new take on the PC.  Apple soon found runaway success with the release of the iPod, a music player that benefited from Apple creating an ecosystem around it; namely, the easy availability of individual songs at a low individual price (99 cents per song) through Apple's iTunes application and store.

29.    The iPod also benefited from the antitrust case against Microsoft.  Microsoft had

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

1   limited the interoperability of Apple's QuickTime media player.  iTunes, built on QuickTime

2   architecture, was initially only compatible with Apple's Mac computers.  But, in 2002, Microsoft

3   entered a consent decree with the United States, which included making various Microsoft APIs

4   available to third-party developers, including Apple.  Thus, in 2003, Apple was able to launch a

5   cross-platform version of iTunes that was compatible with Windows, vastly expanding Apple's

6   music market, and making the iPod much more useful.  This, in turn, boosted iPod sales—from a

7   few hundred thousand the first two years the iPod was launched (when it was not compatible with

8   Windows) to millions per year.  Over the next two decades, aided by how the Microsoft antitrust

9   case opened the platforms that Apple had access to, Apple sold hundreds of millions of iPods.

10       30.    Jobs followed on the success of the iPod with the iPhone in 2007—which he

11   famously described as "an iPod, a phone, and an internet communicator" all in one device.  Just

12   like the iPod, the iPhone became a runaway success because of its ecosystem—here, the decision

13   by Apple (led by Jobs) to both open its system by allowing third parties to develop applications

14   (or "apps") for iPhone while also keeping its system closed by requiring these apps to be sold only

15   through Apple's App Store, and to have Apple's operating system for iPhones—the iOS—be

16   exclusive.  Jobs followed up the success of the iPhone with the iPad in 2011.

17       31.    The iPhone launched with only about a dozen native apps that were developed in-

18   house at Apple: Calendar, Camera, Clock, Contacts, iPod, Messages, Notes, Phone, Photos, Safari,

19   Stocks, Voice Memos, and Weather.  But what helped make it a runaway success was the decision,

20   about a year after it was launched, for Apple to allow third-party developers to create native apps

21   for the iPhone.  Within two years of launching the App Store, the availability of apps became a

22   marketing point for the Company, with the slogan, "There's an app for that."

23       32.    The decision to open the app ecosystem to third-party developers was mutually

24   beneficial to Apple developers and users, as they fed off each other: customers bought the iPhone

25   at least in part because of the range of apps available; and developers valued having access to a

26   growing base of users.  Meanwhile, Apple has made billions of dollars in profits from iPhone sales,

27   as well as its 30% commission it charges for in-app purchases.

28       33.    Jobs saw the potential of using developers to build and entrench the iPhone's

1   market share.  First, he and Apple lured developers to the system to sell content and subscriptions

2   within the app and use processors of their choice, without having to pay Apple a commission.  But

3   in 2009, Apple imposed the IAP requirement, with the attendant 30% commission to Apple.  In

4   2010, he said that Apple should "force" developers to use Apple's IAP for both iOS app developers

5   and iPhone users.  Later that year, he discussed how to "further lock customers into our ecosystem"

6   and make it "even more sticky."  In 2011, Apple made the ecosystem stickier by requiring

7   developers who sold in-app subscriptions to use Apple's IAP and pay Apple its 30% cut.  Yet even

8   then, Schiller (then in charge of marketing iPhones), worried about whether "70/30 will last that

9   unchanged forever" because "someday we will see enough challenge from another platform or

10  web based solutions to want to adjust our model."  Schiller wondered if Apple should "rachet down

11  from 70/30 to 75/25 or even 80/20" to maintain profitability.  Instead, Apple has been able to

12  maintain its commission because it has not seen "enough challenge" from competitors to "want to

13  adjust its model[.]"  Though Apple has reduced commissions for some smaller developers to 15%,

14  that was a result of regulatory pressure.  Apple's now-CEO, Tim Cook, stated that "lawsuits and

15  all the rest of the stuff" were on his mind when the program was implemented.

16      34.    Shortly after the iPad was released, Jobs tragically died from pancreatic cancer.

17  Apple's then-COO, Tim Cook, became the CEO.  Cook mastered production and the supply chain,

18  and under his leadership increased Apple's market value and profits by many multitudes: a

19  whopping 1,900% run up in the stock price, to make Apple one of the top three most valuable

20  companies in the world; and making more than $90 billion in profit annually (and more than $390

21  billion in revenues per year).  Apple's profits exceed every other Fortune 500 company's.  Apple

22  also has more than $100 billion in cash on hand.  Apple Services account for approximately 25%

23  of its global revenue.

24      35.    But Cook has not been as successful in spearheading new products as Jobs was.

25  Under Cook's leadership, the main new profitable product Apple has released is the Apple Watch,

26  but it is not so much a standalone product as a part of the iPhone ecosystem.

27      36.    While Cook has not had as much success with product development as Jobs, he has

28  been able to increase Apple's profits and stock price because he has strengthened the ecosystem

1  surrounding Apple's core products, especially when it comes to the iPhone and iPad.

2  Strengthening the ecosystem, however, did not mean only improving how different services

3  functioned with the iPhone and iPad.  It has also meant blocking competition and keeping the

4  ecosystem tightly controlled.

5        37.    Apple's success with the iPhone built upon a business model it had first perfected

6  with the iPod: a high-end device that people would associate with beauty and prestige, supported

7  by a wide range of services and platform participants.  Today, the iPhone (and to a smaller extent,

8  the iPad) is at the center of a wide range of services, which are high-margin and an increasing part

9  of Apple's overall profits and revenues.  These services include: Apple News+—a selection of

10  news that would otherwise be behind a paywall; Apple Music—which had spurred the growth of

11  the iPod; Apple TV+—for streaming entertainment; iCloud—to allow extra storage for data; Apple

12  Gaming; and a variety of other Apple products.  In addition, Apple offers a browser, Safari,

13  outfitted with Google Search as a default—which Apple adjudges to be the best general search

14  service.

15        38.    Most importantly, the iPhone and the iPad offer the App Store—giving Apple users

16  access to millions of apps developed by third parties, but tightly controlled by Apple.  Apple states

17  that it offers privacy and security by vetting every app, not just through artificial intelligence but

18  through human review, and that is the reason why Apple keeps a tight lid on what apps can be

19  placed in its App Store and does not allow other apps.

20        39.    Though Apple has benefited tremendously from third-party developers creating

21  apps for its ecosystem, it keeps tight control over its system.  Apple requires developers to

22  distribute apps only through Apple's App Store—and making this the only way an iPhone or iPad

23  user can download apps.  Apple also imposes various contractual restrictions.  For example, Apple

24  requires apps to follow its App Store Review Guidelines ("Guidelines").  These Guidelines give

25  Apple the sole discretion to review and approve all apps and app updates, which it then enforces

26  selectively to its own benefit, ignoring or changing the guidelines when it is in Apple's interests.

27        40.    Apple also decides which APIs are available to developers as they create apps.

28  Developers are bound by a non-negotiable Developer Program License Agreement ("DPLA"),

9

1   which requires developers to use "public" APIs only "in the manner prescribed by Apple" and

2   prohibits them from using APIs that Apple designates as "private."  Through its selection of which

3   APIs are "public" or "private," Apple determines what functionality developers can offer to iPhone

4   users, versus what functionality Apple reserves for its in-house apps.  Furthermore, app developers

5   cannot get around the App Store by developing apps that can be downloaded from the web, partly

6   because web apps do not have the full functionality of a native app developed for a mobile device,

7   but also because Apple requires all browsers on the iPhone to use WebKit, Apple's browser engine,

8   which controls what web content can be displayed.

9       41.    The iPhone was the first widely bought consumer smartphone.  A smartphone

10  combines the traditional functions of a mobile phone (making calls, sending text messages) with

11  other advanced hardware and software components (e.g., listening to music, playing games,

12  browsing the internet, managing finances).

13      42.    A smartphone has more advanced hardware than a regular mobile phone.  For

14  example, smartphones include an improved frame and screen.  Apple's screen is made from a

15  specialized glass that is resistant to shattering, and is strong even while it is thin.  The thinness is

16  necessary for Apple to provide a touchscreen, in contrast to a screen on a regular mobile phone

17  that may only display very rudimentary videos or phone calls and cannot be tactilely manipulated.

18      43.    A smartphone also includes an advanced semiconductor chipset, which allows the

19  smartphone to conduct more advanced processing of software instructions, have improved

20  graphics, video, display, memory, data storage, and an improved connection to wireless networks.

21  Chipsets that offer superior performance are expensive, but they in turn help justify the price

22  markup for the smartphone.

23      44.    Smartphones also include cameras, as well as position and motion sensors.  A

24  better-performing smartphone, or "performance smartphone," will have a higher quality camera,

25  better battery life, wireless charging, and advanced biometrics such as thumb or face scanning,

26  than an entry level smartphone (which in turn will still have more features than a basic mobile

27  phone).

28      45.    Smartphones also usually include several antennas that allow phones to

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

communicate with other phones, accessories, or devices, through several widely used, standard protocols:

    a.  Wi-Fi: wireless technology that uses radio waves to provide wireless high-speed internet access;

    b.  Bluetooth: a wireless standard that allows smartphones to use shortwave radio to communicate with accessories like headphones or smartwatches; and

    c.  Near Field Communication ("NFC") that allows smartphones to communicate and share information with other NFC-enabled devices, and is typically used for payment transactions such as the tapping of a phone on a terminal to make a credit card payment.

46.    A few manufacturers dominate smartphone manufacturing and sales. Three device manufacturers, Apple, Samsung, and Google, account for 94% of all smartphone sales by revenue in the United States, with Apple and Samsung alone accounting for 90% of U.S. smartphone revenues.

47.    A smartphone's software is even more important than its hardware. The most important software is the smartphone's operating system, which is the infrastructure that manages both the phone's hardware and software programs. Apple has its own proprietary software—for the iPhone, it is the iOS, and for the iPad, it is the iPadOS. Apple keeps its software closed—so programs developed for other operating systems are often not compatible with Apple's, and vice versa.

48.    In the United States, there are only two significant mobile operating systems: Apple's, and Android, developed by Google. Android is open-source and is used by several device manufacturers: Samsung (the largest smartphone manufacturer), Motorola, Google (for its Pixel phone), and a few smaller players. A version of Android is also used by Amazon for its tablets.

49.    Smartphones rely primarily on software applications, or apps, to perform numerous functions and provide various services, such as sending messages, playing music, or browsing the web. Apple preloads certain in-house-made apps, such as its web browser, Safari, but most of the apps on an iPhone are made by third-party developers. Apps, in turn, depend on the operating

system to function.  For example, to make a video call, an app must interface with the smartphone's operating system to access hardware components on the phone, such as the camera, microphone, and speaker.   Apps communicate with the operating system through other software, called application programming interfaces, or "APIs."

50.     Smartphones constitute a relevant market, as opposed to all mobile phones, because of their more advanced features and usage cases, as described above.

51.     Apple's iPhones can be said to be a part of a narrower market, the performance smartphones.  That is because Apple does not have entry-level smartphones with very few features. Industry participants also distinguish between smartphones in general as opposed to "premium" or "flagship" smartphones.  Apple also internally does not consider entry-level smartphones to be its competition.  Performance smartphones are distinguished from entry-level smartphones through better materials (metal and glass versus plastic, for example); better performance components (more memory, faster processors); and other features such as the NFC antenna, which entry-level smartphones usually lack.  Consumers also purchase these different types of phones under different terms: entry-level smartphones are often bought as part of pre-paid service plans, while performance smartphones are often purchased either separately from a regular service plan or as part of a promotion for these regularly paid service plans.

52.     Whether it is smartphones in general or performance smartphones, the relevant geographic scope of the market is the world, excluding China, with submarkets based on country. Pricing and specifications are country-based, because of different countries' rules and trade barriers and ability to conduct in-person servicing.  China is an exception because its rules are so different that phones have different features there than in the United States or Europe.

53.     Within the United States, Apple has had a particularly enduring and large market share.  Apple estimates that for performance smartphones, it has more than 70% of the U.S. market, and 65% of the overall U.S. smartphone market.  Over the last decade, Apple's market share in the United States has generally increased.

54.     In the United States, there are particularly high barriers to entry for new competitors.   Fewer than 10% of smartphone purchasers in the United States are buying a

12

smartphone for the first time, so there is only a small market for initial customers. The high capital costs required to develop and then manufacture a smartphone also discourage new entrants: for example, a high outlay would be required to source premium semiconductors or specialized glass for screens. Furthermore, regulatory approval takes a long time and introduces uncertainty. Marketing and customer service constitute high ongoing costs. Software development and product design constitute both high initial costs and ongoing costs. Plus, because most phones are purchased through carriers, a new entrant would need to meet the carriers' technical requirements and negotiate fresh distribution agreements plus convince carriers and retailers to promote their new products when customers are already familiar with established players. Here, Apple has one particularly big advantage in that it markets its own products and sells them in its own retail stores (in addition to other stores), so Apple has a built-in marketing machine and distribution channel.

55. As further proof of these high entry barriers, numerous well-capitalized and aggressive companies have sought to make smartphones, failed, and exited the market, including Microsoft (which discontinued its mobile business in 2017), Amazon (which released the Fire phone in 2014 but exited the business the next year), HTC (selling its business to Google in 2017), and LG (which exited in 2021). In the United States, only three manufacturers have meaningful market share in performance smartphones: Apple; Samsung; and, at a distant, single-digit market share, third, Google (which developed and owns the Android operating system).

56. The large user base the iPhone has already acquired also means there are strong network effects between users and developers. Developers have an incentive—and indeed almost a market imperative—to develop apps for this large market of users. And users derive utility from having a wide range of apps to use.

57. In addition, there are high switching costs—psychological as well as technical. As one becomes used to either Android or iOS, a significant learning burden to learn the other system develops. iPhones can interact most easily with other iPhones, just as Android devices can interact most easily with other Android devices, which also discourages switching. Data on one type of phone may not be transferable to another type of phone, which constitutes another switching cost. And, as discussed further below, Apple has increased switching costs by purposefully reducing

1  interoperability with Android phones and by building a web of subscription services to

2  disincentivize an iPhone user from leaving the Apple/iOS ecosystem.

3      58.    Rather, customers must be taken primarily by convincing an Android user to switch

4  to an iPhone or vice versa.  But nearly 90% of iPhone owners buy iPhones as their replacements.

5  One U.S. carrier estimates that as high as 98% of its customers replace their iPhones with another

6  iPhone.  There is a low switching rate because of high switching costs and network effects.

7      59.    Apple executives are aware that they have strong market power, and indeed,

8  monopoly power, because they know they can forego innovation without risking losing customers.

9  Apple's vice president of iPhone marketing even commented internally in 2020: "In looking at it

10  with hindsight, I think going forward we need to set a stake in the ground for what features we

11  think are 'good enough' for the consumer.  I would argue were [sic] already doing *more* than

12  what would have been good enough."  Furthermore, after identifying features that "would have

13  been good enough if we hadn't introduced" new features, she stressed, "anything new and

14  especially expensive needs to be rigorously challenged before it's allowed into the consumer

15  phone."

16      60.    Apple's monopoly power is further evident through its profit and profit margins,

17  and the arbitrary way in which it sets pricing.  Apple has higher per-unit profits than other

18  smartphone manufacturers.  It consistently charges prices at the higher range of smartphones.  It

19  also charges carriers more than rivals to buy and resell smartphones to the public, and contracts to

20  restrict how carriers promote rival smartphones.  Furthermore, Apple arbitrarily set a 30%

21  commission rate for developers for every user app purchase and in-app payment and has not

22  changed that rate in the 18 years since the iPhone came on the market, even after Android-based

23  phones came on the market around 2008 (by HTC, which is no longer in the smartphone market).

24  Apple also charges a 0.15% commission to banks on credit card transactions through Apple Wallet,

25  even when other smartphone manufacturers or carriers do not.  Apple estimates that Apple Pay

26  fees alone will total about $1 billion in 2025.  Apple also has been charging more fees to developers

27  to promote their products in the App Store, estimated as ad revenue, which was approximately

28  $6.5 billion in 2024.

61.     Because Apple's iOS (and to a smaller extent, iPadOS) and Android are incompatible with one another, Apple devices and Android devices constitute two different markets: owing to the incompatibility of the two systems, most smartphone customers do not "multi-home"—i.e., use both an Android smartphone and an iPhone—and thus, most developers do not view Android as a substitute for iOS. Rather, a developer will almost always develop separate apps for iOS and for Android, to maximize their reach.

62.     App developers typically try to program apps in a way that provides a similar experience between iOS and Android. Middleware is software that provides similar APIs and functionality across different operating systems and devices. Middleware would allow developers to program cross-platform applications without having to incur the additional effort, time, and cost of writing separate code for individual operating systems or devices because they can rely on the APIs in the middleware.

63.     At one time, Apple executives were in favor of middleware. Apple's then-Senior Vice President of Software Engineering testified at the Microsoft antitrust trial: "Because we have created QuickTime for both Windows and Macintosh computers, developers can create a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems."

64.     Middleware could include internet browsers, internet or cloud-based apps, super apps (defined *infra*), and smartwatches. Apple now restricts middleware because it has a greater interest in doing so to protect its market share in performance smartphones.

65.     A smartphone is also a two-sided platform, which brings together service providers on the one hand and consumers on the other hand. A smartphone provides a unique platform that is technologically different from other transaction platforms such as a credit card. A smartphone has greater functionality, and its value as a platform increases as it acquires more users and as it acquires more functions—which apps grant it. Thus, the more developers, the more apps, the better the functionality of each app, the more useful a smartphone is to a user, and the better it is as a business proposition. Limiting functionality and apps, generally, is not in a smartphone manufacturer's output—unless, like Apple, it has monopoly power and thus has a rationale for

15

1   limiting output in order to keep prices high (which it would not have the power to do in a

2   competitive market where other entrants can easily come in and drive down prices).

3       66.     Apple's business model requires that consumers think of its products as high-

4   performance and are therefore willing to pay a higher price for them.  Thus, soon after the iPhone

5   was introduced, Apple employees began to be concerned about how its platform could be

6   disintermediated and how the iPhone could be commoditized, which would reduce its profitability.

7   Thus, while Apple at the same time invited developers to create apps so that Apple could tout these

8   as an added value to having an iPhone, Apple has used rules, contractual restrictions, and selective

9   API access, to stop or delay developers from introducing innovations or functions that could

10  threaten Apple's ability to maintain a grip on smartphone sales, as well as used those methods and

11  an expanding web of subscription services to increase the cost and friction of switching from

12  iPhone to another smartphone.

13      67.     In a blockbuster lawsuit by the DOJ filed in March 2024, the DOJ accused Apple

14  of engaging in the following practices to protect its smartphone monopoly through its ability to

15  review, approve, and reject apps:

16          a.   hindering the placement of super apps in the App Store;

17          b.   preventing cloud gaming apps from functioning efficiently;

18          c.   denying third parties access to full API to develop secure messaging in competing

19               with iMessage;

20          d.   preventing smartwatches from syncing with iPhone; and

21          e.   denying users access to alternative digital wallets.

22      68.     The DOJ also highlighted other anticompetitive practices Apple has engaged in,

23  including its expanding web of subscription services that make it increasingly hard for a user to

24  leave the platform.

25      69.     Apple's double-sided platform power, combined with its ability to entrench its

26  market share and keep a huge user base of billions, allows it to extract profits from app developers,

27  and by extension users when costs are passed onto them.  Apple does this primarily through several

28  methods: 1) charging a supra-competitive 30% commission rate on all paid app downloads and in-

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

app purchases (IAP); 2) making developers use Apple's own IAP billing system (though Apple also offers a lower rate to a select group of app developers); and 3) preventing app developers from informing users of other IAP options or making it extremely unattractive for app developers to do so.  The last set of practices, or "anti-steering," have been adjudicated to be anticompetitive in numerous jurisdictions, including, most notably, the European Union ("EU"), and here, in California federal court.

70.    In addition, Apple also squeezes app developers by making them pay for keyword searches so that users could discover the apps to begin with, even though assistance with app discovery was one of Apple's justifications for charging a 30% commission rate.  Furthermore, Apple charges banks and other financial institutions a 0.15% rate for each credit card transaction made via Apple Pay, in contrast to Samsung and Google (Apple's main smartphone rivals) who charge nothing.

71.    Apple's monopolistic conduct has allowed it to continue to charge high 30% commissions and 0.15% fees for financial transactions.  This has in turn kept costs high for its own customers, who because of high switching costs and network effects, continue to use the iPhone for these transactions even though it takes more of their money.  Furthermore, seeing as how they cannot make inroads, banks and other companies have stopped trying to develop digital wallets, impeding innovation for consumers.

72.    Apple's conduct has harmed competition by stifling innovation.  For example, one of the main reasons iPhone users do not switch to Android phones is that Apple has hobbled cross-platform messaging.  Apple has also impeded the development of super apps, which has deprived users of technology that would facilitate switching to other devices.  Apple has hobbled cloud streaming, which has led users to be stuck purchasing more expensive iPhones.  While today this primarily hurts gamers, it also leads to less innovation in other computationally intensive fields, such as gen AI.  And by controlling APIs and NFC technology, Apple has impeded cross-platform smartwatches and improved digital wallets.

73.    Apple's monopoly playbook and wide range of products and services mean there will be less innovation in a wide variety of fields.  This extends even to fields that one does not

typically associate with technology.  For example, Apple's widely expanding role as a film and TV show creator means it now is increasing more control over media content.  Other services and products, such as AirPods, iPads, Music, Photo, Maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash are all areas where Apple can use its existing market power to bolster its market power in these services and in turn raise prices or stifle innovation to improve its own profits.

74.     Apple often rationalizes its conduct as improving privacy and security, but its actual conduct often shows that these rationalizations are mere pretexts.  For example, Apple's refusal to integrate SMS fully with iMessage has long meant that messaging chats where an Android user joins worsens the user experience and the privacy and security of *all* users, including iPhone users, as the entire conversation loses Apple's end-to-end encryption and other quality enhancing features of iMessage.  Furthermore, Apple intermediates whenever a user uses a credit or debit card, which must be done through Apple Pay, and thus Apple collects more data on its users than if the users had simply used their credit card directly, thus decreasing privacy.  Super apps or alternative app stores could also potentially offer more privacy or security, depending on their design, but Apple has outright banned the latter and effectively banned the former, so there is no way for users to find out.  Moreover, Apple's opening the ecosystem to third parties to develop apps necessarily also means it allows developers to collect vast amounts of personal and sensitive data about users, which sacrifice user privacy and security.  Finally, Apple only selectively enforces its rules and restrictions, and thus is ready to violate user privacy and security when it suits it.

**B.     Apple Was Subject to Two Federal Government Antitrust Actions that Put the Board and Apple Officers on Notice to Improve Compliance**

75.     Approximately 10 to 15 years ago, Apple was subject to two other actions brought by the DOJ for violations of the antitrust laws.  Thus, Apple's Board and Apple's officers have already been on notice for the need to improve compliance so that Apple would not engage in further antitrust violations.

76.     In September 2010, Apple and several other Silicon Valley-based tech companies

1   settled an action brought by the DOJ alleging antitrust violations in their hiring practices.[1]

2   Specifically, with respect to Apple, it entered agreements with Google, Adobe, and Pixar where

3   they agreed to refrain from cold calling each other's employees, by placing employees on a "Do

4   Not Cold Call" list that senior executives at the respective companies policed and enforced, which

5   violated Section 1 of the Sherman Antitrust Act of 1890, codified at 15 U.S.C. §§1–38 ("Sherman

6   Act"), "because they eliminated a significant form of competition to attract high tech employees,

7   and, overall, substantially diminished competition to the detriment of the affected employees who

8   were likely deprived of competitively important information and access to better job

9   opportunities."

10          77.     The DOJ's settlement, approved by the court in March 2011, required Apple to

11  refrain from all forms of anticompetitive non-solicitation agreements: "Although the complaint

12  alleges only that the companies agreed to ban cold calling, the proposed settlement more broadly

13  prohibits the companies from entering, maintaining or enforcing any agreement that in any way

14  prevents any person from soliciting, cold calling, recruiting, or otherwise competing for

15  employees.  The companies will also implement compliance measures tailored to these practices."

16          78.     Private litigation that followed the DOJ's action made it clear that Apple played the

17  central role in this anticompetitive conspiracy.  On April 12, 2012, this Court denied the motion to

18  dismiss the Sherman Act and Cartwright Act (the federal and state antitrust) claims.

19          79.     In doing so, this Court observed "[a]ccording to Plaintiffs, the conspiracy consisted

20  of an interconnected web of express bilateral agreements, each with the active involvement and

21  participation of a company under the control of the late Steven P. Jobs ('Mr. Jobs') and/or a

22  company whose board shared at least one member of Apple's board of directors.  Defendants'

23  senior executives actively participated in negotiating, executing, monitoring compliance with, and

24  policing violations of the bilateral agreements. . . .  Defendants' senior executives also actively

25  concealed each bilateral agreement, and Defendants' employees were not informed of, nor did they

26  agree to, the terms of any of the agreements."  These connections included: (1) Jobs was CEO of

27  Apple when it entered a do-not-cold-call agreement with Adobe; (2) Levinson sat on both Apple

28

---

[1]      *See United States v. Adobe Sys., Inc.*, No. 1:10-cv-01629 (D.D.C. filed Sept. 24, 2010).

and Google's boards of directors when they entered their agreement (similarly, then-Google CEO Eric Schmidt also sat on both Apple and Google's boards); and (3) Jobs was the single largest shareholder of Disney, when it acquired Pixar, over which he continued to exercise substantial control, when Apple entered its do-not-cold-call agreement with Pixar.

80.     Furthermore, the Court determined: "the identical nature of the six bilateral agreements may support the influence that these individuals played a role in shaping these agreements."

81.     In August 2014, the Court rejected an initial $325 million cash settlement involving Apple on the grounds that the settlement was too small.  In September 2015, the Court approved a $415 million settlement that included Apple.  Thus, Apple's Board and officers could not fail to be aware of these long-running and high-cost actions, and understand the seriousness of the misconduct.

82.     Less than two years after the DOJ settled its first antitrust action with Apple, it brought another suit alleging another antitrust conspiracy that again centered around Apple.  On April 11, 2012, the DOJ and 33 states and U.S. territories brought a suit alleging that Apple and the Big Six (defined below) publishers conspired to inflate the prices of e-books.[2]  This time, instead of settling, Apple opted to go to trial, even though its publishing company co-defendants settled.  A bench trial was held at the United States District Court for the Southern District of New York ("S.D.N.Y.") between June 3–20, 2013.

83.     In a detailed opinion, S.D.N.Y. found Apple liable for conspiracy to violate the Sherman Act.  The Court ruled: "The Plaintiffs have shown that the Publisher Defendants conspired with each other to eliminate retail price competition in order to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy.  Without Apple's orchestration of this conspiracy, it would not have succeeded as it did in the Spring of 2010."  The Court further determined:

> There is, at the end of the day, very little dispute about many of the most material facts in this case.  Before Apple even met with the first Publisher Defendant in mid-December 2009, it knew that the "Big Six" of United States publishing . , . wanted to raise e-book prices, in particular above the $9.99 prevailing price charged by

---

[2]     *See United States v. Apple Inc.*, No. 1:12-cv-02826 (S.D.N.Y. filed Apr. 11, 2012).

Amazon for many ebook versions of *New York Times* bestselling books . . . and other newly released hardcover books[.]    Apple also knew that Publisher Defendants were already acting collectively to place pressure on Amazon to abandon its pricing strategy.

At their very first meetings in mid-December 2009, the Publishers conveyed to Apple their abhorrence of Amazon's pricing, and Apple assured the Publishers it was willing to work with them to raise those prices, suggesting prices such as $12.99 and $14.99.  Over the course of their negotiations in December 2009 and January 2010, Apple and the Publisher Defendants educated one another about their other priorities.  Apple strongly hoped to announce its new iBookstore when it launched the iPad on January 27, 2010, but would only do so if it had agreements in place with a core group of Publishers by that date, could assure itself it would make a profit in the iBookstore, and could offer e-book titles simultaneously with their hardcover releases.  For their part, if the Publisher Defendants were going to take control of e-book pricing and move the price point above $9.99, they needed to act collectively; any other course would leave an individual publisher vulnerable to retaliation from Amazon.

Apple and the Publisher Defendants shared one overarching interest—that there be no price competition at the retail level.  Apple did not want to compete with Amazon (or any other e-book retailer) on price; and the publisher Defendants wanted to end Amazon's $9.99 pricing and increase significantly the prevailing price point for e-books.  With a full appreciation of each other's interests, Apple and the Publisher Defendants agreed to work together to eliminate retail price competition in the e-book market and raise the price of e-books above $9.99.

Apple seized the moment and brilliantly played its hand.  Taking advantage of the Publisher Defendants' fear of and frustration over Amazon's pricing, as well as the tight window of opportunity created by the impending launch of the iPad on January 27 . . . Apple garnered the signatures it needed to introduce the iBookstore at the Launch.  It provided the Publisher Defendants with the vision, the format, the timetable, and the coordination that they needed to raise e-book prices.  Apple decided to offer the Publisher Defendants the opportunity to move from a wholesale model—where a publisher receives its designated wholesale price for each e-book and the retailer sets the retail price—to an agency model, where a publisher sets the retail price and the retailer sells the e-book as its agent.

The agency agreements that Apple and the Publisher Defendants executed on the eve of the Launch divided New Release e-books among price tiers.  The top of each tier, or cap, was essentially the new price for New Release e-books.  The caps included $12.99 and $14.99 for many books then being sold at $9.99 by Amazon.

The agreements also included a price parity provision, or Most-Favored-Nation clause ("MFN"), which not only protected Apple by guaranteeing it could match the lowest retail price listed on any competitor's e-bookstore, but also imposed a severe financial penalty upon the Publisher Defendants if they did not force Amazon and other retailers similarly to change their business models and cede control over e-book pricing to the Publishers.  As Apple made clear to the Publishers, "There is no one outside of us that can do this for you.  If we miss this opportunity, it will likely never come again."

Through the vehicle of the Apple agency agreements, the prices in the nascent e-book industry shifted upward, in some cases 50% or more for an individual title.  Virtually overnight, Apple got an attractive, additional feature for its iPad and a guaranteed new revenue stream, and the Publisher Defendants removed Amazon's

1    ability to price their e-books at $9.99.

2        84.    The Court's findings concerning how Apple sought to stock its iBookstore with e-

3    books are particularly salient to the current case, because the Court showed how Apple's modus

4    operandi is to populate its mobile ecosystem with third-party goods to create indirect network

5    effects.  Just as the success of the App Store depends on a variety of apps, which then attracts a

6    large number of customers, which then attracts even more app developers, Apple's strategy with

7    the iBookstore required populating it with many book titles from at least the major publishers to

8    attract customers.  The iBookstore was to be one of the centerpieces of the new iPad, though Apple

9    would have launched the iPad even if it did not have an iBookstore in place.  Nevertheless, Eddy

10    Cue ("Cue"), who was "responsible for running all of Apple's digital content stores and had led

11    Apple's negotiations in its deals with major content providers[,]" viewed launching a viable e-

12    bookstore with the iPad as an important corporate and personal goal, because he "knew that Jobs

13    was seriously ill and that this would be one of his last opportunities to bring to life one of Jobs's

14    visions and to demonstrate his devotion to the man who had given him the opportunity to help

15    transform American culture."  By the time of the iPad launch, Cue and Apple in general already

16    had a model for how the iBookstore would work, because the App Store was already well in place

17    on the iPhone, and before then, iTunes had been the centerpiece of the iPod universe.

18        85.    In planning an e-bookstore, Apple had already rejected selling e-books as

19    individual apps as "flawed."  Apple, and Cue specifically, knew that one "reason for Amazon's

20    success in the e-book market was its low prices" but that "Apple had little experience with

21    competing on price when selling content; indeed, it considered itself a price 'leader' in selling

22    music, apps, and other content."  But Cue also knew "that 'all the content owners hate Amazon.'

23    As early as February 2009, Cue recognized that '[t]he book publishers would do almost anything

24    for us to get into the e[-]book business.'  Apple had also discovered analyst reports in June 2009

25    that indicated that a price of $12.99 could be a more profitable price point for e-books than

26    Amazon's $9.99."

27        86.    Apple also did not intend to enter the business based on loss leaders: "Apple

28    understood that the Publishers wanted to pressure Amazon to raise the $9.99 price point for e-

1  books, that the Publishers were searching for ways to do that, and that they were willing to

2  coordinate their efforts to achieve that goal" and "Apple had decided that it would not open the

3  iBookstore if it could not make money on the store and compete effectively with Amazon.  Apple

4  knew that it needed access to a large number of titles."

5      87.    As the Court found, to achieve its business objectives, Apple was willing to and

6  even premised its business on violating the antitrust laws.  Apple from the beginning sought to

7  collude with the major book publishers to raise prices.  Before meeting with the six major book

8  publishers, the so-called "Big Six," Cue "decided to entice the Publishers by conveying an

9  unambiguous message that Apple was willing to sell e-books at prices up to $14.99, that is, at a

10  price point $5 above Amazon's price for many New Releases and NYT Bestsellers."  At the first

11  meeting with the Big Six, "Cue emphasized that Apple would only launch an e-bookstore if it got

12  all of the major Publishers to sign on.  As Cue intended, each of the Publishers understood that

13  this was a reference to the Big Six."  Apple also made it clear it intended to be the price leader,

14  because it "expressed that it 'cannot tolerate a market where the product is sold significantly more

15  cheaply elsewhere.'"

16      88.    While Apple had originally intended to buy books wholesale from the publishers

17  and sell them retail, which was the prevailing model at the time, soon it came around to an idea

18  suggested by two of the publishers, where, just as with the App Store, Apple would instead serve

19  as an agent.  This switch to agency pricing was motivated in part by how "[u]nless the Publishers

20  agreed to lower wholesale prices for e-books, Apple would run the risk of losing money if it tried

21  or was forced to match Amazon's pricing to remain competitive."  And as the Court found, "Apple

22  was already familiar with this model since it used the agency model to sell apps through its App

23  Store."

24      89.    Further modeling the iBookstore on the App Store, and showing that market forces

25  did not determine pricing but rather its own market power and leverage, "Apple settled on an

26  agency model with a 30% commission, the same commission it was using in its App Store."  This

27  "ensured that Apple would make a profit from every e-book sale in its iBookstore without having

28  to compete on price."

90.     Even with the agency model, Apple still exercised control over the overall book prices because it wanted to ensure that prices would remain low enough to attract customers to its store versus staying with Amazon: "Apple realized . . . that in handing over pricing decisions to the Publishers, it needed to restrain their desire to raise e-book prices sky high.  It decided to require retail prices to be restrained by pricing tiers with caps.  While Apple was willing to raise e-book prices by as much as 50% over Amazon's $9.99, it did not want to be embarrassed by what it considered unrealistically high prices."  At the same time, "Apple realized that if it moved to an agency model with the Publishers, Apple would be at a competitive disadvantage so long as Amazon remained on the wholesale model" and could price books lower than Apple.  Thus, "[t]o ensure that the iBookstore would be competitive at higher prices, Apple concluded that it needed to eliminate all retail price competition."  To do that, Apple would need "the Publishers to move all of their e-tailers to agency."

91.     The Court further found that Apple used contractual restrictions to achieve its monopolistic aims, a practice Apple continues to repeat to this day in the App Store.  Apple, through Cue, arrived at an "'elegant' solution" where instead of explicitly requiring Publishers to make their other e-tailers agents, which Apple was not sure was legal, Apple would instead require a most-favored-nation or "MFN" clause in the contract that would require that "the e-books in Apple's e-bookstore would be sold for the lowest retail price available in the marketplace."  And while Apple had used MFNs before for wholesale music, its "use of an MFN for a retail price was a unique feature of its e-book agency agreements."  The MFNs and pricing tiers that Apple required would actually mean that, at least in the short run, Publishers would make less of a profit or even lose money than if they had stuck with selling wholesale to Amazon.  But for Apple, this arrangement "eliminated any risk that Apple would ever have to compete on price when selling e-books, while as a practical matter forcing the Publishers to adopt the agency model across the board."

92.     In negotiating the contracts, the Publisher Defendants pushed back "hardest over the price caps" in the pricing tiers because "[t]hey and Apple knew that these negotiations were really about setting the new industry prices for e-books."  Nevertheless, with some minor

1    concessions from Apple, the Publisher Defendants "capitulated to Cue's revised pricing regime."

2    HarperCollins recognized that the "economics of the deal [were] 'terrible' for it and its authors but

3    'the strategic value' of creating an Apple e-bookstore [was] 'very high.'"

4           93.    Apple also provided the Publisher Defendants leverage as they negotiated with

5    Amazon, partly because Apple's impending iPad launch led to pressure for the publishers to agree,

6    and partly because Apple helped coordinate the publishers.  By late January 2010, "four of the five

7    Publisher Defendants had put Amazon on notice that they were joining forces with Apple and

8    would be altering their relationship with Amazon in order to take control of the retail price of e-

9    books."

10           94.    The Court recognized that this conspiracy to raise prices, through pressuring

11    Amazon to go to the agency model, "would not have happened without Apple's ingenuity and

12    persistence.  Apple's task had not been easy, but it had succeeded.  As [Carol] Reidy [CEO of

13    Simon & Schuster] acknowledged in an email to Cue on January 21 [2010], working with the

14    Publishers had been like 'herding … cats.'"  [Ellipsis in original].

15           95.    The Court found that when the iBookstore launched, with Apple's negotiated prices

16    as the new standard for e-books, this conspiracy both increased prices and decreased output for e-

17    books.  Even materials "prepared by one of Apple's experts" showed a "sudden and uniform price

18    increase" that "occurred at the opening of the iBookstore[.]"  And even hardcover book prices

19    increased "in order to move the e-book version into a correspondingly higher price tier."  Plus, "all

20    of the Publisher Defendants raised the prices of their backlist e-books, which were not governed

21    by the Agreements' price tier regimen."  The Court also determined "the laws of supply and

22    demand were not suspended for e-books.  When the Publisher Defendants increased the prices of

23    their e-books, they sold fewer books."

24           96.    The end result of the e-book conspiracy was that "consumers suffered in a variety

25    of ways from this scheme to eliminate retail price competition and to raise e-book prices.  Some

26    consumers had to pay more for e-books; others bought a cheaper e-book rather than the one they

27    preferred to purchase; and it can be assumed that still others deferred a purchase altogether rather

28    than pay the higher price."  Furthermore, the publishers "were also less willing to authorize

1  retailers to give consumers the benefit of promotions."

2      97.    In a finding that has particular salience because it illustrated Apple's use of its App

3  Store as leverage, Apple also pressured Random House to enter an agency agreement.  Random

4  House had been the lone holdout among the Big Six at the launch of the iBookstore (with Penguin

5  having agreed in principle but entering the agreement a bit later because it needed time to sign

6  Amazon onto an agency agreement).  Cook was also involved in this scheme.  Random House,

7  because it was a hold out, continued to see its books priced lower on Amazon.  In turn, Random

8  House's sales and market share increased:

9      Apple decided to pressure Random House to join the iBookstore.  As Cue wrote to
       Apple CEO Tim Cook, "when we get Random House, it will be over for everyone."
10     Apple had its opportunity in the Fall of 2010, when Random House submitted some
       e-book apps to Apple's App Store.  Cue advised Random House that Apple was
11     only interested in doing "an overall deal" with Random House.  By December, they
       had begun negotiations, and Random House executed an agency agreement with
12     Apple in mid-January 2011.  In an email to Jobs, Cue attributed Random House's
       capitulation in part to "the fact that I prevented an app from Random House from
13     going live in the app store this week."

14     98.    In holding that Apple's conduct violated the Sherman Act, the Court spelled out

15  how its findings led to its conclusion of law, emphasizing Apple's role at every step:

16     The Plaintiffs have shown through compelling evidence that Apple violated Section
       1 of the Sherman Act by conspiring with the Publisher Defendants to eliminate
17     retail price competition and to raise e-book prices.  There is overwhelming evidence
       that the Publisher Defendants joined with each other in a horizontal price-fixing
18     conspiracy.  Through that conspiracy, the Publisher Defendants raised the prices of
       many of their New Releases and NYT Bestsellers above the $9.99 price at which
19     they had previously been sold through Amazon.  They also raised the prices of
       many of their backlist e-books.  The [United States and states and territories] have
20     also shown that Apple was a knowing and active member of that conspiracy.  Apple
       not only willingly joined the conspiracy, but also forcefully facilitated it.

21
       . . .
22
       From late 2008 through 2009, the Publisher Defendants had collectively tried
23     through a variety of means to pressure Amazon to raise the prices of their e-books.
       Their efforts proved futile.  Then, through agency agreements that each Publisher
24     Defendant executed with Apple over the course of just three days in January 2010,
       and with Amazon (and other e-retailers) in the weeks that followed, the Publisher
25     Defendants simultaneously switched from a wholesale to an agency model for the
       distribution of their e-books.  When the iPad went on sale and the iBookstore went
26     live in early April 2010 (or shortly thereafter, in the case of Penguin), each of the
       Publisher Defendants used their new pricing authority to raise the prices of their e-
27     books overnight and substantially.

28     This price-fixing conspiracy would not have succeeded without the active
       facilitation and encouragement of Apple.  Before Apple even met with the Publisher

26

Defendants in mid-December 2009, it was fully aware that the Publishers were adamantly opposed to Amazon's $9.99 price point and were actively searching for an effective means, including through collective action, to pressure Amazon to raise its prices. Inspired by the impending Launch of the revolutionary iPad, scheduled for January 27, Apple seized the moment.

Apple met with the Publishers in December 2009 and heard their unanimous condemnation of the $9.99 price point and desire to raise e-book prices. Volunteering that it was willing to price e-books as high as $14.99 in an e-bookstore, Apple won their rapt attention. Apple then presented a strategy—the agency Agreements—that would allow the Publishers to take control of and raise e-book retail prices in a matter of weeks. Knowing full well, however, that the Publisher Defendants wanted to raise e-book retail prices significantly above the $9.99 price point, even in some instances above the retail prices of the corresponding physical book, Apple placed pricing restrictions or caps on categories of e-books to ensure that the prices in its iBookstore were "realistic" and didn't embarrass Apple. In negotiating the caps for its pricing tiers, Apple understood that it was setting the new retail prices at which e-books would be sold.

Apple had several reasons for engaging as it did with the Publisher defendants. It wanted to announce a well-stocked iBookstore in less than two months, when it launched its iPad; it wanted to avoid competing with Amazon, an arch rival in the market, on the basis of price; and it wanted a guaranteed profit on any new business it entered. To accomplish these goals, Apple was willing to offer the Publisher Defendants a roadmap for raising retail e-book prices well above Amazon's $9.99 price point and urged the Publisher Defendants to use that roadmap to do so. In short, Apple convinced the Publisher Defendants that Apple shared their goal of raising e-book prices, and helped them to realize that goal.

Apple included the MFN, or price parity provision, in its Agreements both to protect itself against any retail price competition and to ensure that it had no retail price competition. Apple fully understood and intended that the MFN would lead the Publisher Defendants inexorably to demand that Amazon switch to an agency relationship with each of them. As Apple's Cue reminded Macmillan's Sargent, this was no more than what the Publisher Defendants had already assured Apple that they wanted to, and would, do.

Because of the MFN, Apple concluded that it did not need to include as an explicit term in its Agreements a demand that a Publisher Defendant move all of its resellers to agency. The MFN was sufficient to force the change in model. The economics of the Agreements were, simply put, "terrible" for the Publishers. . . . . Unless a Publisher Defendant followed through and transformed its relationships with Amazon and other resellers into an agency relationship, it would be in significantly worse terms financially as a result of its agency contract with Apple. As significantly, unless the Publisher Defendants joined forces and together forced Amazon onto the agency model, their expected loss of revenue would not be offset by the achievement of their ultimate goal: the protection of book value.

A chief stumbling block to raising e-book prices was the Publishers' fear that Amazon would retaliate against any Publisher who pressured it to raise prices. Each of them could also expect to lose substantial sales if they unilaterally raised the prices of their own e-books and none of their competitors followed suit. This is where Apple's participation in the conspiracy proved essential. It assured each Publisher Defendant that it would only move forward if a critical mass of the major publishing houses agreed to its agency terms. It promised each Publisher Defendant that it was getting identical terms in its Agreement in every material way. It kept

each Publisher Defendant apprised of how many others had agreed to execute Apple's Agreements. As Cue acknowledged at trial, "I just wanted to assure them that they weren't going to be alone, so that I would take the fear awa[y] of the Amazon retribution that they were all afraid of." As a result, the Publisher Defendants understood that each of them shared the same set of risks and rewards.

Working against its own internal deadline, Apple achieved for this industry in a matter of weeks what the Publisher Defendants had been unable to accomplish for months before Apple became their partner. In the words of Simon & Schuster's Reidy, Apple herded cats. Apple gave the Publishers a deadline and required them to examine with care but quickly how committed they were to challenging Amazon and altering the landscape of e-book pricing. And when it appeared a Publisher Defendant might be too scared to commit to this dramatic business change, Cue reminded that Publisher Defendant that Apple's entry into the market represented a once-in-a-lifetime opportunity to eliminate Amazon's control over pricing. As he warned Penguin just days before the Launch, "There is no one outside of us that can do this for you. If we miss this opportunity, it will likely never come again."

Without the collective action that Apple nurtured, it is unlikely any individual Publisher would have succeeded in unilaterally imposing an agency relationship on Amazon. Working together, and equipped with Apple's agency Agreements, Apple and the Publisher Defendants moved the largest publishers of trade e-books and their distributors from a wholesale to agency model, eliminated retail price competition, and raised e-book prices.

. . .

In sum, the Plaintiffs have shown not just by a preponderance of the evidence, . . . but through compelling direct and circumstantial evidence that Apple participated in and facilitated a horizontal price-fixing conspiracy. As a result, they have proven a per se violation of the Sherman Act.

99.    The United States Court of Appeals for the Second Circuit (the "Second Circuit") upheld S.D.N.Y.'s decision. The Second Circuit emphasized Apple's central role in the conspiracy, and held: "the district court's decision that Apple orchestrated a horizontal conspiracy among the Publisher Defendants to raise ebook prices is amply supported and well-reasoned, and that the agreement unreasonably restrained trade in violation of § 1 of the Sherman Act."

100.    More specifically, the Second Circuit held: "Most significantly, [Apple's] in-house counsel . . . devised an alternative to explicitly requiring publishers to switch other retailers to agency. This alternative involved the use of a 'most-favored nation' clause. . . . In general, an MFN Clause is a contractual provision that requires one party to give the other the best terms that it makes available to any competitor. . . . [T]he MFN would require the publisher to offer any ebook in Apple's iBookstore for no more than what the same ebook was offered elsewhere, such as from Amazon." The Second Circuit further held: "The Big Six understood the economic

28

incentives that the MFN Clause created. . . .  The MFN Clause . . . ma[de] it imperative, not merely desirable, that the publishers wrest control over pricing from ebook retailers generally. . . .  This situation also gave each of the publishers a stake in Apple's quest to have a critical mass of publishers join the iBookstore because, '[w]hile no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could.'"  Furthermore, "Apple understood this dynamic as well. . . .  [I]n the following weeks, Apple assiduously worked to make sure that the shift to agency occurred. . . .  [A]s the district court found, 'the MFN protected Apple from retail price competition as it punished a Publisher if it failed to impose agency terms on other e-tailers.'"  The Second Circuit further held that prices increased across the board, and "even Apple's expert agreed, noting that, over a two-year period, the Publisher Defendants increased their average prices for hardcovers, new releases, and other ebooks."  Furthermore, "[i]ncreasing prices reduced demand for the Publisher Defendants' ebooks."

101.    The Second Circuit further held: "Apple's benign portrayal of its Contracts with the Publisher Defendants is not persuasive—not because those Contracts themselves were independently unlawful, but because, in context, they provide strong evidence that Apple consciously orchestrated a conspiracy among the Publisher Defendants."  This was because "Apple understood that its proposed Contracts were attractive to the Publisher Defendants *only* if they collectively shifted their relationships with Amazon to an agency model—which Apple knew would result in higher consumer-facing ebook prices."  [Emphasis in original].  Furthermore, "ample additional evidence identified by the district court established both that the Publisher Defendants' shifting to an agency model with Amazon was the result of express collusion among them and that Apple consciously played a key role in organizing that collusion."

102.    The Second Circuit emphasized, when Apple tried to argue that the contracts with publishers were legal, "the relevant 'agreement in restraint of trade' in this case is not Apple's vertical Contracts with the Publisher Defendants . . . ; it is the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices."  And "[a] coordinated effort to raise prices across the relevant market was present in every chapter of this story."  Moreover,

"[t]his conspiracy to raise prices also had its intended effect" because prices for e-books rose "[i]mmediately[.]"  Furthermore, "[t]his sudden increase in prices reduced ebook sales by the Publisher Defendants and proved to be durable."  The Second Circuit was also not convinced by Apple's argument that overall e-book sales rose and prices fell in the two years afterwards, because "Apple's evidence regarding long-term growth and prices in the ebook industry is not inconsistent with the conclusion that the price-fixing conspiracy succeeded in actually raising prices."  This is because "[t]he popularization of ebooks fundamentally altered the publishing industry by eliminating many of the marginal costs associated with selling books" and at the time Apple entered, "the ebook market was *already* experiencing rapid growth and falling prices, and those trends were expected to continue."  [Emphasis in original].  Apple's conspiracy with the publishers "tapped the brakes on those trends[.]"  Thus, "[b]y setting new, durable prices through collusion rather than competition, Apple and the Publisher Defendants imposed their view of proper pricing, supplanting the market's free play."

103.  Thus, Apple already proved to be an antitrust recidivist in almost back-to-back actions brought by the U.S. government.  Both actions involved Apple's senior leadership, and Cook, even when he was not yet the CEO, was likely also closely involved as the then-COO and likely successor of Jobs.  And, as CEO, Cook was directly looped in on Cue's efforts to pressure Random House to agree to agency pricing for the iBookstore by denying it access to the App Store for its own e-book apps.  Levinson, then a Board member, and now Chair of Apple, was also a central figure in the first antitrust conspiracy.

104.  As other more recent regulatory and enforcement actions show, instead of improving its compliance to ensure that Apple does not violate antitrust laws in other areas, Apple fiduciaries instead led Apple to engage in even more anticompetitive conduct in its mobile ecosystem and in the smartphone market.

### C.   Recent Congressional Investigations Put the Board and Apple Officers on Notice of Their Anticompetitive Practices

105.  A Congressional investigation in 2019 and 2020, run by the House of Representatives Subcommittee on Antitrust, Commercial and Administrative Law of the Judiciary

1   Committee (the "Subcommittee" or "Committee"), and a Senate hearing from April 2021 provided

2   further information and notice to Apple's fiduciaries of anticompetitive practices in its mobile

3   ecosystem.

4       106.    The Subcommittee Majority Staff issued its report in October 2020 ("House

5   Report"), where it described Apple's dominance over its ecosystem and its anticompetitive

6   conduct.  A report issued by Congressman Ken Buck (R-CO), representing the views of the

7   committee minority, agreed with many of the overall conclusions regarding the corrosive power

8   of dominant tech platforms (the "Buck Report").

9       107.    The House Report included a chart that illustrated Apple's large walled garden:

**Apple's Ecosystem: Hardware, Software Infrastructure, Apple & Third-Party Apps**[2085]



23      108.    The House Report summarized: "Apple was an early pioneer in designing and

24  marketing mass-produced personal computers.  Today, the company 'designs, manufacturers [sic],

25  and markets smartphones, personal computers, tablets, wearables, and accessories, and sells a

26  variety of related services.'  Apple's hardware products include the iPhone, iPad, Mac, Apple TV,

27  and AirPods; its Services business segment includes the App Store, iCloud, AppleCare, Apple

28  Arcade, Apple Music, Apple TV+, and other services and software applications.  Apple tightly

integrates its services and software applications with its products to ensure a seamless experience for consumers."

109.   The House Report further detailed Apple's business clout: revenues of $260 billion in fiscal year 2019; profits of $98.3 billion; and a profit margin of 38.7%.  At the time, Apple was the world's most valuable company measured by market capitalization; in August 2020, two months before the House Report was issued, Apple "became the first publicly traded U.S. firm to be valued at $2 trillion.  Apple's stock rose by 60% in the first 8 months of 2020."  Furthermore:

> Apple is the leading smartphone vendor in the U.S., accounting for approximately 45% of the domestic market, with more than 100 million iPhone users worldwide.  Apple's iOS is also one of two dominant mobile operating systems—the other operating system, Android, is discussed elsewhere in this Report.  iOS runs on more than half of U.S. smartphones and tablets.  Globally, Apple accounts for less than 20% of the smartphone market, and roughly 25% of smartphones and tablets run on iOS worldwide.  In 2018, Apple sold its 2 billionth iOS device, and is projected to sell its 2 billionth iPhone by 2021.

> Apple also owns and operates the App Store for iOS devices.  Launched in 2008, Apple highlights that the App Store allows app developers to reach consumers in 155 countries, and that more than 27 million app developers have published millions of apps in the App Store.  Apple credits the App Store with creating 1.5 million jobs in the United States, and more than $120 billion in worldwide revenue for app developers.  According to Apple, the App Store ecosystem, including direct sales of apps, sales of goods and services inside of apps, and in-app advertising facilitated more than $138 billion in economic activity in the U.S. last year.

110.   The House Report highlighted how Apple was the subject of ongoing regulatory investigations into antitrust violations, had previously been sued and found liable for antitrust violations by federal and state authorities, and had settled other antitrust actions brought by the DOJ and private parties:

> In addition to the Subcommittee's investigation of Apple's market power and conduct, federal antitrust authorities are investigating it for potential violations of the U.S. antitrust laws.  In June 2019, *The New York Times* and the *Wall Street Journal* reported that the Justice Department had opened investigations into potential violations of the antitrust laws by Apple.  Apple is also under investigation by multiple international competition authorities for antitrust violations and anticompetitive practices, as well as private antitrust lawsuits in the U.S.

> Previously, the Justice Department and Attorneys General of 33 states sued Apple for orchestrating a conspiracy to fix prices in the eBooks market in 2012.  Apple was found to have violated state and federal antitrust law and forced to pay $450 million.  In 2010, Apple settled an antitrust complaint with the Department of Justice that it conspired with several other technology companies to eliminate competition in hiring for employees, and it later settled a class action lawsuit by the affected employees through a $415 million joint settlement agreement with other firms.

111.    The House Report next described Apple's "significant and durable market power in the market for mobile operating systems and mobile app stores," pointing out how "Apple's iOS mobile operating system is one of two dominant mobile operating systems, along with Google's Android, in the U.S. and globally."  Furthermore, "[m]ore than half of mobile devices in the U.S. run on iOS or iPadOS[.]"

112.    The House Report found: "Apple's market power is durable due to high switching costs, ecosystem lock-in, and brand loyalty."  And "Apple's control over iOS provides it with gatekeeper power over software distribution on iOS devices.  Consequently, it has a dominant position in the mobile app store market and monopoly power over distribution of software applications on iOS devices."  The House Report further explained:

> Apple's App Store is the only method to distribute software applications on iOS devices.  It does not permit alternative app stores to be installed on iOS devices, nor does it permit apps to be sideloaded.  As discussed earlier in this Report, consumers have a strong preference for native apps to web apps, and Apple has acknowledged key differences between them.  Developers have explained that Apple actively undermines the open web's progress on iOS "to push developers toward building native apps on iOS rather than using web technologies."  As a result, Apple's position as the sole app store on iOS devices is unassailable.  Apple fully controls how software can be installed on iOS devices and CEO Tim Cook has explained that the company has no plan to permit an alternative app store.  The former director of the app review team for the App Store observed that Apple is "not subject to any meaningful competitive constraint from alternative distribution channels."

> In response to these concerns, Apple has not produced any evidence that the App Store is not the sole means of distributing apps on iOS devices and that it does not exert monopoly power over app distribution.  Apple says it does not create—nor is it aware of third-party data—that tracks market share in the app distribution market.  Apple claims the App Store competes in a larger software distribution market that includes other mobile app stores, as well as the open internet, personal computers, gaming consoles, smart TVs, and online and brick-and-mortar retail stores.  While consumers can access software and developers can distribute software through those platforms, none of those platforms permit consumers to access apps on an iOS device, or for developers to distribute apps to iOS devices.

> Apple's monopoly power over software distribution on iOS devices appears to allow it to generate supra-normal profits from the App Store and its Services business.  Apple CEO Tim Cook set a goal in 2017 to rapidly double the size of the Services business by the end of 2020.  Apple met this goal by July 2020, six months ahead of schedule.  The Services business accounted for nearly 18% of total revenue ($46.2 billion) in fiscal year 2019.  Services grew faster than Products in recent years, increasing by more than 41% since 2017.  The Services category is also Apple's highest margin business at 63.7% in fiscal year 2019 and 67.2% for Apple's quarter ending in June 2020.



**Annual Revenue by Segment**[2120]

Industry observers credit Apple's rising valuation and future long-term value to its successful focus on growing the Services business.  Apple has attributed the growth of Services as a driver of the firm's profits from sales and an important factor supporting Apple's overall margins as hardware sales slowed or declined.  The company has consistently credited the App Store, licensing sales, and AppleCare for the success of Services.

113.    The House Report also highlighted Cook's stated strategy of acquiring "a new company every two to three weeks, with a focus on acquiring 'talent and intellectual property.'  In July 2020, Mr. Cook explained that Apple's 'approach on acquisitions has been to buy companies where we have challenges, and IP, and then make them a feature of the phone.'"  Apple's 2020 acquisitions "include[ed] artificial intelligence and virtual reality startups, an enterprise software maker, a contactless payment startup, and a weather application, among others.  One of Apple's largest transactions occurred in 2019, when it paid $1 billion to acquire Intel's smartphone modem business."  Though Apple claimed that it did not have a "strategy of acquiring nascent competitors in service of its growth and market position"; the House Report described a pattern of recent acquisitions that suggested otherwise:

Apple has also recently acquired software companies to create a foundation from which it could launch new apps.  After purchasing the digital magazine subscription service Texture in 2018, for example, Apple integrated most of Texture's functionality into its own Apple News+ service, which debuted the following year.

34

1
2
3
4
5

Similarly, one of Apple's largest purchases to date—its $3 billion acquisition of Beats Electronics in 2014—was instrumental to the 2015 launch of Apple Music. Apple sought to grow Apple Music quickly after its introduction. Apple pre-installed the service on iPhones and made it the only music service accessible through Siri, Apple's virtual assistant. Apple also offered Apple Music with a free month trial period and made it available on Android devices. The strategy saw Apple gain 10 million paying subscribers within six months. Apple supplemented its music services business in 2018 by acquiring the music recognition app Shazam, and most recently in 2020 by acquiring podcast app Scout FM.

6
7
8

It is common for Apple to integrate apps it purchases into its own pre-existing apps or into the iOS mobile operating system. Examples include acquisitions of Swell, a podcast app that Apple acquired in 2014, and HopStop, a transit navigation app it acquired in 2013.

9
10
11
12

Apple has followed a similar strategy for integrating the Dark Sky weather app. Apple shut down Dark Sky's Android app in August 2020 and plans to integrate the app's features with the iPhone's Weather widget on iOS 14. In addition to its app, Dark Sky supplied data to independent weather apps, like Carrot, Weather Line, and Partly Sunny. As a result of Apple's takeover of Dark Sky, independent weather apps will lose access to the inexpensive, hyper-local weather data that Dark Sky supplied, leading some weather apps to shut down and others to rely on higher-priced suppliers for forecast data.

13      114.    The House Report summarized Apple's commission policy: "Apple charges a 30%

14   commission on paid apps—those that charge a fee for users to download—downloaded from the

15   App Store. It also takes a 30% fee on in-app purchases (IAP) of 'digital goods and services.' App

16   subscriptions are charged a 30% commission for the first year and a 15% commission for

17   subsequent years." The House Report also detailed Apple's anti-steering policies: "Apps are not

18   permitted to communicate with iOS users that the app may be available for purchase at a lower

19   price outside the App Store, provide links outside of the app that may lead users to find alternative

20   subscription and payment methods, or offer their own payment processing mechanism in the app

21   to avoid using Apple's IAP. Apps that violate Apple's policies can be removed from the App

22   Store, losing access to the only means of distributing apps to consumers with iOS devices."

23      115.    The House Report also detailed the views of developers who raised concerns about

24   Apple's commissions and fees for IAP. For example, "ProtonMail, a secure email provider,

25   explained that Apple's justification of its 30% commission overlooks the dynamics of the

26   marketplace for distributing software to consumers with iOS devices—conflating practices that

27   may be unremarkable in competitive markets but abusive in monopoly markets." While Apple

28   compared its commissions to those of other software distributors, the House Report pointed out

1   how with most other platforms, a user has more choices in how and from whom to download.  But

2   "Apple owns the iOS operating system as well as the only means to distribute software on iOS

3   devices."  Moreover, "Apple prohibits alternatives to the App Store" and "responds to attempts to

4   circumvent its fees and commissions with removal from the App Store."  Thus, "developers have

5   no other option than to play by Apple's rules to reach customers who own iOS devices.  Owners

6   of iOS devices have no alternative means to install apps on their phones."  And while "Apple notes

7   that its 30% commission has remained static for most apps for more than a decade[,]" the House

8   Report cited a lawsuit brought by developers that "argue[d] that the persistence of Apple's 30%

9   rate over time . . . indicates there is insufficient competition."  The House Report also observed,

10  "there is little likelihood for new market entry in the mobile operating system or mobile app store

11  markets to compel Apple to lower its rates."

12          116.    The House Report also highlighted many developers' complaints that Apple tied

13  IAP to iOS distribution because of its monopoly in the former, and because Apple has a large

14  captive user base, developers are forced to accede to Apple's demands to access this user base:

15          Many developers have stressed that because Apple dictates that the App Store is
            the only way to install software on iOS devices and requires apps offering "digital
16          goods and services" implement the IAP mechanism, that Apple has illegally tied
            IAP to the App Store.  Consumers with iOS devices account for a
17          disproportionately high amount of spending on apps—spending twice as much as
            Android users.  Further, iOS users seldom switch to Android.  Thus, developers
18          cannot abandon the App Store—it is where the highest value customers are and will
            remain.  As a result, developers say that Apple abuses its control of its valuable
19          user base by prohibiting alternative payment processing options to compete with
            Apple's IAP mechanism.
20
            Developers further argue that Apple's 30% commission from IAP is a "payment
21          processing" fee, and not a distribution fee.  In a submission to the Subcommittee,
            [Match Group, Inc. ("Match")] said "Apple distorts competition in payment
22          processing by making access to its App Store conditional on the use of IAP for in-
            app purchases, thus excluding alternative payment processors.  IAP eventually
23          becomes the vessel through which Apple extracts its extraordinary commissions."
            Two app developers that offer services that compete with Apple explained that IAP
24          is a payment processing fee and not a distribution fee.  Both pointed out that Apple
            does not charge apps for distribution, evidenced by the fact Apple admits
25          distributing most apps for free.  Instead, apple generates revenue by adding a 30%
            processing fee on transactions in the App Store and using IAP.  Apple's Developer
26          Program website explains that Apple does charge for distribution—it requires
            enrollment in the Apple Developer Program and payment of a $99 fee to distribute
27          apps on the App Store.

28          117.    The House Report also observed how "Apple's rationale for its commissions and

                                            36

1    fees has evolved over time."  The House Report pointed out how in the first few years around

2    when the App Store was launched, Apple's then-CEO and CFO had claimed that Apple did not

3    "intend to make any money off the App Store" and that it was "just a little over break even."  But

4    the House Report noted, "Apple's financial reports indicate that the App Store is faring far better

5    than the modest business Apple originally contemplated."  The House Report cited market

6    analyses indicated that Apple made more than $17 billion in profits and $50 billion in revenue in

7    2019 to 2020.  Furthermore, "App Store revenue also includes an $2.67 billion Apple would make

8    through the $99 annual fee paid by Apple's 27 million iOS developers."  The House Report also

9    estimated that "Apple also reportedly made $9 billion in 2018 and $12 billion in 2019 to set Google

10   as the default search engine on the Safari browser."

11          118.    Apple does not incur high costs operating the App Store, as a former Apple

12   employee testified: "In an interview with Subcommittee staff, Phillip Shomaker, former director

13   of app review for the App Store, estimated that Apple's costs for running the App Store is less

14   than $100 million."  Moreover, "as the mobile app economy has grown, Apple's monopoly power

15   over app distribution on iPhones permits the App Store to generate supra-normal profits.  These

16   profits are derived by extracting rents from developers, who either pass on price increases to

17   consumers, or reduce investments in innovative new services."  Thus, "Apple's ban on rival app

18   stores and alternative payment processing locks out competition, boosting Apple's profits from a

19   captured ecosystem of developers and consumers."

20          119.    The House Report quoted testimony from David Heinemeier Hansson, Founder and

21   Chief Technology Officer ("CTO") of Basecamp, who "testified . . . that Apple's market power

22   allows it to keep fees 'exorbitantly high.'  By comparison, he noted that other markets, such as

23   credit card processes, are 'only able to sustain a 2 percent fee for merchants[.]'"

24          120.    The House Report also stated: "Several other firms observed that Apple's control

25   over app distribution allows it to extract high fees on a minority of apps, and that competition for

26   processing payments would drive prices down.  For example, developers explain that payment

27   processing typically costs less than 5% of the transaction value.  Before the App Store, one

28   developer reportedly explained that '[w]e typically paid about 5%—not 30%—to a payment

processor,' and it 'worked just as well for small developers as for large.'"  Furthermore, "[o]ther developers have noted that alternative payment processing providers charge significantly lower rates than Apple's fee for IAP."

121.    The House Report further described other developers' experience: "Match estimates that Apple's expenses related to payment processing 'justify charging no more than 3.65% of revenue.'"  Moreover, "[s]ome app developers would prefer to implement in-house payment processing."  But when Epic Games, Inc. ("Epic Games"), attempted to give Fortnite players the option to use Apple's IAP or its own (which charged 10%), "Apple disabled updates for Fortnite for violating the App Store Guidelines."  Moreover, "[d]evelopers have also detailed that Apple attempts [to] lock in its fees by preventing apps from communicating with customers about alternatives."  The House Report recounted another example of a "freemium" app developer who "sent an email to customers with iOS devices with information about how to upgrade to a paid subscription, including a link to the service's website[,]" and Apple responded by "threatening to remove the app from the App Store and blocked [the app's] updates, including security patches."  The House Report also observed how a "game developer described Apple's rules as reaching outside the App Store itself to police the communications that an app can have with its own customers, including communications intended to improve customer experience and offer discounts."

122.    The House Report also recounted how, in June 2020, the European Commission ("EC") announced "a formal antitrust investigation of Apple's App Store rules and conduct, including 'the mandatory use of Apple's own proprietary in-app purchase system and restrictions on the availability of developers to inform iPhone and iPad users of alternative cheaper purchasing possibilities outside of apps."

123.    Despite Apple being under increased regulatory scrutiny, the House Report described how Apple has actually become more forceful about demanding that developers use its IAP, as Apple Services continues to grow:

> As Apple has emphasized growing its Services business, app developers and technology writers have observed Apple is increasingly insistent that apps implement IAP—cutting Apple in on revenue from more developers—and threatening apps that do not comply with expulsion from the App Store.  In June

38

2020, an email app developed by Basecamp called HEY was approved by the App Store and then abruptly told it would have to implement Apple in-app purchasing or face removal from the platform.  While HEY's app updates were eventually allowed, Apple did force it to create a free trial option for iOS customers. Basecamp Founder and CTO David Heinemeier Hansson observed that Apple threatened and abused small app developers for years, and that the conflict with HEY amounted to a 'shakedown.'  In August 2020, Apple denied WordPress the ability to update its app unless it implemented IAP, even though the WordPress app does not sell anything.  Apple ultimately backed off its demands only after the issue received negative attention on social media.  ProtonMail told the Subcommittee that its privacy-focused email app competes with . . . Apple's email app, and after being in the App Store for two years, Apple demanded [that] ProtonMail implement IAP or be removed from the App Store.  ProtonMail complied to avoid damage to its business.

Internal Apple communications reviewed by Subcommittee staff indicate that Apple has leveraged its power over the App Store to require developers to implement IAP or risk being thrown out of the App Store.  Then-Apple CEO Steve Jobs once explained, "there will be some roadkill because of it.  I don't feel guilty" when confronted with developer complaints about Apple's commission and requirement to use IAP.  The Netherlands Authority for Consumers and Markets (ACM) has noted that some app developers attribute Apple's inconsistent application of its rules to inattention to apps that are infrequently updated, and that Apple likely focuses on requiring IAP for high revenue-generating apps.

124.    The House Report also detailed how Apple appeared to take advantage of the increased use of virtual meetings, run through apps, during the COVID-19 pandemic to earn more IAP revenue for itself:

In response to the COVID-19 pandemic, some businesses moved physical events online, often booking through an app and holding the event through a video chat application.  Educators have also shifted resources online, including through apps. *The New York Times* reported that Apple demanded a 30% commission from these virtual class offerings.  As a result, one company stopped offering virtual classes to users of its iOS app.  The *Times* reported that Apple threatened Airbnb that it would remove its app from the App Store if Airbnb did not comply with Apple's demand for a share of its revenues.

In interviews with Subcommittee staff, multiple app developers confirmed the *The New York Times*' reporting.  Airbnb spoke with Subcommittee staff and described conversations with the App Store team in which Apple said it had observed an uptick in the number of apps offering virtual classes in lieu of in-person classes due to the COVID-19 pandemic.  As a result, Apple began canvassing the App Store to require app developers [to] implement IAP, entitling Apple to take 30% of in-app sales.  Airbnb explained that Apple's commission, plus compliance with Apple's pricing tiers for in-app purchases would ultimately result in a 50-60% price increase for consumers.

Technology industry observers have reported similar conduct.  On June 17, 2020, Ben Thompson, a prominent business analyst, wrote that app developers told him that Apple was demanding 30% commissions from businesses that have had to change their business models from live, in-person events to virtual events as a result of the COVID-19 pandemic.  Mr. Thompson quoted one developer that explained

39

Apple was taking advantage of small businesses in the midst of the ongoing public health crisis.

At the Subcommittee's hearing on July 29, 2020, Chairman Jerrold Nadler (D-NY) asked Mr. Cook about the allegations that Apple was canvassing the App Store to extract commissions from businesses that have been forced to change their business model in order to survive during the pandemic. Mr. Cook responded that Apple "would never take advantage" of the pandemic, but justified the conduct, explaining that the app developers were now offering what Apple defined as a "digital service" and Apple was entitled to commissions. Responding to *The New York Times*' reporting on the mat[t]er, Apple defended its conduct, explaining "[t]o ensure every developer can create and grow a successful business, Apple maintains a clear, consistent set of guidelines that apply equally to everyone."

App developers affected by these changes said that after Apple's conduct became public it created an exception to its policies until the end of 2020. However, on January 1, 2021[,] those businesses will be required to implement IAP or remove the ability to book virtual classes in their apps.

125.    The House Report also detailed developers' evidence that showed how Apple's anticompetitive fees harmed competition and consumers, and how Apple internally acknowledged the same:

Developers have submitted evidence that Apple's commissions and fees, combined with the lack of competitive alternatives to the App Store and IAP harm competition and consumers. For instance, Match called Apple's fee for IAP "unreasonable," leading to higher prices for consumers and "an inferior user experience and a reduction of innovation." One developer that offers an app that directly competes with Apple told the Subcommittee that it was forced to raise prices to pay Apple's commission.

As a result, it was less competitive and fewer iOS users purchased its service. The company said that because apps often have small margins, they cannot absorb Apple's fees, so the price consumers pay for its app is more than 25% higher than it would otherwise be. Small developers described Apple's 30% cut "onerous." Epic Games, which recently filed an antitrust complaint against Apple, has told a federal court that Apple's fees and commissions force developers "to increase the prices they charge in order to pay Apple's app tax. There is no method app developers can use to avoid this tax." Mac and iOS app developer Brent Simmons explained Apple's fees reduce innovation and lead to fewer apps in the marketplace, observing:

[T]he more money Apple takes from developers, the fewer resources developers have. When developers have to cut costs, they stop updating apps, skimp on customer support, put off hiring a graphic designer, etc. They decide not to make apps at all that they might have made were it easier to be profitable.

In Apple's internal documents and communications, the company's senior executives previously acknowledged that IAP requirement would stifle competition and limit the apps available to Apple's customers. For example, in an email conversation with other senior leaders at Apple about whether to require IAP for e-Book purchases, then-CEO Steve Jobs concluded, "I think this is all pretty simple—

iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things.

126. Furthermore, the House Report described how international regulators have investigated Apple's App Store commissions and fees for violating competition laws:

International competition authorities have also examined the competitive effects of Apple's App Store commissions and fees. The Australian Competition and Consumer Commission (ACCC) observed that Apple's control over app distribution on iOS devices gives it leverage to extract commissions from apps, reducing the revenue that app providers like media businesses can invest in content. The [Netherlands competition authority] ACM, which completed a comprehensive study of mobile app stores in 2019, noted that developers have increased prices to account for commissions and fees. The ACM also remarked that Apple's 30% commission on in-app purchases may distort competition because Apple's requirement to use IAP often applies to apps competing directly against Apple's apps. As a result, app developers with small margins cannot simply absorb the cost of Apple's commission, so they increase their price, which gives Apple's competing service an advantage. Developers ACM spoke with "mentioned that it is highly unlikely that it is a coincidence that these digital services that are required to use IAP face competition from Apple's own apps, or possibly will do in the future."

127. The House Report also reported on its findings over "whether Apple abuses its role as iOS and App Store owner to preference its own apps or harm rivals." The House Report described how Apple's use of consumers' tendencies to not switch from defaults, and preinstallation of many of its own apps as defaults, was precisely this type of anticompetitive behavior:

It is widely understood that consumers usually do not change default options. This is the case "even if they can freely change them or choose a competitive alternative." Subcommittee staff reviewed communications between Apple employees that demonstrate an understanding inside Apple that pre-loading apps could be advantageous when competing against third-party apps.

Apple pre-installs about 40 Apple apps into current iPhone models. Several of these apps are set as defaults and are "operating system apps" that are "integrated into the phone's core operating system and part of the combined experience of iOS and iPhone." According to Apple, users can delete most of these pre-installed apps. Apple does not pre-install any third-party apps, and until the September 2020 release of iOS 14, it did not allow consumers to select third-party web browser or email apps as defaults. Apple says that it is making "more than 250,000 APIs available to developers in iOS 14."

A report by the Netherlands Authority for Consumers and Markets (ACM) on mobile app stores recently observed that app providers believe they "have a strong disadvantage" when competing with Apple's apps due to the fact that those services are often pre-installed on iOS devices. The study also noted that "pre-installation of apps can create a so-called status-quo bias. Consumers are more likely to use

41

the apps that are pre-installed on their smartphones." Consumers will download apps that compete with pre-installed apps only when there is a noted quality difference, and even then, lower-quality pre-installed apps will still enjoy an advantage over third-party apps. The European Commission's 2019 report on competition in digital markets explained that privileging access to APIs can provide an advantage to those with greater access over those with more innovative products. Public Knowledge concluded that Apple's control of iOS and the App store enables it to advantage its own apps and services by pre-installing them on iOS devices, leading consumers to rely on the pre-installed apps rather than looking for alternatives in the App Store.

128.    The House Report further detailed how Apple uses its access to private APIs, as well as how it defaults public APIs to pre-installed apps, to give its apps further advantages:

Mobile operating system providers develop APIs to permit apps to access a device's features, such as the microphone, camera, or GPS, or other software programs and determine what information on the device apps can access. Public APIs for iOS are made available to app developers to ensure apps are integrated with the device and function as intended. These public APIs also control the services that are opened via default when users click a link to open a webpage or an address to open a map application. Private APIs access functionality that is not publicly released. Apple is permitted to use the private APIs on iOS devices, but third-party developers are not.

Apple's public APIs default to Apple's pre-installed applications. As a result, when an iPhone user clicks on a link, the webpage opens in the Safari Browser, a song request opens in Apple Music, and clicking on an address launches Apple Maps. With some recent exceptions, iPhone users are unable to change this default setting; however they are able to send app-specific links from inside many popular apps. For example, a person can share a link to a song in a third-party music streaming app such that it would open that song in the same app if it is already downloaded on the recipient's smartphone. One app developer has argued, however, that Apple uses its control over iOS to give its own apps and services advantages that are not available to competitors. For example, the developer explained that for years it was barred from integrating with Siri, Apple's intelligent virtual assistant that is built into Apple devices. Although Siri can now integrate with the app, users must explicitly request Siri launch the third-party app, otherwise it will default to launch Apple's service.

Like setting advantageous defaults and pre-installing its own apps, Apple is also able to preference its own services by reserving access to APIs and certain device functionalities for itself. ACM and technology reporters have both noted that "private APIs have the potential to give Apple apps a competitive advantage," and that "Apple has for a long time favored its own services through APIs." For example, from the release of iOS 4.3 until iOS 8, "third-party developers had to rely on the UIWebView API to render web pages in iOS apps, while Apple gave its own apps access to a private, faster API," and as a result, "Google's mobile version of Chrome for iOS could not compete with Apple's mobile version of Safari in terms of speed."

129.    The House Report highlighted how Apple's API policies preferenced its own mobile payments solution, Apple Pay:

42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Apple's mobile payments service, Apple Pay, is an example of an in-house app that enjoys an advantage due to its ability to access certain functionalities, such as near-field communication (NFC), on the iPhone that are off limits to third-party apps. According to Apple, "NFC is an industry-standard, contactless technology" that enables communications between the mobile device and payment terminal. Apple Pay uses the iPhone's NFC chip to allow[] users to make contactless payments at retail outlets that use the technology. However, Apple blocks access for third-party apps.   In June 2020 the European Commission opened a formal antitrust investigation into Apple's conduct in the mobile payments market, including "Apple's limitation of access to the Near Field Communication (NFC) functionality ('tap and go') on iPhones for payments in stores."  In response to questions from Subcommittee Chairman Cicilline and Representative Kelly Armstrong (D-ND) about Apple's treatment of third-party mobile payment apps and access to the iPhone's NFC chip, Apple said that it limits access to the NFC chip to protect the security of the iPhone and has detailed the differences between Apple's treatment of Apple Pay and third-party mobile payment apps.

The advantage Apple provides Apple Pay may be heightened during the COVID-19 pandemic.  Due to the novel coronavirus, consumers have accelerated their adoption of contactless payments, with more than half of global consumers preferring contactless payments over cash or traditional credit cards.  In April 2020, MasterCard reported a 40% rise in use of contactless payments, with the trend expected to continue after the pandemic.  MasterCard CEO Ajay Banga explained the trend was driven by shoppers "looking for a quick way to get in and out of stores without exchanging cash, touching terminals, or anything else."  Apple itself has capitalized on the perception that contactless is the safest way to make transactions, marketing Apple Pay as "a safer way to pay that helps you avoid touching buttons or exchanging cash."

130.    The House Report also highlighted how Apple self-preferenced its own browser and browser engine:

Like Apple Pay, Safari is another pre-installed app that enjoys advantages over rivals.  Safari is Apple's default browser on iOS and Mac devices.  When someone using an Apple device clicks on a website link, the webpage opens in the Safari browser.   Until the September 2020 release of iOS 14, Apple did not allow consumers to select [a] third-party web browser as a default.  This was unique to iOS. Other mobile device operating systems allow the user to set a default browser across all applications.

Apple's policies require alternative browsers apps for iOS (iPhone) to use Apple's WebKit browser engine.  As a result, all competing web browser . . . engines are used in other applications that link to web content, such as email applications. Market participants explained to Subcommittee staff that these guidelines cost significant internal resources and create a hurdle for market entry on iOS.  These requirements also make alternative browsers on iOS less technically distinct from Safari limiting product differentiation.  Further, market participants expressed concern that because Apple mandates the use of WebKit, as opposed to allowing developers an option, that WebKit has become slower to innovate and adopt standards.

At the Subcommittee's second hearing, Chairman Cicilline asked Apple about its policies related to web browser engines.  Apple responded: "By requiring use of WebKit, Apple can provide security updates to all our users quickly and accurately,

43

no matter which browser they decide to download from the App Store." While market participants agree that Apple's WebKit mandates would allow for easier updates to browser apps, there is disagreement about whether WebKit is measurably less secure than other browser engines.

131.    The House Report also described how Apple limited access to APIs to not only preference its own apps, but hurt the functioning of third-party apps, highlighting the example of Tile and other location tracking apps:

> The ACM has noted app providers have limited access to some APIs "that are essential for the functioning of apps.  In certain cases, these functionalities are, however, used by Apple for their own apps," which may limit competitive alternatives to Apple's products and services.

> In January 2020, Kirsten Daru [("Daru")], Chief Privacy Office[r] and General Counsel of Tile offered testimony to [the] Subcommittee about this dynamic.  Tile is a company that makes hardware and software that helps people find lost items.  Tile testified that for years it successfully collaborated with Apple. . . .  In her testimony, Ms. Daru said that Apple planned [to] launch a hardware product to compete with Tile.  In her testimony, Ms. Daru said that Apple's 2019 release of iOS 13 harmed Tile's service and user experience while simultaneously introducing a new pre-installed Apple finder app called Find My.  Changes to iOS 13 made it more difficult for Tile's customers to set up the service, requiring several confusing steps to grant Tile permission to track the phone's location.  Meanwhile, Apple's Find My app was pre-installed on iOS devices and activated by default during iOS installation.  Users are unable to opt out of Find My's location tracking "unless they go deep into Apple's labyrinthine menu of settings."  Tile's response to the Subcommittee's Questions for the Record included detailed location permission flow comparisons between Tile and Find My.  Tile explained that as a result of Apple's changes to iOS 13 it saw significant decreases in users and a steep drop off in users enabling the proper settings on iOS devices.

> A group of app developers wrote to Apple CEO Tim Cook in 2019 arguing that Apple's new location notification permission policies will hurt their businesses and accused Apple of acting anticompetitively because it was treating its own services differently:

>> The developers conclude their email by asserting that Apple's own apps don't have to jump through similar hoops to get access to user location.  An Apple app called Find My for tracking the location of other iPhone users, for example, bypasses the locating tracking requests that apps from outside developers must go through, the email reads.  Instead, Find My gains location access through a process that occurs as users install the new operating system.

> The app developers—including Tile, Arity, Life360, Happn, Zenly, Zendrive, and Twenty—explained that this gives Apple products that compete against their apps an advantage.  "Apple says Find My and other apps are built into iOS and that it doesn't see a need to make location-tracking requests from users for the apps after they install the operating system."  Apple also differentiates Find My by pointing out that "'Find My' stores user location data *locally* on the user's iPhone, and Apple only transmits the location up on the user's request."

> In response to the Subcommittee's questions at its second hearing in July 2019,

44

Apple responded and explained that the iOS 13 changes give users more control over background location tracking by apps. Apple also explained that turning on location tracking to Apple's Find My service was "essential" for users, and that the disparate treatment between Find My and Tile was due to the fact that data from Find My remains on the device, while Tile stores data externally. Additionally, during Apple's June 2020 World Wide Developers Conference, Apple announced that the Find My app would work with third-party finder hardware like Tile's. However, Apple's service would require companies like Tile to abandon their apps and the ability to differentiate their service from Apple's and other competitors. Apple's solution would continue to put Tile and other apps and hardware developers offering finder services at a competitive disadvantage.

[Emphasis in original].

132.    The Committee also examined how Apple preferenced its own apps by favoring them in App Store search rankings. The House Report cited extensively to two investigative reports, by the *Wall Street Journal* and *The New York Times*, which reported how Apple's in-house apps routinely appear ahead of third-party apps in search rankings. The *Times* reported how some searches resulted in as many as 14 Apple in-house apps appearing before results from third-party apps began to appear, even though, the House Report observed, app developers could pay Apple to place ads at the top of search results. The *Journal* reported how 60% of basic searches for terms like "maps" turned up Apple's in-house apps first, and "'Apple apps that generate revenue through subscriptions or sales, like Music or Books, showed up first in 95% of searches related to those apps.'" Furthermore, the "*Journal* noted that growing revenue from its apps is core to Apple's strategy of offsetting sluggish hardware sales by increasing revenue from its Services business."

133.    The House Report also found that third-party apps would find their search rankings worsen when Apple introduced competing products or services:

Rival app developers slipped down the search rankings as Apple introduced new services in their product categories. For example, Spotify had long been the top search result for the query "music," but Apple Music quickly became the top search result shortly after it joined the App Store in June 2016. By the end of 2018, eight of Apple's apps appeared in the first eight search results for "music," and Spotify had fallen to the 23rd result. Similarly, Audiobooks.com was the top ranked result for "audiobooks" for nearly two years but was overtaken by Apple Books shortly after Apple began marketing for Books. Audiobooks explained to the *Wall Street Journal* that losing the top search ranking to Apple "triggered a 25% decline in Audiobooks.com's daily app downloads."

134.    The House Report further illustrated how Apple preferenced its own apps by subjecting them to different, laxer standards than third-party apps, including not subjecting its own

1    apps to user reviews:

> The reporting on App Store search also revealed that Apple may also advantage its apps by holding them to a different standard when they appear in the App Store search rankings. Apple told *The Wall Street Journal* "it uses 42 factors to determine where apps rank," and that the four most important factors are "downloads, ratings, relevance, and 'user behavior,'" with user behavior the most important factor because it measures how often users select and download an app. Approximately forty of Apple's apps come preinstalled on iPhones. These apps do not have reviews and consumers cannot rate them. Mr. Cook explained at the Subcommittee's hearing that Apple's "apps that are integrated into the iPhone are not reviewable by users on the App Store." Apple has also said that its search algorithm works the same for all apps, including its own.

> Despite the fact that Apple's pre-installed apps do not have ratings or reviews— factors that Apple says are most influential in determining app ranking—many of Apple's pre-installed apps "still tend to be ranked first, even when users search for exact titles of other apps." For example, Apple Books has no reviews or rankings and appears first in a search for "books," while competing apps have tens-of-thousands of customer reviews and ratings of 4.8 or 4.9 stars on Apple's five-star rating system. A search by Subcommittee staff of terms "music," "news," "TV," and "podcast" returned Apple Music, News, TV, and Podcasts as top ranked search results although those apps do not have any reviews or ranking.

13    135.    Apple or its executives, including Schiller, attempted to justify Apple's apps having

14    high rankings by pointing out how the in-house apps' generic names were often an exact fit for

15    search terms (e.g., Apple Books for a "books" search). But the House Report pointed out that

16    Apple actually disfavors third parties using generic terms:

> It appears that Apple does not apply the same rule to third-party apps. Documents reviewed by Subcommittee staff show that Apple previously punished non-Apple apps that attempted to "cheat" the app store rankings. Apple determined that at least one third-party app had achieved its high search ranking because its name was a generic name that was also a common search term. Apple's employees determined it was cheating to give an app the name of [a] common search term.

> In February 2018, Apple's App Store search team noted that an app named "Photo Editor—Stylo" was the top ranked result when users searched the App Store for "photo editor." In an email thread with Philip Schiller, Apple's Senior Vice President, Worldwide Marketing, an Apple employee wrote that "[s]ince the app name matched a broad query term like 'photo editor' the developer was able to game the query with a direct name match." The Apple employee explained that "[t]he app has been added to the Search Penalty Box for rank demotion," and the action was labeled as complete. Additional action was slated to disable the initial boost that new apps are given in the app store if the app name is an "exact match to broad queries." Here, Apple punished an app for the same conduct it said justified Apple's position atop the App Store rankings.

27    136.    The House Report concluded that Apple's monopoly power in iOS distribution

28    gave it the leverage to apply different rules to its own apps versus others, even if it insists it does

1  not:

> Apple's position as the provider of iOS enabled it to designate the App Store as the sole means for app developers to distribute software to iPhone users. Apple's public statements, including testimony by Mr. Cook that Apple's apps "go through the same rules" as more than 1.7 million third-party apps appear to be inconsistent with Apple's actual practices. In this case, Apple leveraged its control of iOS and the App Store to give its own apps preferential treatment, and applied a different set of rules than third-party apps, punishing them for the very conduct Apple engaged in. Subcommittee staff did not have access to additional evidence from Apple to determine how widespread this practice is within the company.

137.    The House Committee also investigated whether Apple appropriated information from third parties that relied on the App Store: "Developers have alleged that Apple abuses its position as the provider of iOS and operator of the App Store to collect competitively sensitive information about popular apps and then build competing apps, or integrate the popular app's functionality into iOS. The practice is known as 'Sherlocking.'" The House Report further explained: "Some app developers have complained that Apple leverages its control of iOS and the App Store to glean business intelligence that enables it to better compete against third-party apps. For example, after a stress relief app called Breathe was Sherlocked in 2016, the app's developers said that Apple used third-party developers 'as an R&D arm.'" The House Report quoted *The Washington Post* summarizing these complaints: "Developers have come to accept that, without warning, Apple can make their work obsolete by announcing a new app or feature that uses or incorporates their ideas." Moreover, developers "generally don't sue Apple because of the difficulty and expense in fighting the tech giant—and the consequences they might face from being dependent on the platform."

138.    The House Report summarized testimony from several developers concerning Apple's appropriation of their data:

> At the Subcommittee's fifth hearing, Representative Joe Neguse (D-CO) asked Ms. Daru of Tile about how Apple used competitively sensitive information it collects as owner of the iOS ecosystem to compete against third-party apps. She explained that as operating system provider and App Store operator, Apple knows who Tile's customers are, the types of apps those customers preferred, and the demographics of iOS users that look at Tile's app or search for similar apps—information that would give Apple a competitive advantage against Tile. Ms. Daru testified that Apple had harmed Tile's service and user experience, while simultaneously introducing a rival app and preparing to launch a rival hardware product. Blix, developer of email management app BlueMail, has sued Apple in federal court claimed Apple has engaged in Sherlocking and infringed the patents underlying BlueMail:

47

1

> Apple frequently takes other companies' innovative features, adds those ideas to Apple's own software products without permission, and then either ejects the original third-party application from the App Store (as it did with Blix's software) or causes the third-party software developer to close its doors entirely.

> In response to the requests for information, Match Group, Inc. told the Subcommittee that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app. Phillip Shoemaker, former director of app review for the App Store, similarly told Subcommittee staff that during his time at Apple an app developer proposed an innovative way to wirelessly sync the iPhone and Mac. The app did not violate any of Apple's Guidelines, but it was rejected from the App Store nonetheless. Apple then appropriated the rejected app's feature for its own offerings.

139.    The House Report also noted that while Cook evaded responding to questions about whether Apple had access to and contractually authorized it to use developer's confidential information to build competing apps, Jobs had expressly said that Apple had "'been shameless about stealing great ideas.'" The House Report also found that the "Apple Developer Agreement, which Apple requires every app developer to agree to, appears to warn[] developers that in exchange for access to the App Store, Apple is free to build apps that 'perform the same or similar functions as, or otherwise compete with' apps in the App Store." The Developer Agreement further allows Apple "'to use any information, suggestions or recommendations [the developer] provide[s] to Apple pursuant to this Agreement for any purpose, subject to any applicable patents or copyrights.'"

140.    The House Report further found that Apple applies different, more restrictive rules to developers:

> Mr. Cook's statement that Apple's apps play by the same rules as other apps appears contrary to Apple's stated policies. While the Apple Developer Agreement provides Apple the right to replicate third-party apps, Apple's Guidelines direct developers not to "copy another developer's work" and threaten removal of apps and expulsion from the Developer Program for those that do. Further, the Guidelines instruct developers to "[c]ome up with your own ideas," and admonishes them "[d]on't simply copy the latest popular app on the App Store, or make some minor changes to another app's name or UI and pass it off as your own." Lastly, Apple differentiates between—rather than conflates or confuses—copycat apps and intellectual property infringement, which are both prohibited in the App Store. [Alteration in original].

141.    The House Report also illustrated how Apple excluded rival apps through an

extended discussion of how Apple removed parental control apps from the App Store, just as Apple introduced its own parental control app, Screen Time:

> During the Subcommittee's sixth hearing, Representatives Val Demings (D-FL) and Lucy McBath (D-GA) asked questions regarding Apple's conduct in 2018 and 2019 removing parental control apps from the App Store. In 2018, Apple announced its Screen Time app, a new feature bundled with iOS 12 that helped iOS users limit the time they and their children spent on the iPhone. Thereafter, Apple began to purge many of the leading rival parental control apps from the App Store. Apple explained the apps were removed because they used a technology called Mobile Device Management (MDM). The MDM technology allowed parents to remotely take over their children's phones and block content. Apple noted that MDM could allow the app developer to access sensitive content on the device.

> According to *The New York Times*, the parental control apps using MDM had been offered in the App Store for years, and hundreds of updates to those apps had been approved by Apple. As a result, many apps were forced to shut down, although some were given a reprieve. As a result, many apps were forced to shut down, although some were given a reprieve. Two parental control apps filed a complaint with the European Commission, alleging Apple's App Store policies were anticompetitive. The complaint alleged that as Apple purged competitors it introduced Screen Time, pre-installed Screen Time on iOS 12 and activated it by default, and gave Screen Time access to iOS functionalities it denied to competing third-party apps.

> Subcommittee staff reviewed emails from parents who contacted Apple to complain about the removal of one of the purged parental control apps. They said that Screen Time was a comparably worse option for consumers—and described it as "more complicated" and "less restrictive" than competitors. In emails to the company reviewed by Subcommittee staff, parents complained about Apple's monopoly power over app distribution on iOS and self-interest in promoting Screen Time motivated Apple's actions.

> . . .

> Internally, Apple's Vice President of Marketing Communications, Tor Myhren concurred, responding "[t]his is quite incriminating. Is it true?" to an email with a link to *The New York Times*' reporting. Apple's communications team asked CEO Tim Cook to approve a "narrative" in that Apple's clear-out of Screen Time's rivals was "not about competition, this is about protecting kids['] privacy."

> Developers of the purged apps also contacted Apple, outraged that they had been removed from the App Store while other apps that used MDM remained. One developer explained it had invested more than $200,000 building its parental control app, then another $30,000 to fix the problem Apple identified, only to be told that Apple would no longer support parental control apps in the App Store.

> Although Apple claimed its conduct was motivated to protect privacy and not intended to clear out competitors to Screen Time, Apple reinstated many of the apps the same day that it was reported the Department of Justice was investigating Apple for potential antitrust violations. Apple's solution to address privacy concerns was to ask the apps to promise not to sell or disclose user data to third parties, which could have been achieved through less restrictive means and without removing those apps from the App Store.

Developers of parental control apps asked Apple to "release a public API granting developers access to the same functionalities that Apple's native 'Screen Time' uses." Eventually, Apple did grant some access to APIs, but only after rival app developers were accused of being a risk to children's privacy, removed from the App Store, forced to incur significant costs, only for Apple to change its mind.

. . .

Here, Apple's monopoly power over app distribution enabled it to exclude rivals to the benefit of Screen Time. Apple could have achieved its claimed objective—protecting user privacy—through less restrictive means, which it ultimately did only after significant outcry from the public and a prolonged period of harm to rivals. Apple's conduct here is a clear example of Apple's use of privacy as a sword to exclude rivals and a shield to insulate itself from charges of anticompetitive conduct.

142. The House Report further found other exclusionary conduct: "Subcommittee staff learned that Apple has engaged in conduct to exclude rivals to benefit Apple's services in other instances. For example, Mr. Shoemaker explained that Apple's senior executives would find pretextual reasons to remove apps from the App Store, particularly when those apps competed with Apple services."

143. The Committee also investigated how the App Review Guidelines were used to further Apple's anticompetitive conduct. The App Review Guidelines expressly state that the "line" for rejecting apps is "as a Supreme Court Justice once said, 'I'll know it when I see it.' And we think that you will also know it when you cross it."

144. The House Report highlighted the testimony and statements of several developers concerning how Apple arbitrarily applied its guidelines. For example, Basecamp founder David Heinemeier Hansson testified as to how the App Review Guidelines are "complete tyranny, and the rules are often interpreted differently by different reviewers because they're intentionally left vague." This leaves developers "in constant fear we may have violated these vague rules, and that the next update to our applications will be blocked by Apple." These denials come "without explanation for days or even weeks at a time."

145. The House Report highlighted other submissions, news reports, and internal documents that showed that Apple knew that its review guidelines were applied arbitrarily:

One social media platform expressed concern that Apple has absolute discretion about whether to approve apps or accept updates. Developers are frustrated that Apple's interpretation and enforcement of the Guidelines have changed over time, despite prior precedents and the fact developers rely on understanding the

50

Guidelines to operate their businesses.  One developer described Apple's Guidelines as "arbitrarily interpreted," and another party that called it "opaque and arbitrary."  Internally, after an app was rejected from the App Store an Apple employee wrote to the leadership of the App Store that Apple's decision "still isn't obvious to people insider the company that work directly on the App Store."

In 2017, *Gizmodo* reported that iOS app maker Deucks saw its Finder for AirPods app removed from the App Store.  The app used the iPhone's Bluetooth signal to locate lost AirPods, helping its users find a missing earbud and save money by not having to purchase replacements.  After the app was reviewed and approved, it disappeared from the App Store.  Deucks told [*Gizmodo*] that Apple's app review team "didn't find anything wrong with the app itself, but rather they didn't like the 'concept' of people finding their AirPods and hence [the app] was deemed 'not appropriate for the App Store.'"  At the time, Deucks had several other finder apps, such as Finder for Fitbit and Finder for Jawbone, that remained available in the App Store.

Developers also say that Apple uses its power over the App Store to change the Guidelines when convenient in ways that benefit Apple.  The Guidelines—along with their interpretation and enforcement—all change over time in ways that always appear to benefit Apple.  Spotify noted, "[t]he reality is Apple continues to move the goal posts and change the rules to its advantage and the detriment of developers," and that the company's "selective and capricious enforcement [of its App Store policies] is designed to put companies like [Spotify] at an untenable competitive disadvantage."  ProtonMail explained it offered a free version of its app in the App Store for years, but then Apple abruptly changed the way it applied its IAP requirement and demanded the app add the ability for consumers to purchase upgraded functionality through the app—giving Apple a 30% cut from those subscriptions.  ProtonMail noted that its app competes with an Apple service and that requiring it to implement IAP would increase its customer acquisition costs and make it less competitive, benefitting Apple.  Another party Subcommittee staff spoke with said when Apple introduces a new app, developers with rival apps know they may be targeted for a violation of a rule Apple has suddenly decided to interpret or enforce differently.   Another app developer that competes with an Apple service[] noted the Guidelines are constantly shifting, that Apple arbitrarily decides when an app no longer complies with the rules, and those decisions always favor Apple's interests.

146.    The House Report also recounted how Apple appears to arbitrarily enforce its Guidelines while reserving preferential treatment for others:

Others have noted that Apple unilaterally determines if, how, and when to apply its Guidelines, and that it also freely makes up "unwritten rules" when convenient.  For example, Apple's distinction between "business" and "consumer" apps to justify its June 2020 decision to require Basecamp to redesign its app to permit in-app signups—and attempt to require implementation of IAP—was not a distinction that appeared in Apple's Guidelines until an update on September 11, 2020.  Apple said that it has a "set of standard terms for Amazon, and every other video-streaming service that met the criteria, to launch their service on Apple TV and iOS.  One of Apple's business partners told Subcommittee staff that it suspects Amazon receives preferential treatment by being exempt from sharing revenue for some categories of transactions.

147.    The House Report described in detail Apple's preferential treatment for Baidu,

despite Cook and the Company denying that Apple gives any developer preferential access:

> Subcommittee staff reviewed communications between Apple CEO Tim Cook and an executive from Baidu regarding whether Apple would provide Baidu with preferential treatment.  At the Subcommittee's sixth hearing, Rep. Johnson questioned Mr. Cook whether Apple differentiates in how it treats app developers.  Rep. Johnson also asked if it was true that Apple assigned Baidu two employees to help it navigate the App Store bureaucracy, and whether other app developers receive the same access to Apple personnel.  Mr. Cook responded, "we treat every developer the same," and explained the App Store Guidelines "apply evenly to everyone."

> . . .

> Communications reviewed by Subcommittee staff show that in 2014 Baidu requested, among other things, that Apple "set up a fast track for the review process for Baidu APPs," along with setting Baidu as the default search and mapping services on "all Apple devices in China."  Mr. Cook solicited feedback from Apple's senior executives regarding these and other requests from Baidu, and also noting, "I think we should have someone focus on them as we have done with Facebook, Thoughts?"

> . . .

> Within two weeks, Mr. Cook responded to the Baidu executive's requests.  "I'd like Apple to have a deeper relationship with Baidu," Cook wrote, noting that "some of" the Baidu executive's requests were "great starts."  In response to the Baidu executive's request for "APP Review Fast Track," Mr. Cook wrote "We can set up a process where Baidu could send us a beta app for review and this can often speed up the process."  Mr. Cook then noted he had assigned Baidu two employees from App Store chief Phil Schiller's team to "help manage through Apple."

148.    Furthermore, the House Report explained that Shoemaker, the former app review director, had testified that Apple did not actually treat all app developers equally:

> In a subsequent interview with Mr. Shoemaker, the former Director of App Review for the App Store, Subcommittee staff asked about Apple's treatment of app developers.  Mr. Shoemaker responded that Apple "was not being honest" when it claims it treats every developer the same.  Mr. Shoemaker has also written that the App Store rules were often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors."  He has noted that "Apple has complete and unprecedented power over their customers' devices.  The decisions they make with regards to third-party apps needs to be above reproach, and currently are not."

> Mr. Shoemaker also admitted that Apple advantages its own apps over third-party apps.  In an interview with Subcommittee staff, he described it as inaccurate to say Apple does not favor its own apps over third-party apps.  He has previously noted that apps that compete against Apple's services have a track record of problems getting through the App Store's review process.  For example, Apple's gaming service, Apple Arcade, is a type of app that was "consistently disallowed from the store," when offered by third-party developers, but Apple allowed its own app in the store "even though it violates existing [App Store] guidelines."  Mr. Shoemaker explained to Subcommittee staff that Apple's new Guideline 3.1.2a related to streaming game services was likely written to "specifically exclude Google Stadia,"

52

1    describing the decision as "completely arbitrary."  Similar conduct has been
2    commented on by the courts, as well as international antitrust authorities.

3    149.    The House Report also found that Apple appeared to revise App Store policies only

4    after regulatory scrutiny:

5    Apple appears to have recently revised some of its App Store policies under the
     scrutiny of the Subcommittee, the Department of Justice, and global competition
6    authorities.  In June 2020, Apple announced new policies for its App Store review
     that will allow app developers to appeal decisions by app reviewers and even
7    challenge the Guidelines governing the App Store.  Apple also announced that app
     updates with bug fixes will no longer be held up due to a violation of an App Store
8    guideline.    Additionally, on September 11, 2020[,] Apple changed its App
     Developer Guidelines to address some of the questions raised about the Guidelines
9    arising from many recent controversies described earlier in this Report.

10    150.    The House Report found that Apple has market power in the voice assistant market,

11    through its placement of Siri on its devices: "Market research firm FutureSource Consulting found

12    that as of December 2019 Siri was the leading intelligent virtual assistant with a 35% market share

13    globally.  A third [] party supplied the Subcommittee with additional market research that reported

14    in the first half of 2018 Apple's Siri was built into 42% of virtual assistant-enabled devices sold

15    worldwide. . . .  Siri's success reflects its integration into the iPhone and other Apple hardware,

16    such as the iPad, Mac, Apple Watch, Apple TV, and HomePod.  Siri is the hub of Apple's

17    ecosystem of smart-home devices.  Users can control Apple HomeKit-compatible devices using

18    Siri on an Apple device."

19    151.    Siri the program reflected Apple's merger and acquisition strategy, since it was

20    developed by a startup, Siri, Inc., which first developed the Siri app for iOS and then two months

21    later was purchased by Apple.  Subsequently, Apple acquired other companies "to strengthen Siri's

22    underlying technology and natural language processing."  These acquisitions included: Laserlike,

23    which helped to personalize results; Inductive, which helped correct data flaws through AI;

24    Xnor.ai, which specialized in AI tools for smart home devices; and Voysis, to increase Siri's

25    speech recognition accuracy.

26    152.    Apple has bolstered Siri's dominance in voice assistants through a "walled garden

27    approach to the intelligent voice assistant market by, among other things, limiting interoperability

28    by restricting how digital voice assistants work on Apple devices and how Siri works with non-

53

Apple devices, and by using Siri to guide users to its own products and services."  Furthermore, "Apple does not allow competing digital voice assistants to replace Siri as the default on Apple devices.  On iOS devices the user must download the app for a competing digital voice assistant and then either use Siri to access that voice assistant, or use that app directly."  Moreover, Apple only allows Apple devices, rather than any third-party devices, to respond to Siri commands: "While third-party hardware manufacturers can make their products Siri-compatible through the Works with Apple HomeKit, the voice commands needed to control the smart devices must still be directed to Siri on an Apple device, such as an iPhone or iPad."

153.    Apple also uses voice assistants to direct traffic to its own apps and services: "by default requests to Siri to play music open the Apple Music app; requests for directions open the Apple Maps app; and requests for web searches open the Safari app."  Apple did not allow users to direct Siri to play music through a third-party streaming service, such as Spotify, until 2019. Even more recently, in 2020, "Apple announced that it would update its HomePod smart speaker system to support third-party music services."

154.    The House Report recounted how a "third party that spoke with Subcommittee staff described Siri as a 'closed' intelligent virtual assistant that limits the types of voice interactions voice app developers have access to.  The app developer explained that SiriKit, which allows iOS apps to work with Siri, relies on a pre-de[s]igned list of basic interactions that third parties can use, such as messaging, calling, payments, etc.  The very limited set of interactions permitted by Apple can make it impossible to launch an app for the third-party's services, including applications that compete with an Apple service."

155.    Furthermore, the House Report found that Apple's "practices have recently come under scrutiny by antitrust authorities.  In March 2019, Spotify filed a complaint against Apple before the European Commission, reportedly alleging, among other things, that Apple restricted Spotify's access to Siri.  [In] July 2020, the European Commission's antitrust authority announced that it had opened an inquiry into the use of digital assistants and smart home products by Apple, Google, and Amazon, among other companies.  In her statement accompanying the announcement, Margrethe Vestager, the Commission's Executive Vice President, identified interoperability and

1    self-preferencing as areas of concern."

2    156.    The Buck Report agreed with many of the House Report's findings, and specifically

3    cited to Apple's anticompetitive conduct:

4        [T]he report described how Apple transformed itself from a revolutionary hardware
        company that specialized in producing iPods, iPhones, iPads, and Macintosh
5        computers into a company focused on developing software to compete with third-
        party application developers on the App Store. Apple claims to offer the same set
6        of terms and services to all potential app developers, but the subcommittee's
        investigation found that Apple has engaged in harmful practices that preclude
7        competition, including requiring certain competitors to pay a 30 percent surcharge
        for "web development services," while self-preferencing internal products on the
8        App Store and offering internal products as pre-downloaded apps that cannot be
        deleted.

9
        As an example, all new Apple products come pre-loaded with the Apple Music app.
10        Apple Music only requires a $9.99 per month subscription before a user can enjoy
        unlimited streaming music. However, Apple charges major competitors, including
11        Spotify, a 30 percent fee for similar treatment on the App Store. Users are forced
        to pay $12.99 per month for a Spotify membership if they sign up for an account
12        using an Apple device. Similarly, Apple offers the "Find My" application as a free,
        pre-downloaded app on all new Apple devices, while disadvantaging competitors
13        like Tile, Inc.'s device-locating widget and app. Apple also [is] reportedly working
        to build a competing physical hardware token, which will further dominate this
14        emerging marketplace.

15    157.    And in proposing reforms, the Buck Report notes how Apple and other large tech

16    platforms engage in "[m]onopoly leveraging[,]" where "a firm with monopoly power in one

17    market uses its established power in that market to monopolize or threaten to monopolize a second

18    marketplace."  The Buck Report agreed that "[t]he majority correctly identifies that Apple,

19    Amazon, Google, and Facebook have used their market-dominant positions to expand into new

20    business lines[.]"  The Buck Report also indicated that Apple engages in predatory pricing:

21    "Apple's self-preferencing tactics on the App Store come to mind. Apple uses its control of the

22    App Store to institute a 30 percent surcharge on certain competitors, allowing Apple to offer its

23    home-grown suite of apps for a lower price than competing apps."  The Buck Report further agrees

24    that the House Report "rightfully identifies that Big Tech firms maintain vitally important

25    platforms for digital commerce. Apple and Google maintain market-dominant application and e-

26    commerce stores[.]"

27    158.    Additional written statements submitted to the Subcommittee provided further

28    context for complaints against Apple.

159.    Written testimony for the House by Laura Bassett and John Stanton (*HuffPost*/*Buzzfeed*) discuss how Apple monetizes news and how it hurts the original media outlets' ability to do so: "Apple is leveraging its iPhone and Mac users to roll out its own news subscription product, Apple News+.  Sadly, this product undercuts the subscriptions sold by existing publishers while Apple takes 50 percent of the revenue."  Apple also imposes sign-in requirements that negatively affect how news platforms can monetize their own content because it degrades their ability to track data, while giving Apple more data: "These changes are not about whether data on users will be collected.  Rather, they are about who does the collecting.  In these instances, the changes simply consolidate more data in the hands of the tech giants."

160.    Ajintha Pathmanathan ("Pathmanathan"), CEO and founder of ClinIQ, a health screening and contact tracing company that offered COVID-19 contact tracing and other services, submitted written testimony detailing how Apple hampered ClinIQ's app in favor of its own apps.  She wrote, "Apple has refused to even allow us to test our app via TestFlight, their platform usually available to app developers to help with beta testing.  With Apple, we cannot update our app from the first version, which remains on their App Stores, to the latest version that has critical security fixes."  Furthermore, "Apple made baseless assertions about the risks of our application and neglected to clarify when we . . . sought additional information[.]"  Despite these accusations "[i]n the midst of the review process, Apple and Google both launched competitor products to ClinIQ, including Project Baseline, the Apple COVID screening app and the Apple and Google Exposure Notification System."  Yet, "Apple has not removed the first version of our application, a version that contains the same functionality and design they have deemed unsuitable, from their App Store."

161.    Pathmanathan further testified in writing, "Beginning in March 2020, Apple inundated ClinIQ with an inordinate amount of questions as part of the review process for our app in an attempt to overwhelm and discourage our small team which, as a start-up, is limited in its resources. . . .  [E]very time we responded to a series of onerous questions, Apple would return with more questions that increased in complexity, invasiveness, and/or scale.  Apple made additional requests over telephone calls that seemed to have no legal or medical basis[.]"  These

requests appeared to be motivated by Apple seeking to bolster its rival app: "For instance, Apple asked us for specific information on how ClinIQ performs screening, for us to list every bit of evidence, disclose our algorithm and how we have digitised the contact tracing process—two features crucial to a competitor service provided by Apple."  Furthermore, "[c]ertain questions appeared designed to compel ClinIQ to use Apple and Google systems, including requests from Apple that we transition to using the joint Apple-Google contact tracing framework.  Our integration with Apple's competing system should have no bearing on whether ClinIQ can be listed on the App Store, and yet Apple's question suggested that ClinIQ's approval could be conditional on it."  Another indication of Apple's true motivation was that "[i]n the midst of the review process, Apple and Google both launched competitor products to ClinIQ, including Project Baseline, the Apple COVID screening app and the Apple and Google Exposure Notification System."  She concluded, "Apple and Google's scrutiny appears to be targeted specifically at ClinIQ and the VirusIQ public health project, suggesting they pick apps at their own discretion for a higher degree and misapplication of scrutiny.  As discussed with various independent bodies, we believe Apple and Google view us as a legitimate threat – given our early success and FDA clearance – to their market dominance.  As such, they have taken steps to systematically exclude our app from their marketplaces.  This has dissuaded us from pursuing a direct-to-consumer business model, potentially causing hundreds of thousands of dollars in lost potential revenue, loss of opportunity to further our development and to save lives."  Furthermore, "[r]estricting access to our app not only damages us and helps Apple and Google consolidate power and eliminate their competition in the digital health space, but it also harms the American public in two key ways: 1) it prevents the public from accessing a digital health tool providing timely and critical personal health risk assessments, and 2) it favors access to inferior, competitor products developed by Apple and Google, which have minimal experience in healthcare."

162.    Basecamp (project management software) CTO and co-founder David Heinemeier Hansson, in his written testimony, also testified as to Apple's monopoly power over apps like his, by first making apps a necessity for a functioning business and then by exploiting that necessity with its IAP requirement, anti-steering provisions, and 30% commission:

When Basecamp got started in 2004, providing our application over the open web was the best way to reach consumers. Today, the walled gardens of mobile application app stores are at least as important as that open web, and for many businesses and people, even more so.

. . .

The [Apple and Google app] stores are not optional, if you want to offer a modern software package like ours. We could not continue to be competitive in our market, if we did not offer Android and iOS applications along with our web-based system. But in order to sell software through this duopoly, businesses are required to hand over 30% of their revenue for the privilege! 30%! Most mobsters would not be so brazen as to ask for such an exorbitant cut, but this has been the going rate that Google and Apple have settled on, and it has been stable for years.

Contrast this to the fees that Basecamp must pay to transact in the highly competitive market of credit card processing. There we basically pay around 2% to process a payment, and there are countless competitors constantly trying to win our business by offering lower rates. Credit card processing is a competitive market, and the rates show. Mobile application stores are not a competitive market, and the rates show.

In the case of Apple's App Store, the indignity does not end with the exorbitant cut they ask to process payments. If you choose to opt out of this regime (as we have done at Basecamp, despite it putting us at a competitive disadvantage and being less customer friendly), you are subject to a truly draconian set of rules as to how you can talk about your business.

Apple denies us the ability to sign up trial customers through our iOS app, since we've chosen to take our payment processing to the competitive market of credit card processors. The application essentially has to appear as a speakeasy bar, where you're only let in, if you're already a member.

And if we dare to mention that it's possible to sign up for our service using the open web, Apple's retaliation is swift and brutal. They will simply ban our app from the App Store, until we comply. We've had this happen to us, and it's happened to countless other software makers as well.

The trick is to walk the thinnest possible line, contorting the language to nudge and to wink at customers that it's possible to sign up on the web, without actually telling them outright. This is more art than science, and your ability to get away with such winks and nudges is largely determined by which App Store reviewer you're assigned, and whether you're a small or a large company.

. . .

[T]he rules are often interpreted differently by different reviewers, because they're intentionally left vague. So we live in constant fear we may have violated these vague rules, and that the next update to our applications will be blocked by Apple.

163.    In written responses from Cook, he acknowledged that Apple does not charge commissions for its own apps, stating that "this would be an artificial accounting exercise that would make little economic sense[,]" thus acknowledging that Apple has an inherent pricing

1    advantage.

2    164.    Kirsten Daru, Chief Privacy Officer and General Counsel at Tile, submitted written

3    testimony in both the House investigation that culminated in the 2020 House Report and in the

4    April 2021 Senate hearing devoted to examining app ecosystem dominance.

5    165.    In her 2020 written testimony, Daru described how Apple's relationship with Tile

6    turned from beneficial to adversarial once Apple began to develop competing products and

7    software. Tile makes "software and hardware . . . that help[] people find lost or misplaced items.

8    In particular, Tile sells devices that attach to items like your keys, wallet or purse and also embeds

9    its finding software into 3[rd] party products. All Tile-enabled devices are compatible with the

10   Tile app, which provides a simple user interface enabling customers to find their items." Much of

11   Tile's business revolves around partnerships "with some of the biggest technology companies in

12   the world to integrate our software into their own products—including Bose, Hewlett-Packard,

13   Google, Amazon and, importantly, Apple." Tile's app is in the App Store and starting in 2015,

14   Apple sold Tile's devices in its stores. Indeed, "[i]n 2018, Tile sent an engineer and a designer to

15   Apple's headquarters to help develop a feature where Siri could help consumers find their Tiles

16   with their voices. That feature was showcased on stage at Apple's biggest annual event, its

17   Worldwide Developers Conference (WWDC)."

18   166.    But beginning in 2019, Daru testified, Apple's relationship with Tile "took an

19   ominous turn." First, in April 2019, "reports started surfacing that Apple was launching a

20   competitive 'Tile-like' hardware product and was enhancing its 'Find My iPhone' app into

21   something more resembling our service." Then, in June 2019, "Apple informed us that they would

22   no longer be carrying our products in their stores." Afterwards, "Apple . . . hired the Tile engineer

23   we sent to help them develop the Tile/Siri integration featured at WWDC." In September 2019,

24   Apple's iOS 13 updates "introduced a host of concerning changes.

25       • It introduced a new FindMy app that competes even more directly with Tile;

26       • It made it difficult for consumers to enable their Tile devices. They did this by
27         burying required permissions (called 'Always Allow') deep within the iOS
          settings;

28

59

- Once permissions are enabled, Apple also began sending frequent prompts encouraging our customers to turn them off, causing customer frustration and implying that Tile shouldn't be trusted[.]"

167.    While Apple imposed these additional restrictions on Tile and other third-party apps, "permissions for Apple's native location services—including FindMy—are activated by default as part of 'Express Settings' during iOS installation.  And Apple surfaces neither reminders of FindMy's data collection, nor prompts for its customers to disable it.  These changes increased the 'friction' a user faces when initializing and using third-party apps, while simultaneously decreasing the relative friction for (and transparency of) Apple's own location tracking services."

168.    Apple's advantage, Daru wrote, is even greater because "Apple owns and controls the hardware, the operating system, retail stores and the App Store marketplace, upon which third[-]party app makers like Tile rely.  For instance, FindMy is also installed natively on Apple hardware—to the exclusion of competing apps—and can't be deleted.  This not only gives Apple significant control over the ecosystem but also gives Apple access to competitively sensitive information, including the identity of our iOS customers, subscription take rates, retail margins and more."

169.    Daru also complained about how "Apple's new line of iPhones also include a technology called Ultra Wide Band (or UWB) which can enhance the Tile finding experience.  While reports of Apple's competing hardware devices include leveraging UWB for Apple's own benefit, Apple has given us no indication that they will enable Tile to leverage the technology for its consumers."

170.    Furthermore, around when the new iOS updates occurred, according to Daru, "Apple began aggressively bidding on our branded search terms, serving what look like *Tile* advertisements, and driving customers to the iOS app store."  [Emphasis in original].

171.    Daru also detailed how multiple outreaches to Apple's development team and senior executives were futile, and it was only in response to negative publicity that Apple began to make any kinds of commitments to Tile and other developers, which have to date not been fulfilled:

We've brought our concerns to Apple's attention in a number of ways.  Over the course of several months, we filed what are called "Radars" with Apple, engaged

60

with Apple's developer relations team and sent emails to Apple executives. Our CEO, along with the CEOs of seven other similarly situated tech companies, sent a letter to Tim Cook outlining our concerns. It was only after the *Washington Post* ran an article on November 26 bringing some of these practices to light that Apple contacted us to let us know that the company would eventually restore the "Always Allow" consumer option sometime in 2020. Many other concerns remain unaddressed, we don't know if we will [] have access to UWB technology on iOS, Apple's aggressive search term bidding has resumed and we still don't know when in 2020 permissions will be restored for our customers. Moreover, we don't know what changes will be coming next.

172.    In summary, Daru wrote:

Apple's iOS 13 changes had the practical impact of making it more difficult for consumers to use our products than Apple's own. The iOS changes degraded the user experience for our customers, who must now navigate deep within their settings to enable their Tile products to function and gives users the impression that Tile's services should not be trusted. These changes caused and continue to cause confusion among our customers and result[ed] in a material decline in the efficacy of our products. Apple's advertising practices increased our cost of advertising and affected its efficacy. All of these changes occurred during the most critical time of the year for Tile – draining our engineering resources and forcing us to develop a new onboarding experience with no prior consultation or meaningful notice.

173.    In oral testimony, at the January 2020 hearing, Daru elaborated, "It is like playing a soccer game." "You might be the best team in the league[, b]ut you are playing against a team that owns the field, the ball, the stadium, and the entire league, and they can change the rules of the game in their own favor at any time."

174.    In April 2021, Daru again testified in front of Congress, this time at a Senate hearing, in which she made clear that Apple's conduct towards Tile had only grown worse. In written testimony, Daru explained:

I was honored to testify before the House Judiciary Committee, Antitrust Subcommittee in early 2020 about Tile's experience with Apple. Tile was gratified when the House Majority and Minority Reports later that year validated nearly all of the concerns we had expressed, coming to the conclusion that Apple's exploitation of its dominance over the app ecosystem provides it with an anticompetitive advantage over Tile.

Fast forward to now, and things are worse. Far worse. Apple's anticompetitive conduct has continued unabated despite the House findings, despite our many attempts to work with all levels of Apple's organization to find solutions.

Today, we are here to tell the rest of our story; a story that has far reaching implications for the future of app innovation and consumer choice. These implications all stem from Apple's ongoing abuse of its platform dominance to put competitors at a sharp competitive disadvantage, and specifically include:

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

- Apple's propensity to replicate apps on its platform, with access to competitively sensitive data garnered through its platform and app store operation to build optimal competing software;

- Apple's intent to create a closed ecosystem that "hooks" consumers in and deprive them of choice;

- Apple's rampant self-preferencing of its own apps and services (while replicating competitors and/or denigrating the user experience of competitive apps) to artificially restrain or prohibit competition by reserving information and technology for use in its own products; and

- Apple's demonstration that it will not change its anticompetitive behavior absent regulatory intervention.

. . .

We acknowledge that Google has the same power in its own app market, although our experience to date suggests that in the App Store context, Google has thus far exercised its dominance in a more benevolent manner.

. . .

[Since 2019, a] number of things happened unexpectedly in short succession that were uncharacteristic of our relationship [with Apple] to date, and signaled the anticompetitive challenges ahead:

- Reports started surfacing that Apple was going to release a competing software and hardware product;

- In the midst of planning our Apple store assortment for the 2019 holiday period, we were summarily and without explanation kicked out of all physical Apple stores;

- Apple hired away one of our star engineers who had been required to be on site at Apple for an extended period to co-develop the Tile/Siri integration that had been revealed during WWDC;

- Shortly thereafter, a new FindMy app was introduced with iOS13 that included Tile-like features.  FindMy is installed by default as part of its operating system on all Apple phones, and cannot be deleted;

- At the exact same time that it was tying this new finding capability to its operating system, Apple made changes to its operating system that denigrated our user experience, in sharp contrast to their new capabilities that had been seamlessly integrated into its operating system;

- Apple started sending Tile customers confusing prompts encouraging our customers to essentially turn off Tile.  No corresponding prompts to turn off FindMy were sent to Apple users;

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

- Tile invested significant development cycles to address the unexpected issues caused by Apple's changes and attempted to engage with the company's leadership to no avail.

. . .

In response to the [January 2020 House] hearing, Apple announced that they would reverse course on some of the changes that negatively impacted Tile (i.e. by bringing the "Always Allow" prompt back to the initial permissions set up).

. . .

Apple did not follow through on this commitment.

Later in 2020, when the House reports regarding their investigation of Big Tech were released, we were gratified that the House agreed with and validated each and every one of our antitrust concerns. We were hopeful that Apple would make changes to address the House's concerns.

Apple did not.

. . .

Since Tile's testimony, Apple has continued to exploit its market power in its own favor to the detriment of Tile. For example:

- Instead of restoring the "Always Allow" permission to the first launch of the app, Apple made further changes to our user flow that only added confusion and required our engineers to spend several cycles addressing.

- After we explained that we fit within exceptions to their requirement to use Apple's in-app purchase mechanism for our digital subscription (and thus are not subject to the 30% Apple payment processing fee), they disagreed *for reasons that aren't in their guidelines*.

- Apple announced their competing hardware product, AirTags, available April 30.

- Apple AirTags will use a technology called Ultra-Wide Band (UWB) which can enhance the finding experience by adding additional precision. Whereas Bluetooth can tell you which room an item is located in, UWB can tell you precisely where it is in that room. Apple has not given Tile access to the technology to use for the benefit of its customers, despite repeated requests.

- AirTags will also use a seamless onboarding flow that allows connection to phones without even opening the FindMy app. This flow is unavailable to competing products[.]

- Apple otherwise continues to ignore our suggestions for a level playing field.

Most importantly though, Apple has slowly unveiled its true intentions: to enhance

its closed ecosystem by edging out rivals at the app level in the finding space. The recently launched "FindMy Network Accessory Program" was originally couched in the media as a pro-competitive concession to Tile's concerns, whereby third parties like Tile could enjoy the same rights and privileges as Apple's FindMy App, including access to Apple's "Finding Network" (i.e. encrypted location data from Apple's installed base of iOS devices that are using [B]luetooth to locate devices not otherwise connected to the internet via [Wi-Fi] or cellular connections). But the fine print reveals something VERY different:

- A condition of consumers getting the benefit of the Apple Finding Network is that we abandon our own finding network and app and direct our users to Apple's FindMy App to locate missing items.

- To add insult to injury, in order to enjoy the "benefits" of the Apple Finding Network, competitors have to agree to one-sided terms contained in the MFi (Made for iPhone) Agreement whereby we give Apple unprecedented control over our business. In fact, we were told recently that we needed to sign this agreement to even get up-to-date information about what the program entails. Unfortunately, we can't reveal the details of the agreement because Apple considers it "Confidential Information" protected by our non-disclosure agreement.

The bottom line is that the FindMy Network Accessory Program deprives customers of the <u>choice</u> to use the same data and APIs used by Apple for FindMy to power Tile features. Apple could easily grant Tile customers access to that same data if they were interested in fair competition. [Emphasis in original].

In other words, Apple has once again exploited its market power and dominance to condition our customers' access to data on effectively breaking our user experience and directing our users to FindMy. To be clear, this move ***disincentivizes*** competition at the app level. And it's working. One competitor, Chipolo, has already announced that its newest devices will be available ***exclusively within FindMy***. [Emphasis in original].

Furthermore, joining the FindMy Network Accessory Program would break the interoperability that ensures our customers have a seamless finding experience no matter what technology they choose to invest in. It would break our user experience, render some of our features inoperable and render our customers unable to ***choose*** to use FindMy data to enjoy the unique features and interoperability of Tile. And this is relevant to Apple's true intentions. [Emphasis in original].

As the House Antitrust Subcommittee's investigation reveals, Apple gives its own products and services a leg up over the competition and builds features into its products and services that can only be realized if you pair it with other Apple products. For example, Apple's public APIs default to Apple's pre-installed applications. As a result, when an iPhone user clicks on a link, the webpage opens in the Safari Browser, a song request opens in Apple Music, and clicking on an address launches Apple Maps.

In the context of the Epic litigation, an Apple employee admits that their goal is to create a closed ecosystem that "locks" consumers in and makes it hard to leave. FindMy Friends is in fact mentioned as an app that is part of that strategy, designed by Apple to work exclusively with iOS. Tile is the antithesis of that vision, believing in an open Internet and enabling consumers to seamlessly move across

64

consumer platforms.  With that in mind, it's not surprising that Apple has done an about face and used its market dominance to disadvantage Tile.

. . .

Apple owns and controls the entire commercial iOS ecosystem.  They own the hardware, the operating system, the retail stores and the app store marketplace. This gives Apple access to competitively sensitive information, including identity of our iOS customers, subscription take rate, retail margins and more.  And Apple's control over the ecosystem generally enables it to identify any successful app category and take it over by manipulating the ecosystem to give itself a sharp competitive edge.

Apple has done this in one way, shape or form to categories like screen time apps, flashlight, news, email apps and music, to name a few.  And all the while, these smaller competing app developers line Apple's pockets with as much as thirty percent of their digital revenue to help fuel more anti-competitive behavior.

[Emphasis in original].

175.    Other executives relayed similar experiences at the April 2021 Senate hearing. Match Group, Inc.'s Chief Legal Officer ("CLO"), Jared Sine ("Sine"), testified, in writing, about how Google and Apple programmed users to look for apps but then have used their stranglehold on their respective app ecosystems to impose a 30% "tax" on independent developers:

[T]he pandemic provided Apple and Google the opportunity to double down on the stranglehold they have created over app developers and consumers alike through our smartphones.  Think of the number of daily activities that not coincidentally now require apps, from banking to streaming and ebooks to online fitness classes – and the pandemic has only amplified and accelerated this need.  Just ask the fitness app ClassPass, whose business went viral during the pandemic and then Apple came calling for their cut.

Apple and Google have used their monopoly-controlled smartphone platforms to redirect the meritocracy of the free, competitive, and innovative information superhighway – where the best ideas won and consumers voted with their traffic – to run primarily through the iron fist of their app store monopolies.  They have systematically programmed users to seek out the "app for that" which has resulted in the fact that if you do not have an app, you might as well not exist.

. . .

At the heart of this strategy to control both developers and consumers is the requirement that app developers use Apple's and Google's often inferior in-app payment services – think of a credit card processor – for which Apple and Google charge a 30 percent tax.

But don't take my word for it.  The late Apple CEO Steve Jobs devised this strategy. Back in 2010, Apple grew wary that it was far too simple for users to switch between iOS and Android devices because app developers were allowing users to buy services directly from them that could be readily accessed on either platform. His directive was simple: "Let's force them to use our . . . payment system." . . . This was the precise moment in time when Apple came up with its mandatory IAP

65

policy.  There is no mention by Apple of safety, security, or privacy.  Just a desire to fight off competition by locking in users and developers.

. . .

A few years back, Match had entered into an agreement with . . . T-Mobile to offer a discount to T-Mobile users.  This discount would be provided through the iOS "T-Mobile Tuesdays" app, by providing a discount code that would link to the recently launched Tinder website.  When Apple learned about this arrangement, they blocked the version of the T-Mobile Tuesdays app, asserting that the link to Tinder's website violated T-Mobile's requirement to use Apple's in-app pay system.  Think of it, Apple was so hellbent on maintaining their monopoly grip on Tinder's consumers and app that they blocked T-Mobile's app, forcing T-Mobile to break its contract with us.

. . .

These monopoly activities harm both app developers and consumers in many ways, all of which have a corrosive impact on innovation and our economy; however, I ask the Committee to specifically look at the following:

1. **The app store "tax"** – Today, instead of "*there's an app*" for that, Google and Apple's practices could better be described as "***there's a tax for that***."  Both companies now levy a 30 percent tax on every digital transaction increasing costs on both consumers and developers alike.  For Match these app store fees are our fastest growing and our single largest expense – soon eclipsing half a billion dollars annually.

2. Apple's and Google's in app payment rules force users to hand over massive treasure troves of their most sensitive user data to Apple and Google, which these Tech Giants can use to enrich their own products, or develop their own competing digital services (nearly overnight) and charge 30 percent less than everyone else.

   We have seen them do this again and again, from ebooks to streaming services and child safety apps to most recently fitness services.  Apple and Google will tout the fact that 85% of the apps in the app store only pay the annual $99 developer fee, and in fact, Apple and Google allow these other apps to use their own payments services.  **If mandatory in-app payment was truly about security, it would stand to reason that every business would need to use it**.

3. **Safety is actually harmed in the current system**.  Neither Apple nor Google have been willing to help us with even the most basic safety features.  And because of Apple's and Google's stranglehold on consumers and their data, it's difficult for us to conduct even some of the most basic safety checks.  For example, despite our multiple requests over the years, Apple and Google still allow underage users to download our apps, even when they know the individuals are under 18.  Apple and Google actually make it harder for us to keep our users safe.  [Emphasis in original].

1

2   Perhaps most harmful and corrosive is the fact that these monopolistic practices are:

3       4.  **Incentivizing the monetization of selling user data and reducing innovation** – Apple and Google essentially push

4           developers to adopt a less privacy-friendly business model. Additionally, by removing competition in the payment space

5           innovation is harmed.  The app store in app payment structure incentivizes companies to operate more like social media where

6           consumer data is the commodity and monetized.

7   [Emphasis in original].

8       176.  Spotify's Head of Global Affairs and CLO, Horatio Gutierrez ("Gutierrez"),

9   testified extensively as to Apple's anticompetitive conduct.  In his written testimony, he detailed:

10  The explosion in the app economy opens the door to innovation that will confer huge benefits on consumers and our entire society.  But those benefits will not be

11  realized if platforms are allowed to continue to abuse their unprecedented power to interfere with the relationships between third-party app developers and their

12  customers—which is inflicting serious harm on both consumers and competitors. Our economy is changing at internet speed, and legislative action is urgently needed

13  to give antitrust enforcement agencies the tools they need to prevent platforms from consolidating their domination over this critical, vibrant marketplace.

14  . . .

15  [T]he use of mobile apps is exploding and apps increasingly are consumers'

16  preferred method for purchasing an ever-widening variety of goods and services.

17  . . .

18  Apple—which controls the leading mobile app platform—is abusing its complete power over the apps available to owners of Apple devices to hurt consumers.

19  Apple's actions are preventing competition on the merits and imposing rules that unfairly advantage Apple's own services and disadvantage competitors.  If Apple

20  is permitted to continue to unfairly insert itself as a gatekeeper between third-party app developers and their customers, and reap the resulting unjustified profits, other

21  platforms inevitably will follow its lead.

22  . . .

23  Apple's treatment of Spotify provides a case study of Apple's abusive practices. But Spotify's experience is not at all unique: numerous other app developers—that

24  offer on-line gaming, video streaming, access to ebooks, and myriad other applications—have suffered the same treatment.  Indeed, I have spoken with dozens

25  of developers who have looked on with frustration as Apple has engaged in exclusionary and predatory conduct without any accountability.  Many of them are

26  afraid to speak publicly, fearing retribution from Apple that could end their businesses.

27  . . .

28  Spotify offers two basic types of streaming services.  Our "Free," is free to the

consumer but includes advertisements interspersed with the consumer's streaming selections. Our "Premium," offers ad-free music and offline listening and carries a $9.99 monthly charge. Most consumers at first select the Free service, but many—after experiencing the benefits of Spotify's service—switch to Premium in order to take advantage of its benefits.

For the first two years that Spotify's app was in the App Store, Apple did not offer any in-app purchasing functionality for digital subscription services like Spotify. Accordingly, there were no rules preventing Spotify from directing its users to its web site to subscribe to our Premium service directly with Spotify.

Two years later—in 2011—Apple dramatically changed the rules applicable to Spotify's app.

It adopted a new rule requiring Spotify to use Apple's payment processing system, which Apple calls "in-app Purchase" or "IAP," for any in-app payments. And it prohibited links to any payment mechanisms located on the seller's website or anywhere else outside the app. Apple charges 30% of the purchase price for use of this system—an amount dramatically greater than the 3-5% that other payment methods typically charge sellers.

The reason for this new rule was to enable Apple to eliminate competitors for downstream services provided by Apple. That is clear from contemporaneous emails between Steve Jobs and his subordinates:

- In November 2010, Philip Schiller, an Apple executive, reported to Jobs regarding a television advertisement for Amazon's Kindle electronic book reader that depicted a consumer using her iPhone to purchase and then read a book, and then switching to an Android phone and continuing to read the same book. He observed that the ad's primary message was that "there are Kindle apps on lots of mobile devices," but that the secondary message was "that it is easy to switch from iPhone to Android." In a subsequent message the next day, Schiller observed that Apple had anticipated that users typically "would be buying books on a Kindle device and later accessing them on an iPhone," but "more often Kindle app users are purchasing digital books right on their phones" and therefore should be required to use IAP. Jobs responded by suggesting that the appropriate response was that Amazon "must use our payment system for everything[, . . .] If they want to compare us to Android, let's force them to use our far superior payment system."

- In another exchange several months later, Jobs was more explicit: "iBooks is going to be the only bookstore on IOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from IOS without paying us, which we acknowledge is prohibitive for many things."

Spotify at first sought to comply with Apple's new rule by making it impossible for customers to purchase Premium service from a link within the app—and requiring them instead to go to Spotify's website to make such purchases. That artificial arrangement significantly disadvantaged Spotify by making it much more difficult for customers to sign up for Premium service. And Apple repeatedly pressured Spotify to adopt the IAP system, eventually taking the position that Spotify's failure

to incorporate the IAP payment violated its rules even if all purchases took place outside of the app.

In 2013, Apple threatened to ban Spotify from the App Store unless it incorporated IAP into its app. Spotify in 2014 therefore incorporated IAP and—to cover Apple's 30% tax—raised the cost of Premium to $12.99.

It was not a coincidence that at the same time Apple was forcing Spotify to use IAP, Apple (also in 2014) acquired a music streaming service, Beats Music. In 2015—a year after Apple had effectively forced Spotify to increase its price—Apple introduced Apple Music, a streaming service competing directly with Spotify, priced at $9.99. Apple, of course, did not have to bear the cost of the 30% tax it imposed on Spotify.

Spotify recognized that it could not compete with Apple's lower price and in May 2016 eliminated IAP, which required it to forgo any in-app purchases of Premium and any in-app upgrades from Free to Premium. After Spotify removed IAP, it gave app users an opportunity to click on an "Email Me" button that would send an email informing the customer of an opportunity to upgrade to Premium at a discount. Apple unilaterally added new App Store restrictions, barring not only links to outside-app payment services but also any "calls to action that direct customers to purchasing mechanisms other than IAP."

In other words, Apple retroactively outlawed Spotify's defensive move by unilaterally changing the rules that govern the App store. Apple repeated this pattern over the years, broadening its view of prohibited conduct both in the language of its rules and in their abusive enforcement, in order to punish app developers who chose not to implement Apple's IAP.

Spotify is prohibited even from informing its customers about the opportunity to sign up for Premium on Spotify's own website. And Apple interprets this restriction broadly, to prohibit Spotify from advertising promotions in its app (for example, opportunities to sign up for Premium at a discounted price) and, more remarkably, from using non-app communications (such as email) to make such offers to consumers.

The bottom line is that Apple's unfettered and unilateral power to impose its web of restrictions effectively prevents head-to-head competition between Spotify and Apple Music based on consumers' assessments of the quality of the two services. Apple instead has aggressively used its App store policies to handicap Spotify in numerous ways: forcing Spotify to choose between a price increase that would render its offering uncompetitive, and restrictions that make it much more difficult to communicate discount offers and other opportunities and, more generally, anything that would enable customers to purchase its service. One doesn't need a Ph.D. in economics to recognize that Apple is hurting consumers by forcing competitors either to charge higher prices or preventing competitors from communicating offers of discounts or other promotional offers.

Consumers are harmed because they are prevented from making informed choices: Apple deprives them of information relevant to their choice of streaming provider, such as the availability of discounts. And Apple's actions reduce innovation, because Apple's competitors have reduced incentives and financial ability to innovate.

Apple's treatment of Spotify has **not** been applied across-the-board to all apps in its App Store. Rather, Apple singles out apps that compete with Apple's own

69

products—music streaming, video streaming, on-line games, and others. The IAP requirement does not, for example, apply to tickets from Ticketmaster or an airline; a mobile coffee order at Starbucks; every single physical good consumers "buy now" on Amazon's app; food ordered from GrubHub; a ride on Uber; and numerous other apps that do not provide for online delivery of services purchased by the customer.

The reason for this starkly different treatment is clear: Apple is leveraging its App Store power to insert itself as a gatekeeper between these app developers and their customers—and impose added costs and communication restrictions that make Apple's competing downstream services more attractive to those customers. Numerous analysts have explained that the market for Apple devices is saturated and Apple's opportunities for future growth lie in convincing consumers to purchase downstream services like Apple Music. Apple therefore is using its control over the App Store to artificially disadvantage its downstream competitors and to give itself an artificial advantage.

Indeed, one analyst frankly recognized Apple's ability to use its control over hardware devices to succeed in the services market: "Apple has evolved from a hardware company to a platform play that cross sells services into a growing installed base" and "is in a unique position of being able to drive Services growth by leveraging its 1.65 billion active user installed base."

Apple's naked use of its App Store power to disadvantage competitors dwarfs the abuses of market power that have been condemned in the past. For example:

- Standard Oil controlled the price and availability of oil. It did not condition the availability of fuel to purchasers of gas furnaces or automobiles on the payment to Standard of 30% of the purchase price of those furnaces or cars and/or restrict the ability of furnace and car manufacturers to communicate with their customers.

- AT&T was accused of using its power over local telecommunications networks to make it difficult for competing equipment and long distance services providers to access customers. AT&T did not contend that it could condition access to customers on payment of 30% of its competitors' revenues for sales of equipment and long distance services or prevent those competitors from offering discounts or other favorable terms to their customers.

- Microsoft did not demand a 30% cut of all revenues obtained through a Netscape browser or other applications that ran on Windows. And it did not attempt to regulate communications to consumers from the websites reached through the browser or from other applications.

Apple's abuse of power is thus dramatically greater, and reaches far more broadly into the economy, than past conduct that was seen to clearly violate fundamental antitrust principles by [unjustifiably] leveraging market power.

. . .

Apple often accuses developers like Spotify of complaining about App Store terms that we originally agreed to and have been in place already for years. Quite the

1 opposite is true.  In fact, what developers experienced was a classic "bait and
switch."  As I've explained, Apple changed the rules after it had attracted third-
2 party developers and used their innovative products and services to drive sales of
Apple devices.  And it changed the rules in order to increase costs of competitors
3 in downstream markets—thereby preventing competition on the merits.

4 . . .

5 Apple can't seriously contend that its IAP requirement, and associated 30% tax, are
necessary for privacy and security when Apple itself admits that 70% of the
6 applications in the App Store utilize alternative payment systems every day—in
millions of transactions.

7

8 . . .

9 Apple's motivation is clear.  It wants to force consumers to utilize Apple's own
downstream services in order to obtain increased services revenues to compensate
10 for stagnating hardware revenues and also to prevent consumer defections to other
platforms.  Thus, a recently-disclosed statement by an Apple executive observed
11 that consumers were less likely to "leave[] Apple's products once they've bought
apps, music, movies, etc."  Or, as Steve Jobs put it: Apple wants to "tie all of its
12 products together, so [Apple] further lock[s] customers into [its] ecosystem."

13 [Emphasis and alteration in original].

14  177. Daru, Sine, and Gutierrez also confirmed, during oral testimony, Apple's market

15 power in the app ecosystem.

16  178. Daru testified about how Apple's iOS update that installed the improved Find My

17 also got rid of one of Tile's permissions, and Apple also "started sending Tile customers confusing

18 prompts encouraging [Tile] customers to essentially turn off Tile."  For Bluetooth, Tile is by

19 default off but Find My by default is on.  Air Tag does not even require turning on Find My.  This

20 "magic flow" is unavailable to Tile but is available to Apple.  Furthermore, Apple has all of Tile's

21 customer data, which gives Apple a further advantage.

22  179. Daru further testified as to her inability to discuss further details because of Apple's

23 NDA with Tile.  Apple would not commit to waiving the NDA, even in a limited fashion, to allow

24 Daru to offer more specific testimony.  Daru pointed out how Apple's rationale that it was still

25 negotiating terms with other app developers, as a rationale for not waiving the NDA, appeared to

26 be pretextual because Tile was told that the contract form was not negotiable.

27  180. Sine testified as to how Apple's purported "safety" justifications for not sharing

28 Match's own user data with Match actually make things less safe.  For example, Apple will not

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

1  share age information with Match to allow Match to filter out underage users.  Apple also will not

2  share data to help Match run registered sex offender checks to keep them off its platform.

3  Furthermore, Apple has blocked multifactor authentication for Match.

4        181.    Gutierrez also testified orally in more detail about Apple's anticompetitive

5  practices:

> a.   He described Apple's anti-steering provisions as a "gag order" that prevented
>      Spotify from informing its customers of other ways to subscribe to its Premium,
>      ad-free option.
>
> b.   Furthermore, he testified that Apple, itself having experience in the music
>      streaming business, knew how high the costs and low the margins are, thus making
>      Apple's 30% commission and ability to undercut Spotify on pricing by not charging
>      a commission on its own Music app an even larger advantage.
>
> c.   Gutierrez further testified that when Spotify was the top grossing app, Apple told
>      them they would receive no marketing support because it's a competitor, and Apple
>      has "thrown the book at us" because of "our decision to speak up."
>
> d.   Gutierrez testified that Apple takes the position that Spotify's customers are
>      actually Apple's users.
>
> e.   He testified that Spotify's success came "despite" rather than "because of" Apple's
>      conduct.
>
> f.   He also testified that Apple's anti-steering became progressively greater because it
>      would give very restrictive interpretations of rules and then a month later would
>      change the rules.  For example, first Apple refused to allow Spotify to have a button
>      to subscribe elsewhere.  When Spotify instead sought to inform users via e-mail,
>      Apple at first told Spotify that was not permissible under its guidelines, and then
>      about a month later, expressly amended the rules to ban that practice.

**D.    This Court Has Invalidated Apple's Anti-Steering Provisions**

27        182.    In *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640 (N.D. Cal.) (the "Epic Games

28  Action"), Epic Games alleged that Apple engaged in a variety of anticompetitive conduct in its

1  App Store.

> Broadly speaking, Epic Games claimed that Apple is an antitrust monopolist over (i) Apple's *own system* of distributing apps on Apple's *own devices* in the App Store and (ii) Apple's *own system* of collecting payments and commissions of purchases made on Apple's *own devices* in the App Store. . . .  Plaintiff focuses its challenge on Apple's control over the distribution of apps to its users and the requirement that developers of apps use Apple's in-app purchases or in-app payments ("IAP") system if purchases are offered in the app.  Under this IAP system and under its agreements with app developers, Apple collects payments made to developers, remits 70% to the developers, and keeps a 30% commission. This rate has largely remained unchanged since the inception.  The trial also contained evidence of Apple's use of anti-steering provisions to limit information flow to consumers on the payment structure related to in-app purchases.

[Emphasis in original].

183.    Though, ultimately, the Court declined to find liability on the Sherman Act claims, largely because the Court credited Apple's proffered explanation that it needed to maintain security in its own operating system, the Court nevertheless found that Epic Games established that Apple's conduct was anticompetitive.

184.    The Court found that Jobs had "recognized that the 'purpose in the App Store is to add value to the iPhone' and ultimately 'sell more iPhones.'"  Furthermore, the "current Vice President of Developer Relations, Mr. Ron Okamoto, similarly acknowledged that well-known developers make Apple's platforms more attractive to users and lead them to buy Apple devices." Thus, app developers and Apple have a "symbiotic relationship[.]"

185.    Nevertheless, Apple has apparently not budged on its high commission rate.  The Court found, "[f]or all digital purchases, Apple charges a 30% commission and only recently instituted some exceptions.  Moreover, "Apple's establishment of a 30% commission rate has remained static since the onset."  Jobs and Cue, at the time the App Store was established, "recognized that '[t]here wasn't really any kind of App Store' when it first launched,"and, "[i]mportantly, and undisputed, Apple chose the 30% commission without regard to or analysis of the costs to run the App Store."  Meanwhile, "[o]ver time, and given Apple's success, some developers have actively complained about the 30% commission" and several developers have sued for a lower rate, while "Epic Games challenges the levy of *any* commission[.]"  [Emphasis in original].  The Court also found: "

1
2
3
4

> While Apple's 30 percent commission began as a corollary to the 30 percent rate being charged in the gaming industry, the evidence is substantial that the economic factors driving that rate do not apply equally to Apple. Other gaming industry participants operate under a distinctly different economic model, facing different levels of competitive pressure. . . . For example, unlike those in the computer gaming market, nothing other than legal action seems to motivate Apple to reconsider pricing and reduce rates. . . . [O]perating margins [were] over 70%[.]

5       186.    The Court also found that the vast majority of the App Store revenues come from

6    gaming, though they accounted for a minority of the downloads, making this sector particularly

7    profitable for Apple: "Apple has recognized that '[g]ame spend is highly concentrated' among

8    certain gaming consumers. . . . 6% of App Store gaming customers in 2017 accounted for 88% of

9    all App Store game billings and were gamers who spent in excess of $750 annually."

10      187.    With Apple demanding so much on a few high-spending gamers to generate App

11   Store profits, it has a natural incentive to guard against encroachments on that profitability. For

12   example, the Court described how Apple purposely headed off cloud gaming to maintain its own

13   profitability. The Court noted Apple's restrictive guidelines for cloud gaming, where "each

14   streamed app is made available as a separate app on the App Store[.]" The Court further found:

15   "Nvidia, Microsoft, and Google sought to launch their game streaming services as native iOS apps

16   before Apple modified its Guidelines, but all three were rejected by Apple. None of these services

17   chose to subsequently launch separate iOS apps—one per streamed game—as required by the new

18   App Guidelines. Craig Federighi, Apple's Senior Vice President of Software Engineering,

19   testified that there are currently no streaming apps for game apps on the App Store. Apple allows

20   entertainment apps such as video and music apps to stream. The restriction only applies to

21   gaming."

22      188.    The Court also found that "Epic Games raises legitimate concerns regarding some

23   of the consequences of Apple's App Guidelines and its refusal to share control of data absent

24   customer agreement." The Court found that "Apple does a poor job of mediating disputes between

25   a developer and its customer. Consumers do not understand that developers have effectively no

26   control over payment issues and or even access to consumers' information." For example, if a

27   developer wanted to offer a customer a refund, it "must contact Apple or tell the customer to

28   contact Apple, which independently 'evaluate[s] that situation.' Thus, developers lack the ability

1    to provide refunds and have worse customer service as the result." At the same time, "because

2    Apple lacks visibility into the transaction, it has created overly simplistic rules to issue refunds

3    which can also increase fraud." Moreover, "Apple's decision prohibits information from flowing

4    directly to the customer so that customers can make these choices themselves."

5        189.   The Court also found that "Apple sought to compete by distinguishing their

6    product, and in the process, making its platforms 'stickier[.]'" Some of the internal Apple

7    documents that demonstrated Apple deliberately seeking to increase switching costs include:

8            a.   A "2013 email from Eddy Cue to Tim Cook and Phil Schiller recommends using

9                 iTunes discounts (as opposed to device discounts) because '[g]etting customers

10                using our stores . . . is one of the best things we can do to get people hooked to the

11                ecosystem.'" Cue notes, "'Who's going to buy a Samsung phone if they have app

12                movies, etc. already purchased? They now need to spend hundreds more to get

13                where they are today.'"

14           b.   Similarly, in an email from a customer concerning his experiences with Google and

15                Apple devices, he tells Google that "'the #1 most difficult [reason] to leave the

16                Apple universe app is iMessage'" and "'iMessage amounts to serious lock-in.'"

17                Apple executives were forwarded this message and were told "'we hear this a lot.'

18                Phil Schiller then advised Tim Cook that 'moving iMessage to Android will hurt

19                us more than help us[.]'"

20       190.   The Court found: "Using Apple's internal documents[,] the Court is able to

21    calculate Apple's market share at 57.1% in the global *mobile* gaming industry." [Emphasis in

22    original]. The Court further found that "Apple would have 57.6% market share in the global

23    mobile gaming industry in 2020." The Court also found that the world is the relevant geographic

24    scope for the mobile gaming market because "Apple's restrictions appear to be imposed by Apple,

25    rather than by market forces" and "Apple actually treats app distribution as a global enterprise. Its

26    rules and guidelines apply globally to all storefronts, the business development team engages with

27    developers globally, the DPLA applies globally, and the complexity and justification for the

28    complexity of the IAP system is due in large part because of the global nature of the business."

1    The Court carved out China from this definition, though, because "[t]he parties agree that China

2    is different."

3        191.    In addition to Apple's market share, "the Court examines other evidence of Apple's

4    market power in the mobile game transactions market and considers pricing, nature of restrictions,

5    operating margins, and barriers to entry."

6        192.    The Court found, "[a]s an initial matter, as detailed above, the 30% commission

7    was not set by competition or the costs of running the App Store, but as a corollary to other gaming

8    commission rates."  The Court further found, "Apple's initial rate of 30%, although set by historic

9    gamble, has apparently allowed it to reap supracompetitive operating margins. . . .  The choice to

10   not raise that price further is consistent with market power if that price already reflects monopoly

11   levels.  Only rarely has Apple reduced its commission in response to competitive pressure[.]"

12       193.    The Court also found: "Apple uses both technical and contractual means to restrict

13   app distribution.  Technically, Apple prevents unauthorized apps from downloading on the iPhone.

14   It does so by granting certificates to developers; no certificate means the code will not run.

15   Contractually, Apple imposes the DPLA, which prohibits developers from distributing apps

16   outside the App Store."  The Court further found: "These contractual terms are standardized and

17   nonnegotiable—a contract of adhesion.  Only a few developers have succeeded in modifying these

18   terms by threatening to go to other platforms.  Specifically, Spotify and Netflix have removed in-

19   app purchasing functionality from iOS apps.  On the other hand, both Down Dog and Match Group

20   have testified that they have been unable to entice users to other platforms with lower prices."

21   Even though "Down Dog has had better success at offering cheaper subscriptions on the web, . . .

22   Apple's anti-steering provision has prevented it from directing users to the cheaper price."  The

23   Court concluded: "evidence shows Apple's anti-steering restrictions artificially increase Apple's

24   market power by preventing developers from communicating about lower prices on other

25   platforms."

26       194.    The Court further found, with respect to App Store profitability, "in light of all of

27   the evidence, the circumstances of Apple's P&L statements, and Apple's low apparent investment

28   in App Store-specific intellectual property, the Court finds that operating margins are probative of

1    market power. . . .  [T]he App Store operating margins are 'extraordinarily high.'  Thus, even

2    without comparison to other stores, the operating margins strongly show market power."

3    Moreover, the Court found, "Apple cannot hide behind its lack of clarity on the value of its

4    intellectual property.  Not all functionality benefits all developers.  Further, as discussed, Apple

5    has actually never correlated the value of its intellectual property to the commission it charges.

6    Apple is responsible for the lack of transparency and whole-cloth arguments untethered to its rates

7    do not ultimately persuade."

8        195.    The Court also found that while "the evidence is mixed" with respect to barriers of

9    entry, one expert "plausibly opine[d] that entry into the platform business is difficult due to the

10   need to attract both users and developers.  Said differently, developers do not develop for new

11   platforms unless they have a healthy user base, but users only go to platforms that already have a

12   developed ecosystem.  Thus, indirect network effects often dominate and create a 'winner-take-

13   all' system that allows only a few large platforms to survive."  The Court observed that while

14   "[t]he rise of game streaming may allow for competition among platforms on iOS[,]" Apple's

15   restrictive policies had meant that large players—Nvidia, Microsoft, and Google—that had

16   previously sought approval for game streaming apps have not sought to do so again, and that at

17   the time of the post-trial decision no cloud gaming applications were in the App Store.  The "DOJ

18   Action," i.e., *United States v. Apple Inc.*, No. 2:24-cv-04055 (N.D. Cal. filed Mar. 21, 2024),

19   further explained how Apple warded off the threat of cloud gaming streaming apps.

20       196.    Concerning anti-competitive effects of Apple's App Store restrictions, the Court

21   found:

22           a.   "Apple's restrictions foreclose competition for large game developers who have

23                well-known games."

24           b.   "Absent competition, . . . it is impossible to say that Apple's 30% commission

25                reflects the fair market value of its services.  Indeed, at least a few developers

26                testified that they considered Apple's rate to be too high for the services provided.

27                . . . Apple has provided no evidence that the rate it charges bears any quantifiable

28                relation to the services provided.  To the contrary, Apple started with a proposition,

77

that proposition revealed itself to be incredibly profitable and there appears to be no market forces to test the proposition or motivate a change." Thus, "the Court finds that Apple's restrictions on iOS game distribution have increased prices for developers."

197. The Court also indicated that Apple, owing to a lack of competitive pressure, has been slow to innovate in its App Store. The Court cites Apple's developer surveys, which "indicate[] that Apple is not moving quickly to address developer concerns or dedicating sufficient resources to their issues." Moreover, "Apple's own former Head of App Review, Philip Shoemaker, has described the App Store as 'antiquated,' with 'no radical innovation, only evolution' for the last ten years." Furthermore, "developers complain that app review guidelines lack clarity and are inconsistently applied." And "Apple's slow innovation stems in part from its low investment in the App Store." The Court concluded, by Apple precluding competition from third-party app stores, "Apple's restrictions reduce innovation in 'core' game distribution services."

198. The Court found that "app review can be relatively independent of app distribution. . . . [E]ven though unrestricted app distribution likely decreases security, alternative models are readily achievable to attain the same ends even if not currently employed." The Court also rejected Apple's contention that Apple's 30% commission rate is justified by the right to be compensated for its investment in its intellectual property: "[T]he record is devoid of evidence that Apple set its 30% commission rate as a calculation related to the value of its intellectual property rights. Nor is there any evidence that Apple could not create a tiered licensing scheme which would better correlate the value of its intellectual property to the various levels of use by developers. . . . Thus, the Court finds that with respect to the 30% commission rate specifically, Apple's arguments are pretextual[.]"

199. With respect to Apple's IAP system, "there is no evidence that IAP provides developers with any unique features." The Court also was skeptical of Apple's proffered procompetitive justifications, pointing out that, for example, "Apple has not shown how [its payment verification] process is any different than other payment processors, and any potential for

1  fraud prevention is not put into practice."

2  200. The Court concluded, overall: "looking at the combination of the challenged

3  restrictions and Apple's justifications, and lack thereof, the Court finds that common threads run

4  through Apple's practices which unreasonably restrains competition and harm consumers, namely

5  the lack of information and transparency about policies which effect consumers' ability to find

6  cheaper prices, increased customer service, and options regarding their purchases. Apple employs

7  these policies so that it can extract supracompetitive commissions from this highly lucrative

8  gaming industry. While the evidence remains thin as to other developers, the conclusion can likely

9  be extended." The Court further concluded: "More specifically, by employing anti-steering

10  provisions, consumers do not know what developers may be offering on their websites, including

11  lower prices. . . . While some consumers may want the benefits Apple offers . . . Apple actively

12  denies them the choice. . . . Thus, loosening the restrictions will increase competition as it will

13  force Apple to compete on the benefits of its centralized model or it will have to change its

14  monetization model in a way that is actually tied to the value of its intellectual property."

15  201. The Court further examined "issues relating to anticompetitive and incipient

16  antitrust conduct, especially given the anti-steering provision therein." The Court observed: "The

17  market in mobile game transactions has grown dramatically over recent years due to growth in

18  gaming generally, smartphone ownership, and digital transactions as a whole. Apple's

19  commission rate has remained static throughout even though Google, Apple's main competitor

20  (and who also charges a 30% commission rate), does not have the same app distribution

21  restrictions. These facts suggest prices are artificially high given Apple's growing market power

22  and growing demand." The Court concluded: "Apple's app distribution restrictions do have *some*

23  anticompetitive effects. . . . Apple's maintenance of its commission rate stems from market power,

24  *not competition* in changing markets. . . . Apple set its 30% commission rate almost by accident

25  when it first launched the App Store without considering operational costs, benefit to users, or

26  value to developers, that is, both sides of the platform. That Commission has enabled Apple to

27  collect extraordinary profits . . . [with] operating margins [that] have exceeded 75% for years. Yet

28  the 30% commission rate has barely budged in over a decade despite developer complaints and

1  regulatory pressure.  High commission rates certainly impact developers, and some evidence exists

2  that it impacts consumers when those costs are passed on."  [Emphasis in original].  The Court

3  also held, "[w]ith respect to indirect evidence, . . . Apple holds considerable market share, 55

4  percent.  Its restrictions harm competition by precluding developers, especially larger ones, from

5  opening competing game stores on iOS and compete for other developers and users on price.

6  Given this but-for-world, increased competition could result in a reduction of Apple's

7  commissions charged to developers, who could then pass on savings to users.  Competing game

8  stores could compete on features. . . .  Further, competing game stores could provide specialized

9  stores tailored to particular groups and otherwise innovate to meet user and developer needs."

10  202.    The Court concluded that Apple violated the California Unfair Competition Law

11  with its anti-steering provisions.  The Court emphasized:

12  As discussed at length, the evidence presented showed anticompetitive effects and
   excessive operating margins under any normative measure.  The lack of
13  competition has resulted in decrease information which also results in decreased
   innovation relative to the profits being made.  The costs to developer are higher
14  because competition is not driving the commission rate.  As described, the
   commission rate driving the excessive margins has not been justified.  Cross-
15  reference to a historic gamble made over a decade ago is insufficient.  Nor can
   Apple hide behind its self-created web of interlocking rules, regulations, and
16  generic intellectual property claims; or the lack of transparency among various
   businesses to feign innocence.

17

18  203.    Furthermore, the Court cited how "Apple's own records reveal that two of the top

19  three 'most effective marketing activities to keep existing users coming back' in the United States,

20  and therefore increasing revenues, are 'push notifications' . . . and 'email outreach.' . . .  Apple not

21  only controls those avenues but acts anticompetitively by blocking developers from using them to

22  Apple's own unrestrained gain.  As explained before, Apple uses anti-steering provisions

23  prohibiting apps from including 'buttons, external links, or other calls to action that direct

24  customers to purchasing mechanisms other than in-app purchase,' and from 'encourag[ing] users

25  to use a purchasing method other than in-app purchase' either 'within the app or through

26  communications sent to points of contact obtained from account registrations within the app (like

27  email or text).'  Thus, developers cannot communicate lower prices on other platforms either

28  within iOS or to users obtained from the iOS platform.  Apple's general policy also prevents

1  developers from informing users of its 30% commission."  At the same time, "[t]hese provisions
2  can be severed without any impact on the integrity of the ecosystem[.]"

3      204.    The Court also found, "[i]n the context of technology markets, the open flow of
4  information becomes even more critical. . . .  [I]nformation costs may create 'lock-in' for platforms
5  as users lack information about the lifetime costs of an ecosystem.  Users may also lack the ability
6  to attribute costs to the platform versus the developer, which further prevents them from making
7  informed choices.  In these circumstances, the ability of developers to provide cross-platform
8  information is crucial."

9      205.    The Court concluded that Apple's "anti-steering provisions 'threaten[] an incipient
10  violation of an antitrust law' by preventing informed choice among users of the iOS platform. . . .
11  Moreover, the anti-steering provisions violate the 'policy [and] spirt' of these laws because anti-
12  steering has the effect of preventing substitution among platforms for transactions."  [Alteration
13  in original].  Thus, "the Court finds that the anti-steering provisions violate the UCL's unfair
14  prong[.]"

15      206.    Moreover, "Apple created a new and innovative platform [the App Store] which
16  was also a black box.  It enforced silence to control information and actively impede users from
17  obtaining the knowledge to obtain digital goods on other platforms. . . .  Apple has not offered any
18  justification for the actions other than to argue entitlement. . . .  Accordingly, the harm from the
19  anti-steering provisions outweighs its benefits, and the provision violates the UCL under the
20  balancing test."

21      207.    The Court also concluded that "the elements for equitable relief are satisfied" and
22  that it could issue an injunction.  The Court held:

23      While Apple's conduct does not fall within the confines of traditional antitrust law, the
        conduct falls within the purview of an incipient antitrust violation with particular
24      anticompetitive practices which have not been justified.  Apple contractually enforces
        silence, in the form of anti-steering provisions, and gains a competitive advantage.
25      Moreover, it hides information for consumer choice which is not easily remedied with
        money damages.  The injury has occurred and continues and can best be remedied by
26      invalidating the offending provisions.  In terms of balancing, Apple's business
        justifications focus on other parts of the Apple ecosystem and will not be significantly
27      impacted by the increase of information to and choice for consumers.  Rather, this limited
        measure balances the justification for maintaining a cohesive ecosystem with the public
28      interest in uncloaking the veil hiding pricing information on mobile devices and bringing
        transparency to the marketplace.  The Court cannot discern any principled reason for

eliminating the anti-steering provisions to mobile gaming only. The lack of information and transparency extends to all apps, not just gaming apps.

208.    To remedy the UCL violations of the anti-steering provisions, the Court gave Apple a simple order:

> Accordingly, a nationwide injunction shall issue enjoining Apple from prohibiting developers to include in their:
>
>> Apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP.
>
> Nor may Apple prohibit developers from:
>
>> Communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

209.    In a one-page injunction accompanying its post-trial opinion (the "First Injunction"), the Court ordered: "Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ('Apple'), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."

210.    Apple refused to comply immediately with the injunction, but instead appealed the Court's judgment and sought to (and obtained) a stay of the injunction. On April 24, 2023, the Ninth Circuit Court of Appeals ("Ninth Circuit") affirmed the Court's injunction. It also criticized the District Court's finding "that there was no tie [between the App Store and IAP] because app distribution and IAP are not separate products." But the Ninth Circuit held "the district court clearly erred"—"the App Store and IAP clearly can be separated because Apple *already does* so in certain contexts, namely that IAP is not required for in-app purchases of physical goods." [Emphasis in original].

211.    Despite facing a final legal mandate, and a simple order, Apple continued to refuse to obey the injunction. Rather than a flat-out refusal, Apple resorted to a form of what some

commentators call "malicious compliance," where Apple "complied" in a narrow, literal sense, but put up so many roadblocks that it in effect did not comply. Worse, Apple executives knew what they were doing. After about a year of this behavior, Epic Games was forced to sue to enforce the injunction. When the Court initially heard Epic Games's arguments, it was alarmed by Apple's litigation conduct, including overbroad privilege redactions and withholding documents from discovery, and thus, the Court ordered additional discovery and an additional, more detailed evidentiary hearing in late 2024. The Court grew more and more troubled and, on April 30, 2025, issued a detailed, scathing decision explaining why it was ordering Apple to immediately comply with a second injunction (the "Second Injunction").

212. In its April 2025 decision, "the Court **FINDS** Apple in willful violation of this Court's 2021 Injunction which issued to restrain and prohibit Apple's anticompetitive conduct and anticompetitive pricing. Apple's continued attempts to interfere with competition will not be tolerated." [Emphasis in original].

213. The Court further noted, "[b]y way of background, after a May 2021 trial between Epic Games and Apple, this Court issued a 180-page order which, in part, enjoined Apple's conduct impeding competition with respect to in-app and out-of-app purchases. On April 24, 2023, in a 91-page order, the Ninth Circuit affirmed. On January 16, 2024, the Supreme Court declined review. The next day, the Injunction issued."

214. The Court expressed: "Apple's response to the Injunction strains credulity. After two sets of evidentiary hearings, the truth emerged. Apple, despite knowing its obligations thereunder, thwarted the Injunction's goals, and continued its anticompetitive conduct solely to maintain its revenue stream. Remarkably, Apple believed that this Court would not see through its obvious cover-up (the 2024 evidentiary hearing). To unveil Apple's actual decision-making process, not the one tailor-made for litigation, the Court ordered production of real-time documents and ultimately held a second set of hearings in 2025."

215. The Court further summarized Apple's obstructive conduct and rationale:

*One*, after trial, the Court found that Apple's 30 percent commission "allowed it to reap supracompetitive operating margins" and was not tied to the value of its intellectual property, and thus, was anticompetitive. Apple's response: charge a *27 percent commission* (again tied to nothing) on off-app purchases, where it had

previously charged nothing, and extend the commission for a period of seven days after the consumer linked-out of the app. Apple's goal: maintain its anticompetitive revenue stream. *Two*, the Court had prohibited Apple from denying developers the ability to communicate with, and direct consumers to, other purchasing mechanisms. Apple's response: impose *new* barriers and *new* requirements to increase friction and increase breakage rates with full page "scare" screens, static URLs, and generic statements. Apple's goal: to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream. In the end, Apple sought to maintain a revenue stream worth billions in direct defiance of this Court's Injunction.

216.    The Court further found:

In stark contrast to Apple's initial in-court testimony, contemporaneous business documents reveal that Apple knew exactly what it was doing and at every turn chose the most *anti*competitive option. To hide the truth, Vice-President of Finance, Alex Roman, outright lied under oath. Internally, Phillip Schiller had advocated that Apple comply with the Injunction, but Tim Cook ignored Schiller and instead allowed Chief Financial Officer Luca Maestri and his finance team to convince him otherwise. Cook choose poorly. The real evidence, detailed herein, more than meets the clear and convincing standard to find a violation. The Court refers the matter to the United States Attorney for the Northern District of California to investigate whether criminal contempt proceedings are appropriate.

[Emphasis in original].

217.    The Court concluded:

This is an injunction, not a negotiation. There are no do-overs once a party willfully disregards a court order. Time is of the essence. The Court will not tolerate further delays. As previously ordered, Apple will not impede competition. The Court enjoins Apple from implementing its new anticompetitive acts to avoid compliance with the Injunction. ***Effective immediately*** Apple will no longer impede developers' ability to communicate with users nor will they levy or impose a new commission on off-app purchases.

[Emphasis in original].

218.    The Court emphasized that:

[The Court] found that "Apple's initial [commission] rate of 30% . . . has apparently allowed it to reap supracompetitive operating margins.". . . The rate was a historic relic not tied to intellectual property. Further, there was no actual commission charged for link-out transactions, then or in the past. The Court focused on Apple's anti-steering provisions, finding . . . that a "remedy to eliminate those provisions is appropriate.". . . The remedy, notably, would "not require the Court to micromanage business operations which courts are not well-suited to do as the Supreme Court has appropriately recognized.". . . However, the Court warned that, with respect to Apple's commission rate, "Apple cannot hide behind its lack of clarity on the value of its intellectual property. Not all functionality benefits all developers. Further, . . . **Apple has actually never correlated the value of its intellectual property to the commission it charges**. Apple is responsible for the lack of transparency and whole-cloth arguments untethered to its rates do not ultimately persuade.". . . ([E]mphasis supplied).

219.    The Court summarized Apple's January 2024 notice of compliance with the First Injunction, and noted that this compliance consisted of three components: (1) "New policy charging developers 27% on link-out purchases instead of IAP's 30%"; (2) "Various restrictions on the manner and mode of communicating with customers which were distinctly less user-friendly than those otherwise allowed"; and (3) "Exclusions on the concurrent participation in other programs that offered discounted commissions[.]"

220.    The Court then recounted how Epic Games moved to enforce the injunction and hold Apple in contempt about two months after Apple purported to comply.  Then, as the Court held a six-day evidentiary hearing over six days in April and May 2024, "[a]s testimony unfolded, and Apple attempted to justify its response, the Court became increasingly concerned that Apple was not only withholding critical information about its business decision for complying with the Injunction, but also that it had likely presented a reverse-engineered, litigation-ready justification for actions which on their face looked to be anticompetitive.  The Court immediately ordered Apple to produce all injunction-compliance related documents . . ., and referred all discovery matters to" a magistrate judge.

221.    But "Apple engaged in tactics to delay the proceedings.  The Court later concluded that delay equaled profits.  By September 30, 2024, Apple represented that it had produced around 89,000 documents out of the 1.5 million it had reviewed and expected to produce a few thousand more by October 7, 2024. . . .  Apple, however, had asserted privilege over more than a third of responsive documents."  After the magistrate judge "largely found Apple's privilege claims to be unsubstantiated after reviewing eleven exemplar documents[,]. . . Apple used this decision to delay further and 'offered' to re-review all 57,000 documents for which it claimed privilege in full or in part.  Ultimately, Apple withdrew approximately 42.1% of its privilege claims.  Although Apple now tries to recast its re-review as 'of its own accord,' that framing belies the reality that the documents should have never been withheld in the first instance."

222.    The Court further determined, "Apple's production positions, after its dissembling at the evidentiary hearing, revealed that delay worked to its advantage."  The Court then held three more days of evidentiary hearings in February 2025.

223.   The Court systematically dismantled the justifications for Apple's "five categories of changes" that Apple purported it implemented to comply with the Court's First Injunction: "Apple imposed (A) a 27% commission on link-out purchases, (B) new external purchase link placement and design restrictions, (C) requirements that induce purchase-flow friction, (D) limitations on developers' ability to use calls to action, and (E) exclusion of certain programs utilized by large developers from the Link Entitlement."

224.   Concerning (A), the Court noted that Apple had not allowed "linked-out purchases," i.e., those "made off the Apple platform, but from which a consumer can leave the platform using a link on the app[,]" but because of the First Injunction, Apple would now charge a commission for such purchases.  But "under the revised Guidelines, Apple not only charges developers 'a 27% commission,' but also expanded the scope of the commission requirement by demanding a 27% commission on digital goods and services transactions that take place on a developer's website upon immediate use of the link, *and* payment for any 'digital goods and services transactions that take place on a developer's website within *seven days after a user taps through* an External Purchase Link . . . to an external website."  [Emphasis in original].  The Court further found, "Apple hid its decision-making process from the Court only to have it uncovered at the second evidentiary hearing in 2025[.]"

225.   The Court cited to internal documents discussing how to comply with the First Injunction in the days after it issued in September 2021 (and before the injunction was stayed pending appeal).  There, just three days after the First Injunction issued, "discussions began about the specific rate and under what circumstances a commission on external purchases should be charged, if any.  Notes of a meeting that day describe three options for how to charge a commission and focused on linked-out purchases already required in Korea:" (1) "Do nothing but allow the separate payment methods in"; (2) "Charge an alternative commission but audit"; and (3) "Charge on a different metric (downloads/redownloads) but cuts into different set of developers than we do today."  And even though the meeting was ostensibly about requirements in Korea, "the notes indicate that 'YGR's opinion needs to be taken into account; charging for commission – is it fine to do?!' and 'YGR's decision – are we in a different place?  Commission is ok under YGR but

1   decision stated to allow Devs to link out to other payment methods.'"  "YGR" stands for Yvonne

2   Gonzalez Rogers, the judge who adjudicated the Epic Games Action.  Based on these initial

3   deliberations within Apple, "the Court finds it was immediately apparent to the Apple working

4   group that the commission issue, including whether and how much, was core to compliance with

5   the Injunction.  Given the nature, length, and content of the Injunction, on which Apple is on

6   notice, both constructive and actual, the working group's view is hardly surprising."

7       226.   Apple's compliance efforts, first termed "Project Michigan," which "appears to

8   have ceased" when the Ninth Circuit issued its stay of the First Injunction in December 2021, and

9   then was "renewed . . . under the codename 'Wisconsin,'" were "hidden from the Court and not

10  revealed until the 2025 hearing."

11      227.   The Court then described a May 18, 2023 meeting, which concerned "[a]n internal

12  presentation [that] proposed two options for achieving compliance with the Injunction":

13          a.   "*Proposal 1* would include *no* commission but would restrict the placement and

14              appearance of links in purchasing flows. . . .   The 'Key Risks' identified with

15              Proposal 1 include that the proposal: '[d]iverges significantly from existing and

16              future approaches'; '[c]reates new in-app channel for developers without

17              commission'; and '[r]equires Apple to review against multiple new policies and

18              restrictions'; and that '[r]eview cannot prevent all policy evasion, but will allow for

19              remediation.'"  [Emphasis in original].

20          b.   "*Proposal 2*, by contrast, permitted display placement '[a]nywhere, including

21              merchandising page,' with '[n]o restrictions' on pricing language but *would* include

22              a '[d]iscounted commission' of 3% off its prior 30% rate, i.e., a 27% commission.

23              . . .   Key risks identified with Proposal 2 included that: the '[c]urrent approach to

24              collections is manual and will not scale'; and it was '[d]ifficult to estimate impacts

25              of non-economic developer rationales (e.g. value of direct customer relationship).'"

26              [Emphasis in original].

27      228.   The Court further found, "[d]ocuments revealed that Apple believed Proposal 1's

28  no-commission model would 'be very attractive to developers,' 'cause a lot of developers to adopt

1  the link[-]out options,' and 'would create competitive pressure on IAP,' which in turn 'would drive

2  . . . spend outside of the app.'"  The Court further found, Senior Director of Business Management

3  Carson Oliver ("Oliver") "acknowledged, and understood, that creating this competitive pressure,

4  which Apple identified as a key risk factor of Proposal 1, was one of the goals of the Injunction."

5  Oliver also acknowledged an internal "concern that if Apple adopted a no-commission approach

6  on link-outs in the United States, it would be harder to justify a commission elsewhere in the

7  world."

8       229.    Furthermore, the Court found:

9       Apple also considered the revenue impact of the commission and no-commission
        models, under various customer adoption scenarios.  Under Proposal 1's no-
10      commission model, Apple anticipated that most large developers and potentially
        many medium and small developers would offer link-out purchases to their users. .
11      . .  As a result, Apple estimated a revenue impact of hundreds of millions to billions
        under the no-commission model for customer adoption ranging from 10% to 25%.
12      . . . .  By contrast, and importantly, for Proposal 2, Apple anticipated that a linked-
        out option subject to a 27% commission, at most, might only be attractive to the
13      largest developers. . . .  Specifically, the presentation focused on potential adoption
        by only the top 10 and 50 largest developers with 20% to 50% adoption, indicating
14      potential revenue impact of tens of millions. . . .  In short, Apple estimated, and
        both Messrs. [Phillip] Schiller [head of the App Store and Apple Events] and Oliver
15      acknowledged, that as of May 2023 the revenue impact of a no-commission option
        with placement restrictions (Proposal 1) posed a significantly larger hit to Apple
16      than the impact of a 27% commission option without placement restrictions
        (Proposal 2).

17

18      230.    Moreover, the Court emphasized, "[u]ltimately, Apple's 2024 response to the

19  Injunction was the most anticompetitive option: a link entitlement program that included *both* the

20  placement restrictions of Proposal 1 *and* the 27% commission from Proposal 2."  [Emphasis in

21  original].

22      231.    The Court further found:

23      [I]n May 2023, Apple through Oliver and others received feedback from Bumble,
        a large, well-known developer on Apple's and Google's alternative billing
24      programs. . . .  Bumble specifically advised Apple that "[p]ayment processing fees
        average out significantly higher than the 4% fee reduction currently offered by
25      Google in the [user choice billing] program or [the] 3% fee in Apple's . . . solution
        resulting in negative margin for developers." . . .  In other words, Bumble explained
26      to Apple that a "3% discount" was not economically viable for a developer because
        the external cost of payments exceeds 3%.  Apple's own internal assessment from
27      February 2023 reflects data meriting the same conclusion—that the external costs
        of payments for developers on link-out purchases would exceed Apple's 3%
28      discount if it demanded a 27% commission rate.  [Thus,] [t]he evidence uncovered
        in the 2025 hearing demonstrated Apple's knowledge and expectation that the

88

1  restrictions would effectively dissuade any real developer participation, to Apple's
2  economic advantage.

3      232.    The Court then described a June 1, 2023 meeting, attended by Cook, Schiller,
4  Oliver, Luca Maestri (the CFO), and Matthew Fischer ("Fischer") (former manager of the App
5  Store) to discuss "'Epic Injunction Implementation.'"  A meeting presentation "estimated revenue
6  impacts to Apple based on potential commission discount (3%, 5%, 7.5%) and link-out billings
7  share (10-60%). . . .  For the section of the chart covering 3% and 5% discounts, no revenue impacts
8  were listed.  Notably, the chart simply notes that it '[m]ight not be economically viable for
9  developer to shift' at those rates, irrespective of the link-out billings share.'"  The Court further
10  found, "[c]rucially, at this point, Apple's notes reflect uncertainty about whether it could in fact
11  impose a commission without violating the Injunction.  In one slide deck, Apple's notes explain
12  that '[i]f we decided *and had the ability* to charge a commission, we believe there would be very
13  little developer adoption of link-out, assuming a scenario where we would give a cost of payments
14  discount at 3%.'. . .  ([E]mphasis supplied).  Those same notes indicate that Apple planned to
15  '[c]ome up with a couple of models in the spectrum of what we think the judge will accept' but to
16  '[s]tart with the minimum.'"  The Court found, "Apple's knowledge and consideration of these
17  issues was hidden from the Court and not revealed until the 2025 hearing."

18      233.    The June 1, 2023 meeting was followed by another meeting on June 13, 2023,
19  which included further discussions of linked-out commission options, which included "Option A
20  . . . the 'Standard Commission Discount,' under which 'Apple would discount the commission on
21  link-outs based on cost of payments[,]'" an "Option B" with "a 'Time-limited, Discounted
22  Commission,' where 'Apple would charge a discounted commission for 1 year and then 0%
23  thereafter[,]'" and "Option C proposed a 'Flat Affiliate Fee,' where 'Apple would charge a flat fee
24  per customer tap-through on an in-app link-out[,]'" and where Apple employees insisted that a
25  "'30% commission [was] fair and defensible' even though this Court and the Ninth Circuit had
26  already found the rate was 'supracompetitive.'"  Again, the Court found: "Apple's knowledge and
27  consideration of these issues was hidden from the Court and not revealed until the 2025 hearing."

28      234.    The Court summarized a June 20, 2023 meeting: "[p]rior to the June 20 meeting,

there were individuals within Apple who were advocating for a commission, and others advocating for no commission. . . .  Those advocating for a commission included Mr. Maestri [the CFO] and Mr. [Alex] Roman [a finance executive]. . . .  Mr. Schiller disagreed. . . .  In an email, Mr. Schiller relayed that, with respect to the proposal for 'a 27% commission for 24 hours,' 'I have already explained my many issues with the commission concept,' and that 'clearly I am not on team commission/fee.' . . .  Mr. Schiller testified that, at the time, he 'had a question of whether we would be able to charge a commission' under the Injunction, a concern which he communicated. . . .  Unlike Mr. Maestri and Mr. Roman, Mr. Schiller sat through the entire underlying trial and actually read the entire 180-page decision.  That Messrs. Maestri and Roman did neither, does not shield Apple of its knowledge (actual and constructive) of the Court's findings."  Furthermore, "[a] businessperson at Apple explained the team's current thinking in a June 15, 2023 email and reveals a core decision.  Apple has chosen not to value its intellectual property (the opening allowed by the Court in its Order) and does not want to relinquish its hold on this revenue stream."  Indeed, this executive appeared to believe that trying to peg a value for the commission would "implicitly devalu[e] our IP / proprietary technology."  The June 20, 2023 presentation emphasized how a 27% linked-out commission "would generate more revenue" than not having a commission, and "documents revealed that not only would Apple generate more revenue, it would lose minimal to none: as Apple's earlier financial modeling had indicated, because developers' external costs will exceed 3% when utilizing linked-out transactions, Apple's 27% commission on linked-out transactions renders every linked-out transaction more expensive to a developer than an IAP transaction at 30% commission."

235.    The Court found, "[d]espite the fact that the Court now has evidence that Apple investigated the landscape, knew how it would harm developers, and understood it would not comply with the goal of the Injunction, Apple nonetheless determined at the June 20, 2023 meeting that it *would* charge a commission on link-out purchases,  although it had not yet decided what that commission would be."  [Emphasis in original].  Again, the Court stressed, "Apple's knowledge and consideration of these issues was hidden from the Court and not revealed until the 2025 hearing."

236.    The Court then described a June 28, 2023 meeting that Cook, Maestri, Schiller, Fischer, and Oliver attended, also regarding implementing the First Injunction.  In this meeting, the range of linked-out commissions being considered ranged from 20%–27%, and while the consensus appeared to hover around 20%–23%, Maestri pushed for 27%.  The Court again emphasized, "this was hidden from the Court and not revealed until the 2025 hearing."

237.    The Court discussed a July 5, 2023 meeting of the "Price Committee," which included Cook, Maestri, and Schiller, where they made the final determination as to what commission to charge linked-out payments: "At the meeting, Apple settled on a 27% commission for linked-out purchases, a decision ultimately made by Messrs. Cook, Maestri, and Schiller. . . . As Mr. Schiller was not advocating for a commission, and Mr. Maestri was fully advocating for the lucrative approach, Mr. Cook was the tie-breaker. . . .  Commissions would be collected on a seven-day window, even if those subsequent purchases on a developer's website were made on a device other than the user's iPhone."  The Court concluded, "[t]hus, in response to the Injunction, Apple chose to impose a new commission representing the most anticompetitive option considered (Primary and Overarching Finding No. 1)."  And, the Court again emphasized, "Apple's knowledge and consideration of these issues was hidden from the Court and not revealed until the 2025 hearing."

238.    The Court did not give credit to a study done by Analysis Group, dated January 2024, that purported to justify the 27% commission.  The Court pointed out, "[n]o references to the study appear in any of the materials upon which Apple relied in its meetings leading up to its July 5, 2023 decision to impose a 27% commission, although the presentation for that July 5, 2023 meeting does refer to an AG report."  The Court further observed, "[d]espite its own considerable evaluation, during the first May 2024 hearing, Apple employees attempted to mislead the Court by testifying that the decision to impose a commission was grounded in AG's report."  The Court singled out "[t]he testimony of [Alex] Roman, Vice President of Finance, [which] was replete with misdirection and outright lies.  He even went so far as to testify that Apple did not look at comparables to estimate the costs of alternative payment solutions that developers would need to procure to facilitate linked-out purchases."  Rather than credit Apple's version of events, "[t]he

1  Court finds that Apple *did* consider the external costs developers faced when utilizing alternative

2  payment solutions for linked out transactions, which conveniently exceeded the 3% discount Apple

3  ultimately decided to provide by a safe margin."  [Emphasis in original].  Furthermore, the Court

4  determined, "Apple *did not* rely on a substantiated bottoms-up analysis during its months-long

5  assessment of whether to impose a commission, seemingly justifying its decision after the fact

6  with the AG's report."  [Emphasis in original].

7       239.    The Court further criticized Roman for "testify[ing] that up until January 16, 2024,

8  Apple had no idea what fee it would impose on linked-out purchases[,]" which the Court called

9  "[a]nother lie under oath: contemporaneous business documents reveal that on the contrary, the

10  main components of Apple's plan, including the 27% commission, were determined in July 2023."

11       240.    The Court further determined: "Neither Apple, nor its counsel, corrected the, now

12  obvious, lies.  They did not seek to withdraw the testimony or to have it stricken (although Apple

13  did request that the Court strike *other* testimony).  Thus, Apple will be held to have adopted the

14  lies and misrepresentations to this Court."  [Emphasis in original].

15       241.    The Court also found: "Apple's restrictions on link placement and design come in

16  two flavors: (i) where Apple limits placement of links for a linked-out purchase in the purchasing

17  flow, and (ii) whether Apple permits a 'button'-style link."

18       242.    The Court also found: "[a]s outlined earlier, in May 2023, Apple initially

19  considered two program proposals.  Proposal 1 would include *no* commission but would restrict

20  the placement and appearance of links in purchasing flows. . . .  As far as link placement, this

21  generally means that if an app displays something for purchase, an IAP buy button could be placed

22  next to that item, but the link-out option would have to be placed on another page in the app. . . .

23  Proposal 2, by contrast, permitted display placement '[a]nywhere, including merchandising page,'

24  with '[n]o restrictions' on pricing language but *would* include a 27% commission."  [Emphasis in

25  original].

26       243.    The Court determined that "the juxtaposition of the two proposals indicates that

27  Apple considered imposition of a commission a trade off with the placement and appearance of a

28  link."    The Court noted, "[d]uring testimony, Apple pushed back on the 'trade off'

1  characterization."  The Court was skeptical of this testimony: "Yet, the side-by-side proposals

2  evidence that the link placement and restriction served as an explicit offset to a lack of commission.

3  Further, the June 1, 2023 presentation confirms that connection: in discussing one proposal, Apple

4  indicates that, '[s]*ince* we are charging a commission, the link could be placed once per page,

5  including alongside IAP.' . . .  Notes of the meeting further confirm as much: 'If you want to

6  charge a commission, you have to give them better placement,' but '[i]f you don't charge a

7  commission, you need to lock it down to a plain url link and internet style "button."'"  [Emphasis

8  in original].  "The notes also indicate the business team was tasked 'to define the 2-3 scenarios

9  where we can limit the ruling where Tim [Cook], Phil [Schiller], and Legal are comfortable with.'"

10  244.  The Court was skeptical of how Oliver testified as to his lack of understanding of

11  what "limit the ruling" meant; instead, "the Court finds that the obvious inference to draw from

12  these statements collectively is that, absent a commission, placement restrictions would 'lock [the

13  app] down' to protect Apple from an anticipated loss of revenue which would naturally spring

14  from the competition the Injunction sought to stimulate."

15  245.  Furthermore, the Court found, "[t]he June 20, 2023 presentation evidenced, and

16  thereby confirmed, the same trade-off discussed above.  Option 1 had no fee but included 'more

17  stringent restrictions on style and placement,' specifically, the link would be '[o]nce per page,'

18  '[n]ot on same page as Apple IAP buy flow,' and a '[p]lain link or button.' . . .  Option 2, by

19  contrast, imposed a '[c]omission or flat fee' but permitted a '[d]eveloper-styled link or button' and

20  allowed the link to be on the same page as the Apple IAP buy flow."  Furthermore, "[a]s to Option

21  1, the presentation explains that the 'share of billings linking-out . . . will depend where is the text

22  and language developers are allowed to use.' . . .  As Mr. Schiller acknowledged, the more

23  restrictive Apple became on its suggested placement, format, and language of a link that a

24  developer uses for a linked-out transaction, the less likely those links would be seen and used. . . .

25  More to the point, the more restrictive Apple's rules about how developers can format links, the

26  lower a developer's link-out share and adverse impact on Apple's revenue."

27  246.  The Court determined: "Here again, Apple ultimately chose the most aggressive,

28  *anti*competitive option, namely to take the more restrictive elements of both options: Apple

93

1    charged a commission as in Option 2, and it imposed the more restrictive link placement and design

2    requirements of Option 1 (Primary and Overarching Finding No. 2)." [Emphasis in original].

3    247.    The Court explained, "[f]riction in transactions matter. Apple modelled the revenue

4    impact of a no-fee link-out purchase scenario based on breakage (i.e., percentage of purchases

5    where a user fails to complete a link-out transaction) and the developer's link-out share (i.e.,

6    percentage of purchases diverted from IAP to a developer's external payment system). . . .

7    Specifically, Apple's sensitivity analysis projected revenue impact where breakage ranged from

8    0%–25% and where link-out share ranged from 10%–50%. . . . The speaker notes indicate that,

9    '[b]eyond [Redacted]%' breakage, 'developers reach a tipping point where they lose more on

10   linking out than they would sticking with Apple IAP and the higher commission.'" Thus, Apple

11   at an early stage was trying to create the most breakage, by introducing difficulties for linking out,

12   to disincentivize developers from offering alternatives to its ecosystem.

13   248.    The Court further determined, "[a]s early as the July 5, 202[3] price committee

14   meeting, the evidence is compelling that Apple had decided upon combining the most restrictive

15   aspects of the June 20, 2023 proposal: impose both a commission *and* restrictions on link

16   placement and design. . . . The link entitlement required developers to adhere to the following

17   restrictions: '[l]anguage and design must follow templates'; '[o]ne URL per app'; '[l]ink can only

18   be displayed once in an app, on an app page user navigates to (not an interstitial, modal, or pop

19   up), and can't persist when user leaves page'; '[l]ink can not be displayed on any page that is part

20   of an in-app flow to merchandise/initiate an IAP.' . . . Messrs. Cook, Schiller, and Maestri were

21   the ultimate decisionmakers 'about what they felt was [an] acceptable' level of risk to cabin the

22   Injunction's effect in terms of link placement and design." [Emphasis in original].

23   249.    The Court also found, consistent with that goal: "Consistent with the July 5, 2023

24   price committee meeting presentation, Apple's final Link Entitlement program requires that an

25   external link '[n]ot be displayed on any page that is part of an in-app flow to merchandise or initiate

26   a purchase using in-app purchase.' . . . That restriction presents serious problems for developers'

27   ability to compete with Apple's IAP and Apple knew it." On the stand, the Court observed, Fischer

28   admitted after repeated pressing "that the requirement would be more profitable for Apple and less

1  profitable for developers."  The Court also observed, "Mr. Schiller acknowledged, the most useful

2  time for a user to know their purchase options is when the user is in the in-app store reviewing

3  prices. . . .  However, that is precisely when Apple instructs developers that they *cannot* share

4  alternative purchase information with users."  [Emphasis in original].

5  250.    The Court noted how "Apple claimed that restrictions on link placement protect

6  against 'security risks.'"  But the Court held, "Again, Apple attempted to mislead."  The Court

7  goes on to describe, "Mr. Schiller asserted that having an external link appear on the same page as

8  IAP can increase the risk of a user's exposure to fraudulent conduct. . . .  No real-time business

9  documents credit that view.  Mr. Schiller acknowledged that Apple does not permit developers to

10  include an external link in an app under the Link Entitlement unless Apple first reviews and signs

11  off on the link. . . .  Apple can sign off on an external link regardless of whether it was placed in

12  the IAP purchase flow or elsewhere in the app. . . .  The link itself would be the same, and the only

13  difference would be a user's perception and potential confusion. . . .  The confusion, Mr. Schiller

14  explained, is that a user 'may not understand which purchase method is not in-app purchase and

15  which isn't.' . . .  Yet, as Apple has structured the program, a user would nonetheless understand

16  the external link directs them outside the app by virtue of Apple's scare screen informing them of

17  such and the link's appearance as a hyperlink to an outside web page. . . .  Confusion is not a

18  security risk.  Given the lack of any document identifying this alleged concern, the Court finds

19  these justifications pretextual; said differently, the proffered rationales are nothing more than after-

20  the-fact litigation posturing or outright misrepresentations to the Court."

21  251.    Furthermore, the Court found, "[a]s to external link design, Apple's internal

22  materials reflect awareness that the Injunction requires that '[d]evelopers must be able to . . . format

23  these prompts as buttons or other calls to action, not just blue HTML links.' . . .  Yet, the Link

24  Entitlement prohibits what consumers would expect to see as a button. . . .  The *only* button Apple

25  permits under its guidelines is what it refers to as the 'Plain Button style,' which 'may not be

26  enclosed in a shape that uses a contrasting background fill,' but rather the 'background surrounding

27  text must match the background of [the] app's page.' . . .  A 'link out icon provided by Apple must

28  be displayed directly to the right of [the] website URL' and 'must visually match the size of the

1    text.'"  [Emphasis in original].

2    252.    The Court also highlighted how "[t]he June 20, 2023 presentation highlights

3    Apple's self-created distinction between a 'link' or 'button.'  Option 1, which did not include a

4    commission or fee, presented the following options for a 'plain link or button' style":



14    253.    The Court observed, "[n]othing about either example appears to be a 'button,' by

15    the ordinary usage and understanding of the word.  There is, certainly, an external-link icon next

16    to the call to action and hyperlink, but Apple strains to call either of these strings of text a 'button.'"

17    254.    The Court contrasted the above "button" with "Option 2, which would include a

18    commission, presented the following '[d]eveloper styled link or button'":

28    255.    The Court added, "Apple's witnesses acknowledged that the plain-link-style

96

'button' is the least visually prominent of the button styles that Apple's guidelines provide:



256.     The Court added further, "[u]nderstanding that developers use visually prominent buttons to attract users to click on a link (as recommended by Apple in other contexts), Apple's own witness Mr. Fischer testified that he could think of no other reason to require developers to use a plain-link-style 'button' other than to stifle competition."

257.     Furthermore, the Court noted that while Schiller "attempted to reverse course on this admission," Apple's documents made the admission: "At the end of the day, Apple's internal documents reflect the underlying motivation to stifle competition by cabining developers' ability to attract users to alternate payment methods: 'How much can we limit what devs do with the text and links?'"

258.     The Court also highlighted how, "Apple understood, and used to its advantage, that the more friction in a purchase flow, the more breakage a developer faces. . . .  [T]o stifle competition, Apple was modeling the tipping point where external links would cease to be advantageous for developers due to friction in the purchase flow."  To that end, the Court held, "[t]wo aspects of Apple's Link Entitlement in particular increase purchase-flow friction for users attempting to conduct an external purchase outside of Apple's IAP: deploying a scare screen and requiring static URLs."

259.     The Court found, "Apple deployed a warning message, referred to as a 'scare screen,' to deter users from using third-party payment options.  Apple does not require developers selling *physical* goods to display any warning at all before users proceed to make a payment with a third-party payment solution. . . .  By contrast, Apple now requires developers selling *digital*

97

goods to display an '[i]n-app system disclosure sheet' when a user links-out to a third-party payment solution[.]"  [Emphasis in original].



260.    The Court further found, "[t]wo months after the Injunction issued, Apple began evaluating options for its warning screen.  In an appendix to a draft November 15, 2021 Apple presentation, Apple details three different '[w]arning Options,' involving escalating levels of warning messages, presumably as exemplars to show customers as part of the link-out flow under consideration."



261.    The Court characterized the images as: "The screen on the left is called a 'link,' where the user would simply be taken directly to the external site. . . .  The middle screen is called a 'dialogue,' which generates a small pop-up after a user clicks on an external link that communicates to the user they are leaving the app. . . .  The screen on the right is called a 'sheet,' which is a full screen takeover after the user clicks on an external link."

262.    The Court determined, "[a]gain, Apple chose the most anticompetitive option, namely the full screen takeover. . . .  (Primary and Overarching Finding No. 3)."

263.    Internal communications, the Court found, buttressed the point: "In Slack communications dated November 16, 2021, the Apple employees crafting the warning screen for Project Michigan discussed how best to frame its language. . . .  Mr. [Rafael] Onak suggested the warning screen should include the language: 'By continuing on the web, you will leave the app and be taken to an external website' because "'external website" sounds scary, so execs will love it.' . . .  From Mr. Onak's perspective, of the 'execs' on the project, Mr. Schiller was at the top. . . .  One employee further wrote, 'to make your version even worse you could add the developer name rather than the app name.' . . .  To that, another responded, 'ooh - keep going.'"

264.    The Court determined, "[a]gain, Apple decided on the most anticompetitive option, that is, the 'even worse' option of including the developer's name rather than the app name (Primary and Overarching Finding No. 4)."

265.    The Court also emphasized, "[a]ll of this was hidden from the Court and not revealed in the May 2024 evidentiary hearings."

266.    Furthermore, "[f]rom 2021 to 2023, while this Court's Injunction was stayed, Apple employees also worked on warning screens for similar compliance requirements imposed in other jurisdictions, including the Netherlands and Japan."  Furthermore, after Schiller pushed back against "In App Messaging – link out" that merely told a user they would "continue," another "employee confirmed that '[w]e updated the title and the copy to be super clear on what is about to happen and have more of that warning tone.'"

267.    The Court also observed that at a March 15, 2022 "meeting to discuss the warning screen for the Netherlands and Japan response," those "developing the warning screen language"

1  who sought to implement Schiller's feedback "discussed how to make the language 'scarier.'"  The

2  Court expressed skepticism when Apple exec Rafael Onak sought to explain away "scary" as a

3  "term of art" and instead concluded: "Mr. Onak's testimony was not credible and falls flat given

4  reason, common sense, and the totality of the admitted exhibits.  The designers' discussions

5  contextualize their use of the word 'scary' to indicate its ordinary meaning and, most applicable

6  here, indicate the goal of deterring users as much as possible from completing a linked-out

7  transaction.  Apple repeatedly acted to maintain its revenues and stifle competition.  This was no

8  exception.  His attempts to reframe the obvious meaning of these communications do not persuade.

9  All of this was hidden from the Court and not revealed in the May 2024 evidentiary hearing."

10      268.    Furthermore, the Court found: "[a]fter the June 20, 2023 meeting regarding this

11  Court's Injunction, Apple decided that it would implement a full screen warning after users click

12  on an external link, regardless of which commission option was ultimately selected."  Moreover,

13  "[a]t the meeting, Mr. Cook 'asked the team to revise the customer warning screen . . . to reference

14  the fact that Apple's privacy and security standards do not apply to purchases made on the web.' .

15  . .  The team updated the warning screen, sent it to Mr. Schiller for approval, and returned the

16  revised copy to Mr. Cook on June 23, 2023. . . .  The updated warning screen changed a sentence

17  from 'You will no longer be transacting with Apple' to 'Apple is not responsible for the privacy

18  or security of purchases made on the web.' . . .  As Mr. Goldberg's notes reflect, the idea discussed

19  was that this '[i]nterstitial . . . tells ppl [sic] its dangerous and they are leaving the app store.'"

20      269.    The Court found that a "presentation for the June 28, 2023 meeting reflects Mr.

21  Cook's revision . . . and is included in the final version of the warning screen that Apple adopted.

22  . . .  This 'system disclosure sheet' pops up for every single user that clicks on an external link,

23  and for every single instance that clicks on any external link, not just the first time. . . .  Further,

24  these chilled consumer conduct, especially given the use of other informative 'warning screens,'

25  like those asking to track a user's activity across companies' apps and websites."

26      270.    The Court also found that Apple required developers to use static as opposed to

27  dynamic URLs, i.e., a link that specifies a place a user would be sent to versus a URL where the

28  destination can change and where information such as user identification or geolocation can be

embedded in.  Epic Games explained that "static URLs can introduce friction in a purchase flow where dynamic URLs do not.  Increased friction decreases competition."  This is due to the greater functionality of a dynamic versus static URL: "For instance, a dynamic link can identify the user and automatically log that user into their account after clicking the link. . . .  For a static URL, however, a user would have to log in before making a purchase."

271.    The Court noted, "as with the other restrictions . . . , Apple claimed the static URL requirement protects users' security and privacy."  The Court was skeptical: "Yet, despite these concerns, developers can program dynamic links for any other propose—Apple in general only prohibits the use of dynamic links for external links for link-out purchases. . . .  In fact, 'any app that's connected to the internet doing anything nontrivial is going to have to use dynamic URLs.' . . .  Thus, . . . '[i]f dynamic URLs are a security risk, then 'all of iOS is a security risk because the platform gives you every ability to make Internet requests with dynamic URLs.'"

272.    Moreover, the Court held, "Apple understood well that breakage increases with additional friction in the purchase flow . . . and capitalized on that option."  The Court found that Bumble had told Apple in May 2023 that just one additional step in Google's three-screen system resulted in a drop-off rate for customers in a linked-out transaction.

273.    The Court determined: "[a]gain, here, the Court finds that Apple chose the most anticompetitive option to reduce the efficacy of external link-outs that compete with IAP (Primary and Overarching Finding No. 5)."

274.    Furthermore, the Court found: "[u]nder the final component of the Link Entitlement program, Apple prohibits developers from using calls to action other than the text of external links. . . .  Even when using an external link, a developer 'must match the template language' that Apple provides—e.g., the 'purchase template' requires a develop[er] to say 'Purchase from the website at www.example.com[.]' . . .  That statement—one of five templates which constitutes the external link for a link-out—is the entirety of the call to action that developers may use."

275.    Furthermore, "[a] developer cannot use words beyond those provided in the templates to communicate with users about external purchase availability. . . .  If a developer wanted to compete on price not by offering lower prices but by offering other products or benefits on the web, there is no way to communicate that to a user in-app. . . .  Apple is aware that, absent these restrictions, developers *would* like to include calls to action directing users to their websites, including through text without a link if the developer can do so without paying a commission to Apple."  [Emphasis in original].

276.    The Court found that Apple employees had internally considered other options, but recognized "that unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites."  Instead, the Court determined, "Apple chose the most anticompetitive option (Primary and Overarching Finding No. 6)."

277.    The Court additionally found that Apple also sought to discourage certain media app developers, who had negotiated lower commissions than the standard 30%, from linking out, by removing their eligibility for the lower commission (known as the Video Partner Program, "VPP," and the News Partner Program, "NPP") if they link out.  Apple had originally considered, in December 2022, whether the European Union's Digital Markets Act ("DMA") might change its business model, and noted that "VPP and NPP 'can serve as a tool for retaining developers exclusively on Apple IAP.' . . .  This is because the effect of losing program benefits—the lower

102

commission rate—makes choosing alternative payments more costly given the commission rate increases to Apple's standard IAP commission."

278.    The Court then found, "Apple repurposed its EU analysis for the June 28, 2023 presentation regarding this Court's injunction. . . .  This time, no reference is made to how the exclusion can serve as a tool for IAP retention, noting instead that excluding VPP and NPP developers from the Link Entitlement '[r]equire[s] participants to maintain high bar of user experience and ecosystem integration aligned with partner program goals' and there would be a '[l]imited number of developers impacted.' . . .  At the same time, Apple believed that very large developers like those participating in VPP and NPP were the most likely to use linked purchases if Apple charged a commission. . . .  Apple acknowledged that excluding these developers from the program would deter adoption of link-out purchases in the United States, because link-outs would be much more costly due to the commission rate doubling from 15% to 30%."  Furthermore, "[t]o underscore this reasoning, the presentation for the June 20, 2023 meeting with Mr. Cook provides data projecting that Apple would lose more revenue if developers participating in VPP or NPP were still eligible for program discounts."

279.    The Court also found: "Apple workshopped how to articulate the rationale for VPP and NPP program exclusion from the Link Entitlement.  Notes from a June 26, 2023 Project Wisconsin meeting indicate that Mr. Vij was slated to present on 'Program Eligibility' and that the team wanted a 'more nuanced way to write our positioning here,' floating the idea that they 'want to maintain a high bar of user experience for participants.' . . .  Yet, on June 28, 2023, Mr. Vij messaged Mr. Oliver that he thought 'our argument on vpp npp is weak' and acknowledged '[o]n VPP and NPP the argument on the high bar can be made with the discount as well.'"  Nevertheless, "even though the program eligibility slide in the June 28, 2023 presentation was pulled from the EU presentation that indicated VPP and NPP exclusion could serve as an IAP retention tool, the slide used for Project Wisconsin presents Mr. Oliver's rationale instead and scrubs any mention of the retention benefits for excluding VPP and NPP."  The Court determined, "[h]ere too, Apple chose the most *anti*competitive course."  [Emphasis in original].

280.    The Court also determined: "Finally, under the Link Entitlement, Apple reserves

1    the right in its sole discretion to revoke a link entitlement at any time. . . .  This rule targets external

2    links mandated by the Injunction—Apple permits developers to include links to external websites

3    for non-transaction purposes without applying for an entitlement or obtaining permission from

4    Apple. . . .  Apple does *not* require developers who sell physical goods or services to apply for any

5    type of entitlement before their app links to a third-party payment solution."  [Emphasis in

6    original].

7        281.    The Court found, "[a]s of the May 2024 hearing, only 34 developers out of the

8    approximately 136,000 total developers on the App Store applied for the program, and seventeen

9    of those developers had not offered in-app purchases in the first place.  In May 2024, Apple argued

10   that it would take more time for developers to take advantage of the Link Entitlement and that the

11   adoption rates could not be known."  But the Court held "Apple attempted here to mislead."

12   Rather, "[g]iven the revelations of the February 2025 hearing, Apple modeled the lack of

13   adoption."

14       282.    The Court concluded: "That Apple adduced no testimony or evidence indicating

15   developer adoption of the program is no surprise. . . .  Apple knew it was choosing a course which

16   would fail to stimulate any meaningful competition to Apple's IAP and thereby maintain its

17   revenue stream."

18       283.    The Court rejected Apple's argument that it followed the letter of the First

19   Injunction and was not required to deduce its spirit: "*First*, it is ludicrous to expect any court to

20   repeat the contents of a 180-page order issued in conjunction with a simultaneously issued one-

21   paragraph injunction.  The latter flows from the former.  To suggest otherwise strains credulity.

22   *Second*, even limited to the four corners of the Injunction, Apple violated the literal text.  *Third*,

23   contrary to Apple's position, other courts within this and other circuits will look to the spirit of the

24   injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly

25   where that interpretation is designed to evade the injunction's goals. . . .  *Fourth*, Apple's approach

26   would require courts to effectively engage in a 'whack-a-mole' game to require compliance. . . .

27   *Fifth*, Apple's arguments that the Court did not enjoin Apple's commission ignore explicit findings

28   in the Injunction.  Most importantly, this Court, and the Ninth Circuit, found Apple's 30%

commission on IAP transactions was supracompetitive and unjustified." [Emphasis in original].

284.    Furthermore, "[c]rucially, no commissions had ever existed on external link-out purchases. That is undisputed. Apple's *new* attempt to change this 'zero commission' rubric are evaluated under the terms of the Injunction. While true that the Court did not select a rate, the Court is authorized to evaluate Apple's response to the Injunction as based on its Primary and Overarching Findings." [Emphasis in original].

285.    Thus, the Court concluded: "the evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction. In fact, despite numerous opportunities, not once did Apple choose a path that would have shown compliance." [Emphasis in original].

286.    The Court further emphasized, "Apple's conduct lacks any justification: it does not comport with the text of the Injunction, requires a strained and questionable interpretation of that language, completely ignores this Court's 180-page Injunction and the Ninth Circuit's 91-page opinion, and prompted lies on the witness stand." Furthermore, while "[t]he law requires that Apple be on notice of the scope of permissible conduct to hold Apple in civil contempt[,] Apple was." The Court determined: "at every step Apple considered whether its actions would comply, and at every step Apple chose to maintain its anticompetitive revenue stream over compliance. Given the repeated misrepresentations, the real-time business documents, and the proffer of a made-for-litigation expert 'report,' the Court reasonably concludes that Apple knew it was violating the Injunction."

287.    The Court concluded, more specifically: "Several aspects of the Link Entitlement program, taken together and to a certain extent independently, violate the Injunction. The Court considers them in two groups: (i) the commission rate, and (ii) design restrictions and purchase-flow friction."

288.    Regarding the 27% commission rate, the Court found: "Apple assessed the external costs developers face when utilizing linked-out transactions, which generally ranged based on the size of the developer—the larger the developer, the better able to reduce the external costs of

1    linked-out transactions. With that information, Apple selected a 3% discount on its 30% IAP

2    commission that it knew was anticompetitive. In doing so, Apple willfully set a commission rate

3    that in practice made all alternatives to IAP economically non-viable." The Court further opined

4    that it "cannot conceive of how any reasonable mind interpreting this Court's and the Ninth

5    Circuit's orders would find that structure permissible, because it *forecloses competitive*

6    *alternatives*. That appears to have been the point. Business documents reveal that the internal

7    justification was to maintain the existing anticompetitive revenue stream." [Emphasis in original].

8        289.    The Court appeared to find it especially galling that it had already determined that

9    Apple could charge a commission on developers: "Apple was tasked with valuing its intellectual

10   property, not with reverse engineering a number right under 30% that would allow it to maintain

11   its anticompetitive revenue stream. . . .  Apple ignored this opportunity choosing instead to

12   retroactively justify the desired end result."

13       290.    The Court also criticized Apple's commissioned report from Analytics Group "as

14   the basis for its commission determination is entirely manufactured, and Apple's reliance thereon

15   is a sham. . . . As the 2025 hearing revealed, the AG's report did not materially factor into Apple's

16   decision-making process. It was created as a show piece for the Court. The plan backfired."

17       291.    Instead, the Court held, "[t]he real-time business documents which the Court

18   ordered Apple to produce revealed the true business decision. Apple's focus was on the impacts

19   to its revenue as well as some analysis of the costs developers would face when implementing a

20   link-out transaction."

21       292.    The Court also criticized how "Apple imposed a variety of restrictions on

22   developers' ability to craft a link-out program: requiring any external purchase link be placed

23   outside of the IAP purchase-flow to which a user is ordinarily directed; prohibiting developers

24   from designing 'buttons' aside from Apple's 'plain "link" button' style; prohibiting developers

25   from using any calls to action aside from a limited set defined by Apple; instituting a full-window

26   takeover (scare screen) after clicking on an external link *only* in the context of purchases of digital

27   goods; and prohibiting the use of dynamic URLs." [Emphasis in original].

28       293.    The Court also criticized Apple for how it "decided to replace the explicit anti-

1    steering provisions the Injunction prohibited with a mosaic of the same: an ensemble of

2    requirements that significantly reduces developers' ability to steer consumers to any competitive,

3    favorable alternatives."  Furthermore, the Court determined: "Nor was this accidental: Apple's

4    sensitivity analyses of breakage reveal that Apple was modeling precisely the amount of friction

5    needed in a transaction to ensure that link-out transactions were not viable for a developer.  While

6    Apple initially considered imposing some of these restrictions *as an alternative* to a commission,

7    it decided to impose *all* restrictions *and* set a commission rate.  In other words, Apple sought to

8    secure its illegal revenue stream from every angle."  [Emphasis in original].

9         294.    Moreover, the Court held, "Apple's justifications for these requirements . . . strain

10   credulity.  Most notably, and to underscore Apple's meritless justifications, Apple does not require

11   developers selling physical goods to apply for a link entitlement before deploying link-out

12   transactions.   Apple imposes these restrictions *only* for link-outs that compete with IAP."

13   [Emphasis in original].

14        295.    The Court further found: "two of Apple's restrictions are explicitly at odds with the

15   Injunction.  The Injunction prevented Apple from stopping developers from 'including in their

16   apps and their metadata buttons, external links, or other calls to action that direct customers to

17   purchasing mechanisms, in addition to' IAP.  Apple resorts to dictionaries . . . to argue that it no

18   longer categorically prohibits developers from using buttons or other calls to action.  While

19   perhaps literally true, the gamesmanship abounds as the business documents reveal the true motive

20   (and do not rely on dictionaries)."

21        296.    The Court further explains: "For button styles, Apple limits developers to what

22   Apple calls the 'plain' button style—essentially just a hyperlink—because Apple does not want

23   the developers to use the more effective 'button.'  A more effective button would increase

24   competition. . . .  Similarly, Apple limits calls to action to five, narrowly cabined templates. . . .

25   Nowhere does the Court authorize those limitations.  At a minimum, the Court need not decide

26   whether these restrictions alone violate the Injunction, because Apple has violated the central

27   mandate of this Court's orders: that Apple not foreclose competitive alternatives to IAP."

28        297.    The Court concluded: "To summarize, this Court's orders required that Apple not

impose restrictions in its iOS marketplace which would prohibit consumer access to and awareness of competitive alternatives to IAP.  The Injunction specifically enjoined Apple's anti-steering provisions which at the time prohibited developers from raising that consumer awareness and access.  In response, Apple intentionally devised a compliance scheme to prevent developers from deploying competitive alternatives to IAP.  Apple's discounted commission rate, on its own, forecloses a developer's use of link-out purchases.  Adding to that, Apple's various design restrictions and purchase-flow friction arbitrarily decrease the attractiveness of competitive alternatives (if they were utilized) and increase breakage in a purchase flow."

298.    The Court further concluded: "Apple's conduct violates the Injunction.  The non-compliance was far from 'technical or de minimis.'  Apple's lack of adequate justification, knowledge of the economic non-viability of its compliance program, motive to protect its illegal revenue stream and institute a new de facto anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court cannot, in any universe, real or virtual, be viewed as product of good faith or a reasonable interpretation of the Court's orders."

299.    Thus, "The Court **HOLDS** Apple in civil contempt.'"  [Emphasis in original].

300.    In determining sanctions for contempt, the Court again noted how: "Apple was afforded ample opportunity to respond to the Injunction.  It chose to defy this Court's order and manufacture *post hoc* justifications for maintaining an anticompetitive revenue stream.  Apple's actions to misconstrue the Injunction continue to impede competition.  This Court will not play 'whack-a-mole,' nor will it tolerate further delay."

301.    Thus, "the Court **PERMANENTLY RESTRAINS AND ENJOINS** Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them, from":

1. Imposing any commission or any fee on purchases that consumers make outside an app, and as a consequence thereof, no reason exists to audit, monitor, track or require developers to report purchases or any other activity that consumers make outside an app;

2. Restricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app;

3.  Prohibiting or limiting the use of buttons or other calls to action, or otherwise conditioning the content, style, language, formatting, flow or placement of these devices for purchases outside an app;

4.  Excluding certain categories of apps and developers from obtaining link access;

5.  Interfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message apprising users that they are going to a third-party site; and

6.  Restricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase.

The Court pre-authorizes the "dialogue" version of Apple's screen in advance so as not to hinder developer progress:



As these are *restrictions* on the specific actions Apple took to violate this Court's Injunction and as they require no affirmative action on Apple's parts, the **INJUNCTION IS EFFECTIVE IMMEDIATELY**. The Court will not entertain a request for a stay given the repeated delays and severity of the conduct.

Time is of the essence. Every day since January 16, 2024, the date of the Supreme Court's refusal to hear its appeal, Apple has sought to interference with competition and maintain an anticompetitive revenue stream. This Injunction terminates the conduct.

[Emphasis in original].

302.   The Court also criticized "Apple's abuse of its privilege assertions" that "caused months of delay in this proceeding." The Court observed: "Notably, . . . on re-review Apple withdrew a significant body of its privilege claims, effectively withdrawing approximately 42.1% of those claims. These dilatory tactics were unwarranted, wasted party and judicial resources, and delayed the Court's ability to effectuate relief." Furthermore, "[t]he record is rife with . . . examples of over-designation of privilege." Moreover, when the Court initially concluded that

sanctions were warranted, in February 2025, "Apple filed a 'response,' but that response ultimately harms its position. . . .  In its defense, Apple blames everyone but itself[.]"  The Court found "that Apple's abuse of attorney-client privilege designations to delay proceedings and obscure its decision-making process warrants sanction to deter future misconduct."  As a result, "Apple is **SANCTIONED** in the amount of the full cost of the special masters' review and Epic[] [Games's] attorneys' fees on this issue[.]"  [Emphasis in original].

303.    The Court also stressed how "a more significant response may be warranted."  To address Apple executives' lies and misrepresentations on the stand, "the Court refers the issue to the United States Attorney for the Northern District of California, Patrick D. Robbins, or his designee(s), for investigation against Apple and Alex Roman, Apple's Vice President of Finance specifically.  The Court takes no position on whether a criminal prosecution is or is not warranted. . . .  It will be for the executive branch to decide whether Apple should be deprived of the fruits of its violation, in addition to any penalty geared to deter future misconduct."

304.    The Court finally concluded: "Apple *willfully* chose not to comply with this Court's Injunction.  It did so with the express intent to create *new* anticompetitive barriers which would, by design and in effect, maintain a valued revenue stream; a revenue stream previously found to be anticompetitive.  That it thought this Court would tolerate such insubordination was a gross miscalculation.  As always, the cover-up made it worse.  For this Court, there is no second bite at the apple."  [Emphasis in original].

305.    On December 11, 2025, the Ninth Circuit upheld this District Court's injunction for the most part, while modifying or remanding a portion of the order.  On the remand, this District Court is to determine what a reasonable commission Apple can charge would be, rather than a flat prohibition of any commissions whatsoever.  Furthermore, the Ninth Circuit modified this District Court's injunction to clarify that app developers' external links, buttons, and calls to action will not be placed in a more prominent position than Apple's own.

306.    The Ninth Circuit affirmed this District Court's determination that the 27% linked-out commission is anticompetitive and violated this District Court's original injunction.  The Ninth Circuit held that the 27% commission, when coupled with the fact that an app developer's own

1  processing costs will exceed 3% (and thus exceed Apple's 30% commission within its ecosystem),

2  and thus the linked-out commission essentially prohibits the app developer from linking out at all:

3  "Apple has demonstrated that charging commissions on linked-out purchases gives it the power to

4  prohibit them. . . .  Once Apple's commission on those transactions was large enough, no rational

5  developer would offer them.  The Injunction prohibits that type of conduct."  The Ninth Circuit

6  also rejected Apple's argument that the original injunction "says nothing about commissions"

7  because "Apple does not 'have an immunity from civil contempt because the plan or scheme which

8  [it] adopted was not specifically enjoined.'. . .  Having 'experiment[ed] with disobedience of the

9  law,'. . . it must now bear the burden of being found in contempt."  [Alterations in original].  The

10  Ninth Circuit further explained that Apple's position would mean that it could create an endless

11  runaround from court orders because "Apple could 'work out a plan that was not specifically

12  enjoined' and 'once more obtain' 'immunity … because the new plan was not specifically

13  enjoined.'. . .  By doing so, 'a whole series of wrongs [would be] perpetrated and [the Injunction

14  would] go[] for naught.'"  [Alterations in original].

15       307.    The Ninth Circuit also upheld this District Court's restrictions on Apple's conduct,

16  i.e., ordering Apple to allow links, buttons, and calls to actions to external payment methods, with

17  some modifications to ensure that Apple would have parity with the app developers.  The Ninth

18  Circuit held that Apple both violated the express terms of the First Injunction and "violated the

19  Injunction's 'implicit command to refrain from action designed to defeat it.'"

20       308.    The Ninth Circuit held that Apple "violate[d] the strict letter of the Injunction"

21  when it: (1) defined a "button," which the First Injunction called for, as a "plain button" that "is

22  no button at all" because it "is invisible"; and (2) violated the First Injunction's requirement that

23  Apple permit "other calls to action" when Apple only "limit[ed] developers to particular, limited

24  templates[.]"

25       309.    The Ninth Circuit also held that Apple's conduct, in restricting where links could

26  be placed, in placing "scare screens," and in requiring static rather than dynamic URLs, violated

27  the First Injunction because they were designed to defeat its purpose.  Regarding link placement

28  where "external purchase links never appear where users naturally expect to see their purchase

options and would find them most useful: at the time of purchase[,]" the Ninth Circuit held that Apple violated the First Injunction because "[i]n practical effect at least, this restriction prohibited linked-out purchases."   Similarly, Apple's use of the "scare screen[,]" where "[t]he record confirms that Apple designed the scare screen to prevent external purchases[,]" also violated the First Injunction: "By engineering this screen to prevent users from completing linked-out purchases, Apple engaged in conduct designed to defeat the Injunction."   Finally, when Apple required developers to use static rather than dynamic URLs, "the record shows that Apple designed the purchasing experience to make external links as hard to use as possible" and the Ninth Circuit held: "This flies in the face of the Injunction's spirit."

310.    The Ninth Circuit rejected Apple's proffered justification that these restrictions were designed to advance user privacy and security, holding that these considerations were "irrelevant . . . [w]hatever the Injunction prohibited, Apple must not do."   Furthermore, the Ninth Circuit held that "the district court found that Apple's privacy and security justifications are pretextual, and there was no clear error in its ruling."   The Ninth Circuit observed that "one of Apple's witnesses testified that he could think of no other reason to use a plain, link-style 'button' other than to stifle competition."   Furthermore, "Apple claimed that dynamic links were dangerous because they could be used to pass along private information, but Apple allows developers to set up dynamic links for purposes other than linked-out purchases."   Thus, the Ninth Circuit held, "Apple offers no credible reason for its restrictions on external purchase links."

**E.    Apple Has Locked Up iOS Through a Variety of Anticompetitive Conduct**

311.    In March 2024, the United States and a coalition of state attorneys general filed an antitrust action, amended on June 11, 2024,[3] alleging that Apple protected its market dominance in smartphones and performance smartphones through contractual restrictions, its app review process, and through blocking access between apps (by denying access to application programming interfaces or APIs) and the iOS, and the amended complaint "highlights five examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones."

---

[3]    *See United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J. filed Mar. 21, 2024).

312.    Apple has used its control of the iOS to block the distribution of super apps.

313.    A "super app" is an app that serves as a platform that includes smaller "mini" programs within it, coded with programming languages like HTML5 or JavaScript that are standard to most web pages, and therefore the mini-programs are cross-platform so that they work the same way on any web browser and on any device.  A super app provides multiple services to a user and are most common in East and Southeast Asia.  While in the United States, super apps are uncommon, and thus a user must open separate apps to partake of different services (e.g., one app for payments, one app for streaming, one app for gaming, iMessage for messaging), super apps can provide all these services through just one app.

314.    According to the DOJ, Apple executives recognized that super apps were a threat because their ability to provide users with multiple functions would disincentivize users from sticking with an iPhone and relying on a multitude of apps, rather than getting a cheaper smartphone and using super apps.  One Apple executive, according to the DOJ, asked, "who doesn't want faster, easier to discover apps that do everything a full app does?"

315.    Furthermore, a super app also makes app developers less reliant on Apple and its App Store.  Developers can instead write mini programs to run on the super app.  This further makes the iPhone itself less necessary for users to access apps or for app developers to reach users.

316.    According to the DOJ, one Apple manager even stated that if Apple allowed super apps to become "the main gateway where people play games, book a car, make payments, etc." that would "let the barbarians in at the gate"—because "iOS stickiness goes down."

317.    The perceived threat of super apps even reached the Board, according to the DOJ, which quoted a Board presentation which highlighted how "[u]ndifferentiated user experience on [a] super [app]" would be a "major headwind" to growing iPhone sales in countries where these super apps function because they resulted in "[l]ow stickiness" and "[l]ow switching cost."  The DOJ further noted how in 2017, Apple stated that a risk of a potential super app developer was that it would "replace[] usage of native OS and apps resulting in commoditization of smartphone hardware."  [Alterations in original].

318.    Apple met the threat of super apps, not by innovating, but by restricting the ability

1    of app developers to offer super apps.

2        319.    Since at least 2017, Apple has used its developer agreement to require required apps

3    in the United States to only display mini programs with flat, text-only lists; mini programs cannot

4    display icons or tiles, which then prevents them from displaying a descriptive picture of content

5    or services offered by the mini program.  Apple also banned apps from displaying recently played

6    games or more games from the same developer, which limited the utility of games in super apps

7    (thus forcing a user to rely on individual gaming apps, as they do now, and funnel money to Apple

8    through IAP billing).

9        320.    Apple further hindered the implementation of mini programs by barring them from

10    accessing Apple's IAP system, even if developers were willing to use that system and pay the 30%

11    commission.  At the same time, Apple contractually barred developers from using other payment

12    methods, such as virtual currencies, for mini programs.  As a result, Apple stopped developers

13    from being able to monetize the mini programs, which further stopped them from implementing

14    them, and thus further disincentivized developers from developing super apps that could compete

15    with the iOS ecosystem.

16        321.    Apple also headed off another threat to its dominance by hindering the

17    implementation of cloud streaming gaming apps.

18        322.    A cloud streaming gaming app outsources computational power to an offsite server

19    (i.e., the cloud) so that a user could have a better experience regardless of the baseline hardware

20    they are working with.  Cloud streaming thus devalues the computational power of a smartphone,

21    because even someone with a low-quality smartphone would still be able to have a full gaming

22    experience when they can use off-site cloud streaming to make up for lower memory or other

23    performance on their devices.  Cloud streaming is a threat to Apple, which relies on its premium

24    features as a selling point, because a gamer who relies primarily on cloud streaming would have

25    less of a need to pay the high markup for a high-performing iPhone and can instead buy a cheaper

26    lower-quality device and rely on the cloud to make up for the device's lower performance.

27        323.    Cloud streaming also benefits developers, because a cloud-based platform can be

28    made to work across different platforms, so that a developer does not have to incur separate costs

1   for developing an Android app versus an iOS app, as well as be able to support other, smaller

2   operating systems without incurring additional development costs.

3       324.   But Apple has effectively prevented developers from offering cloud streaming

4   gaming apps, thus guarding itself against one potential threat to its smartphone market share.

5   Apple has done so by requiring that any cloud streaming game, or any update to a cloud streaming

6   game, be submitted as a standalone app for approval by Apple.  This requirement increased the

7   cost of releasing games on iPhone, and thus limited the number of games a developer could make

8   available to iPhone users, because an individual game could require daily or even hourly updates.

9   Requiring individual approval of each of these updates would cause unacceptable delays across all

10   platforms, or require updates to only non-iOS platforms, which would be unacceptable because

11   that could make the iOS version of the game incompatible with other versions on other platforms

12   while awaiting Apple's approval for the update.

13       325.   Apple also, until recently, made it onerous for gamers to use cloud streaming apps

14   because it required a user to download cloud streaming software separately for each individual

15   game, install identical app updates for each game individually, and thus force a gamer to make

16   repeated trips to the App Store to find and download these games.  Because of these onerous

17   requirements, no developer has designed a cloud streaming app for the iPhone.

18       326.   As with other apps, Apple also required cloud games to use Apple's IAP system,

19   which would require payment redesigns specifically for iPhones.

20       327.   Furthermore, Apple has impeded cross-platform cloud storage apps in favor of

21   steering iPhone users to its own cloud storage platform, iCloud.

22       328.   Apple has also hindered cross-platform messaging.  Messaging apps facilitate—

23   and are often the primary means of—communications between different smartphone users.  They

24   operate through "protocols," one of the most widespread and important ones being SMS, which

25   offers a broad user network but limited functionality.  All mobile phones can receive SMS

26   messages, but the protocol does not support modern messaging features, such as attaching large

27   files, messaging editing, or many emojis or reactions (e.g., a thumbs up or a heart).  Many

28   messaging apps, such as WhatsApp, Facebook Messenger, and Signal, use proprietary, internet-

based "over-the-top" or "OTT" protocols, which allow for more security and advanced features, including, for example, end-to-end encryption, read receipts, typing indications, disappearing or ephemeral messages, or the ability to share rich media. Because OTT protocols are proprietary, they only work between users of the same messaging app.

329.    Apple has hindered the implementation of OTT protocols on the iPhone, and generally makes other messaging protocols worse than its own, the iMessage or Apple Messages. One way Apple hinders OTT is by designating APIs needed to implement SMS as private. Third-party developers thus have no means to access these APIs, and are prohibited from doing so under Apple's developer agreement, and thus third-party messaging apps cannot combine the universal texting feature of SMS with the advanced features of OTT messaging. This means that for a user to message another, other than through iMessage, they must first confirm whether the other user has the same messaging app. But if an iPhone user wants to message someone else, they merely need to send a message as they would regularly through text, because Apple Messages incorporates SMS and an OTT protocol.

330.    Apple further restricts third-party messaging apps by prohibiting them from operating in the background when the app is closed, which impairs functionality such as message delivery confirmation. Or, when a user receives a video call, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance before answering a call.

331.    Thus, for a long time, Apple has made messaging so unattractive to non-iPhone users that it has driven stickiness in its own messaging app. Recently, at the end of 2024, in response to regulatory developments in Europe, at least in part, Apple has begun to adopt a 2019 version of the Rich Communication Services ("RCS") protocol, which combines SMS and an OTT protocol. RCS, however, is not quite as advanced as iMessage, and if Apple does not support later versions of RCS, cross-platform messaging may again devolve in quality.

332.    Apple also made third-party messaging unattractive by degrading the quality of a conversation between an iPhone user and a non-iPhone user. When an iPhone user messages a non-iPhone user, the messages will turn from a blue bubble (in iMessage) to green. Beyond aesthetics, before Apple adopted RCS, the message quality would degrade to the point where the

conversation would lose its encryption, videos would become pixelated and grainy, and users would lose their ability to edit messages or see typing indicators, among other degradations in quality. Even after Apple has adopted RCS, the message quality is not on par with iMessage, and therefore any conversation where a non-iPhone user joins would degrade the quality for everyone.

333.    The combination of a degradation in quality and a change in the aesthetics (from a bright blue to a dull green) would lead to social pressure for non-iPhone users to switch to iPhones. This social stigma would be especially acute among younger users, where iPhones have an estimated 85% market share among teenagers. In 2022, a public exchange captured iPhone's dominance in messaging. An iPhone user whose mother uses Android asked Tim Cook to improve the inter-phone messaging capacity because, "It's tough . . . not to make it personal but I can't send my mom certain videos." Cook's response: "Buy your mom an iPhone."

334.    According to the DOJ Action, Apple executives have long recognized that purposely degrading cross-platform messaging would preserve or strengthen the iPhone's market share. In 2013, Apple's Senior Vice President of Software Engineering explained that to support cross-platform OTT messaging "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." [Alteration in original]. And in March 2016, Apple's Senior Vice President of Worldwide Marketing sent an email to Cook stating that "moving iMessage to Android will hurt us more than help us."

335.    Similarly, Apple has made it difficult for iPhone users to use other voice and AI assistants in favor of its own, Siri, even though Siri has fallen behind many chatbots and voice assistants powered by generative artificial intelligence.

336.    Apple also limits iPhones' ability to work with other smart watches, other than the Apple Watch, as a way to preserve the value of both.

337.    Smartwatches—like regular watches—are worn on the wrist, and include an interactive display and apps that help a user monitor health data, respond to messages and notifications, perform mobile payments, as well as tell time like a regular watch. For a smartwatch to function properly, it must be paired with a smartphone. Smartwatches are relatively expensive, and users are less willing to buy a smartphone that is not compatible with their smartwatch.

338.    The Apple Watch is only compatible with an iPhone.  When a user buys an Apple Watch, they are almost guaranteed to then also buy an iPhone, just as the iPhone user base drives customers to buy Apple Watches (rather than other smartwatches).  Apple keeps this narrow compatibility on purpose, because if a user can buy a smartwatch that is compatible with different smartphones, that would increase the user's options of buying an iPhone, an Android, or other phone.  They would merely need a Bluetooth compatible device.

339.    The DOJ Action quotes a 2019 email from the Vice President of Product Marketing for Apple Watch, who acknowledged that ownership of an Apple Watch "may help prevent iPhone customers from switching."  The DOJ also states that surveys have confirmed this conclusion.  The DOJ also quotes another Apple document that making Apple Watch compatible with Android would "remove [an] iPhone differentiator."  [Alteration in original].

340.    Apple also degrades the functionality of third-party cross-platform smartwatches by: (1) depriving iPhone users of the ability to respond to notifications with third-party smartwatches; (2) inhibiting third-party smartwatches from maintaining a reliable connection with an iPhone; and (3) undermining the performance of third-party smartwatches that connect through a cellular network.  Apple realizes that each of these functions is important to users.

341.    The DOJ cites Apple's own market research that the ability to "[s]end and receive text messages from social and messaging apps" is a critical feature for a smartwatch consumer. [Alteration in original].  This was evident in how, in 2013, Apple provided third-party smartwatch developers with access to APIs relating to Apple Notification Center Service, Calendar, Contacts, and Geolocation, but then began to limit access to improved APIs the next year, when Apple introduced the Apple Watch.  Apple now only provides third-party smartwatches to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

342.    Apple also prohibits third-party smartwatch developers from maintaining a Bluetooth connection between the watches and iPhone.  Apple Watch, however, does have that functionality.  This alone makes the functionality of the Apple Watch better for iPhone users because of the improved connectivity.  But in addition, Apple requires users to turn on

118

"Background App Refresh" and disable "Low Power Mode" on iPhone when connected to a third-party smartwatch to maintain a consistent connection, while not forcing these battery draining moves on users of Apple Watch.

343.    Apple has also impaired the workaround of a cellular connection between a smartwatch and a smartphone (which would obviate the need for the two to be paired). Apple Watch is itself cellular-enabled, accounting for 20% of its sales. Apple Watch users can use the same phone number as their iPhone, which enables, among other things, a message to be delivered both to the phone and the watch, allowing for an integrated messaging experience. But Apple requires third-party smartwatch users to disable Apple's iMessage service on their iPhone to use the same phone number for both devices, which is a deal breaker (since it shuts off messaging capabilities), and if an iPhone user maintains a different phone number for a third-party smartwatch, that adds a layer of inconvenience and worsens the user experience.

344.    Similarly, Apple has also undermined third-party location tracking, as well as video platforms, in favor of its own, FaceTime. Apple has also introduced friction around the new eSIM technology, which makes it difficult to transition from an iPhone to another phone while keeping the same phone number.

345.    Apple has also degraded the ability to maintain different digital wallets on the iPhone.

346.    Digital wallets are apps for a user to store and use passes and credentials, most notably payment methods such as credit cards, but also forms of personal identification, car keys, movie tickets, or other credentials. One important function for a fully functioning digital wallet is the ability to tap a device on a payment terminal to make a payment, or tap-to-pay.

347.    Apple's proprietary wallet is the Apple Wallet. While its primary purpose is to facilitate making payments by iPhone users, Apple envisions that Apple Wallet could be like a physical wallet (or a super app) and be used for shopping, keys, transit, identification, travel, entertainment, and other services. Apple recognizes that because Apple Wallet is only available on the iPhone, as users rely on it for payments and other services more, having Apple Wallet on the iPhone "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem[.]"

[Alteration in original].  More functionality of the Apple Wallet also makes switching costs much higher, because doing so may involve not only familiarizing oneself with a new app and setting up with a new digital wallet, but also potentially losing credentials and personal data stored in Apple Wallet.

348.    Cross-platform digital wallets would allow an easier and potentially more secure switch from iPhones to other kinds of phones.  Similarly, if other financial institutions were allowed to offer digital wallets across platforms, that would also make switching between phones easier.

349.    But to be attractive as cross-platform digital wallets, one would have to have the ability to offer tap-to-pay, i.e., the ability to make a payment by tapping a smartphone on a terminal.  Near-field communication (NFC) hardware is necessary to provide tap-to-pay through a digital wallet app.

350.    Apple restricts developers or financial institutions from offering their own digital wallets by allowing only Apple Wallet to use NFC, though Apple encourages banks and other parties to participate in Apple Wallet, Apple also takes payments from banks, charging them 15 basis points (0.15%) for each credit card transaction through Apple Pay.  By contrast, payment apps from Samsung and Google are free to issuing banks.  Apple earns significant revenue: according to the Consumer Financial Protection Bureau, Apple Pay facilitated nearly $200 billion in transactions in 2022.  But while Apple encourages and even requires other institutions to go through Apple Wallet, it blocks them from competing with their own digital wallets by prohibiting them from incorporating tap-to-pay functionality, which, as quoted in the DOJ Action, was to prevent other payment apps from "proliferat[ing]" which would in turn "disable" Apple Pay and make it "trivial[.]"

351.    Meanwhile, Apple is not technically barred from allowing developers to access its NFC technology.  Indeed, Apple allows merchants to use iPhone's NFC to accept tap-to-pay payments from customers.  In Europe, where Apple has faced regulatory pressure to make its products more interoperable with others, it has acknowledged that it is technically possible to enable an iPhone to use another app as the default payment app, and intends to allow this

1    functionality there.

2        352.    Apple also impedes the incorporation of other digital wallets by restricting others

3    from offering the ability to authenticate digital payment options on online checkout pages.  This

4    prevents them from providing a simple and comprehensive solution to make online purchases.

5        353.    Furthermore, Apple blocks other digital wallets from serving as an alternative to

6    Apple's IAP system.  This restriction prevents developers from offering users better or different

7    customer experiences, such as allowing use of reward points, or loyalty programs, or digital

8    receipts, coupons, or the ability to make easy returns.  Apple also prohibits other developers from

9    notifying users in the developer's app that cheaper prices for services are available through

10   alternative digital wallets or direct payments.

11       354.    Apple also requires developers who have developed digital car keys to add them to

12   Apple Wallet.  This, in turn, has cemented Apple Wallet's position as the digital car key depository

13   while decreasing access to the original developers.  It also decreases incentives of automakers to

14   innovate because they are forced to share data with Apple while being starved of an opportunity

15   to differentiate themselves from Apple.

16       355.    Apple has also increased its control of car infotainment by having its CarPlay

17   system take over all the screens, sensors, and gauges of a car where it is installed, which makes

18   the driving experience itself dependent on the iPhone.

19       356.    Apple has further locked in users into its ecosystem by offering an extensive set of

20   subscription services, including for news, games, video, music, cloud storage, and fitness.  While

21   individual services may not be profitable, they form an ecosystem that makes switching from

22   iPhones difficult for users, and subscriptions and other services have become an increasingly

23   significant portion of Apple's revenues and profits.

24       357.    Furthermore, Apple's subscription services—and the sheer amounts of money they

25   generate—have led it to have increasing power over content creators and newspapers, through

26   controlling how audiences access these works, decreasing traffic to independent websites and apps

27   (e.g., an iPhone user will read an article through Apple News rather than the original news

28   website), and positioning Apple as a middleman between creators and users.  Apple has thus used

1    its power in terms of number of users to now assert an increasing role in creative and journalistic

2    output.

3        358.    On June 30, 2025, the United States District Court for the District of New Jersey

4    denied Apple's motion to dismiss the DOJ Action.  The Court found "that Plaintiffs have set forth

5    adequate allegations of entry barriers and '[o]ther germane factors' that support Apple's monopoly

6    power."  [Alteration in original].  The Court pointed to both plaintiffs' allegations regarding the

7    lack of switching and the switching costs, as well as plaintiffs' allegations regarding the

8    investments required to enter the market, the need to negotiate distribution requirements and

9    satisfy carriers' requirements, and the fact that several companies tried and failed to enter the

10   market.  The Court rejected Apple's defense that they merely refused to deal with competitors,

11   instead holding that the government did "not allege Apple is failing to deal with its smartphone

12   rivals, but rather that Apple's conduct is imposing restrictions on developers and smartphone users.

13   Courts across the country have refused to extend the refusal to deal doctrine to such conduct."

14   Furthermore, the Court found that the government adequately alleged that Apple committed

15   various forms of anticompetitive conduct because "[t]he Amended Complaint sets forth several

16   allegations of technological barricades that constitute anticompetitive conduct" such as how

17   "Apple imposes exclusionary requirements," "prevents developers from collecting payments[,]"

18   requires onerous update requirements that increased costs, "imposes technological limitations to

19   prevent developers from offering key features[,]" "degrades the functionality of third-party cross-

20   platform" devices, and "prohibits developers from accessing NFC hardware[.]"  These allegations,

21   the Court held, "are sufficient to establish a *prima facie* case[.]"  Moreover, the Court found "the

22   Amended Complaint pleads allegations supporting Apple's specific intent to monopolize the

23   smartphone and performance smartphone markets.  The Amended Complaint includes numerous

24   statements allegedly made by Apple executives regarding the barriers set in place to maintain its

25   monopoly."

26       359.    On August 8, 2025, a group of developers (the "Developers") filed an amended

27   class action complaint (the "Developer Class Action") in this Court that tied together the antitrust

28

122

misconduct Apple has committed in the smartphone and iOS markets.[4]  In addition to what the DOJ alleged and what this District Court found in the Epic Games Action, these Developers also alleged a variety of other practices and policies that Apple used to protect its market share and foreclose competition in smartphones and in mobile operating systems.  Incorporating many of the allegations in other litigation, recently, the Developers allege Apple violated Sections 1, 2, and 3 of the Sherman Act, California's Unfair Competition Law, Korea's Monopoly Regulation & Fair Trade Act, Japan's Antimonopoly Act, and Japan's Civil Code, asserting how "[f]or more than a decade, Apple has maintained a monopoly in the iOS App Distribution Market and iOS App Payment Processing Market by imposing restrictive policies, suppressing competition, and extracting supra-competitive commissions from iOS App developers."

360.    The Developers emphasize how Apple has benefited tremendously from third-party developers:

> The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform.  To create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value.  Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. . . .  When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple.  This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

361.    The Developers further observe:

> The interplay between apps and smartphones makes smartphones a fundamentally different product from any other consumer electronic device.  Because they are designed for a specific smartphone OS, smartphone apps typically work only on smartphones running that same system.  Developing the same app for a different type of device may be outright impossible. . . .  Additionally, the form factor of smartphones—a pocket-sized computer capable of running apps—makes them unique from the perspective of the consumer.  And because 97% of consumers in the United States today own a smartphone, access to those consumers also makes smartphones unique from the perspective of developers selling into the U.S. geographic market.  Accordingly, neither consumers nor developers view smartphones as reasonably interchangeable with non-smartphone devices.

362.    The Developers also observe that because apps to be developed for iPhones only

---

[4]     Am. Consol. Class Action Compl., *Korean Publishers Association v. Apple, Inc.*, No. 4:25-cv-04438-YGR (N.D. Cal. Aug. 8, 2025), ECF No. 44.

work on iOS, the relevant market is iOS app distribution: "Today, users who want apps on their iOS devices must download them from Apple's iOS App Store app—there is no other way to purchase apps on an Apple phone."

363.    Apple has been especially restrictive in how it distributes apps on the iPhone: "by means of updates to each new version of iOS . . ., other exclusionary design choices for each new version of the iPhone and its accompanying iOS versions released since 2008 . . ., and the contractual restraints discussed herein, Apple has engaged in a continuous campaign to prevent iPhone users and iOS App developers from using or selecting other third-party services to purchase or distribute iOS Apps."   The Developers further allege: "In this way, Apple is significantly different than other companies.  For example, in the Android OS, Android users can download Android applications from multiple application marketplaces—including Google's Play Store, Amazon's Appstore, and Samsung's Galaxy Store.  Apple takes multiple, active steps to prevent anything similar for iOS devices, including both technologically and contractually preventing users and application developers from circumventing that prohibition."

364.    These restrictions are "highly anticompetitive because apps must be designed to run on a specific OS. . . .  [F]or iOS users, apps written for other OSes are not interchangeable at all with iOS Apps because they cannot be used on an iOS device."  Furthermore, "App developers face the same problem.  The existence of other mobile device OSes is meaningless to developers who program apps and in-app products specifically for use on iOS devices."  As a result, "other app distribution services for other OSes offer no competitive downward pressure on iOS App distribution pricing."

365.    Furthermore, "Apple largely keeps a stranglehold on payment processing through its control of the iOS mobile OS.  Specifically, in most cases, Apple mandates that the only payment processing service allowed within iOS Apps is Apple's own payment processing service."

366.    Another chokepoint for Apple is consumers' reliance—especially in the United States—on retail stores.  Apple has its own network of retail stores that consumers rely on for discovering and servicing products.  Moreover, at least in the United States, consumers buy their smartphones through retailers to take advantage of promotions from mobile carriers.  Furthermore,

Apple operates its App Store through 175 "storefronts" that are tied to geography. Furthermore, geography serves as a chokepoint because different countries have different currencies, so switching to another country's "storefront" may render one's usual currency used to make payments useless.

367.    The Developers also detailed how Apple thwarted attempts at alternative app stores in the iOS system:

a.    Cydia: an alternative app store for users that "jailbroke" their devices to circumvent Apple's restrictions, which at its peak had millions of users and thousands of apps unavailable on the App Store. But Apple used technical restrictions through iOS updates, eventually eliminating Cydia as a viable option by around 2019–2020.

b.    AltStore: an app that allowed users to install apps directly from the internet without jailbreaking their devices, launched in 2019. Apple knocked out AltStore through iOS modifications that made AltStore inoperable months after its launch.

c.    Web-based app platforms: Multiple companies have tried to use web-based platforms to bypass the App Store, instead allowing users to download apps through browsers (such as Safari). But Apple undercut these efforts through limitations on its browser restrictions, other limitations on web app installation, and degradation of web apps versus mobile apps.

d.    Streaming game platforms: Covered also by the DOJ Action, Apple imposed onerous requirements, such as requiring separate apps for each streaming game, that made it economically unviable for any cloud or streaming game provider to develop an app.

e.    Super App Platforms: Also covered by the DOJ Action, Apple used restrictive App Store guidelines to stop mini-programs from being coded in a super app, though the Developers note that Apple made an exception for WeChat (in Asia) because of the latter's importance in Asian markets.

f.    Traditional Payment Processors: Despite having better technology, lower fees, and better fraud protection, payment processing companies such as Square, Stripe, and

PayPal have been prevented from competing for payment services because Apple allows only its own IAP on the iOS.

g. Cryptocurrency and Digital Payment Platforms: Similarly, cryptocurrency companies and their technology have been excluded from IAP though they include lower fees and other distinct payment features.

h. Regional and Specialized Payment Methods: Apps that specialize in regional payment methods (e.g., Alipay, WeChat Pay) or specialized payment types (e.g., installment payments or buy-now-pay-later) have also been excluded from IAP.

i. Developer-Specific Payment Solutions: Large developers who have their own payment processing infrastructure can offer better fraud protection, customer service, and integration with their existing business systems. But they are forced by Apple's rules to use Apple's IAP.

j. European Alternative App Stores: Though regulatory developments in Europe mean Apple is required to offer the option for alternative app stores, it has limited individual platforms to specific jurisdictions, which in turn limits the scale these app stores can achieve, and thus thwart them from becoming viable.

k. Asian Super App prevention: Even though super apps are successful in Asian markets, Apple has prevented them from being developed in the United States.

368. Apple has the "ability to disable competing services at will" given its complete control over APIs, system integration points, iOS security certificates, and code signing processes. Yet, "Apple's integration of app distribution and payment processing with iPhone hardware features (like Touch ID, Face ID, and secure enclave) provides its own services with technical advantages that are denied to competitors. This hardware-level exclusion makes it impossible for competitors to offer equivalent functionality even when they have superior software solutions." Thus, "Apple's conduct has resulted in nearly 100% market foreclosure in both iOS App Distribution and iOS App Payment processing." And "iOS users have been completely deprived of choice in both app distribution and payment processing, unlike users of other mobile platforms, who can select from multiple competing services."

369.    In addition, the Developers detailed other ways in which Apple has preferenced itself or reinforces its moat:

    a.   Apple prevents consumers from knowing that they do not have other app store options.  The app restrictions are against developers, and since consumers are not parties to those agreements, they would not naturally find out about the restrictions.  Indeed, Apple has some preloaded products, such as Apple Maps and Apple Mail, where consumers are also free to download alternatives.  Thus, consumers who do not know about the App Store and IAP restrictions may not assume there is.  Apple also keeps consumers from knowing by forbidding developers, in general, from telling them about the 30% commission or restrictions.

    b.   Consumers also face high information costs, such as the resources needed to compile pricing data that would demonstrate how Apple has been indirectly taxing them when the 30% commission costs get passed down to consumers.  Apple does not break down the commission from the total price, nor do developers break down what costs get passed on to consumers, because they are forbidden to under Apple's developer agreement.

370.    As also detailed in the DOJ Action, there are high switching costs such as the learning curve for learning to use a different phone on a different operating system or the social costs of using an Android messaging platform versus Apple's iMessage.  The Developers also detail how "Apple makes it very easy for iPhone users to place their digital life on Apple servers but then difficult to remove it once there.  For example, one's photos and videos, music collection, and message histories with loved ones, friends, and business connections are tied to Apple's servers—making it extraordinarily difficult (if not impossible) for iOS device users to take those digital items with them if they want to consider switching to a non-iPhone smartphone."

371.    Apple hampers developers' access to APIs while ensuring "its own products (e.g., the iPhone) have full, unfettered access to other Apple services, like iCloud Photos."  Third-party developers, on the other hand, are subject to "strict and arbitrary limits about which functionality those developers can access and on what terms."

372.    Apple also "artificially increases its share of the applications that are distributed" in iOS "and makes it artificially difficult for users to switch away to applications that are competitive with Apple's first-party applications[.]"  For example, "when a user purchases an iPhone, the user is steered to use Apple's default email product, Apple Mail.  It is only through a complex labyrinth of settings that a user can change their default email application away from the Apple 'Mail' application towards an alternative like Gmail[.]"  As another example, in iOS, the "default calendar is Apple Calendar, and that default cannot be modified."

373.    Apple also self-preferences when it "allows its own first-party applications like Mail and iCloud Drive to engage in continuous background updating and monitoring.  When a user takes a new photograph, that photograph might automatically be stored in iCloud Drive due to Apple's passive background monitoring.  Third-party applications . . . cannot access this functionality[.]"

374.    Furthermore, "Apple grants access to certain functionality and features to its first-party applications that it denies to third-party applications."  For example, "Apple's first-party password manager, Keychain can (1) autofill credit card information, (2) autofill contact information, (3) provide 'hide my email' functionality when the user is about to provide their email address, (4) provide password generation when a website/app asks for a password, and (5) autosave logins."  Apple does not offer such functionality to third-party developers.

375.    Apple offers "family plans and family sharing whereby family members can share subscriptions, track locations and finances, and more"—but with a catch that increases the lock-in effect—"when all family members are iPhone users."

376.    As also described in detail in the DOJ Action, Apple has—through imposing onerous technical requirements—thwarted the development of super apps.

377.    As also described in detail in the DOJ Action, Apple has imposed contractual requirements that make cloud streaming platforms economically impractical to put on the App Store, eliminating a source of competition for the iPhone, where cloud streaming would have led to consumers purchasing "the cheapest hardware" like an "Android for 25 bux [sic] at a garage sale and . . . have a solid cloud computing device" that "works fine."

378.    As described further in the DOJ Action, Apple limits messaging capabilities with other companies' devices.

379.    Furthermore, "[a]ll iOS App developers must contract with Apple's U.S. entity, agree to Apple's DPLA, and agree to Apple's App Guidelines before they can make their iOS Apps available to Apple device users (i.e., consumers).  As this Court recognized, the DPLA is a 'contract of adhesion.'  Pursuant to the DPLA and the App Guidelines, Apple restricts iOS App developers from distributing and selling their iOS Apps using any app distribution or any IAPs that compete with Apple."  Apple's App Guidelines, in particular, require iOS app developers to use Apple's IAP to "unlock features or functionality" within their apps.  Apple is also contesting the District Court's injunctions barring anti-steering provisions from the DPLA and App Guidelines.

380.    The Developers also quoted testimony in the Epic Games Action from Defendant Cook, who confirmed that when Apple dropped its 30% commission to 15% for small developers, it was not due to "competition" but rather "the result of feeling like we should do something for small business[.]"

381.    The Developers also allege how Apple imposes additional fees on app developers, in an arbitrary manner, because of Apple's control of the ecosystem.  For example, Apple charges a $99 annual fee from all developers.  In June 2017, Apple introduced an App Store guideline that would ban any app that shared a code base or template with another app.  That effectively meant developers would have to create a new developer account for each different business.  A few months later, Apple reverted to allowing developers to submit templates, instead, which meant developers would only have to pay one fee for an app that they can then use for many clients or businesses.

382.    The Developers also allege how other companies have fewer restrictions and smaller commissions in their equivalents to the App Store.  For example, Microsoft's app store charges only a 5% commission.  Amazon developed an app distribution payment method that is based on consumer engagement with apps.

383.    Furthermore, the Developers allege that Apple's products are indeed inferior to

competitors' and thus Apple's stranglehold on app distribution and IAP harms consumers: "For example, Apple's in-app payment solutions have a failure rate multiple times greater than the failure rate of Apple's competitors' payment systems, leading to fewer sales and to worse customer experiences.  Further, Apple often withholds from iOS App developers their earned revenues for, on average, 30 to 50 days (and sometimes more than two months), whereas competitor payment platforms remit iOS App developers' revenues in significantly less time (with some platforms, like Stripe, paying all earned revenue within seven days), denying iOS App developers (sometimes) much-needed liquidity.  As another example, whereas Apple's in-app payment processing system does not facilitate standard retail payment functionality, like dynamic pricing or multiple simultaneous purchases (e.g., shopping carts), Apple's competitors' payment platforms permit such advanced practices.  And though Apple's competitors attempt to compete with Apple on quality by tracking individual customer transactions with detailed receipts, leading to a superior customer experience and facilitating transaction-level reconciliation and financial auditing, Apple avoids doing so through its anticompetitive conduct."

384.    The Developers also allege: "Apple's abusive tactics also stifle innovation in iOS Apps themselves—another way Apple hurts competition (and users and developers) generally.  By largely excluding app store competitors, and by taking an iron hand approach to what it views as 'permissible' for the iPhone, Apple reduces the number of locations app developers can feature their apps and prevents them from innovating in any ways that Apple disfavors.  Consumers, as well as developers and competition generally, benefit from other venues that host iOS Apps and encourage the development of more and better types of apps—including categories that break the mold in term[s] of what 'apps' can do.  All of these results would engender far more innovation and consumer choice but are stifled by Apple's dominance over the iOS App Distribution Market."

385.    The Developers also detail how Apple's anticompetitive conduct has continued to the present: "Apple has engaged in a continuous course of conduct to maintain its market power to charge supra-competitive monopoly rents.  This course of conduct includes: (1) requiring app developers to pay a fee and renew their DPLAs every year; (2) imposing contractual anti-steering provisions on app developers; (3) implementing scare screens on user devices; (4) willfully

1  evading court orders intended to open the market to competition; and (5) continuously enforcing

2  its anticompetitive restrictions and other monopolistic practices to preserve its dominant market

3  position and revenue streams."

4      386.    The Developers elaborate on Apple's "contractual and technological restraints . . .

5  to exclude . . . competitor iOS App distributors" by "continuously modif[ying] its App Store

6  policies to preclude iOS App developers from attempting to distribute their apps through any

7  channel except the App Store and to shore up perceived holes in the terms that might permit

8  developers to distribute their apps or process in-app payments through alternatives" to Apple's

9  IAP.

10      387.    The Developers also describe how Apple used software updates and other technical

11  restrictions that have "prevent[ed] users from using alternative app stores on iOS at all" and further

12  entrench the App Store's position by placing it "on the home screen of every iOS device it sells .

13  . . and disables users' ability on every one of those devices to uninstall the App Store. . . .  Apple

14  does not permit any other app stores on iOS devices. . . .  It also prevents users from downloading

15  apps through websites. . . .  Apple deploys similar means to control and hinder application

16  publishers through the iOS APIs[.]"

17      388.    The Developers also highlight how Apple has aggressively sought to force

18  developers to earn Apple more by "pausing or delaying iOS App approval on an ad-hoc basis if

19  iOS App developers do not add more revenue-generating features for Apple, such as in-app

20  purchases."

21      389.    The Developers also highlight how Apple has become progressively more rigorous

22  in "enforce[ing] its payment processing monopoly" on app developers.  For example, "[a]pps that

23  attempt to circumvent IAP requirements are rejected during the review process or removed from

24  the App Store after publication.  This enforcement mechanism is particularly powerful because

25  developers have no alternative distribution channel and cannot reach iOS users without Apple's

26  approval."  Furthermore, "Apple has systematically escalated its enforcement of payment

27  processing restrictions over time. . . .  Apple has progressively closed . . . loopholes through

28  increasingly restrictive policy updates and more aggressive enforcement actions."  Moreover,

"[w]ith every new iPhone activation and every new iOS App developer account creation, Apple has imposed its payment processing restrictions through updated contractual terms." Because these terms are "non-negotiable[,]" any "[d]evelopers who refuse to agree to exclusive use of Apple's IAPs are denied access to the iOS market entirely[.]"

390.    Furthermore, the Developers describe how "Apple selectively enforces its payment processing requirements in ways that discriminate against services that compete with Apple's own offerings. For example, Apple has been more aggressive in enforcing IAP requirements against music streaming services like Spotify (which competes with Apple Music) while being more lenient with services that do not compete directly with its products."

391.    Furthermore, the Developers describe how "Apple has continuously expanded the scope of its payment processing monopoly to cover new types of digital transactions. Initially focused on traditional app purchases, Apple has extended IAPs requirements to cover subscriptions, virtual currency, in-app advertising removal, and even tips or donations to content creators."

392.    Moreover, Apple has only offered limited concessions in response to "regulatory pressure in various jurisdictions[.]" Apple, in a move similar to its response to this District Court's First Injunction in the Epic Games Action, in "purported compliance" with Korean law on IAP, "introduced new anticompetitive 26% payment processing commissions in Korea that effectively eliminated any possibility that alternative payment platforms would become widely adopted."

393.    Apple has also faced a long-running consumer class action concerning payments relating to apps in this District Court.[5] In their brief opposing summary judgment (which the Court has recently indicated it would likely deny), the consumers highlight the following evidence:

  a.  Apple's "dominance in iPhones and iPads is mutually reinforcing, with high rates of co-ownership and purchase of one device often leading to purchase of the other."

  b.  Only 2% of iPhone purchasers are even aware that Apple charges a 30% commission on in-app purchases, and "[c]onsumers have no way of knowing how much of their App Store spending is due to Apple's supracompetitive commission."

---

[5]    *See In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714 (N.D. Cal. filed Dec. 29, 2011).

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

c.  Apple benefits from high switching costs because "[f]ear of losing device interoperability, the expense and hassle of transferring or losing device content, and the cost of new devices are significant factors that deter switching."

d.  Apple also actively uses its market power to restrict developers' distribution and payment processing choices: "Apple takes advantage of its market power and product stickiness to actively constrain device owners' buying options for app and in-app purchases.  Through its Developer Program License Agreement ('DPLA') and App Store Review Guidelines ('Guidelines'), Apple conditions developer access to iOS tools and consumers on exclusive distribution through the App Store.  . . . Under the Guidelines, Apple has also prohibited developers from creating store-like apps, using apps to direct consumers to other platforms, informing customers about Apple's 30% commission, employing a payment solution other than Apple's In-App Purchase ('IAP'), or (with limited exceptions) creating apps that access content purchased on other platforms unless the content is also sold in-app. . . . Apple reinforces these restrictions through its 'walled garden' and voids the warranties of consumers who circumvent it."

e.  Consumers have suffered concrete harm through increased costs because of Apple's monopoly: "Consumers have suffered from Apple's monopoly. Competition would drive down Apple's commission rate by roughly half. . . .  That difference has caused over $20 billion in consumer losses. . . .  Apple's monopoly has also decreased app output, restricted availability of in-app purchases, and reduced quality and innovation in the App Store and among apps (e.g., cloud streaming and 'super' apps)."

394.  Apple has also been sued by credit unions concerning how it abused its dominance in iOS app distribution, smartphones, smartwatches, and tablets to stifle competition in payment solutions.[6]  The Credit Union Action alleged that Apple "exercises its market power in the device

---

[6]    Amended Class Action Complaint, *Affinity Credit Union v. Apple, Inc.*, No. 4:22-cv-04174-JSW (N.D. Cal. Oct. 28, 2022), ECF No. 40 (the "Credit Union Action").

markets by requiring that consumers of its mobile devices also acquire its mobile wallet—Apple Pay—and prevents consumers from using competing mobile wallets capable of offering competing tap-and-pay solutions." By contrast, "on non-Apple mobile devices, consumers have a selection of competing wallets to choose from" because "[m]obile device manufacturers using the Android OS do not restrict access to NFC technology on their devices—it is available for use to all comers, including digital wallets that compete with Google's digital wallet, Google Pay."

395.    The Credit Union Action, alleging similar conduct as the DOJ Action, notes how Apple charges issuers a 15-basis point fee for credit transactions and a 0.5¢ fee on debit transactions, which "generated a reported $1 billion for Apple in 2019, and this revenue stream— earned from card issuers—is predicted to quadruple by 2023." Meanwhile, "[i]n the Android ecosystem, where multiple digital wallets compete, there are no issuer fees whatsoever." Furthermore, the Credit Union Action alleges that "Apple has further cemented its market power by preventing all US-based card issuers from passing on Apple Pay's fees to consumers." An issuer who wants to have access to Apple Pay "must agree not to charge its cardholders for Apple Pay transactions. This restraint prevents issuers from using differential pricing to drive cardholders to lower cost alternative modes of payment." Thus, the Credit Union Action includes allegations about the anticompetitive effects of anti-steering provisions that are similar to the Epic Games Action allegations.

396.    Furthermore, the Credit Union Action alleges that "Apple bundles the 'e-commerce' functionality with the 'tap-and-pay' service and requires that issuers who accept the latter also accept the former. As with tap-and-pay, when a user completes an Apple Pay transaction in e-commerce, members of the class must pay the same supracompetitive charges to Apple. Thus, even though Apple's exclusionary conduct—i.e., the restriction on the use of NFC technology— operates on point-of-sale transactions, Apple, by bundling its tap-and-pay and e-commerce services, can extract the same monopoly rents on transactions in e-commerce. This compounds the injury card issuers suffer."

397.    The Credit Union Action also refers to how the EC was already investigating and at the time preliminarily concluded that Apple's NFC-related restrictions likely violated

competition laws.  On September 27, 2023, the Court mostly denied Apple's motion to dismiss the Credit Union Action.

398.    Following the DOJ Action, numerous private parties have also filed actions alleging antitrust violations in the smartphone and smartwatch markets.  These actions were consolidated into an MDL in the United States District Court for the District of New Jersey, where the DOJ Action is being adjudicated.  The private actions make further allegations that illustrate Apple's anticompetitive conduct.

399.    Direct smartwatch purchasers ("direct smartwatch purchasers") alleged that "Apple use[d] . . . anticompetitive acts and agreements to degrade user experience, block innovation, hamper app developers, and stifle competition with . . . the Apple Watch[.]"[7]  Thus, while the DOJ alleged that Apple used the Apple Watch to lock in iPhone users, the direct smartwatch purchasers alleged that Apple used similar conduct and tactics to lock in Apple Watch users who relied on the iPhone, and therefore, Apple created a smartwatch monopoly where rival Android- or other OS-based smartwatches cannot compete with the Apple Watch.  The direct smartwatch purchasers further alleged:

> Apple has followed the tech monopolist's playbook.  It first forces key third parties to sign illegal agreements that block competitors from offering smartwatches with basic features, such as the ability to reply to text messages, and prevent third-party app developers from marketing iPhone apps that work with competing smartwatches.  Apple's agreements limit competition from other smartwatches and have contributed to companies such as Samsung and Google declining to make smartwatches that connect to the iPhone, further restricting choice for iPhone users.
>
> Then, for the few competitors that remain, Apple ensures they cannot compete on the merits by continually updating and redesigning the iPhone operating system in ways that disrupt and degrade competing smartwatches, harming its own iPhone users who have ventured to purchase competing smartwatches.  Apple creates an unending barrage of problems that cause competitor smartwatches to disconnect from paired iPhones and constrain the information competitor smartwatches can provide their users.
>
> Apple's tactics are familiar: Microsoft used a combination of illegal agreements and illegal design choices to exert control over the operating system and web browser markets in the 1990s.  And more recently, Google used a combination of illegal agreements and artificial technical constraints to monopolize the markets for digital publisher advertising tools and app stores on Android smartphones.

---

[7]    Direct Apple Watch Purchaser Plaintiffs' First Amended Class Action Complaint, *In re Apple Inc. Smartphone Antitrust Litig.,* No. 2:24-md-03113-JXN-LDW (D.N.J. July 30, 2025), ECF No. 86.

Apple's monopolistic abuses have been enormously successful. As a result of its conduct, approximately 79% of iPhone owners who own a smartwatch have an Apple Watch. At the same time, competitor smartwatches are disappearing. Less than two years after Apple first released the Apple Watch in 2015, Apple's anticompetitive conduct led to the failure of Pebble, a then-leading maker of iOS-compatible smartwatches. Following Apple's introduction of the Apple Watch, three of the world's largest consumer-technology companies have either stopped making smartwatches that connect to iPhones or declined to enter that market. In 2021, Samsung—the world's leading smartphone manufacturer—stopped making smartwatches that connect to the iPhone. In 2022, Meta [Platforms, Inc. ("Meta")] abandoned plans to launch a smartwatch that would compete with the Apple Watch. And that same year, Google announced that it would not release its Google Pixel Watch for iOS, citing Apple's anticompetitive restrictions. Meanwhile, Samsung and Google continue to release successful smartwatches that connect to Android smartphones.

Apple's monopolistic abuses have also been enormously profitable. In 2023, Apple reportedly earned an estimated $23.8 billion in revenue from Apple Watch sales, approximately the same annual revenue as McDonald's globally.

Apple's years-long campaign to limit smartwatch competition has harmed Apple iPhone users. Because of Apple's anticompetitive conduct, iPhone users who want a fully functional smartwatch have only one option: the Apple Watch. And for iPhone users who insist on purchasing a competitor smartwatch, Apple makes that smartwatch needlessly difficult to use. By foreclosing competition, Apple has been able to charge higher-than-competitive prices for its Apple Watch.

400. Going into more detail than the DOJ Action, the direct smartwatch purchasers describe how Apple has stifled specific competitors in the smartwatch space. By way of background, the direct smartwatch purchasers describe how Apple's conduct in the smartwatch market is similar to how it had first lured and then shut out other rivals:

Apple's conduct in the smartwatch market bears a striking resemblance to its conduct in markets for other iPhone-enhancing accessories. At first, Apple appears to allow the arrival of iOS-connected devices because they improve the iPhone user experience, provide innovative functionality, and increase demand for iPhones. But once Apple develops its own competing product, it limits or degrades the functionality of the non-Apple device, interferes with third-party software designed to improve the non-Apple device, and otherwise discourages iPhone users from adopting the non-Apple device.

For example, Apple initially celebrated the creation of location-tracking tags made by Tile, which allowed users to locate physical items with an iPhone app. But when Apple developed its own location-tracking tags (called "AirTags"), Apple sent Tile users iPhone notifications encouraging them to turn off the Tile app's tracking capabilities for privacy reasons. Apple only stopped some of this behavior after Tile's General Counsel and Chief Privacy Officer testified about the consequences of Apple's conduct before the House Antitrust Subcommittee in January 2020. Apple later developed an "accessory program" that gave Tile access to some of the capabilities of its location-sharing platform, but only on the condition that Tile shut down its competing location-sharing network.

Similarly, Apple initially supported and collaborated with Sonos, the maker of high-quality speakers that played music controlled directly from users' iPhones. But things changed when Apple announced its own iOS-connected speakers (called "HomePods"). Apple subsequently removed the ability to control Sonos speaker volume by pressing the iPhone's exterior volume buttons—requiring users instead to unlock their phone, open the Sonos app, and adjust the volume level on a slide. HomePod speakers, meanwhile, can still be controlled with a single push of the iPhone's exterior buttons.

Apple's treatment of Tile and Sonos showcases the company's willingness to employ strategies straight out of the tech monopolist's playbook: Apple will send users distressing and misleading notifications, deprive competitors of key technologies, and redesign its software platform to disrupt competitors' operations—all by exploiting its dominance over iPhone owners.

Apple has employed these practices—in conjunction with anticompetitive contracts—to monopolize the smartwatch market. Apple initially permitted third-party smartwatches to connect to iPhones, as they improved iPhone users' experience and made apple's flagship product more attractive. But then, once Apple decided to enter the smartwatch market, it began using anticompetitive contracts and its control over iOS to limit, disrupt, and degrade competitor smartwatches. Apple's strategy worked. After it entered a once-diverse and growing smartwatch market, few competitors are left today.

401. The direct smartwatch purchasers describe how smartphones' software dependence on linkage with a smartphone makes them vulnerable to Apple's anticompetitive attacks. To connect to a smartphone, a smartwatch requires the phone to have a "companion app" that "allows competitor smartwatches to pair and exchange information with the iPhone via Bluetooth." Smartwatches also have "sister" apps that "are not essential to pairing, but are designed to enhance the way the smartwatch works, or the way the smartwatch works with an iPhone." The smartwatches' dependence on companion and sister apps to function effectively means "Apple is able to exercise control over these apps and app developers to harm smartwatch competition." The fact that "all apps, including companion and sister apps, must be distributed on Apple's App Store" means that "Apple's smartwatch competitors and developers who make apps for their products have no choice but to agree to Apple's contracts governing iOS apps and their distribution on the App Store." Furthermore, "competitor smartwatches' dependency on companion apps allows Apple to introduce anticompetitive degradations to competitor smartwatches by updating and redesigning iOS software in ways that disrupt and harm competitor smartwatches and their users."

402. Apple makes all app developers sign the DPLA and agree to the App Review Guidelines. The DPLA, as a threshold matter, limits app developers' access to APIs to those that

137

Apple designates as "public" or "Documented," rather than the "private" APIs that Apple often reserves for its in-house apps.

403.    One set of APIs where rival smartwatches are restricted to the "public" ones are those related to messaging, versus Apple Watch, which has access to "private" messaging APIs. As a result, only the Apple Watch can send and receive messages through Apple's end-to-end encrypted platform, Apple Messages or iMessages.

404.    Apple has thwarted attempts to work around its messaging restrictions.  For example, in 2023, rival smartwatch Pebble's co-founder, Eric Migicovsky, released an app, Beeper Mini, which enabled Android smartphone users to message iPhone users through iMessage.  But Apple used the DPLA to block Beeper Mini from the App Store, and then re-engineered iMessage to prevent other apps from using Beeper Mini's program.

405.    Furthermore, Apple restricts access to the public APIs for SMS and RCS text messaging so that competitor smartwatches also cannot send or reply to text messages on other platforms.  Apple also prevents competitor smartwatches, such as Garmin or Pebble (which has since gone out of business), from using cellular networks to send or receive messages.

406.    These messaging restrictions crucially prevent many Android-based or other non-iOS based smartwatches from being competitive with the Apple Watch, even though they often have battery life orders of magnitude greater than the Apple Watch, better AI assistance integration, and other features that would, standing alone, make them better than the Apple Watch. Competitors Apple has stifled include major companies like Samsung and Google, but also smaller smartwatch-specialized companies like Pebble or Garmin.

407.    Apple has made similar restrictions to APIs that have hampered the ability of rival smartwatches from receiving notifications or from having notifications customized either in direction (which ones get sent to the smartwatch and which get sent to the smartphone) and in number.  Apple Watch, on the other hand, can be set to have only select notifications go to it while others go to the iPhone.

408.    Apple also restricts mobile wallet APIs from rival smartwatches, unlike the Apple Watch, which by default is integrated with an iPhone user's Apple Wallet.  Mobile wallets are an

1    important feature for smartwatches—for example, even Garmin, which only makes smartwatches

2    but not smartphones, invested in developing a mobile wallet called "Garmin Pay."

3    409.    In addition to restricting access to APIs through conditions in the DPLA, Apple

4    also uses the App Review process to slow down the rollout of new features and other updates for

5    rival smartwatches, which creates a worse user experience and is another factor in discouraging

6    iPhone users from buying rival smartwatches rather than the Apple Watch.

7    410.    The Guidelines also contain anti-steering-like provisions that hamper the

8    discoverability of sister apps associated with rival smartwatches: Guideline 2.3.10 prevents an app

9    from including "names, icons, or imagery of other mobile platforms in [the] app or metadata" that

10    in turn prevents an app from using topical search words, for example, as well as other ways to

11    improve discoverability; Apple also uses the App Review process to shut down sister apps that

12    refer to a rival smartwatch, further preventing discoverability, while encouraging the sister app to

13    highlight its compatibility with Apple Watch.

14    411.    Beyond using process as an excuse to degrade competition, Apple also uses its

15    control of the App Store and iOS to degrade competitor smartwatches' ability to deliver

16    information or keep connected to the iPhone through frequent updates and redesigns of iOS.

17    412.    Because a smartwatch must continually exchange data with a user's smartphone to

18    operate effectively, "background execution"—when an app operates even when it is not open and

19    displayed on the iPhone screen—is especially important to a smartwatch's effective operation.

20    Apple's updates have given rival smartwatches rapidly decreasing amounts of time to execute in

21    the background: when the Apple Watch was released, apps had three minutes to complete

22    background execution; when Apple released iOS 13 in 2019, it cut that time down to 30 seconds;

23    and subsequent iOS releases have pared this time down to 10 seconds.  This drastically shortened

24    time means smartwatches cannot transfer and keep up to date all the information a user transfers

25    between their smartphone and smartwatch.  This has also led rival smartwatches to eliminate

26    certain features.  Apple further restricts background execution of rival smartwatches when an

27    iPhone is in Low Power Mode, which iPhone users often use to conserve battery power.  Apple

28    also decreases the ability of a rival smartwatch from receiving private notifications unless an

iPhone user enables a preview notification on the iPhone, which for many users defeats the point of having a private notification in the first place. Apple also prevents rival smartwatches from sending information to Apple Health, purportedly because of a different measurement standard that rival smartwatches often use. The deteriorated performance and limited functionality hurt the user experience. Apple Watch, on the other hand, does not have similarly short or arbitrary time limits to complete background execution. The European Commission recognized this problem, telling Apple in March 2025 that it needed to comply with the DMA by "allow[ing] third parties effective interoperability with the same background execution feature" that is "available to Apple[.]"

413. Furthermore, iOS updates often introduce bugs, delays, and connection issues that further degrade the user experience for a rival smartwatch. Apple further degrades the user experience for rival smartwatches by presenting "scare screens" asking a user if and when they want to enable location tracking, key to unlocking the full functionality of a smartwatch, whenever a user opens an app. But Apple also does not warn users that turning off background location tracking can hamper certain features, thus further degrading the user experience for rival smartwatches. Apple also hampers the Bluetooth connection between an iPhone and a rival smartwatch: when a user turns off Bluetooth, this turns off the connection between an iPhone and a rival smartwatch, even though with Bluetooth "off," the connection is still on between an iPhone and the Apple Watch. Apple also arbitrarily requires companion apps for rival smartwatches to be open in the background to function.

414. Apple, however, does not receive the brunt of complaints about these problems; rather, the rival smartwatch maker is often blamed by the user for disconnections, degraded functions, and limited features. As a result of Apple's anticompetitive practices that degrade the user experience, while dodging blame for causing this degraded experience, Apple maintains a high market share for iOS connected smartwatches: in 2023, the Apple Watch constituted approximately 79% of the iOS-connected smartwatch market. Apple's dominance is so great that three large technology companies—Google, Meta, and Samsung—have either refused to enter the smartwatch market or have exited. Meanwhile, even though Apple Watch is often inferior to

Android-supported smartwatches in terms of having fewer or less advanced features and costing much more (often by orders of magnitude). While the prices of Android-supported smartwatches have in general been lower than they were in 2018–2020, the Apple Watch price has remained about the same since then.

415. iPhone direct purchasers also added allegations in their complaint[8] that further illustrate Apple's dominance in the performance smartphone market, iOS distribution, and the importance of both for Apple's continued market dominance:

    a. iPhone sales continue to drive Apple's financial performance, accounting for a majority of Apple's revenues every year since 2012, with a profit margin exceeding 30% per device.

    b. Following iPhone sales, the second largest source of revenue for Apple is "Services," and an important complement to the device sales are "Wearables, Home, and Accessories." Those two categories account for approximately one third of Apple's revenues, or four times what Apple makes from Mac computer sales.

    c. Phillip Shoemaker, former director of app review for the App Store, has acknowledged that App Store rules were often "arbitrary" and "arguable" while "Apple has struggled with using the App Store as a weapon against competitors." He further acknowledged, "Apple has complete and unprecedented power over their customers' devices. The decisions they make with regards to third-party apps needs to be above reproach, and currently are not."

    d. App Store profits are enormous, with some estimating it to be more than $85 billion per year.

    e. Jobs, during the early days of implementing the App Store, admitted that requiring developers to use Apple's IAP would mean some "roadkill" but that he did not "feel guilty" about it.

---

[8]    Direct Purchaser Plaintiffs' Consolidated Class Action Complaint, *In re Apple Inc. Smartphone Antitrust Litig.*, No. 2:24-md-03113-JXN-LDW (D.N.J. July 30, 2025), ECF No. 87.

f.   Apple has used its anti-steering and other contractual and technical provisions to hamper the implementation of WeChat in the United States, which is one of the dominant super apps in China, and has only agreed to allow WeChat to tell users about WeChat Pay, its in-app purchasing processor, if WeChat shares its mini-program revenues with Apple.

g.   In a deposition in the Epic Games Action, Eddy Cue had acknowledged that Apple could have implemented "crosscompatibility with the iOS platform so that users of both platforms would have been able to exchange messages with one another seamlessly," but Apple had decided to not do so.

h.   Apple implemented the RCS protocol in 2023 shortly before the DOJ filed suit, but the rollout has been subject to many user complaints, RCS chains can easily break in a group chat if one user sends an SMS message, and RCS messaging does not enjoy end-to-end encryption.

i.   In 2024, while Apple opened access to its NFC chip to third parties in response to regulatory pressure from the EU (and the DOJ Action), Apple made developers enter into new commercial agreements with new eligibility requirements and fees.

j.   "Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware, facilitate switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling the development of cross-platform technologies.  For instance, Apple has undermined third-party location trackable devices that fully function across platforms.  Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime.  Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit.  Protocols that Apple has placed around new 'eSIM' technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number.  Apple has impeded

142

cross-platform cloud storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult.  Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones.  And Apple has worsened its users' experience by making it difficult for iPhone users to use superior voice and AI assistants and steering users to use Siri as a voice assistant."

k.  "Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers.  For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well.  The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car.  At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct."

416.  "Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone.  Apple's smartphone dominance extends to CarPlay, an Apple infotainment system that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car.  Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. Indeed, in 2022, Apple engineering manager Emily Schubert revealed that 98% of new cars in the United States come with CarPlay installed—and that a reported 79% of U.S. buyers would only buy a car if it supported CarPlay."

## F.  Apple Has Also Been Fined Billions of Euros for Anti-Steering and Other Anticompetitive Conduct

417.  On June 15, 2020, the European Commission "opened formal antitrust investigations to assess whether Apple's rules for app developers on the distribution of apps via the App Store violates EU competition rules.  The investigations concern in particular the

mandatory use of Apple's own proprietary in-app purchase system and restrictions on the ability of developers to inform iPhone and iPad users of alternative cheaper purchasing possibilities outside of apps."  The investigation was in response to "separate complaints by Spotify" filed in March 2019 "and by an e-book/audiobook distributor" filed in March 2020 "on the impact of the App Store rules on competition in **music streaming** and **e-books/audiobooks**."  [Emphasis in original].  The EC was particularly concerned with "restrictions imposed by Apple in its agreements with companies that wish to distribute apps to users of Apple devices" through (1) "The mandatory use of Apple's own propriety **in-app purchase system 'IAP'** for the distribution of paid digital content.  Apple charges app developers a 30% commission on all subscription fees through IAP" and (2) "Restrictions on the ability of developers to inform users of **alternative purchasing possibilities** outside of apps.  While Apple allows users to consume content such as music, e-books and audiobooks purchased elsewhere (e.g. on the website of the app developer) also in the app, its rules prevent developers from informing users about such purchasing possibilities, which are usually cheaper."  [Emphasis in original].

418.    In its June 2020 announcement, the EC expressed its "concerns that Apple's restrictions may distort competition for music streaming services [and e-books and audiobooks] on Apple's devices.  Apple's competitors have either decided to disable the in-app subscription possibility altogether or have raised their subscription prices in the app and passed on Apple's fee to consumers.  In both cases, they were not allowed to inform users about alternative subscription possibilities outside of the app.  The IAP obligation also appears to give Apple full control over the relationship with customers of its competitors subscribing in the app, thus dis-intermediating its competitors from important customer data while Apple may obtain valuable data about the activities and offers of its competitors."

419.    Also on June 15, 2020, the EC "opened a formal antitrust investigation to assess whether Apple's conduct in connection with Apple Pay violates EU competition rules.  The investigation concerns Apple's terms, conditions and other measures for integrating Apple Pay in merchant apps and websites on iPhones and iPads, Apple's limitation of access to the Near Field Communication (NFC) functionality ('tap and go') on iPhones for payments in stores, and alleged

1    refusals of access to Apple Pay."  The EC explained, "Apple Pay is Apple's proprietary mobile

2    payment solution on iPhones and iPads, used to enable payments in merchant apps and websites

3    as well as in physical stores."  The EC's "preliminary investigation" uncovered "concerns that

4    Apple's terms, conditions, and other measures related to the integration of Apple Pay for the

5    purchase of goods and services on merchant apps and websites on iOS/iPadOS devices may distort

6    competition and reduce choice and innovation."  Furthermore, "Apple Pay is the only mobile

7    payment solution that may access the NFC 'tap and go' technology embedded on iOS mobile

8    devices for payments in stores.  The investigation will also focus on alleged restrictions of access

9    to Apple Pay for specific products of rivals on iOS and iPadOS smart mobile devices."

10          420.    On April 29, 2021, the EC "informed Apple of its preliminary view that it distorted

11    competition in the music streaming market as it abused its dominant position for the distribution

12    of music streaming apps through its App Store."  The EC took "issue with the mandatory use of

13    Apple's own in-app purchase mechanism imposed on music streaming app developers to distribute

14    their apps via Apple's App Store" and was "concerned that Apple applies certain restrictions on

15    app developers preventing them from informing iPhone and iPad users of alternative, cheaper

16    purchasing possibilities."

17          421.    In its April 2021 press release, the EC explained that it preliminarily found "that

18    Apple has a **dominant position** in the market for the distribution of music streaming apps through

19    its App Store.  For app developers, the App Store is the sole gateway to consumers using Apple's

20    smart mobile devices running on Apple's smart mobile operating system iOS.  Apple's devices

21    and software form a '*closed ecosystem*' in which Apple controls every aspect of the user

22    experience for iPhones and iPads."  [Emphasis in original].  Furthermore, "Apple's App Store is

23    part of this ecosystem and the only app store that iPhone and iPad users can use to download apps

24    for their mobile devices."  The EC "found that users of Apple's devices are very loyal to the brand

25    and they do not switch easily.  As a consequence, in order to serve iOS users, app developers have

26    to distribute their apps via the App Store, subject to Apple's mandatory and non-negotiable rules."

27    Furthermore, the EC found that in following Apple's requirement that app developers use its IAP,

28    which Apple charges a 30% commission for, "most streaming providers passed this fee on to end

1  users by raising prices."  Furthermore, the EC expressed concern that Apple's anti-steering

2  provisions caused "users of Apple devices [to] pay significantly higher prices for their music

3  subscription services or they are prevented from buying certain subscriptions directly in their

4  apps."  The EC expressed its "preliminary view is that Apple's rules distort competition in the

5  market for music streaming services by raising the costs of competing music streaming app

6  developers.  This in turn leads to higher prices for consumers for their in-app music subscriptions

7  on iOS devices.  In addition, Apple becomes the intermediary for all IAP transactions and takes

8  over the billing relationship, as well as related communications for competitors."  The EC warned,

9  "[i]f confirmed, this conduct would infringe Article 102 of the Treaty on the Functioning of the

10 European Union [("TFEU")] that prohibits the abuse of a dominant market position."

11        422.    On February 27, 2023, the EC "sent a Statement of Objections to Apple clarifying

12 its concerns over App Store rules for music streaming providers."  Though the EC "no longer

13 take[s] a position as to the legality of the IAP obligation for the purposes of this antitrust

14 investigation[,]" it did "take[] the preliminary view that Apple's anti-steering obligations are unfair

15 trading conditions in breach of Article 102" of the TFEU.  The EC explained that it was "concerned

16 that the anti-steering obligations imposed by Apple on music streaming app developers prevent

17 those developers from informing consumers about where and how to subscribe to streaming

18 services at lower prices.   These anti-steering obligations: (i) are **neither necessary nor**

19 **proportionate** for the provision of the App Store on iPhones and iPads; (ii) are **detrimental** to

20 users of music streaming services on Apple's mobile devices who may end up paying more; and

21 (iii) **negatively affect** the interests of music streaming app developers by limiting effective

22 consumer choice."  [Emphasis in original].

23        423.    On March 3, 2024, the EC "fined Apple over €1.8b for abusing its dominant

24 position on the market for the distribution of music streaming apps to iPhone and iPad users ('iOS

25 users') through its App Store.  In particular, the Commission found that Apple applied restrictions

26 on app developers preventing them from informing iOS users about alternative and cheaper music

27 subscription services available outside of the app ('anti-steering provisions').  This is illegal under

28 EU antitrust rules."

424. The EC further explained: "Apple is currently the sole provider of an App Store where developers can distribute their apps to iOS users throughout the European Economic Area ('EEA'). Apple controls every aspect of the iOS user experience and sets the terms and conditions that developers need to abide by to be present on the App Store and be able to reach iOS users in the EEA." Furthermore, the EC "found that Apple **bans music streaming app developers from fully informing iOS users about alternative and cheaper music subscription services** available outside of the app and from **providing any instructions** about how to subscribe to such offers." [Emphasis in original]. These anti-steering provisions include prohibiting app developers from: (1) "[i]nforming iOS users within their apps about the prices of subscription offers available on the internet outside of the app[,]" (2) "[i]nforming iOS users within their apps about the price differences between in-app subscriptions sold through Apple's in-app purchase mechanism and those available elsewhere[,]" or (3) "[i]ncluding links in their apps leading iOS users to the app developer's website on which alternative subscriptions can be bought. App developers were also prevented from contacting their own newly acquired users, for instance by email, to inform them about alternative pricing options after they set up an account."

425. The EC "conclude[d] that Apple's anti-steering provisions amount to **unfair trading conditions**, in breach of Article 102(a) of the Treaty on the Functioning of the European Union ('TFEU'). These anti-steering provisions are **neither necessary nor proportionate** for the protection of Apple's commercial interests in relation to the App Store on Apple's smart mobile devices and **negatively affect the interests of iOS users**, who cannot make informed and effective decisions on where and how to purchase music streaming subscriptions for use on their device." [Emphasis in original].

426. The EC further found that "Apple's conduct, which lasted for almost **ten years**, may have led many iOS users to **pay significantly higher prices for music streaming subscriptions** because of the high commission fee imposed by Apple on developers and passed on to consumers in the form of higher subscription prices for the same service on the Apple App Store. Moreover, Apple's anti-steering provisions led to non-monetary harm in the form of a degraded user experience: iOS users either had to engage in a cumbersome search before they

found their way to relevant offers outside the app, or they never subscribed to any service because they did not find the right one on their own."  [Emphasis in original].

427.    In explaining the fine, the EC "took into account the duration and gravity of the infringement as well as Apple's total turnover and market capitalization.  It also factored in that Apple submitted incorrect information in the framework of the administrative procedure."  The EC also "add[ed] to the basic amount of the fine an additional lump sum of €1.8 billion to ensure that the overall fine imposed on Apple is sufficiently deterrent."  The EC explained that this enhancement "was necessary in this case because a significant part of the harm caused by the infringement consists of non-monetary harm, which cannot be properly accounted for under the revenue-based methodology" of the EC's fining guidelines and "the fine must be sufficient to deter Apple from repeating the present or a similar infringement; and to deter other companies of a similar size and with similar resources from committing the same or a similar infringement."

428.    Furthermore, the EC "ordered Apple to remove the anti-steering provisions and to refrain from repeating the infringement or from adopting practices with an equivalent object or effect in the future."

429.    Despite Apple being subject to orders to stop its anti-steering practices by the European Commission and by this Court, Apple continued to engage in these violations.  On March 24, 2024, only weeks after the above fine was levied, the EC opened another investigation concerning whether Apple's anti-steering rules violated the Digital Markets Act (DMA).  The EC explained, "Article 5(4) of the DMA requires gatekeepers to allow app developers to 'steer' consumers to offers outside the gatekeepers' app stores, free of charge."  The EC expressed concern that "Apple's measures may not be fully compliant" because it "impose[s] various restrictions and limitations."  The EC expressed that Apple "constrain[ed] . . . developers' ability to freely communicate and promote offers and directly conclude contracts, including by imposing various charges."

430.    In its March 24, 2024 press release, the EC also "opened proceedings against Apple regarding their measures to comply with obligations to (i) enable end users to easily uninstall any software applications on iOS, (ii) easily change default settings on iOS and (iii) prompt users with

1  choice screens which must effectively and easily allow them to select an alternative default service,

2  such as a browser or search engine on their iPhones."  The EC expressed that it was "concerned

3  that Apple's measures, including the design of the web browser choice screen, may be preventing

4  users from truly exercising their choice of services within the Apple ecosystem, in contravention

5  of Article 6(3) of the DMA."

6      431.    The EC also announced it was "taking other investigatory steps to . . . clarify

7  whether . . . **Apple's new fee structure** and other terms and conditions for alternative app stores

8  and distribution of apps from the web (sideloading) may be defeating the purpose of its obligations

9  under Article 6(4) of the DMA."  [Emphasis in original].

10     432.    On June 23, 2024, the EC informed Apple of its preliminary view that its anti-

11 steering rules violated the DMA.  The EC also "opened a new non-compliance procedure against

12 Apple over concerns that its new contractual requirements for third-party app developers and app

13 stores, including Apple's new 'Core Technology Fee', fall short of ensuring effective compliance

14 with Apple's obligations under the DMA."

15     433.    Concerning the anti-steering rules, in its June 23, 2024 press release, the EC

16 explained, "[u]nder the DMA, developers distributing their apps via Apple's App Store should be

17 able, free of charge, to inform their customers of alternative cheaper purchasing possibilities, steer

18 them to those offers and allow them to make purchases."  The EC preliminarily found that Apple's

19 "business terms governing its relationship with app developers" did not "**allow developers to**

20 **freely steer their customers**.  For example, developers cannot provide pricing information within

21 the app or communicate in any other way with their customers to promote offers available on

22 alternative distribution channels."  [Emphasis in original].  Furthermore, "under most of the

23 business terms available to app developers, Apple **allows steering only through** '**link-outs**', i.e.,

24 app developers can include a link in their app that redirects the customer to a web page where the

25 customer can conclude a contract.  The link-out process is subject to several restrictions imposed

26 by Apple that prevent app developers from communicating, promoting offers and concluding

27 contracts through the distribution channel of their choice."  Furthermore, "[w]hilst Apple can

28 receive a fee for facilitating via the AppStore the initial acquisition of a new customer by

developers, the **fees charged by Apple go beyond what is strictly necessary** for such remuneration.  For example, Apple charges developers a fee for every purchase of digital goods or services a user makes within seven days after a link-out from the app."  [Emphasis in original].

434.    Furthermore, on June 23, 2024, the EC also announced "a third non-compliance investigation into Apple's new contractual terms for developers as a condition to access some of the new features enabled by the DMA, notably the provision of alternative app stores or the possibility to offer an app via an alternative distribution channel.  Apple has so far kept the option to subscribe to the previous conditions, which do not allow alternative distribution channels at all." The EC "will investigate whether these new contractual requirements for third-party app developers and app stores breach Article 6(4) of the DMA and notably the necessity and proportionality requirements provided therein."  These practices include: "Apple's Core Technology Fee, under which developers of third-party app stores and third-party apps must pay a €0.50 fee per installed app"; "Apple's multi-step user journey to download and install alternative app stores or apps on iPhones" that includes "various information screens displayed by Apple to the user"; and "[t]he eligibility requirements for developers related to the ability to offer alternative app stores or directly distribute apps from the web on iPhones.  The Commission will investigate whether these requirements, such as the 'membership of good standing' in the Apple Developer Program, that app developers have to meet in order to be able to benefit from alternative distribution provided for in the DMA comply with the DMA."  [Emphasis removed].  The EC also "will continue undertaking preliminary investigative steps outside of the scope of the present investigation, in particular with respect to the checks and reviews put in place by Apple to validate apps and alternative app stores to be sideloaded."

435.    On April 22, 2025, the EC "found that Apple breached its anti-steering obligation under the Digital Markets Act (DMA)" and fined Apple €500 million.  The EC explained, "[u]nder the DMA, app developers distributing their apps via Apple's App Store should be able to inform customers, free of charge, of alternative offers outside the App Store, steer them to those offers and allow them to make purchases."  The EC "found that Apple fails to comply with this obligation.  Due to a number of restrictions imposed by Apple, app developers cannot fully benefit

1  from the advantages of alternative distribution channels outside the App Store.  Similarly,

2  consumers cannot fully benefit from alternative and cheaper offers as Apple prevents app

3  developers from directly informing consumers of such offers.  The company has failed to

4  demonstrate that these restrictions are objectively necessary and proportionate."

5      436.   In addition to the fine, which "takes into account the gravity and duration of the

6  non-compliance[,]" the EC also "ordered Apple to remove the technical and commercial

7  restrictions on steering and to refrain from perpetuating the non-compliant conduct in the future,

8  which includes adopting conduct with an equivalent object or effect."

9      437.   The EC also announced on April 22, 2025, that it had reached a deal with Apple

10  concerning its "user choice obligations under the" DMA.  As a result of a "constructive dialogue"

11  between the EC and Apple, the Company "changed its browser choice screen, streamlining the

12  user experience of selecting and setting a new default browser on iPhone" and "Apple also made

13  it easier for users to change default settings for" other features, as well as some other measures

14  making it easier for users to uninstall several pre-installed apps—"a functionality previously

15  unavailable."  Nevertheless, the EC "will keep monitoring Apple's measures and continue its

16  regulatory dialogue to ensure full and effective user choice, as safeguarded by the DMA."

17      438.   Even after being fined €500 million, by late June 2025 Apple was facing additional

18  charges, when it resisted an order to inform customers of alternatives to the app store.  Fines under

19  the DMA can be as high as 5% of average daily worldwide revenues per day of non-compliance.

20      439.   In addition, on March 31, 2025, the French antitrust regulatory fined Apple €150

21  million for how Apple's app tracking transparency system failed to comply with the General Data

22  Protection Regulation's privacy rules, by forcing apps to display multiple pop-ups and make their

23  use excessively complex.

24      440.   The latest instance of Apple's malicious compliance is its claim, after its September

25  2025 reveal of upcoming product developments, that it cannot offer advanced translation features

26  through AirPod in Europe because of purported requirements under the DMA.  But a European

27  Commission official stated that Apple had unilaterally made this decision, without consulting with

28  the EC, and further stated, "[t]he DMA does not impede the launch of new products in EU markets.

To the opposite, it preserves innovation and freedom of choice[.]"

**G.    The United Kingdom Competition and Markets Authority Found that Apple Is Dominant in Its Mobile Ecosystem**

441.    In January 2025, the UK Competition and Markets Authority ("CMA") announced an investigation into Apple regarding whether its mobile operating system, app stores, and web browsers hindered competitors.  Earlier, the House Report had cited with approval the CMA's earlier findings regarding Apple.

442.    On July 23, 2025, the CMA released a report concerning its "Strategic Market Status Investigation into Apple's Mobile Platform" with a "Roadmap of possible measures to improve competition in mobile ecosystems" (the "CMA Report").  Though the CMA Report applied specifically to the United Kingdom, most of its findings apply globally, as well.

443.    The CMA Report observed: "Through our investigation thus far, we have heard widespread concerns as to how a lack of competition in relation to Apple's Mobile Platform is impacting the ability of app developers (and businesses more broadly) to grow and bring innovative new products and services to market.  These concerns include:" (1) Apple's control over app distribution and the "lengthy and unpredictable" app review process; (2) Apple's app review process giving Apple access to competitor data because "Apple reviews new apps and updates to apps which compete with its own apps" (e.g., in music and streaming entertainment); (3) Apple's ranking algorithm being used "to preference its own apps over those of third parties"; (4) Apple's 30% commission rate "makes the distribution of some digital content and services unviable, with implications for producers of digital content and services like streaming of music and TV, newspapers, audiobooks, in-app gaming purchases like coins or tokens[,]" with distribution further hampered by Apple's anti-steering provisions; (5) Apple restricting access to iOS and iPadOS leads to "limiting the features and functionality third-party app developers can offer to consumers in their apps[,]" which then "provides Apple's own services with an advantage over those of third parties.  Concerns have been raised in areas such as digital wallets and connected devices"; and (6) "requir[ing] all browsers that wish to operate on iOS and iPadOS to use [Apple's] browser engine[,] WebKit, again limiting the features and functionality third-party

1    browsers can offer.  It is particularly important that this restriction does not hold back innovation

2    in mobile browsing, for example for mobile browsers incorporating AI."

3         444.    The CMA expressed that, "[t]aken cumulatively, these concerns could mean UK

4    consumers lose out" because: "(a) new and valuable innovations could be held back, for example

5    apps offering innovative services using AI"; "(b) choice is more limited, for example consumers

6    miss out on the wider set of options available for accessing content on their mobile devices, such

7    as rival app stores, web apps, super-apps, rival browsers or digital wallets"; and "(c) prices are

8    higher than they should be, for example app store commissions are above a competitive rate and

9    this feeds through into the price consumers pay for digital content and services accessed through

10   the mobile platform."

11        445.    The CMA "provisionally find[s] that Apple's Mobile Platform" (which consists of

12   the iOS, iPadOS, and their ecosystems, but not the physical phones themselves) "meets the SMS

13   conditions" because "Apple has substantial and entrenched market power in respect of the

14   provision of its Mobile Platform" and "faces limited competitive constraint from rival Mobile

15   Ecosystems."  The "SMS"—or "strategic market status"—is essentially a dominant market actor

16   that the CMA can regulate, by "introduc[ing] measures to promote competition and protect

17   consumers in relation to the relevant digital activity[.]"  Apple faces "limited competitive

18   constraint" because while it and Android both have approximately half the "mobile platform"

19   markets, Apple caters to a higher "price segment" than Google, with limited overlap, and

20   consumers who purchase mobile devices are "locked into that Mobile Platform[.]"  Moreover,

21   Apple's improvements to its platforms are driven not so much "in response to competition" but

22   more so by "other factors, such as driving greater sales of replacement Apple mobile devices.

23   These findings are reinforced by agreements between Apple and Google which limit their

24   incentives to compete [referring primarily to the agreement where Google shares search ad revenue

25   with Apple in exchange for default positioning on Apple devices' search access points]."

26        446.    The CMA Report concluded that "[f]or app developers distributing digital content

27   and services through Apple's Mobile Platform, the evidence shows that they have little alternative

28   if they want to reach a significant user base."  This is because "[t]here are significant barriers to

entry and expansion, which limit the threat of a new rival emerging or an existing rival growing into a greater competitive constraint on Apple."  For example, "[t]he need to attract a sufficient number of app developers to make the platform attractive for consumers as well as attract a sufficient number of consumers to make the platform attractive for app developers ('indirect network effects') is a particularly strong barrier which the likes of Microsoft, Samsung, Mozilla and Amazon have been unable to successfully navigate."  Furthermore, "[e]vidence indicates that, although technological developments such as AI and [augmented-reality/virtual-reality ("AR/VR")] products may affect Apple's conduct in relation to its Mobile Platform, they are not expected to significantly change Apple's position in the next five years."

447.    The CMA "also provisionally find[s] that Apple faces limited competitive constraints in relation to its content distribution (App Store and Safari) within its Mobile Ecosystem and from non-mobile alternatives."

448.    Regarding "native app distribution, Apple's policies prevent competition from alternatives to its App Store within Apple's Mobile Ecosystem (for example, alternative app stores are not permitted, nor is downloading apps from other sources – 'sideloading').  Web-based alternatives (like web-apps) provide only a weak competitive constraint.  Furthermore, non-mobile content distribution alternatives (such as gaming platforms) are typically seen as complements rather than substitutes to the App Store."

449.    Regarding "mobile browsers, Apple's Safari also faces limited competitive constraints within Apple's Mobile Ecosystem.  Although other mobile browsers are available – in March 2025, Safari had a web traffic share of supply of 86% on Apple's Mobile Ecosystem in the UK.  The ability of other mobile browsers to provide a competitive constraint is limited by several barriers to entry and expansion, in particular the requirement to use Apple's WebKit browser engine, as well as Safari's superior access to functionality, and choice architecture.  Alternatives to mobile browsers (namely native apps and AI tools) only provide a limited competitive constraint for a limited set of use cases.  Non-mobile browsing alternatives (such as desktop browsing) are generally considered a complement rather than a substitute for mobile browsing."

450.    The CMA also concluded: "There are no expected or foreseeable developments that

are likely (whether individually or in combination) to be sufficient in scope, timeliness and impact to eliminate Apple's substantial market power in the provision of its Mobile Platform over the next five years. This includes market developments, technological developments and regulatory developments. Accordingly, our provisional view is that Apple's substantial market power in the provision of its Mobile Platform is entrenched."

451. The CMA further "provisionally find[s] that Apple has a position of strategic significance in the provision of its Mobile Platform. Apple's Mobile Platform is used by a very large number of UK users ([e.g.,] to access, view and engage with digital content and services on their Apple mobile devices) and businesses in the UK ([e.g.,] as a means of reaching those users). The services provided by Apple as part of its Mobile Platform are important to a wide range and large number of other businesses in the UK to provide digital content and services to users of Apple's mobile devices."

452. The CMA, in addition to focusing on Apple's dominance of the iOS market, also discusses Apple's dominance of the iPadOS. Other than noting that Amazon is also a significant player in tablets, the analysis for both iOS and iPadOS is largely the same. The CMA also notes that while Amazon has some market share in tablets, it is a distant third to Apple and Android, and Apple has by far the largest share of the tablet market, "with over half of active tablets in 2024 being iPads." The CMA therefore concludes: "Apple's significant share of supply, which has experienced little change over a sustained period of time, is consistent with there being limited effective competitive constraint on Apple in tablets."

453. The CMA further concludes that "there are no foreseeable or expected market or technological developments that are likely to significantly change Apple's position, such that we do not anticipate substantial change to these shares of supply over the next five years."

454. Furthermore, in the smartphone market, CMA concluded that "Apple is by some distance the largest smartphone device manufacturer in the UK" since iOS only runs on smartphones that Apple manufactures, while Android runs on devices manufactured by Samsung, Huawei, Google, and smaller players.

455. Apple and Android effectively hold a duopoly, according to the CMA, but Android

1  offers only limited competition for Apple because "Apple and Google focus predominantly on

2  different price segments" and "end-users are often 'sticky' and disinclined to switch from their

3  current Mobile Ecosystem[.]"  The CMA "found no evidence of Apple adjusting its prices in

4  response to competition from Google in its internal documents."

5      456.  With regard to switching, the CMA found that only 4% of iOS users switched to

6  Android, while 14% of Android users have switched to iOS.  Furthermore, only 11% of users who

7  have not switched during their most recent smartphone purchase have even considered doing so.

8  Switching costs also appeared to be higher for iOS users rather than Android users: "Our consumer

9  survey results indicate that material perceived barriers apply to switching both to iOS and to

10  Android.  However, barriers appear to be more significant for iOS users that did not consider

11  switching than for the equivalent Android smartphone users, but 54% of Android smartphone users

12  that did not consider switching mentioned at least one barrier."  Furthermore, the CMA "found

13  substantial evidence from our consumer survey, internal documents (from both Google and Apple)

14  and third-party responses of material perceived barriers to switching related to: (i) learning costs

15  associated with switching; (ii) transferring data and apps across mobile devices; and (iii) losing

16  access to other devices (including connected devices) and having a worse experience of interacting

17  with friends' and family's devices."  Furthermore, "our consumer survey found that 35% of all

18  users that switched to iOS or Android experienced some difficulty with at least one aspect of the

19  switching journey, implying barriers to switching impose at least some actual costs on users that

20  do switch."  And "we received little evidence to suggest that these barriers are likely to weaken

21  over the next five years."

22      457.  The CMA indicated that Android did not drive improvements in Apple's iOS

23  because "there are factors other than competition which are likely driving some or all of Apple's

24  improvements to its Mobile Platform":

25          a.  "Apple's business model provides it with an incentive to improve its products and

26             services over time. . . .  Apple makes the majority of its revenues from selling

27             devices and, as almost all mobile devices purchased in the UK are replacement

28             devices, Apple has a strong incentive to offer some new features and functionality

to encourage iPhone and iPad end-users to buy a new mobile device."

b. "Apple is incentivised to generate more money from the existing user-base of its Mobile Ecosystem beyond the purchase of replacement mobile devices. Mobile Platform suppliers have an incentive to innovate in ways that increase the usage of mobile devices by end-users ([e.g.,] in terms of engagement or time spent) or increase the offerings available through apps (if innovations allow app developers to offer additional services or features that are charged for). This increases opportunities for generating additional revenue and may be of increasing importance given the more limited opportunities for further revenue growth in hardware sales to new end-users. . . .  Apple's revenue mix has been increasingly shifting away from devices and towards services."

c. High "stickiness" and switching costs, as buttressed by "internal documents" that do not reflect "any evidence that Apple is materially concerned about its end-users switching away or that Apple changes its commercial strategy in response to competitive threats" provides another reason to doubt that competition drives Apple's product innovations.

d. "The strength of Apple's brand may result in it facing less pressure to compete on quality. . . .  [B]rand loyalty can also strengthen market power by creating a barrier to switching and leading to consumer disengagement which can raise barriers to entry and expansion for rivals."

e. "The CMA's previous work has identified a range of areas where innovations have been held back in Mobile Ecosystems due to a lack of competition.  For example, the MBCG MI found that Apple's ban on alternative browser engines in its Mobile Platform, and therefore the lack of competition faced by Apple's WebKit browser engine, had materially limited the capabilities of mobile browsers and web apps." The CMA also quotes an email excerpted in the DOJ Action, where an Apple executive questioned whether Apple should release new features when existing ones are "'good enough' for the consumer."

458.    The CMA cautioned that though "weak competition does not necessarily mean . . . improvements and innovations will stop entirely[,]" nevertheless, "[t]he most damaging impact of sustained weak competition in key digital markets is the brake that this applies to the pace of innovation and progress over time, especially where potentially disruptive new technology and business models are held back.  This can be hard to measure, and where innovation is being held back in some way, it may well not be apparent to consumers that they are missing out and reports from consumers of being satisfied are not necessarily evidence that markets are delivering the best possible outcomes."  Furthermore, "[i]f Apple were to face stronger competition . . . or a more plausible threat of facing effective competition . . . it would likely have stronger incentives to invest, innovate and further improve its Mobile Platform."

459.    The CMA also examined how "revenue sharing agreements between Apple and Google . . . significantly limit their incentive to compete for users."  The CMA primarily examined the "Information Services Agreement" or "ISA" that Google and Apple have had since 2002, where Apple agrees to place Google Search on key Apple search access points (Safari, Siri, and Spotlight) in return for a share of revenues Google earns from search ads.  Apple is also entitled to a cut of revenue from searches run on Google Chrome on Apple devices.

460.    The CMA had previously "concluded that the terms and interplay of this significant revenue sharing between the two main browser vendors in Apple's Mobile Platform [Apple's Safari and Google's Chrome] limit Apple's and Google's financial incentives to compete in mobile browsers on Apple's Mobile Platform.  They alter the normal process of rivalry between Apple and Google as they significantly reduce the financial benefit of successfully winning a customer from their key rival."  This is particularly the case since "[t]he level of revenue share paid to Apple – and hence the revenue retained by Google – does not differ significantly depending on whether Apple's Safari or Google's Chrome browser is used."

461.    Furthermore, the CMA "consider[s] it likely that the revenue sharing provisions of the ISA affect the competitive dynamics between Apple and Google more broadly. . . .  [T]he scale of Google's payments to Apple under the ISA makes Google one of Apple's largest sources of revenue and profits, and revenue from mobile search (including through the ISA) accounts for the

majority . . . of Google's mobile revenues in the UK."  Furthermore, "[t]he ISA covers various products and services provided by Apple and Google (including their respective mobile browsers and Apple's virtual assistant) which are in competition via their respective Mobile Ecosystems."

462.    Because Google Search is the default search engine on various search access points on Apple devices under the ISA, "if an Android end-user using Google Search switches to an Apple mobile device, Google is likely to retain that user as a user of Google Search.  Therefore, the financial consequence on Google of losing a user from its Mobile Ecosystem are diminished compared to a situation in which the revenue-sharing provisions are not in place."

463.    Moreover, "Google has a wider incentive not to disrupt its relationship with Apple by competing with it head-on."  Google's default positioning on Apple devices, which accounts for about 43% of the UK market, and its positioning on Android devices gives Google the majority of searches in the UK, and "[t]his plays an important role in entrenching its highly profitable position in general search and makes it more difficult for general search rivals to compete."  Thus, "it is unlikely to be in Google's interest to disrupt its financially and strategically important relationship with Apple."

464.    Similarly, the CMA Report concluded that Android is unlikely to serve as a constraint on iOS for competition for developers.  Owing to how the two systems are not interoperable, and how both Google Play Store and iOS have approximately half of the total market, which do not overlap, "app developers consider both the App Store and the Play Store as 'must-have' and distinct distribution channels.  Therefore, they are unlikely to delist or deprioritise their listings on the App Store."

465.    The CMA concluded that Apple faced little competitive pressure from Android in setting its 30% commission, even when Apple has reduced its commission overall:

a.    "The App Store's annual average commission rate . . . remains relatively close to the headline rate of 30%.  This implies that the reduced rates apply only to a small proportion of the total value of transactions and the vast majority of revenue earned by app developers is charged at the headline rate of 30% - which has not been reduced since Apple launched the App Store in 2008."

b. "[S]ome of the most recent changes to Apple's commission rates including the Small Business Program and the changes to the 'Reader Rule' in 2021 may have come, at least in part, due to other factors unrelated to competition such as regulatory, legislative, and enforcement pressure."

466. The CMA "did not find evidence in Apple's internal documents from 2022 to 2024 of Apple monitoring Google's fees or responding to competition from Google in setting its own fees in the UK."

467. App developers appear to have little room to switch to a lower-commission app store even though almost half of the app developers surveyed by the CMA indicated that they felt the rates were too high.

468. The CMA's "profitability analysis show[s] that Apple was and is expected to continue to make high profits and that Apple is not being forced to erode those profits by responding to competition, [e.g.,] through reductions in commission rates."

469. The CMA similarly concluded that any improvements in quality, through improved features or functionality for app developers or users, "do not appear to be driven by strong competition from the Play Store[.]"

470. CMA "identified only one internal document from 2022 that directly compares the App Store's marketing functionalities with the functionalities available on Google's Play Store."

471. Furthermore, there are widespread complaints about the App Store's quality, and the fact that Apple has not resolved these issues is further evidence that it faces little competitive pressure: "[T]here are material concerns regarding the quality of services on the App Store. Specifically, 33 out of 55 native app developers submitted that they have concerns in relation to how Apple operates the App Store, and these concerns relate to several key aspects of app distribution, such as app discoverability, listing or updating apps, and Apple's use of app developers' data. We do not consider this is indicative of strong competition between Apple and Google on quality to attract app developers."

472. The CMA described the "significant barriers to entry and expansion in providing a competing Mobile Platform. This is illustrated by the exit or unsuccessful entry of well-resourced

companies in smartphones such as Microsoft and Amazon and the difficulties faced by those using versions of Android without [a suite of programs offered by Google]." The four main "barriers to entry and expansion" are:

    a.  "**Indirect network effects**: which result from the fact that a Mobile Platform is a two-sided platform connecting mobile device users with content providers." [Emphasis in original].

    b.  "**Barriers to provide individual components of a Mobile Platform**: as noted above, Apple's Mobile Platform comprises interconnected components, namely: (a) a mobile operating system (for smartphones and tablets respectively); (b) native app distribution; and (c) a mobile browser and browser engine. Therefore, in order to compete effectively with Apple's Mobile Platform, a rival would need to be able to provide (either itself or by outsourcing to a third party) a version of each of these components, in which they are configured to work together." [Emphasis in original].

    c.  "**Barriers relating to mobile devices**: a rival will also need mobile devices for its Mobile Platform to be installed upon. In other words, it would need to either produce its own mobile devices, or license its Mobile Platform to third-party mobile device [original equipment manufacturers ("OEMs")]." [Emphasis in original].

    d.  "**Ecosystem-wide barriers**: in addition to the barriers inherent in producing individual components of a Mobile Platform, there are additional barriers which apply at the Mobile Ecosystem level." [Emphasis in original].

473. The indirect network effects flow from how "a Mobile Platform is a two-sided platform connecting end-users with mobile content providers. The more end-users can access mobile content through the Mobile Platform, the more they value the Mobile Platform. In turn, content providers value a Mobile Platform more the greater the number of end-users using that Mobile Platform." This "creates a 'chicken and egg' problem where a Mobile Platform needs a critical mass of end-users to attract content providers, but it equally needs to offer a critical mass of mobile content to attract end-users." Thus, "it is difficult for a new entrant to gain traction as it

1    cannot attract one set of customers without the other."

2    474.    Apple, according to the CMA, admitted to the importance of these indirect network

3    effects.  Furthermore, "Microsoft, Samsung and Mozilla all submitted that their attempts to enter

4    failed because they were unable to attract enough app developers to create apps for their Mobile

5    Platforms."  The CMA also observed that "one of the reported reasons for the lack of success of

6    Amazon's Fire Phone . . . was its narrow selection of apps[.]"

7    475.    The CMA further cited how "[t]hird parties confirmed that indirect network effects

8    constitute a very significant barrier to entry.  Most (9 out of 13) third-party OEMs and app store

9    providers that responded to our information requests confirmed that network effects were an

10    important feature of Mobile Platforms.  Many app developers (28 out of 55) also confirmed this

11    or submitted that the number of users they can reach influences where they choose to distribute

12    their apps.  Most browser vendors submitted that web compatibility can limit the ability of smaller

13    browsers to grow.  Web compatibility generates an indirect network effect as web developers

14    maintain compatibility with browsers with enough users, which limits smaller browsers' ability to

15    grow."

16    476.    The CMA also found high barriers to provide individual components of a mobile

17    platform.  To begin with, "there are high barriers to supplying a mobile operating system[.]"  iOS,

18    iPadOS, and Amazon's Fire OS are not licensed out.  Google does license Android, but it does so

19    conditioned on an OEM entering the Android Compatibility Commitment ("ACC"), and thus

20    subjecting themselves to Google's compatibility criteria, but that makes it more difficult for an

21    Android-powered device "limited in their ability to differentiate their offering" that limits their

22    "ability to . . . compete with existing providers of Mobile Platforms."

23    477.    Moreover, the CMA found, another barrier to entry is the high cost in time and

24    money for developing and maintaining a new operating system, should licensing be unviable,

25    because "a significant portion of these costs are fixed and do not vary with the number of users of

26    the operating system, making it more difficult for a new entrant to compete against established

27    operating systems with large numbers of users and therefore lower costs per user."  Even Amazon,

28    which based its tablet operating system on the open-source code of Android, still admitted that "its

Android fork operating system has required substantial investments."

478.    Furthermore, indirect network effects form another barrier to creating a new operating system because a "successful mobile operating system . . . needs both a critical mass of end-users and content providers."

479.    Even if a new entrant can create or license a mobile operating system, "there are high barriers to supplying native app content as part of a new Mobile Platform[.]"  Because native apps are written for a specific operating system, a new entrant cannot simply pull apps from existing platforms.  But apps are subject to indirect network effects, so a new entrant would need a lot of users to incentivize developers to write apps for them, but to attract the users, the entrant would need a lot of apps, so this "chicken and egg" problem would likely also stop entrants.  Furthermore, because Apple and Google already own the most popular mobile apps, they can starve a new entrant from access, which would hamper their efforts to attract users (who expect these apps).  Finally, there would be high costs relating to developing and operating an app store, which include high initial fixed costs, which further impede new entrants.  The CMA also "do[es] not consider that any of the alternatives to native app distribution via an app store ([e.g.,] web apps) provide a viable substitute at present and this is unlikely to change over the next five years."

480.    A "Mobile Platform needs to be installed on a mobile device."  This is a significant barrier.  It cannot be installed on Apple because Apple uses only its own platform on the devices it manufactures.  And for Android, OEMs are often tied to Google because they have agreements with Google to license Android and a suite of Google-owned apps that are considered "must-have," such as Google Search, Chrome, and Gmail, and receive substantial payments from Google from those agreements.  Thus, most major OEMs will not want to switch away from the Google-controlled version of Android for a new provider's version.

481.    Though, theoretically, a new provider can manufacture its own mobile device to place its new platform on, the production and development process itself is costly, and serves as another barrier, because: "modern mobile devices are relatively high-tech pieces of hardware, requiring the sourcing and assembly of many components including the touchscreen, camera, processor, memory, speaker, and microphone.  Producing mobile devices efficiently requires the

1   establishment of a well-organised production process."

2       482.   The CMA also found that while "the barriers identified for each component above

3   have a cumulative effect in the sense that a rival Mobile Platform would need to provide all of

4   these components[,]" in addition, a new platform would have to contend with "additional barriers

5   which apply at the combined Mobile Ecosystem level as follows:" (1) a product would have to

6   have hardware and software well-integrated; (2) the new platform has to contend with the high

7   iOS and Android switching costs and "stickiness" of their respective users; (3) accessories and

8   other components of each respective ecosystem provides another "stickiness" factor and cost to

9   developing a true rival; and (4) the new entrant may not be able to take advantage of one part of

10  the ecosystem to support another (for example, how Google has been able to use its dominance in

11  search to support Android).

12      483.   Because of the "significant barriers to entry and expansion in providing a

13  competing Mobile Platform[,]" the CMA found "that Apple faces limited constraints by the threat

14  of entry and expansion of competing suppliers of Mobile Platforms."

15      484.   The CMA further found that "there are no expected or foreseeable [technological

16  and market] developments that are likely (whether individually or in combination) to be sufficient

17  in scope, timeliness and impact to eliminate Apple's substantial market power in relation to its

18  Mobile Platform over the next five years."

19      485.   Starting with artificial intelligence, and in particular, gen AI, where Apple's own

20  struggles to create and integrate features have been well documented, the CMA nevertheless found

21  that AI developments are not "likely to disrupt Apple's position in respect of its Mobile Platform

22  over the next five years"—as "many third-party views were that AI is not likely to substantially

23  disrupt Apple's position in respect of its Mobile Platform over the next five years" and "Apple's

24  internal documents . . . only included very limited mention of AI as a potential threat to its position

25  in respect of its Mobile Platform."

26      486.   Furthermore, the CMA found that "evidence suggests that Apple may be able to

27  use AI to strengthen its position in respect of its Mobile Platform and wider Mobile Ecosystem."

28  The integration of AI likely would "reinforce barriers to entry and expansion in Mobile Platforms"

1    because "[c]reating a highly integrated platform that facilitates smooth interactions between

2    different products and services across the operating system to compete effectively with Apple's

3    Mobile Platform offering can be costly."  Furthermore, third parties have told CMA "that Apple

4    may be able to use AI to strengthen its position in respect of its Mobile Platform and wider Mobile

5    Ecosystem" because, for example, Apple can use its "position as the operating system provider"

6    and may be able to "use AI to disintermediate between end-users and third party content and

7    service providers."  Moreover, Apple can strengthen its position by integrating AI features (not

8    necessarily developed in-house, but possibly through partnerships with existing AI providers) into

9    its devices.

10        487.    Similarly, Apple's struggles with creating an augmented-reality/virtual-reality

11   (AR/VR) device, in the lackluster sales of the Vision Pro, have been widely reported.  But the

12   CMA also concluded that developments in that market are unlikely to "significantly change

13   Apple's position in respect of its Mobile Platform" because, as many third parties told the CMA,

14   AR/VR devices are not likely to "hav[e] a significant commercial impact" or have a "limited scope

15   for future market disruption given this trend is largely a continuation of AR/VR trends in the past."

16   Furthermore, some third parties have told the CMA that AR/VR can actually "further entrench

17   Apple's position in its wider Mobile Ecosystem" because "connected devices are likely to remain

18   dependent on smartphone connections over the next five years, such that Apple's control over this

19   connection could enable it to raise barriers to competition in the supply of Mobile Platforms[.]"

20        488.    Thus, the CMA concluded that "Apple's Mobile Platform faces limited competitive

21   constraint from other Mobile Platforms and we have not seen evidence of expected or foreseeable

22   developments suggesting this is likely to change over the next five years."

23        489.    The CMA also concluded that Apple faces little competition from alternatives to

24   native-app distribution, as well as little competition to its browser and browser engine.

25        490.    Web apps, which can be downloaded through a mobile browser, would theoretically

26   be a source of competition to the App Store, which distributes native apps.  But "[t]he evidence

27   shows that within Apple's Mobile Ecosystem, web apps are used far less frequently than native

28   apps."  Furthermore, "for content providers, at present, web apps are not a viable substitute for

native apps downloaded from the App Store" because web apps have limited functionality, imposed by restrictions Apple has placed on mobile browsers, and limited discoverability, compared to native apps in the App Store.  Despite Apple's submission to the CMA that web apps are a source of competition, from the CMA's "analysis of Apple's internal documents" it "did not find evidence to suggest that Apple currently monitors the future impact of web apps on its Mobile Ecosystem."

491.    Cloud-based gaming apps and super apps also do not create significant competition for Apple.  Cloud-based gaming apps, for one thing, can only serve a subset of needs—gaming. Neither cloud-based gaming apps nor super apps have the same user base size as native app distribution.  Furthermore, as detailed in other litigation, Apple has used various contractual and technical restrictions to make super app or cloud-based app distribution impractical.

492.    The CMA also concluded that "[t]he evidence . . . does not indicate that AI-related developments are likely to significantly disrupt the App Store's position over the next five years[,]" both because "AI assistants are unlikely to replace the roles of apps . . . in a widespread or commercialised manner in this period" and "integrating AI tools in the App Store may provide Apple with greater control over how apps are presented to end-users, thus reinforcing its current position."  To reinforce the second point, the CMA pointed out that "Apple submitted that AI-related technologies could enable it to enhance its App Store's existing services and features, provide an interface for users to perform tasks and as such impact how users interact with their mobile devices and services . . . and connect with app developers."  And CMA's "assessment of Apple's internal documents from the last two years . . . found only limited mention of AI developments in the context of competition facing the App Store."  Furthermore, "any third-party AI-based content distribution models will remain reliant on Apple's App Store for distribution within Apple's Mobile Ecosystem and that their access to inputs such as on-device AI compute will likely be controlled by Apple as the operating system provider."

493.    CMA also considered Apple's argument that "it competes against PC and console app platforms" and that Apple claimed "that an increasing number of non-mobile devices other than desktop computers and gaming consoles ([e.g.,] notebooks, televisions, cameras, cars,

speakers and eBook readers) are becoming methods of distributing apps to consumers[.]"  But "third-party evidence overall demonstrates that non-mobile gaming and content distribution is viewed as a complementary, separate category of content distribution, rather than a viable substitute to the App Store:" (1) "mobile devices are generally used on the go, but other devices are typically used in a static location and have key differences in functionality such as screen sizes and keyboards"; (2) "a few gaming developers also submitted that certain games work best for mobile devices or may not function properly on other devices such as PCs or on portable gaming consoles"; (3) "a few games developers told us that there are differences in the user bases and reach of distribution methods on and off mobile devices"; (4) "one gaming distribution platform provider submitted that mobile devices are currently siloed from gaming on non-mobile devices because Apple imposes various restrictions that make its Mobile Ecosystem less accessible to third parties."  These restrictions include those "on alternative methods of app distribution and preventing app developers from steering users to external websites for app discovery and purchases"; and (5) "some content will not always be available across native apps on mobile devices and other platforms.  For example, low-end games for mobile devices may not be suitable for game consoles which usually offer high-end games that require considerable investment."

494.    Thus, the CMA concluded "that the alternatives available within Apple's Mobile Ecosystem, such as web-based content distribution, cloud-based gaming platforms and super apps impose only a weak competitive constraint on the App Store and we have not seen evidence of expected or foreseeable developments suggesting that this is likely to change significantly over the next five years."  Furthermore, the CMA "conclude[s] that the App Store faces limited competitive constraint from non-mobile content distribution alternatives which are typically seen as complements rather than substitutes to the App Store."

495.    The CMA also "[found] that [Apple's browser] Safari faces limited competitive constraints and this is unlikely to change over the next five years.  Although other mobile browsers are available on Apple's Mobile Ecosystem, these are limited by several barriers to entry and expansion, and Safari's consistently high share of supply indicates that these are a weak constraint."  Moreover, "Apple faces no competition on its Mobile Ecosystem to its browser engine

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

WebKit, and its provision of in-app browsing."  Furthermore, "[a]lternatives to mobile browsers, namely native apps, AI tools, and desktop browsing, only provide a limited competitive constraint for a limited set of use cases."

496.    Regarding mobile browsers, Google told the CMA that its browser, "Chrome has strong incentives to win users from Safari within Apple's Mobile Ecosystem, and competes strongly with significant investment and marketing efforts."  But, the CMA examined how Safari has had roughly an 86%–90% share of browser traffic on its Mobile Ecosystem for the last three years, while Chrome has had a share of roughly 10%–12%, with remaining browsers accounting for only 2%.  This "consistently high share of supply for many years" is "consistent with Safari facing limited competitive constraints."  Furthermore, as the CMA analyzed in a previous section of its Report, the Apple-Google ISA also dampens Google's incentives to compete with Apple for browser share, because, either with Safari or Chrome, Google Search has default placement, and with either Safari or Chrome, Google gives up the same share of search ad revenue to Apple. Apple's internal documents, according to the CMA, also "do not consider competition from rival mobile browsers."

497.    Regarding AI, the CMA held that the evidence "is mixed: whilst a few third parties state that AI could potentially have an impact on competition in mobile browsers, more third parties did not mention it as a potential significant development, and the extent of any impact within the next five years is presently highly uncertain."  Furthermore, "through its current position with Safari, and its control of its Mobile Ecosystem, Apple will continue to benefit from advantages such as pre-installation and default status, which are likely to limit the ability of new entrants to compete."

498.    Regarding mobile browser engines, Apple faces no competition because "[o]n Apple mobile devices, all mobile browsers are required to use Apple's WebKit browser engine ([i.e.,] as a result of the WebKit restriction), as specified in Apple's App Store Review guidelines." Apple's monopoly on browser engines within iOS and iPadOS "will not change unless Apple lifts its total prohibition on the use of alternative browser engines on its Mobile Ecosystem."

499.    Apple    also    faces    no    competition    from    "alternative    in-app    browsing

implementations" because "app developers have two options for implementing in-app browsing, both of which are provided by Apple and based on the WebKit browser engine. . . . This position will not change unless Apple lifts its total prohibition on the use of alternative in-app browsing implementations on its Mobile Ecosystem."

500.    Furthermore, the CMA found high barriers of entrance and expansion that limit the potential for future competition:

a.    There is low user awareness of alternative mobile browsers.

b.    Apple's requirement to use its proprietary browser engine, WebKit, means that other browser developers are constrained in "their ability to innovate and develop features[,]" "are prevented from developing their own in-app browsing implementations using their own browser engines[,]" and "increases their costs by requiring them to develop a WebKit-based version of their browser to enter as a mobile browser on Apple's Mobile Ecosystem, as opposed to being able to use the same browser engine that they use on other platforms."

c.    Safari's "greater and/or more immediate access to certain functionalities on Apple's Mobile Ecosystem has provided [it] with a competitive advantage relative to third-party mobile browsers, by allowing Safari to implement features that are not available to rival mobile browsers, and therefore limiting the competitive constraint on Safari."  Even if features are made available to third-party browser developers, they are often done so after a delay, which reduces their usefulness to the developers.

d.    Safari has an advantage due to Apple's "choice architecture" by having a prominent placement on the default home screen and being the pre-installed default, because they "can all influence user behaviour in light of behavioural biases such as status quo bias."

501.    Apple also restricts other mobile browsers in how to offer in-app browsing implementations because it requires them to be based on its proprietary WebKit browser engine, and by preventing the browsers from offering their own solutions, "limits the share of web traffic

1    these browsers account for" and "may also have a negative impact on user experience with third-

2    party mobile browsers as users cannot benefit from the use of their chosen mobile browser in in-

3    app browsing on Apple's Mobile Ecosystem."

4         502.   The CMA also examined how native apps, AI tools, and non-mobile alternatives

5    only give "limited competition" to Safari and WebKit.

6         503.   In-app browsing in native apps "do not replicate the full functionality of a mobile

7    browser such as browsing the open web and accessing content without the need for downloads"

8    and "the vast majority [of content providers] continue to distribute via the web (and therefore

9    through mobile browsers) . . . to reach as many users as possible."

10        504.   AI tools, similarly, even according to Apple's own submission, "tend to serve as

11   complements rather than substitutes" for mobile browsers, and "other browser vendors submitted

12   that AI personal assistants are a limited substitute for mobile browsers currently, and several

13   indicated that they do not replicate the full use case of mobile browsers."  A CMA consumer survey

14   showed that a "relatively low proportion of respondents reported using AI frequently for tasks such

15   as searching for information and searching for products, which might otherwise be performed in a

16   mobile browser."

17        505.   Even desktop or laptop browsing offers only limited competition because of

18   different use cases, such as how mobile browsing "enables 'on the go' browsing, which is not

19   possible on desktop" while desktop browsing tends to be used for "'anything fiddly', or anything

20   that required high security[.]"

21        506.   Thus, the CMA concluded "that Apple faces limited competitive constraints in

22   relation to content distribution within its Mobile Ecosystem."

23        507.   The CMA also examined how Apple's mobile ecosystem contributes to its profits.

24   It observed that "[w]hile the majority of Apple's revenue has historically come from device sales,

25   the contribution and importance of Apple's services business, which includes App Store and

26   Safari, has been increasing steadily in recent years.  Services accounted for almost 25% of revenue

27   in 2024, and almost 40% of gross profits."  These services revenues also include the search ad

28   revenue share from Google according to their ISA.  Digital content is the largest contributor to

1  services revenue, while advertising (including the Google revenue share) is the second.  The App

2  Store accounts for between 20%–30% of Apple's total services revenue.

3  508.  For all these reasons—Apple's dominance of its platform, the importance of its

4  services to users and businesses, and the lack of competition it faces for iOS/iPadOS, the CMA

5  concluded that "Apple has a position of strategic significance in respect of its Mobile Platform[.]"

6  The CMA concluded "that Apple has **substantial market power** in the provision of its Mobile

7  Platform" and that market power "is **entrenched** as at this stage there is no clear and convincing

8  evidence that Apple's current position of substantial market power will likely dissipate over the

9  next five years."  [Emphasis in original].

10  509.  The CMA, having held that Apple had strategic market status, also published a

11  "Roadmap of possible measures to improve competition in mobile ecosystems[.]"  The CMA

12  proposed that remedies it was considering starting in autumn 2025 include:

13      a.  "Requiring that Apple reviews apps to be distributed in its app store in a fair,

14          objective and transparent manner" in response to Apple's unilateral control of what

15          apps to allow in iOS and iPadOS, as well as complaints that "Apple's app review

16          is often non-transparent and applied inconsistently."  The CMA notes that

17          "uncertainty or delay in this review process can dissuade app developers from

18          launching new services and chill innovation."

19      b.  "Requiring that Apple ranks apps in its app store in a fair, objective and transparent

20          manner" owing to how "discoverability of apps on the app store can be a key factor

21          in determining their overall success" and "could cause an issue if Apple treats its

22          first-party products and services more favourably than third parties'."

23      c.  "Requiring that Apple does not use data collected for the purposes of reviewing

24          apps unfairly, such as for its own app development purposes" in response to how

25          "Apple has access to large amounts of data associated with the apps that it hosts on

26          the App Store, in particular from the review it undertakes for new apps and app

27          updates" and how CMA has "heard concerns that Apple may use this data to

28          support its own development of first-party apps[.]"

d.  "Requiring that Apple allows app developers to direct their potential customers off the App Store (steering)"—which addresses similar concerns as the U.S.- and EU-based anti-steering actions and orders.  In particular, the CMA cites how, after the Second Injunction in the Epic Games Action in this Court, the CMA has "seen the potential benefits of this approach in the US. . . .  As a result of a court judgment Apple is currently obliged to allow steering by app developers with no associated fees and minimal frictions.  Some examples of the resulting benefits for users include:"

    i.  "Spotify updated its app to allow for 'user-friendly' changes such as the ability to provide clear pricing information, link and change subscriptions.  It also allows users to buy individual audiobooks and purchase additional 'Top Up' hours for audiobook listening beyond the 15 hours included in Premium each month."

    ii.  "Kindle introduced a new 'Get Book' option in its iOS and iPadOS apps, allowing users to purchase books more easily."

    iii.  "Proton (a provider of high-privacy software products) announced that it would be reducing its prices to US users by up to 30%."

    iv.  "Patreon (a content creator platform) has rolled out an updated version of its app that now allows users to make purchases via the web."

e.  "Requiring Apple to fairly and objectively consider requests from third parties for interoperable access to functionality in its operating systems" owing to "concerns that Apple's control over its operating systems allows it to control the features and functionality UK companies can access and incorporate into their apps."  The CMA further noted that it did not aim "to create a default interoperability requirement but rather to require that Apple fairly and objectively considers requests from app developers for interoperable access to features within its iOS and iPadOS operating systems, and does so in a timely manner."

510.  The CMA also noted that it would begin to "consult" or "launch investigations" in

"the first half of 2026 onward" on whether it should "requir[e] Apple [to] enable[] interoperable access for third parties to key functionality in iOS and iPadOS in relation to key use cases"—in particular, digital wallets and connected devices.

511.    Regarding digital wallets, the CMA noted how until recently, Apple prohibited third parties from accessing its NFC chip on its smartphone, and that in response to regulatory developments, "in Europe Apple has committed to provide, and subsequently released, a solution that provides access to the NFC chip free of charge" and "Apple has recently released an alternative solution in the rest of the world, including the UK, for which it charges a fee." The CMA is "keen to ensure that this solution provides for effective access to the NFC chip on Apple smartphones[.]"

512.    The CMA has also considered complaints concerning how Apple restricts interoperability between third-party connected devices and its mobile devices, which causes users to "be 'locked' into Apple's mobile ecosystem and innovative connected device manufacturers . . . and their associated software developers, could be prevented from operating and/or growing":

    a.    Pebble, a smartwatch maker, "set out publicly a list of things which are harder or impossible for third-party smartwatches ([i.e.,] non-Apple Watches) to do on iPhone, including issues around sending messages from the watch, replying to notifications or taking actions, interacting with other iOS apps."

    b.    "Samsung stated that hardware interoperability measures, including ensuring that third-party wearables work as well on iOS as they do on Android, would help bring[] down mobile phone switching cost to consumers who wish to pair their new mobile device with their existing wearable devices."

    c.    "Meta stated that Apple's restrictions of functionality prevented third parties (but not Apple itself) from offering consumers a seamless, out-of-the-box pairing experience and properly responding to notifications, as well as requiring users to open apps on their iPhones and click on pop-up screens each time they want to connect their iPhones to their non-Apple device."

513.    Also in this medium term, the CMA is considering whether to "[r]equir[e] Apple to allow third-party browsers and app developers to use alternative browser engines on iOS and

iPadOS[.]" The CMA notes, "[b]rowsers, along with native apps, are one of the two key gateways to accessing digital content on mobile devices." In particular, the CMA appears to be focused on requiring Apple to give up its imposed monopoly of requiring its own browser engine, WebKit, in response to complaints from browser developers who "have stated that limitations in WebKit have restricted or prevented features such as":

    a. "Restricting the ability for the browser vendor to offer additional security and privacy features and improvements";

    b. "Reduced performance compared to what they would expect to achieve with alternative browser engines";

    c. "Lacking important functionality to support websites, web apps and Progressive Web Apps, undermining the ability to offer a compelling user experience."

514. The CMA was also considering, in the medium term, whether to "[r]equir[e] that Apple's choice architecture supports active user choice and does not give Apple's own products and services an advantage over those of third parties[.]" [Emphasis removed]. "Choice architecture refers to the way that environments are structured to influence the decisions that users make" and the CMA has "heard concerns that Apple designs elements of its choice architecture to drive customers towards its own products and services (or those that directly benefit Apple), for example by ensuring prominent placement on the home screen, setting its own products as defaults, embedding prompts to encourage users to switch to its own services, and generally embedding frictions that dissuade users from switching away from these services." This self-preferencing choice architecture "makes it harder for app developers competing with Apple's own products and services to compete and grow their businesses," which in turn means "consumers miss out on alternative products and services which may better suit their needs."

515. On October 22, 2025, the CMA issued its "Final Decision" that was largely a reprint of the findings of the CMA Report. The CMA concluded: "Having carried out an investigation and consulted Apple and other stakeholders, we have decided to designate Apple as having SMS in the provision of its **Mobile Platform**." [Emphasis in original].

516. Explaining Apple's "substantial and entrenched market power in respect of its

Mobile Platform[,]" the CMA found: "Apple's Mobile Platform operates in ways that interact and mutually reinforce one another; for Apple, for content providers and end-users. For Apple, providing its users with access to a wide range of content and services makes its Mobile Devices more attractive, leading to substantial hardware sales as well as revenues through in-app transactions. For content providers, Apple's Mobile Platform provides the infrastructure through which to offer their services to large numbers of consumers, and consumers in turn get access to all the content that is made available to them."

517.    The CMA further explained that "across these interconnected facets of Apple's Mobile Platform, we can see that it has consistently succeeded on all fronts, and very profitably:"

    a.    "Apple has the largest UK Mobile Ecosystem and has held a large and stable group of end-users over a number of years, mutually reinforced by content providers wanting to be on Apple's Mobile Platform in order to reach those consumers."

    b.    "Apple's restrictions to a large degree prevent competition within the platform, with alternative app distribution, and alternative browser engines prohibited. Where there is competition – in browsers – Apple has an overwhelmingly strong position."

    c.    "Apple has been highly profitable globally for at least the last ten years, making high profits and a high return on capital globally, supported by revenues from the App Store and Safari."

518.    Furthermore, "[k]ey elements of our detailed consideration . . . include:"

    a.    "Share of end-users – substantial for Apple, and higher at the premium end of the smartphone market."

    b.    "Low switching rates and relatively little consideration of switching between two differentiated Mobile Ecosystems, resulting in a stable user base."

    c.    "Content providers want access to that user base, and have to go via Apple's Mobile Platform to do so."

    d.    "Dampened competition between Google and Apple due to their revenue-sharing agreement."

e.  "Significant barriers facing any potential alternative Mobile Platform, such as network effects."

f.  "High profits and a high return on capital globally from Apple's Mobile Platform."

519.  The CMA further concluded: "Overall, our assessment shows that Apple faces limited current competitive constraints in the provision of its Mobile Platform.  Apple faces a very limited constraint with respect to content providers and consequently, any constraint in relation to end users would need to be particularly pronounced to ensure that Apple does not have substantial market power.  However, our assessment shows that Google only exerts a limited competitive constraint in relation to end users."

520.  The CMA further observed that "technological developments, particularly involving artificial intelligence" are not evidently "sufficient in scope, timeliness and impact to eliminate Apple's substantial market power in the provision of its Mobile Platform over the next five years."

521.  The CMA also "found that Apple has a position of strategic significance in the provision of its Mobile Platform" because:

a.  "Apple's Mobile Platform is used by a very large number of UK users . . . and businesses"; and

b.  "The services provided by Apple as part of its Mobile Platform are important to a wide range and large number of other businesses in the UK to provide digital content and services to users of Apple's Mobile Devices."

522.  The CMA's findings, which are consistent with the allegations and findings in U.S. and EU actions, promises a substantial risk of regulatory actions and resulting liability, owing to Apple's anticompetitive conduct in its iOS (and iPadOS) system.

H.  **The United Kingdom Competition Appeal Tribunal Found Apple to Be Liable for Anticompetitive Conduct**

523.  A class action filed in 2021 in the UK Competition Appeal Tribunal (the "Tribunal") by Rachael Kent ("Kent") claimed £1.5 billion in damages, and alleged Apple charged

excessive commissions for purchases made in its App Store.[9]  The case was tried in January and February of 2025.  The Tribunal reached a determination in Kent's case in October 2025, finding Apple to be liable.  The Tribunal summarized:

> These are collective proceedings brought on behalf of approximately 36 million class members by Dr[.] Rachael Kent (the "Class Representative") against two Apple entities (together, "Apple") which are, broadly speaking, responsible for the operation of Apple's App Store.  The claim is that Apple has abused its dominant position, infringing section 18/Chapter II of the Competition Act 1998 (the "1998 Act") and Article 102 of the Treaty on the Functioning of the EU (the "TFEU") (prior to 31 December 2020) by imposing exclusionary practices on app developers in relation to two alleged markets: one of "IOS app distribution services" and one of "iOS in-app payment services", and by charging developers a headline rate of commission (the "Commission") of 30% for those services, which is said to be an excessive and unfair price.
>
> The premise of the claim is that, from 1 October 2015 to 15 November 2024 (the "Claim Period"), Apple should have charged developers a non-abusive price for iOS app distribution services and iOS in-app payment services, which would have resulted in lower prices to users of Apple devices who made payments relating to apps.  The average amounts which are said to be recoverable by individual users are relatively small, in the region of £27 to £75.  However, the aggregate claim for damages is large, ranging from £1.184 billion to £2.237 billion (including interest claimed).  That reflects the underlying philosophy of the collective proceedings regime, which allows consumers to aggregate claims which would not otherwise be economically viable, so they can be pursued, in the interests of redress and as a deterrence for anticompetitive behaviour.  The main issues in the proceedings (in the same order in which we will address them in this judgement) are as follows:
>
> (1) What market definition(s) should we adopt for the purpose of analysing Apple's conduct?
>
> (2) Is Apple dominant in the market(s) we identify?
>
> (3) Has Apple acted abusively by foreclosing competition in the defined market(s), either through exclusionary restrictions or through tying one service to another?
>
> (4) Is Apple's pricing for its services abusive because it is excessive and unfair?
>
> (5) Are there justifications for Apple's conduct which excuse what would otherwise be abusive conduct?
>
> (6) If Apple has committed an abuse, what level of overcharge has that caused and how much of that overcharge has been passed on to end users (that is, class members)?

524.    The trial took place from January 13 to February 28, 2025, for a total of 28 days. The Tribunal considered various written submissions, as well as testimony from a variety of fact

---

[9]      Kent v. Apple Inc. [2025] CAT 67 (UK).

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

and expert witnesses.  The fact witnesses included several Apple officers and industry participants, including:

    a.  Christian Bailey Owens, founder of Paddle.com Market Limited, one of the merchants that claimed Apple charged it excessive commissions;

    b.  Kevan Parekh, Apple's current CFO, and formerly a senior executive in retail and products finance;

    c.  Trystan Kosmynka, senior director of App Review at Apple;

    d.  Phillip Schiller, an Apple Fellow who oversees the App Store and Apple Events, and was on Apple's executive team from 1997 to 2020;

    e.  Craig Federighi, Senior Vice President of software engineering, and in charge of Apple's operating systems, who has been in his current position since 2012;

    f.  Mark Rollins (written testimony only), a senior finance manager at Apple;

    g.  Jacqueline Harlow (written testimony only), an in-house IP counsel at Apple.

525.  The Tribunal also described how Apple came to operate an app store.  Apple launched the iPhone when "it was entering a market with several well-established competitors who marketed a variety of handheld devices, including BlackBerry, Motorola, Nokia and Samsung. However, the iPhone offered a product that is generally considered to be revolutionary: it had a touchscreen interface; it provided easy access to the internet; and it supported application software, now known as apps."  And "[i]n launching the iPhone in 2007, Apple created a digital 'ecosystem' with the ostensible purpose of integrating its devices with its software products."  This "'ecosystem' refers to[:] (1) the device – the iPhone and the iPad – (2) the iOS operating system (3) the iOS apps which are installed on the device and (4) the services provided to iOS users, including the App Store which Apple launched in 2008."  Apple designed the ecosystem deliberately to be a "walled garden" of a closed platform that Apple would control access to— "[i]n an oft-quoted email in 2010, Apple's CEO, Steve Jobs, stated that the strategy of the company was to 'tie all of our products together, so we further lock customers into our ecosystem', so as to 'make [the] Apple ecosystem even more sticky[.]'"  [Alteration in original].

526.  The Tribunal further explained, "[t]he App Store, since its launch, is itself an app

1  which comes pre-installed on iPhones and iPads and allows developers to offer apps to users, and

2  users to find and download apps produced by developers.  In that sense it is a 'two-sided

3  platform[,]' connecting developers with users and providing a 'matchmaking' service between the

4  two groups."  To be eligible to list an app in the App Store, "a developer must: (i) enrol[l] in the

5  App Developer Program; (ii) enter into the Developer Agreement ('DA'); and (iii) enter into the

6  Developer Program License Agreement ('DPLA')."

7      527.  About a year after the App Store launched in 2008 (which was a year after the

8  iPhone launched), iOS introduced in-app purchases in 2009.  Initially, "there was no possibility

9  for iOS device users to make in-app purchases."  According to Schiller, as a result of requests from

10  developers to "allow sales of in-app content and features[,] [i]n March 2009, Apple announced a

11  new set of APIs introducing in-app purchase functionality to the App Store.  Mr. Schiller refers to

12  this functionality or 'In-App Purchase' or 'IAP' as a 'feature of the App Store commerce

13  system[.]'"  IAP was launched in September 2009.

14      528.  The Tribunal explained the App Store's rapid growth since its launch: "The App

15  Store has grown since its launch to an extent that perhaps not even Apple predicted.  As already

16  noted, there were around 500 apps available at launch; in January of 2017, there were 2.2 million.

17  As of March 2021, the App Store has 28 million registered developers.  In the first half of 2020,

18  the App Store facilitated 18.3 billion app downloads.  An estimate of consumer spend in the App

19  Store in 2020 was $72.3 billion globally, a 30.3% increase from the same period in 2019.  Apple

20  reports the App Store's performance within its 'services' category and the App Store had by 2016

21  grown to be the biggest product by revenue in this category."

22      529.  Apple sought to justify its 30% commission as payment for Apple's services to app

23  developers (defined by the Tribunal as the "Commission"), and to compensate Apple for its

24  investments in intellectual property, safety, security, and privacy, while an annual $99 Program

25  Fee "is simply a threshold requirement to participate in app development."  Kent, however, sought

26  to distinguish between the Program Fee, which she maintained was made for Apple providing app

27  developers with tools and technology, from the Commission, which she maintained was for

28  marketing and delivery of the app in the App Store.  The Tribunal sided with Kent: "Our view is

that, as a matter of contract, the Class Representative [Kent] is clearly correct in her contention that the Program Fee is charged as consideration for the provision of the tools and technology. That may well not be the way in which Apple has thought about or currently thinks about the arrangements, but it is manifestly what the contractual documents provide[.]"  Thus, the Tribunal indicated, the Commission would have to be justified on separate grounds.

530.    Concerning whether the Commission is anticompetitive, the Tribunal concluded:

(1) A rate of 30% in a similar market (distribution services for PC games) was materially reduced below that level by all main market participants following market entry and enhanced competition.  By analogy, we would expect a reduction of the Commission if there was more competition for the focal products. . . .

(2) The Epic Games Store and the Microsoft Store are in our view suitable comparators, bearing in mind the need to recognise product differentiation and price dispersion.

(3) Steam's commission rate for its largest developers also seems a suitable comparator, providing something of higher end reference point for the competitive commission level in the PC games distribution market.

(4) Dr. Singer's [one of the Class Representative's experts] adjusted Rochet-Tirole model [estimating what a competitive commission would be] is at least consistent with that assessment.

(5) The likely level of competitive commission is in the region of 12% to 20%, based on the benchmark comparators.  Even taking into account a considerable measure of price dispersion, there is good evidence that the current Commission is materially in excess of the competitive commission level plus a 5% to 10% increment for the SSNIP test.

(6) Further corroboration comes from the evidence of Mr[.] Dudney in relation to Limb 1 of the excessive and unfair pricing allegations.  That evidence, which we accept later in this judgment, demonstrates a considerably greater operating margin and return on capital employed than would ordinarily be the case in competitive markets, indicating that the Commission is set materially above competitive levels.

531.    The Tribunal found: "In our judgement, it is more probable than not that Apple's Commission is set at a level significantly above the likely competitive level. . . .  Apple has raised its prices by a significant and non-transitory amount above the competitive price on what must be assumed to be a profitable basis."

532.    The Tribunal further found: "The contractual arrangements between Apple and developers have the effect of requiring all iOS app distribution to take place through the App Store

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

1    and removing the prospect of any alternative route by which the consumer base of iOS device

2    users who wish to access iOS apps might be reached by developers."

3        533.    The Tribunal further found that iOS app distribution and iOS in-app payment

4    constitute separate markets: "in relation to the iOS in-app payment focal product:"

5        (1) "iOS in-app transactions take place between a developer and iOS device user.

6        While Apple provides services to users through the processes by which it manages

7        in-app purchases, in-app payments are not part of the matchmaking service that the

8        App Store provides for initial search, app selection or download (free or paid).  The

9        in-app payment transactions do not take place via the App Store."

10        (2) "Apple requires developers to treat in-app purchases as a technically separate

11        process and it has different processes itself for managing the payment services

12        involved.  The technical process to distribute paid apps was put in place before the

13        process to allow for in-app payments.  While we accept Apple's argument that this

14        should not be determinative, it is in our view an influential point suggesting a

15        separate market."

16        (3) "As well as the technical distinction in the way that the two types of payments are

17        made, there is generally a temporal distinction, with in-app payments taking place

18        once the app has been purchased and distributed to the user[.]"

19        (4) "This distinction is further reflected in Apple's descriptions of the ways in which

20        developers can monetise their iOS apps [citing Schiller's testimony distinguishing

21        between "freemium" and "paid" apps]."

22        (5) "[T]here is a range of payment service providers who could supply iOS in-app

23        payment services.  This is a different group of entities . . . as potential suppliers of

24        iOS app distribution services."

25        (6) "There are examples of legislative and regulatory interventions in the EU, the

26        Netherlands and South Korea where iOS in-app payment services are treated as a

27        distinct product from iOS app distribution services, with a requirement that they be

28        allowed to be provided separately."

534.    The Tribunal thus concluded, as to market definition, "the relevant markets for consideration are:"

(1) "An iOS app distribution services market.  This is a two-sided market, undertaking matchmaking services between iOS app developers and iOS device users.  It is an aftermarket to the separate market for the sale and purchase of devices."

(2) "An iOS in-app payment services market.  This is a single[-]sided market in which iOS device users transact directly with developers to purchase in-app content and other features.  It is an aftermarket to iOS app distribution services."

535.    The Tribunal further made findings concerning Apple's dominance of the respective two markets.  As an initial analysis, the Tribunal observed: "It might be thought that the question of dominance was cut and dried given the 100% market share which Apple holds in the relevant markets and the absolute barriers to entry which Apple has created through the restrictions it has imposed.  The consequence of that position is that there is a large consumer group of iOS device users who can only be accessed by developers of iOS apps through the complete control that Apple exerts on iOS distribution and iOS in-app payment services."

536.    The Tribunal further found, "[b]y contrast with the position taken by Steam [a digital game distribution platform], which adjusted its commission levels down the most for its largest developers when faced with a competitive threat, Apple has not made any adjustments to seek to preserve its high value developers."  Furthermore, "Apple has effectively created a captive group of iOS device users and controls access to those users through contractual restrictions on developers (regardless of whether alternative payment channels are available, all developers must transact with Apple to allow users to access their apps), with the consequence that it has a monopoly position protected by very high barriers to entry."  The Tribunal reiterated, "Apple has built an impressively large user base, which is effectively locked into the App Store as the only source of iOS app distribution.  It has also required that user base, and the developers who sell in-app content, to use Apple's payment systems for in-app purchases in most circumstances."  The Tribunal also found: "More interesting, to our thinking, is evidence that Apple was aware of its growing captive market of iOS device users and its growing market power over those users and

the developers who wished to distribute iOS apps or sell iOS in-app content."

537.  With respect to dominance, the Tribunal concluded: "The monopoly position of Apple in iOS app distribution services and iOS in-app payment services, buttressed by the contractual restrictions which create very high barriers to entry, is a strong indication of dominance."  And rather than credit Apple's arguments that it is constrained, the Tribunal concluded "that Apple, whether deliberately or not, has created markets in which it has near absolute market power.  It has made some adjustments to its pricing arrangements, but for avowedly commercial reasons, rather than reacting to any market competition.  It has experienced disputes with large developers[,] but has not adjusted its terms and conditions in any material respect as a result."  Thus, the Tribunal is "comfortable with our conclusion that Apple is dominant in the iOS app distribution services market and the iOS in-app payment services market."

538.  With respect to whether Apple abused its dominance, the Tribunal first characterized: "The Class Representative [Kent] has pleaded two forms of exclusionary abuse:"

(1) "Exclusive dealing, by which the Class Representative alleges that Apple has foreclosed competition in the iOS app distribution services and iOS in-app payment services markets by requiring that iOS apps can only be distributed through the App Store and that iOS in-app purchases must use Apple's payment systems."

(2) "Tying, by which the Class Representative alleges that Apple has unlawfully tied IAP, being that aspect of Apple's payment systems that deals exclusively with iOS in-app payments (the tied product) to the App Store (the tying product)."

539.  With respect to competition on the merits, which was Apple's purported justification for having a closed iOS system, the Tribunal found that "argument" to be "unsustainable as a matter of principle."  While Apple pointed to competition in the smartphone market, the Tribunal "agree[d] with the Class Representative that Apple cannot rely on competition in a different market (the devices market) to excuse exclusionary conduct in the separate iOS app distribution services or iOS in-app payment services markets.  To do so would provide a licence for anti-competitive behaviours in aftermarkets simply by reference to competition in the primary market."  Furthermore, "[c]ompetition law is concerned with functioning markets for the benefit

of consumers.  A class of consumer that is essentially captive in an aftermarket is clearly disadvantaged by abusive behaviour in that market, however beneficial it might be to consumers participating in the primary market."  The Tribunal further emphasized: "the abusive conduct in issue here is the exclusion of all competition from the iOS app distribution services and iOS in-app payment services markets.  We find it difficult to see how such extreme exclusionary conduct can sensibly be justified as competition on the merits.  That is in itself the answer to any argument from Apple that there is competition on the merits in the iOS app distribution services market as a consequence of quality, innovation or choice offered by the App Store.  Apple is not competing on the merits – it is not competing at all, by virtue of the total exclusion of competition it has achieved through its contractual restrictions."  [Emphasis in original].

540.  As to exclusive dealing, the Tribunal concluded: "Apple has infringed Chapter II/Article 102 through foreclosing competition in the iOS app distribution services and iOS in-app payment services markets by the means of the iOS app distribution restrictions and the iOS in-app payment restrictions, including by requiring that iOS apps can only be distributed through the App Store and that iOS app purchases and iOS in-app purchases must use Apple's payment systems."

541.  The Tribunal also concluded that Apple anticompetitively tied IAP to iOS distribution: "In our judgment, Apple has infringed Chapter II/Article 102 by tying its payment services (in the context of the iOS in-app payment services market), to the App Store, in circumstances where: there is separate demand for those products; Apple is dominant in the iOS app distribution services market; developers are required to purchase the tied product (in-app payment services) with the tying product (the App Store); and there is substantial market foreclosure as a consequence."

542.  The Tribunal next needed to determine whether Apple's anticompetitive conduct led to excessive and unfair pricing.

543.  The Tribunal found "a significant and persistent difference between the price of services in the App Store and the costs of those services" and that "[t]he Commission is therefore excessive[.]"

544.  To establish that the Commission was unfair, the Tribunal "ma[d]e the following

findings of fact in relation to the setting of the 30% rate:"

(1) "The Commission was not set in 2008 by reference to any costs that Apple expected to incur in the creation and development of the App Store. There is also no evidence before us that the level of Commission was linked to the investment made by Apple in its tools and technology, or indeed in any other aspect of its ecosystem."

(2) "On the contrary, Mr[.] Jobs stated during the March 2008 launch event that Apple did not intend to make money from the App Store and that he hoped (but was unsure) that the Commission would cover the costs of running the App Store."

(3) "Nor was any other financial or economic analysis undertaken which might justify the level at which the Commission was set."

(4) "There is no evidence that the Commission was set by reference to any quantified benefit to developers which was being provided by their ability to distribute apps through the App Store."

(5) "We accept Mr[.] Schiller's evidence that Steam and Handango were comparators which Mr[.] Schiller and others had reference to when setting the App Store Commission. We also accept his evidence that the CD distribution market and the charges levied by certain telecoms providers were considered in the decision-making process."

(6) "We note Mr[.] Schiller's evidence in the Australian proceedings that Apple thought they were setting an 'aggressive' rate with the Commission at 30%."

(7) "It is also clear that Apple's intention was to attract developers to the App Store, with the intention that the offering in the App Store would be appealing to customers and would help Apple sell more iOS devices. In this sense, there was a competitive objective behind the initiative – to allow Apple to compete more effectively in the devices market."

(8) "However, the extent to which competition in the devices market operated as a constraint (or indeed, what the relevant market for the assessment at the time actually was) was not the subject of any detailed evidence or consideration by the

economic experts."

(9) "It is clear that the conditions of the market during the Claim Period are quite different from those in 2008.  In 2008, Apple had sold some 11.6 million iPhones.  In 2015 alone, it sold 231 million.  The size of the user group who can only install native apps onto their iOS devices through the App Store has become very material.  It is the level of Commission which arises from the restricted access to that larger group of iOS device users from 2015 any onwards that matters for the assessment of workable competition, not the position seven years earlier."

(10)    "Apple noted that developers earned [redacted] from revenues obtained through the App Store in 2022.  That however tells us little about the competitive position that prevails in relation to the setting of the Commission.  Clearly, developers earn significant revenues, but the question is whether those revenues are unfairly depressed by Apple's pricing."

(11)    "In conclusion, the 30% Commission rate appears to be an arbitrary one, at least by the time of the commencement of the Claim Period, and one which is not reviewed or made subject to competitive pressure throughout the Claim Period, even though it has been reduced in some limited circumstances for commercial reasons or to respond to regulatory concerns."

545.    The Tribunal concluded: "The Commission is . . . considering all the evidence in the round, an unfair price.  It represents trading benefits which could not have been obtained in conditions of workable competition."

546.    The Tribunal further concluded: "We have found that the Commission is excessive . . . and unfair[.] . . .  We therefore conclude that Apple is abusing its dominant position by charging excessive and unfair prices in the form of the Commission which it charges developers for iOS app distribution services and iOS in-app payment services."

547.    The Tribunal also concluded that Apple could not justify its anticompetitive conduct and pricing based on its purported "objective of securing increased privacy, safety and security for iOS device users."  Apple also "argued that the restrictions are necessary to achieve

1    enhanced performance, arguing that centralised distribution enhances the efficacy of App Review

2    which in turn helps iOS apps perform reliably, and prevents low quality or copycat apps."

3        548.    In rejecting Apple's purported justifications, the Tribunal concluded: "We would

4    not in any event have been satisfied that the value of the efficiencies asserted by Apple outweighed

5    the harm arising to users.  This is for several reasons:"

6        (1) "Apple has failed to establish that any performance, security or privacy benefits

7        were attributable specifically to the restrictions it has imposed in relation to iOS

8        app distribution and iOS in-app payments.  The evidence before us made it clear

9        that, absent the restrictions, there would still be significant protections afforded by

10       Apple's defence in depth system, which included the hardware sandbox

11       protections, software protections and some degree of app review (either a full App

12       Review by Apple . . . or the likelihood of at least some version of that on most

13       alternative platforms)."

14       (2) "[Regarding security] all that would be materially different is the potential for

15       fragmentation of information held by Apple.  However, we are not persuaded that

16       this is a sufficiently material issue to lead to a safety, security or privacy problem

17       that requires the restrictions to resolve."

18       (3) "In relation to the measurement of the value of any efficiency gain, [Apple's

19       expert's] analysis failed to identify any causal connection between the restrictions

20       and the value users might place on safety, security and privacy.  He did not attempt

21       to compare the effects of the restrictions on safety, security and privacy in the real

22       world with a counterfactual world absent the restrictions. . . .   Under cross

23       examination, his analysis was exposed as superficial and not reflective of a realistic

24       counterfactual world.  Apple produced no other evidence to show what link there

25       might be between user value and the restrictions.  In our view [Apple's expert's]

26       analysis goes nowhere near the causal and quantitative specificity that is required

27       in order to establish an efficiencies defence."

28       549.    The Tribunal also rejected similar "security and privacy" related arguments by

187

Apple for maintaining its monopoly on IAP. The Tribunal concluded that alternative payment processors would be subject to similar security standards, and "it is not for Apple to seek to exclude potential market participants on the basis that users need to be protected from the perceived risks of using those alternative providers." Moreover, "[t]o the extent that Apple's objective is to facilitate the collection of Commission, that is an internal benefit, not an external one, and cannot properly be the basis for an objective necessity defence." The Tribunal also characterized Apple's accusation that other payment processors may be worse at fraud detection as "not only speculative but also lacking in credibility" because "payment service providers are in general highly sophisticated at fraud detection and protection."

550. The Tribunal was "fortified in our views by several other factors:"

(1) "The near complete absence of any internal Apple documents making a connection between the need for the restrictions and the benefits they are said to deliver is a telling factor against Apple's objective necessity defence. Surely, if Apple thought it was an important objective to justify the restrictions, that would have been extensively documented internally."

(2) "The regulatory interventions in the EU, the Netherlands and South Korea all suggest that there is a perfectly workable outcome where iOS app distribution services and iOS in-app payments services are open to competition, without material impact on the services Apple provides."

(3) "The fact that the regulators in those jurisdictions have taken the steps they have tends to confirm that they do not see the restrictions as necessary or proportionate."

(4) "We therefore find that Apple's objective necessity defence fails, in relation to both the iOS app distribution restrictions and the iOS in-app payment restrictions. In our view, the restrictions cannot sensibly be justified as being necessary or proportionate to deliver the benefits which Apple puts forward as flowing from its objective of an integrated and centralised system. On the contrary, the competition which would exist absent the restrictions is in our view much more likely to deliver the benefits that consumers want, in the form and at the price point they want them."

188

551. The Tribunal also analyzed the damages:

a. The Tribunal determined that based on comparisons to the Epic Games Store, the Microsoft Store, and Steam, "the competitive rate of commission would be in the range of 12 to 20%. . . . Applying . . . an approach of 'informed guesswork[,]' . . . we find that the likely range of Apple's Commission for iOS app distribution services . . . is between 15% and 20%. For the purposes of quantifying the overcharge . . . we will use the mid-point of that range, which is 17.5%. The overcharge is the difference between a commission set at that level and the Commission actually charged by Apple for those services."

b. The Tribunal determined that "Paddle's headline commission rate of 10% represents a fair and reasonable benchmark for the level of Apple's Commission in the iOS in-app payment services market. . . . For the purposes of quantifying the overcharge . . . we therefore find that the counterfactual price for iOS in-app payment services is 10%. The overcharge is the difference between a commission set at that level and the Commission actually charged by Apple for those services."

552. To determine the damages owed to the consumer class, the Tribunal made a further determination of how much the overcharge was borne solely by the developers and how much was passed onto the consumers. The Tribunal determined, "taking into account all of that evidence and to an extent resorting to the 'informed guesswork' permitted by the case law," that 50% of the overcharge is passed onto consumers.

553. The Tribunal also "[e]xercis[ed] [its] broad discretion and on the basis of the information before [it]" to award interest of about 8% to Kent, at roughly the rate of private borrowing.

554. Thus, the Tribunal concluded: "The Class Representative is entitled to damages in respect of the claims of class members, assessed on an aggregate basis under Section 47C(2) of the [Competition Act 1998], for the total amount of the overcharge described above which has been passed on to class members" and "is entitled to interest on those damages at a simple rate of 8%."

555.    On November 13, 2025, The Tribunal held a subsequent hearing to hear argument on costs, an application for appeal, and questions regarding calculating the damages.  Kent claims that damages could be as much as £1.5 billion (or $2 billion).  The Tribunal also rejected Apple's request for permission to appeal its judgment.  Apple has 21 days to appeal directly to the Court of Appeals.

556.    In January 2026, another claim was brought before the Tribunal alleging that Apple engaged in anticompetitive conduct concerning Apple Pay, which allegedly increased banking costs by £1.5 billion.  The Tribunal will determine if this action can proceed as a collective action.  Together with other Tribunal actions against Apple, these could potentially result in billions of dollars of damages.

## I.    Apple Is Using Its Dominance in Smartphones and iOS to Also Gain Dominance in Gen AI

557.    Generative artificial intelligence (gen AI) exploded on the scene with the release of ChatGPT by OpenAI in November 2022.

558.    Apple's struggles in developing and incorporating gen AI are well-reported.  In 2011, Apple released a voice assistant for iPhone, Siri, which was ground-breaking for its time.  But Apple did not invest in innovations, so that by the 2020's, Siri was no longer considered to be particularly advanced.  The gap between Apple's AI capabilities, where Siri is its flagship product, and gen AI-powered chatbots has only grown since ChatGPT was released.

559.    In June 2024, Apple announced "Apple Intelligence," which it touted as its entry into the gen AI race.  In September 2024, Apple announced that the next iPhone upgrade, iPhone 16, would be "[b]uilt from the ground up" for Apple Intelligence.  Yet, when the iPhone 16 was released later that month, it had none of the touted Apple Intelligence features.  Apple has instead announced that it would be taking more time to perfect its Apple Intelligence product, and has not yet released many important features.

560.    According to a March 2025 report in *Bloomberg*, a senior member of Apple's AI team has declared that Apple's struggles to catch up in gen AI are a "crisis[.]"  Another team member compared Apple's AI efforts to a foundering ship that has "been sinking for a long time."

Eddy Cue, the head of Services at Apple, has testified in the DOJ's antitrust suit against Google that the development of AI could make the iPhone irrelevant in a decade. He has also internally expressed concern about AI's potential to displace Apple, essentially doing to Apple what Apple's iPhone did to Nokia flip phones.

561.    The latest struggle Apple has had in the AI field is how rivals like Meta have managed to poach Apple's key AI employees, such as when Meta poached Ruoming Pang, Apple's key AI architect, for $200 million.

562.    Gen AI is not the first key field that Apple has not succeeded in. General search is another key area—no mobile phone could be fully functional if it could not conduct internet searches reliably. Apple has also considered, but ultimately chose not to enter the general search market, in part owing to the billions of dollars, specialized talent, and scale required to enter the market. Rather than create a general search service, Apple instead has an agreement with Google where Google serves as the default search engine on various search entry points on Apple's devices (most importantly, its browser, Safari). In return, Apple gets a significant cut of search ad revenues from Google, which exceeds $20 billion for Apple in its coffers.

563.    Borrowing a page from its playbook with Google, Apple has recently sought to enter agreements with other companies with better AI products than its own. Apple can leverage its position as the dominant smartphone and performance smartphone in the United States to offer a wide distribution network to an AI partner, and the AI partner would in turn help Apple entrench its dominance as AI becomes an enhancement rather than a disadvantage.

564.    News reports have stated that, just as Apple has entered a mutually beneficial relationship with Google for search, it is now discussing having Google build a tailored version of Google Gemini for Siri. This deal would help Apple head off gen AI as a threat, as well as creating a huge distribution network for Google to build and entrench market share for its gen AI product.

565.    Meanwhile, Apple has also been holding discussions with OpenAI and Anthropic, keeping its options open while offering a huge boon to any of the nascent gen AI players. Apple is also reported to be considering buying Perplexity AI, the maker of a popular gen AI-powered search engine. Apple is also reportedly working on creating its own AI-search-powered search

1    engine or "answer engine" to be integrated with Siri.

2        566.    On August 25, 2025, xAI and X Corp. sued Apple and Open AI alleging that they

3    have colluded to strengthen each other's monopolies in smartphones and gen AI, respectively (*X*

4    *Corp. v. Apple Inc.*, No. 4:25-cv-00914 (N.D. Tex. filed Aug. 25, 2025), the "AI Antitrust

5    Action").

6        567.    The AI Antitrust Action observes how "[t]he more a user relies on the functionality

7    offered by a generative AI chatbot for a significant number of tasks, the less important other

8    features of a smartphone become."  The AI Antitrust Action observes how gen AI "chatbots have

9    also accelerated the rise of super apps," which also can act as a replacement for the myriad apps

10   of a smartphone.

11       568.    Meanwhile, the AI Antitrust Action also details OpenAI's early dominance in gen

12   AI chatbots.  The action notes how, after OpenAI released ChatGPT in 2022, it already had

13   acquired 1 million users merely five days after its release.  By comparison, the AI Antitrust Action

14   notes, Instagram took 2 1/2 months and Netflix took 3 1/2 years to reach 1 million users,

15   respectively.  The AI Antitrust Action notes how "today ChatGPT has approximately 700 million

16   weekly active users worldwide."

17       569.    The AI Antitrust Action alleges that Apple and OpenAI have entered an exclusive

18   partnership, publicly reported: "In June 2024, Apple and OpenAI announced a deal: Apple would

19   integrate ChatGPT into iOS.  This deal is exclusive.  Apple has not integrated with any other

20   generative AI chatbots. . . .  Others have also been locked out of integration with iOS. . . .  As

21   Google's CEO Sundar Pichai testified earlier this year, Google could not reach an agreement to

22   integrate with Apple because Apple had decided to integrate [with] ChatGPT."

23       570.    As the AI Antitrust Action emphasizes, "As a result of the Apple-OpenAI deal,

24   ChatGPT is not just the default—it is the *only* generative AI chatbot with a first-party integration

25   into Apple's smartphones. . . .  [T]his means that iPhone users who want to use a generative AI

26   chatbot for certain tasks on their iPhones can use *only* ChatGPT."  [Emphasis in original].  The AI

27   Antitrust Action continues, "[w]ith this integration, users who use Apple Intelligence on their

28   iPhones can do things like receive answers from Apple's voice assistant, Siri, based on information

192

provided by ChatGPT; natively use their iPhone camera to learn information from ChatGPT about the places or objects around them; and use ChatGPT with Apple's Writing Tools to compose text from a description. So if an iPhone user wants to ask Siri a question and receive a response that taps into generative AI chatbot capabilities, the user can do so only through ChatGPT. There is nothing the iPhone user can do—no app the user can download, no setting the user can change— that allows the user to receive information from Siri provided by any other generative AI chatbot."

571. The complaint points out, "[a]lthough iPhone users can still access other generative AI chatbots on their iPhones by using a web browser or by downloading a particular generative AI chatbot's app, those options do not provide the same level of functionality, usability, integration, or access to user prompts as ChatGPT's first-party integration with Apple. For example, there is currently no way for Siri to provide answers from a generative AI chatbot other than ChatGPT. This means that ChatGPT has exclusive access to billions of potential prompts. Additionally, Apple's Writing Tools (e.g., using AI to draft emails) and Apple's camera application have native integrations with ChatGPT. This, too, provides ChatGPT exclusive access to user prompts in these apps." Furthermore, "because OpenAI's ChatGPT is the only generative AI chatbot integrated with Apple's iPhone and can be accessed by users through that integration, users that might otherwise download other generative AI chatbots from Apple's App Store have no reason to do so."

572. As the AI Antitrust Action points out, just the fact of OpenAI's "integration gives ChatGPT exclusive access to potentially billions of user prompts originating from hundreds of millions of iPhones." Meanwhile, "[p]rompt volume is critical for generative AI chatbots like ChatGPT because generative AI chatbots derive significant advantages from scale. More prompts result in more responses, giving the AI model more training data. Because generative AI chatbots continually improve their algorithms as they receive additional user prompts, additional prompts improve a generative AI chatbot's model. These improvements draw in more users and create more prompts. And because the Apple-OpenAI arrangement deprives other generative AI chatbots of all prompts natively originating from iPhones, it deprives those competitors of scale and opportunities to improve their technology."

573.    While Apple offers gen AI providers scale, it benefits from arrangements with the providers because an improved gen AI experience on the iPhone increases switching costs away from them.  Apple also stands to benefit more directly because, as the AI Antitrust Action points out, "Apple ultimately aims to further profit from the deal by striking a revenue-sharing agreement with OpenAI through which Apple gets an eventual cut of OpenAI's monetization of ChatGPT prompts through its iPhones and other devices."

574.    The AI Antitrust Action also alleges that "Apple has deprioritized the apps of super app and generative AI chatbot competitors, . . . in its App Store rankings to favor OpenAI and undermine developing threats to its own monopoly."  It further alleges, "[b]eing prominently featured in Apple's App Store rankings is crucial for app developers . . . because the rankings influence an app's number of downloads, which in turn affects the revenue generated by the app. Indeed, App Store rankings are so important that there is now an entire ecosystem of tools and services aimed at facilitating 'app store optimization,' or the art of increasing a given app's visibility through its App Store rankings."  Furthermore, Apple represents that its app selection process both relies on "algorithmic recommendations" and are "curated lists selected by experts." The AI Antitrust Action cites "Phillip Shoemaker, the former director of app review for Apple's App Store, [as having] acknowledged that App Store rules are often 'arbitrary' and 'arguable,' and that 'Apple has struggled with using the App Store as a weapon against competitors.'  He also admitted that Apple has favored its own apps over those of competitors and has used pretextual reasons to remove apps from Apple's competitors."

575.    The AI Antitrust Action describes how in "an iPhone, the 'Apps' landing page on the App Store contains various lists of recommended apps—for example, 'Must-Have Apps' and 'Top Free Apps.'  The category of 'Must-Have Apps' is the first to appear and thus has the most visibility to iPhone users.  Apple exercises more editorial control over the 'Must-Have Apps' rankings than it does over other lists."

576.    The AI Antitrust Action alleges that "the X app and the Grok app are consistently highly ranked in Apple's subject-specific 'Top Apps' charts in the App Store, which take into account criteria such as usability, positive reviews and ratings, and downloads."  For example, in

1    August 2025, "the X app ranked as the number 1 free app for 'News' and the Grok app ranked as

2    the number 2 free app for 'Productivity.'"  Yet, "[d]espite their high rankings in the subject-matter-

3    based 'Top Apps' lists, neither the X app nor the Grok app appeared in the 'Must-Have Apps'

4    section of the App Store" for that time.  Furthermore, "ChatGPT is the *only* generative AI chatbot

5    with an app that appeared in the 'Must-Have Apps' section of the App Store" for that time.

6    [Emphasis in original].  Meanwhile, "other apps that are ranked lower than the X app and the Grok

7    app in their respective 'Top Apps' lists are featured in the 'Must-Have Apps' section of the App

8    Store."  The AI Antitrust Action took this to be Apple's preferencing of OpenAI's product, where

9    it had the incentive to promote because of their partnership, even at the cost of downgrading a

10   product that consumers have revealed they actually preferred.

11       577.    The AI Antitrust Action further alleges, "[i]n addition to deprioritizing the X App

12   and the Grok app in its App Store rankings, Apple has also protected its arrangement with OpenAI

13   and OpenAI's dominant market position by delaying approvals for updates to the Grok app and by

14   rejecting numerous requests by xAI for the Grok app to be featured in the App Store, including

15   when it launched and when innovative enhancements were added to its offering, such as its new

16   'Imagine' feature."  This, the AI Antitrust Action observes, is consistent with the DOJ Action's

17   allegations of how "Apple had engaged in widespread 'use [of] App Store rules and restrictions to

18   penalize and restrict developers that take advantage of technologies that threaten to disrupt,

19   disintermediate, compete with, or erode Apple's monopoly power.'"  [Alteration in original].

20       578.    In a short summary order, on November 13, 2025, the Court denied Apple's motion

21   to dismiss the AI Antitrust Action.

22       579.    On September 5, 2025, authors Grady Hendrix and Jennifer Roberson (the

23   "Authors") sued Apple for allegedly infringing their copyrights by allegedly using pirated versions

24   of their works to train Apple's AI models.  *See* Class Action Complaint, *Hendrix v. Apple, Inc.*,

25   No. 3:25-cv-07558 (N.D. Cal. Sept. 5, 2025) (the "AI Copyright Action").  The AI Copyright

26   Action illustrates how Apple can use its massive scale to gain advantages in the gen AI field that

27   can in turn help it gain market dominance in the field.

28       580.    It takes enormous capital (including human capital) to host, train, and develop an

195

AI model.  The model would have to digest an enormous amount of data.  The AI Copyright Action alleges that Apple is building its model on "Books3, a dataset of pirated copyrighted books that includes the published works of" the Authors and a proposed class of similar authors.  Few companies even have the resources to take advantage of such a huge data set, so the fact that Apple can avail itself of this set of works to train its AI model on is itself a demonstration of its scale.

581.    The Authors also allege that Apple trains its model "by using Applebot, a software program that copies mass quantities of webpages (also known as 'scraping')."  The Authors allege that "Apple scraped data with Applebot for nearly nine years before disclosing that it intended to train its AI systems on this scraped data."  Beyond how long Apple has been able to keep scraping, its Applebot also has wide reach: "Scrapers like Applebot can also reach 'shadow libraries' that host millions of other unlicensed copyrighted books, including, on information and belief, [the Authors' and proposed class's] copyrighted works."  The fact that Apple can maintain this enormous web crawling tool is itself proof of its scale and the depth of its resources.

582.    Furthermore, Apple has the resources to compensate authors or publishers directly, as the Authors allege how in many instances, Apple does so.  As the Authors observe, Apple announces that it "licensed" some of the data that it uses to train its AI models.

583.    In October 2025, two similar copyright lawsuits were filed against Apple: one by two medical school professors, *Martinez-Conde v. Apple, Inc.*, No. 5:25-cv-08695-BLF (N.D. Cal. filed Oct. 9, 2025); and one class action by a historical fiction writer, *Alexander v. Apple, Inc.*, No. 5:25-cv-09090-YGR (N.D. Cal. filed Oct. 22, 2025).

## V.    THE INDIVIDUAL DEFENDANTS VIOLATED THEIR FIDUCIARY DUTY OF LOYALTY BY FAILING TO OVERSEE COMPLIANCE OR ENGAGING IN MISCONDUCT

### A.    Duties of All Individual Defendants

584.    As fiduciaries of a California corporation, directors and officers owe duties of care and loyalty to the Company.

585.    More specifically, the California Corporation Code states: "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best

1    interests of the corporation and its shareholders and with such care, including reasonable inquiry,

2    as an ordinarily prudent person in a like position would use under similar circumstance." CAL.

3    CORP. CODE §309(a).

4    586.    A director is entitled to rely on advisors or other board directors to inform their

5    decision, "so long as, in any such case, the director acts in good faith, after reasonable inquiry

6    when the need therefor is indicated by the circumstances and without knowledge that would cause

7    such reliance to be unwarranted." *Id*. §309(b)(3).

8    587.    "The California business judgment rule is intended to protect a director from

9    liability for a mistake in business judgment which is made in good faith and in what he or she

10   believes to be the best interest of the corporation, where no conflict of interest exists. . . .  It requires

11   directors to act in good faith and with the prudence that an ordinary person would under like

12   circumstances.  However, it also entitles a director to rely on information supplied by others.  If

13   directors meet the requirements of the business judgment rule, they are entitled to immunity from

14   personal liability for acts of ordinary negligence under California law." *F.D.I.C. v. Castetter*, 184

15   F.3d 1040, 1044 (9th Cir. 1999) (citation modified).

16   588.    "Notwithstanding the deference to a director's business judgment, the rule does not

17   immunize a director from liability in the case of his or her abdication of corporate responsibilities:

18   When courts say that they will not interfere in matters of business judgment, it is presupposed that

19   judgment—reasonable diligence—has in fact been exercised.  A director cannot close his eyes to

20   what is going on about him in the conduct of the business of the corporation and have it said that

21   he is exercising business judgment." *Gaillard v. Natomas Co.*, 256 Cal. Rptr. 702, 710 (Cal. Ct.

22   App. 1989) (citation modified).

23   589.    In California, though directors can be exculpated from liability for money damages

24   for some breaches of fiduciary duty, they cannot be exculpated for, among other things "acts or

25   omissions that involve intentional misconduct or a knowing and culpable violation of law" or "for

26   acts or omissions that a director believes to be contrary to the best interests of the corporation or

27   its shareholders or that involve the absence of good faith on the part of the director" or "acts or

28   omissions that show a reckless disregard for the director's duty to the corporation or its

1    shareholders" or "acts or omissions that constitute an unexcused pattern of inattention that amounts

2    to an abdication of the director's duty to the corporation or its shareholders[.]"  *Id.* §204(10).

3         590.    A California appellate court has held: "a director acts with 'reckless disregard' of

4    his duties, within the meaning of section 204, subdivision (a)(10)(A)(iv), when the director (1)

5    does an intentional act or intentionally fails to act in accordance with those duties, (2) with

6    knowledge, or with reason to have knowledge, that (3) the director's conduct creates a substantial

7    risk of serious harm to the corporation or its shareholders." *Kanter v. Read*, 309 Cal. Rptr. 3d 375,

8    387 (Cal. Ct. App. 2023).

9         591.    Similarly, "Delaware deems the intentional failure to act in the face of a known

10   duty to act as describing, and being fully consistent with, the lack of good faith conduct that the

11   *Caremark* court held was a necessary condition for director oversight liability, i.e., a sustained or

12   systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure

13   a reasonable information and reporting system exists. . . .  An intentional failure to act in the face

14   of a known duty to act expresses the same concept as an unexcused pattern of inattention that

15   amounts to an abdication of the director's duty.  Accordingly, the *Caremark* standard is consistent

16   with section 204, subdivision (a)(10)(A)(v)." *Id.* at 388 (citation modified).

17        592.    California law also calls for certain statutorily defined officers: "(a) A corporation

18   shall have (1) a chairperson of the board, who may be given the title of chair of the board,

19   chairperson of the board, chairperson, or a president or both, (2) a secretary, (3) a chief financial

20   officer, and (4) such other officers with such titles and duties as shall be stated in the bylaws or

21   determined by the board and as may be necessary to enable it to sign instruments and share

22   certificates." *Id.* §312(a).  Thus, under California law, the Board Chair counts as an officer.

23        593.    Officers do not benefit from any exculpation clause.  "[N]o such provision shall

24   eliminate or limit the liability of an officer for any act or omission as an officer, notwithstanding

25   that the officer is also a director or that his or her actions, if negligent or improper, have been

26   ratified by the directors." CAL. CORP. CODE §204(10).

27        594.    Apple's bylaws designate the "Chief Executive Officer" and "Chief Financial

28   Officer" as two of the officers of the Company, as well as other "[s]ubordinate [o]fficers" that

either the Board, the Chair, or the CEO may appoint.  The CEO also has the power to appoint "[d]ivisional and [o]ther [o]fficers[.]"

595.     The official legislative comment to Section 309 also explains that an officer, unlike a director, is not entitled to rely on information or presentations from others "in view of the greater obligation he may have to be familiar with the affairs of the corporation[.]"  CAL. CORP. CODE §309 (Legislative Committee Comment).

596.     The duty of loyalty includes the duty to provide oversight over regulatory compliance.  Directors and officers fail to execute their duty of loyalty of oversight when they fail to have sufficient reporting systems to raise these issues to their attention, or, if they implement these systems, then ignore red flags that the Company is not complying with the law.

597.     Directors and officers also violate their fiduciary duties when they directly violate the law or order the Company to engage in actions that they know will violate the law.

598.     The directors' and officers' duties are further explained in the Company's governing documents, Corporate Governance Guidelines, and Code of Conduct.

599.     The Company's Restated Articles of Incorporation, published on Apple's website, emphasizes, "The purpose of this corporation is to engage in any *lawful* act or activity[.]" [Emphasis added].  Thus, the Restated Articles of Incorporation recommit Apple's directors and officers to conduct compliant activities, and remind them that profitable but unlawful activities would violate the purpose of the corporation.

600.     Apple's Amended and Restated Bylaws, effective as of August 20, 2024, posted on Apple's website, also emphasize the directors' fiduciary duty to manage the Company.  Under 2.1, "Powers" of the directors, the Bylaws emphasize that while the Board "may delegate the management of the day-to-day operation of the business" to others, this delegation is subject how "the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board of Directors."  Thus, the Bylaws make clear, as the California Corporation Law also does, that the Board's fiduciary duties to oversee the Company are non-delegable.

601.     The Bylaws also specify that the CEO and CFO are among the officers of the

Company, and that either the Board, the Chair, or the CEO may also designate "such other officers as the business of the Corporation may require[.]"  The "powers and duties" of the CEO include, among other things, to "act as the general manager and chief executive officer of the Corporation and, subject to the direction of the Board of Directors, to have general supervision, direction, and control of the business and affairs of the Corporation."  The "powers and duties" of the CFO include, among other things, to "supervise and control the keeping and maintaining of adequate and correct accounts of the Corporation's properties and business transactions[.]"

602.    Apple's Corporate Governance Guidelines, published on Apple's website, further explain the directors and officers' fiduciary duties.  The very first numbered provision states:

> The Board oversees the Chief Executive Officer (the "CEO") and other senior management in the *competent and ethical operation* of the Corporation on a day-to-day basis and seeks to ensure that the *long-term interests of shareholders are being serve*d.  To satisfy its duties, directors are expected to take *a proactive, focused approach* to their position to ensure that the Corporation is committed to business success through the maintenance of *high standards of responsibility and ethics*.

[Emphasis added].

603.    Thus, at the very beginning of the Corporate Governance Guidelines, the directors and officers are put on notice that their job is not one of passive oversight or checking boxes, but to ensure a "competent and ethical operation" and to take a "proactive, focused approach[.]"

604.    The Corporate Governance Guidelines further remind "directors, as well as officers and employees, to act ethically."   In particular, "Director Responsibilities" include their "fundamental role . . . to exercise their business judgment to act in what they reasonably believe to be the best interests of the Corporation and its shareholders."  Furthermore, "[d]irectors are encouraged to talk directly with any officer or employee of the Corporation."

605.    The Corporate Governance Guidelines also state that the standing committees (at present, the Nominating and Corporate Governance Committee, Audit and Finance Committee, and People and Compensation Committee) will meet the criteria of director independence under Nasdaq and SEC standards.

606.    Directors and officers are also subject to Apple's Business Conduct Policy.  The policy states, "Apple conducts business ethically, honestly, and in full compliance with applicable

laws and regulations.  This applies to every business decision in every area of the company worldwide."  "Honesty" and "Compliance" are re-emphasized as two of Apple's core business principles.  The Business Conduct Policy further requires reporting of violations, and notes, failure to comply or "failure to report a policy, regulatory, or legal violation" could "result in disciplinary action, up to and including termination of employment."  Furthermore, the Business Conduct Policy emphasizes: "If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct."  The Policy further assures that reporting can be anonymous and will be protected from retaliation.

607.    The Business Conduct Policy highlights competition and antitrust concerns:

Competition and Trade Practices[:] Competition and innovation are at the core of Apple's DNA.  We vigorously compete to develop and create the very best products for our customers.  Apple will never seek to eliminate or reduce competition through illegal agreements with competitors.  Agreements with competitors are subject to rigorous scrutiny in all countries. Agreements with our resellers, distributors, and suppliers can also give rise to scrutiny, particularly if Apple has a leading position in the market.

You should never:

- Agree with or exchange information with competitors regarding price, policies, contract terms, costs, inventories, marketing plans, capacity plans, or other competitively significant data.

- Agree with competitors to divide or assign sales territories, products, or dedicate customers.

- Agree with resellers on the resale pricing of Apple products without legal approval. Resellers are free to determine their own resale pricing.

- Violate fair bidding practices, including bidding quiet periods, or provide information to benefit one vendor over other vendors.

- Remember:  Always  consult  the Competition  Law Team whenever you have a question. For more information, see the Antitrust and Competition Law Policy.

608.    Furthermore, the Company publishes an "Apple Antitrust and Competition Law Policy Statement," which expressly commits the Company, directors, officers, and employees to following antitrust and competition laws:

Apple Antitrust and Competition Law Policy Statement[;] Apple is committed to conducting business ethically, honestly, and in full compliance with applicable laws

201

and regulations, including U.S. and international antitrust and competition laws.

Antitrust and competition law is a complex area of law.  How to apply the law is not always clear.  When in doubt, you should always seek advice from your local counsel or the Competition Law Team (competitionlaw@apple.com).

You should consult with your local legal counsel or the Competition Law Team whenever there is a question as to the appropriateness of a particular business decision or course of action.  Directors, officers, or employees who learn of any misconduct that raises potential competition risks, including violations of this Policy and the law, must immediately report such misconduct either to the Antitrust Compliance Officer or to Apple's Business Conduct Helpline.

Violations of Apple's Antitrust and Competition Law Policy or applicable global laws may result in disciplinary action up to and including termination of employment.  Violations of the law may also result in legal liability for Apple and individual employees involved in the misconduct, and could lead to significant fines, or penalties, including jail time.

Reporting violations is required.  Apple will not tolerate retaliation against any individual filing a good-faith complaint with management, HR, Legal, Finance or the Business Conduct Helpline, or for participating in the investigation of any such complaint.

609.    Apple's policy that specifically speaks to antitrust compliance highlights how directors and officers "who learn of any misconduct that raises *potential competition risks*" have a duty to "*immediately report*" their concerns, and further emphasizes, "*Reporting violations is required*."  [Emphasis added].  Notably, the policy covers "potential competition risks," thus telling directors and officers that they should err on the side of caution rather than on the side of permission.

**B.**    **Additional Duties of Board Committees**

610.    The Audit and Finance Committee at Apple is designated as having overall oversight into regulatory compliance, as well as the accuracy of its financial statements.  The Audit and Finance Committee Charter states that its "purpose" includes "[a]ssist[ing] the Board in oversight and monitoring of . . . compliance with legal, regulatory and public disclosure requirements" and "enterprise risk management[.]"  Under "Duties and Responsibilities[,]" the Charter states, among other things, "The Committee shall . . .  [r]eview and discuss with management the program that management has established to monitor compliance with the Corporation's Business Conduct Policy" as well as "[r]eview and discuss with management . . . management's program to identify, assess, manage, and monitor significant business risks of the

Corporation, including . . . operational . . . legal and regulatory compliance, and reputational risks[] and . . . management's risk management decisions, practices, and activities." Furthermore, the Committee shall "[r]egularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Committee deems appropriate."

611.  The Nominating and Corporate Governance Committee at Apple is responsible for nominating Board directors, setting nominees qualifications, setting corporate governance guidelines, and therefore also has oversight of fiduciary duties. Specifically, its duties include, among other things, "[c]onsider the performance of incumbent members of the Board in determining whether to recommend that they be nominated for reelection" and "[m]onitor compliance with the Corporate Governance Guidelines . . . and, as it relates to individual directors, the Corporation's Business Conduct Policy."

612.  The People and Compensation Committee is responsible for setting the CEO's and executives' compensation, as well as "[a]ssist the Board in its oversight of the Corporation's strategies, policies, and practices relating to its people and teams[.]" Among other things, its duties include "at least annually review the assessment and mitigation of risks associated with the Corporation's compensation policies and practices" and "discuss with management the Corporation's strategies, policies, and practices . . . relating to the Corporation's people and teams as the Committee deems appropriate from time to time."

## C.    The Board Directors Violated Their Fiduciary Duties Under California Law

613.  Apple's directors violated their fiduciary duties under California law through their failure to oversee antitrust compliance at the Company, as evident by the long and uninterrupted anticompetitive conduct as detailed in numerous antitrust enforcement and civil actions, plus the billions of dollars in fines and settlement. As described above, this anticompetitive conduct involved decision-making at the highest managerial levels of the Company, such as:

    a.  Cook and Maestri pushing through an anticompetitive plan to skirt around the First Injunction in the Epic Games Action;

    b.  the initial decision by Jobs to impose a 30% commission in the App Store, which Cook and other senior executives continue to ratify by never deviating from this

base rate, even as they expressly chose to carve out exceptions based on regulatory or litigation pressure;

c.  Cook expressly endorsing Apple not having interoperability between SMS and iMessage, even going so far as to tell a customer whose mother has an Android-based phone to get her an iPhone; and

d.  other decisions to close the Apple system, even when it degrades overall security (such as the loss of end-to-end encryption when an Android device joins an iMessage chat), which could only be made at the highest executive levels because they are central to Apple's business.

614.    The lack of oversight by the Board is further evident in how, even though Apple represents that its Audit and Finance Committee has oversight on regulatory compliance and business risks, the Audit and Finance Committee's Charter merely calls for it to "[r]eview and discuss with management" their plan to oversee compliance.  This is evidence that despite the Board's representations to the contrary in the January 10, 2025 Definitive Proxy Statement filed with the SEC ("2025 Proxy"), and in Apple's public facing documents concerning the purportedly active oversight of the Board, the Board in fact did not have a reporting mechanism for antitrust and other regulatory matters, but instead relied entirely on management to raise issues with it.  The fact that decades of anticompetitive conduct went on, subject to litigation that began almost as soon as the App Store was established, also indicates that the Audit and Finance Committee did not actually oversee regulatory compliance or management enterprise risks, despite the explicit charge to do so.

615.    Similarly, the People and Compensation Committee is charged with oversight regarding Apple's employees and teams, but appears to have conducted no oversight into numerous non-compliant product decisions made by Apple executives and their teams, thus indicating that it conducted little to no oversight.  The compensation system, designed almost solely around increasing shareholder value, also indicates that there was a concurrent lack of emphasis on regulatory compliance, as profits and growth became the overriding focus for executives to maximize their compensation.

616. The Nominating Committee is charged with overseeing corporate governance at the Company, and yet the widespread anticompetitive conduct indicates that the Nominating Committee did not offer real oversight in that area, either.

617. Alternatively, if the Board was on notice of antitrust violations, then they failed to fulfill their fiduciary duties by ignoring numerous red flags of noncompliance and allowing anticompetitive conduct to continue to this day. These red flags, which warned Apple directors to stop the conduct, include:

    a. the DOJ and civil actions showing that Apple violated antitrust laws in agreeing to not recruit employees of other high-tech companies in exchange for those companies refraining from recruiting Apple employees, where Levinson played a key role in facilitating the conspiracy;

    b. the DOJ e-books action that found that Apple facilitated a conspiracy to raise the prices of e-books in its then-new iBookstore, which also included how Apple used its power over the App Store to bring publishers in line;

    c. a highly publicized investigation by Congress into digital platforms, including Apple, that occurred between 2019 and 2020, included testimony from Cook in July 2020, and a more than 400-page report by the House Majority Staff in October 2020, which outlined a wide variety of anticompetitive practices that were already the subject of regulatory actions or investigations in Europe and other countries.

    d. Consumer litigation concerning monopolistic iOS app distribution that began in 2008 and where key claims were upheld at the U.S. District Court, the Ninth Circuit Court of Appeals, and even the United States Supreme Court.

    e. The DOJ cited a presentation to the Board in its action, which highlighted how "[u]ndifferentiated user experience on [a] super [app]" would be a "major headwind" to growing iPhone sales in countries where these super apps function because they resulted in "[l]ow stickiness" and "[l]ow switching cost." Though the DOJ Action does not date the presentation, it appears to be from 2017, and it appeared to also highlight a risk of a potential super app developer that would

"replace[] usage of native OS and apps resulting in commoditization of smartphone hardware."  Thus, the Board was on direct notice of Apple employees' efforts to stifle super app development because it knew that Apple considered super apps to be a "major headwind" and would lead to "commoditization of smartphone hardware."

f.   Epic Games' action against Apple that culminated in a 2021 anti-steering order, upheld on appeal in 2023.  Despite this court order, Apple continued to defy the court for more than a year, until the court issued a contempt order and injunction to take effect immediately.

g.   Actions in the European Union where investigations began in 2023 or earlier, and resulted in massive fines that totaled billions of euros in 2024 and 2025.

h.   A comprehensive report of Apple's monopolistic practices by the UK CMA in July of 2025.

**D.    The Officers Violated Their Fiduciary Duties Under California Law**

618.    The above evidence of directors' failure to oversee antitrust compliance also apply to the Officer Defendants, who as senior executives at the Company, either had oversight of the entire company—such as Cook and Maestri—or oversight of key aspects of Apple's monopoly, such as Schiller.

619.    In addition, the underlying actions show that the Officer Defendants also violated their fiduciary duties by actively participating in anticompetitive activities:

a.   As detailed above, Cook, Maestri, and Schiller were actively involved in Apple's decision to implement Apple's anticompetitive attempts to skirt the Court's first anti-steering injunction.  Though Schiller was initially opposed to imposing a 27% linked-out commission, he appeared to accept the decision once it was made to implement it.  The Court has already criticized Cook for "cho[osing] poorly" in approving the 27% linked-out commission.

b.   As detailed above, Cook, Maestri, and Schiller appeared to have also approved the implementation of the other anticompetitive measures, such as the scare screen and

206

the "button" that was really just plain text.

c.  The Officer Defendants also misled the court when their testimony was geared towards trying to convince the court of Apple's compliance, while hiding facts or declining to give testimony that would have revealed the truth of Apple's efforts to skirt compliance with the First Injunction.

d.  Under Cook's leadership, Apple continues to ratify the initial decision to charge what this District Court, the Ninth Circuit, and the Tribunal have maintained is a supracompetitive 30% commission for in-app purchases, even as Cook and other Apple leaders have had numerous opportunities to revisit and lower the base rate.

e.  Under Cook's leadership, Apple has also continued to force app developers to use Apple's IAP program, and to continue to resist regulatory pressure to allow developers to use other programs, and to even prevent steering to alternative payment methods even when faced with straightforward court orders or regulatory orders to do so.  Also, Cook and Maestri pushing through an anticompetitive plan to skirt around the First Injunction in the Epic Games Action.

f.  Cook expressly endorsed Apple not having interoperability between SMS and iMessage, even though the lack of interoperability runs counter to Apple's justification that a closed system is more secure, because an SMS conversation will take away end-to-end encryption from iMessage users, as well, in a chat.  Cook's intent is also evident through his telling a customer whose mother has an Android-based phone to get her an iPhone.

g.  Other decisions to close the Apple system could only have been made at the highest levels of leadership, such as Apple's choices to prevent others from having access to NFC, except to the extent ordered by regulators, or by prohibiting iPhone from being interoperable with smartwatches other than Apple Watch, or the contractual restrictions that have made super apps or cloud streaming apps almost impossible to operate through the App Store, because all of these activities are central to Apple's business model of having a "walled garden" where Apple customers are

forced to use other Apple products to the maximum extent possible.

620.    The fact that the Board relies on management representations, and the indications as described above that the Board had no reporting up to it of numerous antitrust violations, is another indication of the officers' violation of their fiduciary duties because it indicates that the officers did not inform the Board of numerous antitrust violations.

## VI.    APPLE FIDUCIARIES HAVE CAUSED APPLE TO VIOLATE THE EXCHANGE ACT

621.    Apple's fiduciaries have also acted disloyally by causing Apple to violate Section 10(b) and 14(a), as well as attendant rules and regulations, of the Exchange Act.

622.    In its Form 10-K, filed on November 2, 2023, for fiscal year ended September 30, 2023, the Company states:

Competition

The markets for the Company's products and services are highly competitive, and are characterized by aggressive price competition and resulting downward pressure on gross margins, frequent introduction of new products and services, short product life cycles, evolving industry standards, continual improvement in product price and performance characteristics, rapid adoption of technological advancements by competitors, and price sensitivity on the part of consumers and businesses. Many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property.

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. Principal competitive factors important to the Company include price, product and service features (including security features), relative price and performance, product and service quality and reliability, design innovation, a strong third-party software and accessories ecosystem, marketing and distribution capability, service and support, and corporate reputation.

The Company is focused on expanding its market opportunities related to smartphones, personal computers, tablets, wearables and accessories, and services. The Company faces substantial competition in these markets from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software, and service offerings with large customer bases. In addition, some of the Company's competitors have broader product lines, lower-priced products and a larger installed base of active devices. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products at little or no profit or even at a loss. The Company's services compete with business models that provide content to users for free and use illegitimate means to obtain third-party digital content and applications. The

208

Company faces significant competition as competitors imitate the Company's product features and applications within their products, or collaborate to offer integrated solutions that are more competitive than those they currently offer.

623. The above is false and misleading because the Company did not disclose that its competitive advantage actually came from anti-competitive conduct, such as: (1) its anti-steering provisions that multiple jurisdictions, including this District Court, determined are illegal; (2) contractual and technical constraints that hamper cloud streaming, super apps, interoperability with smartwatches and digital wallets, and messaging; (3) self-preference of Apple's own apps over third-party apps; and (4) charging a supracompetitive 30% commission on in-app purchases, as well as force developers to use Apple's IAP.

624. Regarding the App Store in particular, in the 2023 Form 10-K, Apple claims:

From time to time, the Company has made changes to its App Store, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future, including as a result of legislative initiatives impacting the App Store, such as the EU Digital Markets Act, which the Company is required to comply with by March 2024, or similar laws in other jurisdictions. Changes have included how developers communicate with consumers outside the App Store regarding alternative purchasing mechanisms. Future changes could also affect what the Company charges developers for access to its platforms, how it manages distribution of apps outside of the App Store, and how and to what extent it allows developers to communicate with consumers inside the App Store regarding alternative purchasing mechanisms.

625. The above statement is false and misleading to the extent the Company indicates "competition" and "market conditions" cause it to make changes to the App Store. Rather, as various regulatory and adjudicatory authorities have found, Apple does not face competition regarding the App Store because of, among other things: (1) Apple's monopoly on iOS and its prohibition of alternative app stores; (2) Apple faces no competition from Android in mobile operating systems; rather, the two are separate markets and a given app developer needs to address both iOS and Android, given the huge market shares of both; (3) Apple has entered many contractual and technical restrictions that prevent competition for the App Store; (4) Apple itself appears to give little to no stock to competitive pressures in the App Store, as evident by how Apple has maintained a 30% commission rate since the App Store's inception almost two decades ago, despite complaints that it is high and judicial findings that it is supracompetitive; (5) Apple

has further hampered competition through anti-steering provisions, and to the extent it allows steering, it is not owing to competition but due to regulators' and this District Court's order; and (6) high switching costs and brand strength further protect Apple's monopoly.  Instead, Apple's App Store changes are driven by regulation and litigation, and Apple is misleading investors by minimizing those issues, which would tend to show Apple's App Store engages in unlawful or otherwise anticompetitive practices.

626.    In its Form 10-Q filed on February 1, 2024, the Company represented:

> From time to time, the Company has made changes to its App Store, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future. For example, in the U.S. the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms.
>
> . . .
>
> The Company is also currently subject to antitrust investigations in various jurisdictions around the world, which can result in legal proceedings and claims against the Company that could, individually or in the aggregate, have a materially adverse impact on the Company's business, results of operations and financial condition. For example, the Company is the subject of investigations in Europe and other jurisdictions relating to App Store terms and conditions. If such investigations result in adverse findings against the Company, the Company could be exposed to significant fines and may be required to make further changes to its App Store business, all of which could materially adversely affect the Company's business, results of operations and financial condition.

627.    The above statements are false and misleading to the extent the Company indicates "competition" and "market conditions" cause it to make changes to the App Store.  Rather, as various regulatory and adjudicatory authorities have found, Apple does not face competition regarding the App Store because of, among other things: (1) Apple's monopoly on iOS and its prohibition of alternative app stores; (2) Apple faces no competition from Android in mobile operating systems; rather, the two are separate markets and a given app developer needs to address both iOS and Android, given the huge market shares of both; (3) Apple has entered many contractual and technical restrictions that prevent competition for the App Store; (4) Apple itself appears to give little to no stock to competitive pressures in the App Store, as evident by how Apple has maintained a 30% commission rate since the App Store's inception almost two decades ago, despite complaints that it is high and judicial findings that it is supracompetitive; (5) Apple

has further hampered competition through anti-steering provisions, and to the extent it allows steering, it is not owing to competition but due to regulators' and this District Court's order; and (6) high switching costs and brand strength further protect Apple's monopoly.  Instead, Apple's App Store changes are driven by regulation and litigation, and Apple is misleading investors by minimizing those issues, which would tend to show Apple's App Store engages in unlawful or otherwise anticompetitive practices.

628.    The 10-Q filed on February 1, 2024, also omitted material information that the United States was one of the jurisdictions where it faced advantaged antitrust investigations, as only barely a month later, the DOJ and a coalition of state attorneys general filed a comprehensive antitrust complaint.  Instead, Apple sought to hide this fact by merely remarking that "other jurisdictions" had ongoing antitrust investigations.

629.    On February 1, 2024, in an earnings call, an analyst asked about how complying with the DMA affects Apple's profitability, and Cook responded, in part: "If you think about what we've done over the years is we've really majored on privacy, security and usability. And we've tried our best to get as close to the past in terms of the things that are -- that people love about our ecosystem as we can. But we're going to fall short of providing the maximum amount that we could supply because of -- we need to comply with the regulation."

630.    The above statement is materially false and misleading because Cook presented Apple's closed ecosystem as a consumer benefit—"majored on privacy, security and usability"—and blamed "fall[ing] short of providing the maximum" on the "regulation."  But Cook omitted that Apple fell short of the "maximum" often because of its own anticompetitive conduct.

631.    On May 2, 2024, in its Form 10-Q, the Company represented: "From time to time, the Company has made changes to its App Store, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements.  The Company expects to make further business changes in the future.  For example, in the U.S. the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms."

632.    The above statements were materially false and misleading to the extent the

211

Company indicates "competition" and "market conditions" cause it to make changes to the App Store.  Rather, as various regulatory and adjudicatory authorities have found, Apple does not face competition regarding the App Store because of, among other things: (1) Apple's monopoly on iOS and its prohibition of alternative app stores; (2) Apple faces no competition from Android in mobile operating systems; rather, the two are separate markets and a given app developer needs to address both iOS and Android, given both huge market shares; (3) Apple has entered many contractual and technical restrictions that prevent competition for the App Store; (4) Apple itself appears to give little to no stock to competitive pressures in the App Store, as evident by how Apple has maintained a 30% commission rate since the App Store's inception almost two decades ago, despite complaints that it is high and judicial findings that it is supracompetitive; (5) Apple has further hampered competition through anti-steering provisions, and to the extent it allows steering, it is not owing to competition but due to regulators' and this District Court's order; and (6) high switching costs and brand strength further protect Apple's monopoly.  Instead, Apple's App Store changes are driven by regulation and litigation, and Apple is misleading investors by minimizing those issues, which would tend to show Apple's App Store engages in unlawful or otherwise anticompetitive practices.

633.    In a May 2, 2024 earnings call, Cook responded to a question about how Apple was implementing the DMA by stating in part, "[w]e just implemented in March, as you probably know, in the European Union, the alternate app stores and alternate billing, et cetera.  So we're focused on complying while mitigating the impacts to user privacy and security that you mentioned. And so that's our focus."

634.    The above statement is materially false and misleading because Cook omitted the material fact that Apple was not merely concerned with "user privacy and security" but sought to protect its walled garden by undertaking actions that were anticompetitive and could even hurt privacy and security.  For example, Apple degraded the security of messages with non-iMessage platforms.

635.    Apple filed its Form 10-K for the fiscal year ended September 30, 2024, on November 1, 2024.

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

636.    In the 2024 Form 10-K, with respect to competition, Apple stated:

The markets for the Company's products and services are highly competitive, and are characterized by aggressive price competition and resulting downward pressure on gross margins, frequent introduction of new products and services, short product life cycles, evolving industry standards, continual improvement in product price and performance characteristics, rapid adoption of technological advancements by competitors, and price sensitivity on the part of consumers and businesses. Many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures, and by imitating the Company's products and infringing on its intellectual property.

The Company's ability to compete successfully depends heavily on ensuring the continuing and timely introduction of innovative new products, services and technologies to the marketplace. The Company designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications and related services. Principal competitive factors important to the Company include price, product and service features (including security features), relative price and performance, product and service quality and reliability, design innovation, a strong third-party software and accessories ecosystem, marketing and distribution capability, service and support, and corporate reputation.

The Company is focused on expanding its market opportunities related to smartphones, personal computers, tablets, wearables and accessories, and services. The Company faces substantial competition in these markets from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software, and service offerings with large customer bases. In addition, some of the Company's competitors have broader product lines, lower-priced products and a larger installed base of active devices. Competition has been particularly intense as competitors have aggressively cut prices and lowered product margins. Certain competitors have the resources, experience or cost structures to provide products at little or no profit or even at a loss. The Company's services compete with business models that provide content to users for free and use illegitimate means to obtain third-party digital content and applications. The Company faces significant competition as competitors imitate the Company's product features and applications within their products, or collaborate to offer integrated solutions that are more competitive than those they currently offer.

637.    The above is false and misleading because the Company did not disclose that its competitive advantage actually came from anti-competitive conduct, such as: (1) its anti-steering provisions that multiple jurisdictions, including this District Court, determined are illegal; (2) contractual and technical constraints that hamper cloud streaming, super apps, interoperability with smartwatches and digital wallets, and messaging; (3) self-preference of Apple's own apps over third-party apps; and (4) charging a supracompetitive 30% commission on in-app purchases, as well as force developers to use Apple's IAP.

638.    The 2024 Form 10-K also states

> From time to time, the Company has made changes to its App Store, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future. For example, in the U.S. the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms.

639.    The above statement is false and misleading to the extent the Company indicates "competition" and "market conditions" cause it to make changes to the App Store. Rather, as various regulatory and adjudicatory authorities have found, Apple does not face competition regarding the App Store because of, among other things: (1) Apple's monopoly on iOS and its prohibition of alternative app stores; (2) Apple faces no competition from Android in mobile operating systems; rather, the two are separate markets and a given app developer needs to address both iOS and Android, given the huge market shares of both; (3) Apple has entered many contractual and technical restrictions that prevent competition for the App Store; (4) Apple itself appears to give little to no stock to competitive pressures in the App Store, as evident by how Apple has maintained a 30% commission rate since the App Store's inception almost two decades ago, despite complaints that it is high and judicial findings that it is supracompetitive; (5) Apple has further hampered competition through anti-steering provisions, and to the extent it allows steering, it is not owing to competition but due to regulators' and this District Court's order; and (6) high switching costs and brand strength further protect Apple's monopoly. Instead, Apple's App Store changes are driven by regulation and litigation, and Apple is misleading investors by minimizing those issues, which would tend to show Apple's App Store engages in unlawful or otherwise anticompetitive practices.

640.    In a Form 10-Q filed on January 31, 2025, Apple stated: "From time to time, the Company has made changes to its App Store, including actions taken in response to litigation, competition, market conditions and legal and regulatory requirements. The Company expects to make further business changes in the future. For example, in the U.S. the Company has implemented changes to how developers communicate with consumers within apps on the U.S. storefront of the iOS and iPadOS App Store regarding alternative purchasing mechanisms."

641.    The above statement is false and misleading to the extent the Company indicates

"competition" and "market conditions" cause it to make changes to the App Store. Rather, as various regulatory and adjudicatory authorities have found, Apple does not face competition regarding the App Store because of, among other things: (1) Apple's monopoly on iOS and its prohibition of alternative app stores; (2) Apple faces no competition from Android in mobile operating systems; rather, the two are separate markets and a given app developer needs to address both iOS and Android, given the huge market shares of both; (3) Apple has entered many contractual and technical restrictions that prevent competition for the App Store; (4) Apple itself appears to give little to no stock to competitive pressures in the App Store, as evident by how Apple has maintained a 30% commission rate since the App Store's inception almost two decades ago, despite complaints that it is high and judicial findings that it is supracompetitive; (5) Apple has further hampered competition through anti-steering provisions, and to the extent it allows steering, it is not owing to competition but due to regulators' and this District Court's order; and (6) high switching costs and brand strength further protect Apple's monopoly. Instead, Apple's App Store changes are driven by regulation and litigation, and Apple is misleading investors by minimizing those issues, which would tend to show Apple's App Store engages in unlawful or otherwise anticompetitive practices.

642.    In a May 1, 2025 earnings call, Cook responded to a question about "yesterday's Epic [Games] case injunction" (a question that was first directed to the new CFO), by responding, "[t]he case yesterday, we strongly disagree with. We've complied with the court's order, and we're going to appeal." This statement was false and misleading, as the court had already pointed to evidence showing that Cook knew that the measures, including the 27% linked-out commission, were anticompetitive, but approved them anyway.

643.    These misstatements were material information because the Company needed to assess when and whether to repurchase stock.

644.    In the last two years, the Company made the following purchases of its own stock, while relying on the false information authorized by the Director Defendants, Cook, and Maestri (collectively, the "10(b) Defendants"):

| Date of Repurchase | Number of Shares Repurchased | Weighted-Average Price per Share | Total Amount Paid ($) |
|---|---|---|---|
| Sep 2023 | 20,347,000 | $176.31 | $3,587,379,570 |
| Oct 2023 | 45,970,000 | $174.03 | $8,000,159,100 |
| Nov 2023 | 33,797,000 | $187.14 | $6,324,770,580 |
| Dec 2023 | 31,782,000 | $194.29 | $6,174,924,780 |
| Dec 2023 | 40,119,000 | $186.95 | $7,500,247,050 |
| **Total for 2023** | **172,015,000** | **$183.74** | **$31,587,481,080** |
| Feb 2024 | 40,120,000 | $183.88 | $7,377,265,600 |
| Mar 2024 | 50,053,000 | $172.27 | $8,622,630,310 |
| Mar 2024 | 45,690,000 | $169.74 | $7,755,420,600 |
| May 2024 | 51,729,000 | $188.38 | $9,744,709,020 |
| Jun 2024 | 41,354,000 | $205.54 | $8,499,901,160 |
| Jun 2024 | 35,697,000 | $224.11 | $8,000,054,670 |
| Aug 2024 | 42,910,000 | $221.39 | $9,499,844,900 |
| Sep 2024 | 33,653,000 | $222.86 | $7,499,907,580 |
| Sep 2024 | 41,627,000 | $229.51 | $9,553,812,770 |
| Nov 2024 | 32,784,000 | $227.13 | $7,446,229,920 |
| Dec 2024 | 25,379,000 | $248.05 | $6,295,260,950 |
| Dec 2024 | 36,809,000 | $235.43 | $8,665,942,870 |
| **Total for 2024** | **477,805,000** | **$210.69** | **$98,960,980,350** |
| Feb 2025 | 31,856,000 | $238.07 | $7,583,957,920 |
| Mar 2025 | 39,455,000 | $221.77 | $8,749,935,350 |
| Mar 2025 | 43,161,000 | $200.79 | $8,666,297,190 |
| May 2025 | 28,223,000 | $203.17 | $5,734,066,910 |
| Jun 2025 | 32,880,000 | $200.73 | $6,600,002,400 |
| **Total for 2025** | **175,575,000** | **$212.91** | **$37,334,259,770** |
| **Grand Total** | **825,395,000** | **N/A** | **$167,882,721,200** |

645.    The 10(b) Defendants made these statements with scienter:

    a.    as discussed above, the Director Defendants either knew about red flags and ignored them, or recklessly refused to conduct oversight to prevent themselves from having knowledge of antitrust violations; and

    b.    as discussed above, Cook and Maestri directly participated in the misconduct by choosing anticompetitive practices.

646.    The Director Defendants, Cook, and Maestri also signed the SEC filings or otherwise reviewed and approved them as part of their duties.

647.    The stock price dropped after the DOJ antitrust action was filed in March 2024.  On March 20, 2024, the day before the DOJ filed its action, Apple stock traded at $178.67.  The day the DOJ Action was filed, Apple stock traded at $177.05 at the open.  On March 22, 2024, after

1  the DOJ Action was filed, Apple traded at $172.28 at the close and did not recover until May 2,

2  2024.  After this District Court entered its Second Injunction in the Epic Games Action, the stock

3  price started dropping on May 1, 2025, and did not recover until May 13, 2025.  Thus, the

4  Company was damaged through having to pay inflated prices for the stock, when disclosures of

5  the truth caused the stock prices to drop.

6      648.    The 2025 annual meeting proxy was filed on January 10, 2025.  It states that "[t]he

7  Board takes an active role in overseeing corporate and product strategy and seeks to ensure the

8  long-term interests of Apple and its shareholders are being served.  The Board believes that

9  evaluating the executive team's management of the risks confronting Apple is one of its most

10  important areas of oversight.  In carrying out this responsibility, the Board is assisted by its

11  committees, each of which considers risks within its areas of primary responsibility and expertise

12  and apprises the full Board of significant matters and management's response."

13      649.    The above statement was false and misleading because the Board did not take an

14  "active role" in evaluating antitrust compliance risks, as evidenced by multi-billion-euro fines that

15  the Company has already incurred in Europe for its anti-steering provisions, while the Company

16  continued to defy this District Court's First Injunction in the Epic Games Action.  Instead, as this

17  District Court stated, the Company "chose the most anticompetitive" possible means to nominally

18  comply with the Court's First Injunction, to the extent where this District Court issued a contempt

19  order and immediate Second Injunction and made a criminal referral for the perjury on the stand

20  of another Apple executive.  Furthermore, the Board's "active role" was belied by the numerous

21  other long-standing anticompetitive practices Apple has engaged in to lock in its position in

22  performance smartphones and iOS app distribution, as described above.

23      650.    The 2025 Proxy goes on to make many similar misstatements that purport to show

24  how much oversight the Board is exercising, when, as discussed above, the longstanding antitrust

25  violations actually show that the Board exercised little oversight:

26          a.  In opposing some shareholder proposals, the 2025 Proxy emphasized, "Apple has

27              a well-established compliance program" and "[o]ur Board and management

28              maintain active oversight of legal and regulatory risks and compliance for our

global business."

b. In discussing the Company's "Corporate Governance Framework," the 2025 Proxy states: "Our CEO is focused on managing Apple and our independent Chair drives accountability at the Board level"; "Our Board has significant interaction with senior management and access to other employees"; "Our Board regularly receives updates on ethics, compliance, and governance as well as emerging topics relevant to the evolving needs of the Company."

c. In discussing the "Role of the Board of Directors," the 2025 Proxy states, "Apple's Board oversees the CEO and other senior management in the competent and ethical operation of Apple and seeks to ensure that the long-term interests of shareholders are being served. Directors are expected to take a proactive, focused approach to ensure Apple is committed to business success through the maintenance of high standards of responsibility and ethics."

d. In discussing the "Board and Committee Structure," the 2025 Proxy highlights how Apple's separation of the Chair and CEO roles "best serves Apple's overall corporate structure and the Board's ability to carry out its roles and responsibilities on behalf of Apple's shareholders, including its oversight of management and corporate governance matters. The Board also believes that the current structure allows our CEO to focus on managing Apple, while leveraging our independent Chair's experience to drive accountability at the Board level."

651. In describing "Board Oversight," in addition to the above overarching statement, the section further describes:

a. The role of the "Board of Directors" is it "[d]irectly oversees corporate and product strategy, executive succession planning, and other matters reserved to the full Board. Reviews and discusses with management significant risks affecting Apple, including matters escalated by its committees from within their respective areas of direct oversight."

b. The Audit Committee: "Oversees financial matters, business conduct, and legal and

regulatory compliance, including antitrust matters . . . and has primary responsibility for assisting the Board with risk oversight."

c.  The People and Compensation Committee "has primary responsibility for assisting the Board with oversight of matters relating to Apple's people and teams."

d.  The Nominating Committee: "Oversees Board structure, governance, and independence, and has primary responsibility for assisting the Board with oversight of environmental and social matters."

e.  The "Management" is "[l]ed by our CEO and executive team . . . implements and supervises day-to-day risk management processes, and reports to the Board and its committees on significant matters."

f.  The "Internal Audit" function is "[d]irectly overseen by the Audit Committee and . . . identifies and helps mitigate risk, and improves internal controls."

g.  The "Enterprise Risk Management Program" is "[d]esigned to identify, assess, and monitor Apple's business risks, including financial, operational, compliance, and reputational risks."  It is "[s]upported by a Risk Oversight Committee, consisting of our Chief Financial Officer, General Counsel, Head of Business Assurance, and other senior leaders, that assists the Audit Committee with its general responsibility for overseeing enterprise risk management."

h.  In describing "Selected Areas of Oversight" –

  i.   when it comes to "Compliance and Business Conduct"—"The Audit Committee regularly reviews and discusses with management Apple's compliance and business conduct risks.  Apple's Chief Compliance Officer is responsible for the development, review, and execution of Apple's Compliance and Business Conduct program and regularly reports to the Audit Committee."

  ii.  When describing "People and Teams" oversight by the Board, "the People and Compensation Committee evaluates whether the design and operation of Apple's compensation programs or policies encourage our executive officers or our employees to take unnecessary or excessive risks."

iii.   Describing oversight into AI, "Apple's full Board directly oversees corporate and product strategy and receives regular updates on emerging technologies."

i.   Concerning "Legal and Regulatory Compliance"—"[t]he Audit Committee oversees legal and regulatory risks related to Apple's business.  Apple's full Board also receives regular updates on legal and regulatory developments, including updates on legislative developments, government investigations, litigation, and other legal proceedings."

j.   In describing the Company's "Business Conduct Policy"—"Apple seeks to conduct business ethically, honestly, and in compliance with applicable laws.  Apple's code of ethics, entitled 'Business Conduct: The way we do business,' sets out the principles that guide Apple's business practices – honesty, respect, confidentiality, and compliance.  The code applies to all employees, including Apple's principal executive officer, principal financial officer, and principal accounting officer.  Relevant sections of the code also apply to the Board. . . .  Apple's code is managed by the Business Conduct organization, under the oversight of Apple's Chief Compliance Officer."

k.   In opposing a shareholder proposal concerning AI reporting and transparency, the 2025 Proxy assures investors, in boldface: "**Our Board and management maintain active oversight**."

l.   In opposing a shareholder proposal concerning reporting on child sexual abuse material, the 2025 Proxy assures investors: "Our Audit Committee assists the Board in monitoring our significant business risks, including operational and reputation exposures . . . or compliance with laws and regulations."

m.   In opposing a shareholder proposal concerning discrimination, the 2025 Proxy responds, in boldface: "**The proposal is unnecessary as Apple already has a well-established compliance program**" and "**Our Board and management maintain active oversight**."  Furthermore, the 2025 Proxy assures investors, "Apple's Audit Committee oversees business conduct, legal, and regulatory risks related to Apple's

global business and Apple's People and Compensation Committee assists the full Board in its oversight of Apple's strategies, policies, and practices relating to Apple's people and teams.  Apple's Board also receives regular updates on legal and regulatory developments, including updates on legislative developments, government investigations, litigation, and other legal proceedings."  Furthermore, "[a]t the management level, Apple's Senior Vice President, Retail + People is focused on matters affecting our people and teams. And within Apple's Legal team, team members led by our Senior Vice President, General Counsel and our Chief Compliance Officer are focused on legal compliance across our global business operations."

n.    In opposing a shareholder proposal concerning charitable giving, the 2025 Proxy assures that "our Board and management maintain active oversight of legal and regulatory risks and compliance for our global business."  And in boldface, the 2025 Proxy reiterates: "**Our Board and management maintain active oversight**." Furthermore, "Apple's Audit Committee oversees business conduct, legal, and regulatory risks related to Apple's global business, while Apple's full Board also receives regular updates on legal and regulatory developments, including updates on legislative developments, government investigations, litigation, and other legal proceedings."  Furthermore, "within Apple's Legal team, team members led by our Senior Vice President, General Counsel and our Chief Compliance Officer are focused on legal compliance across our global business operations."

652.    These statements, cumulatively, are misleading, because they give investors a false assurance of an actively engaged Board, even representing at one point specific oversight into antitrust.  But the longstanding antitrust violations detailed above illustrate how the Board has actually failed to oversee compliance in at least this one key area.

653.    The misleading statements are material, because they contribute to whether shareholders had full information to vote for the Director Defendants' re-election.  The Director Defendants' re-election, in turn, caused harm to the Company as they continued to fail to conduct

1    antitrust compliance oversight to this day.

2    654.    The misleading statements are also material because they contributed to whether

3    the shareholders had full information to cast a say-on-pay vote to approve the executives'

4    compensation.  The 2025 Proxy disclosed that the Board would take into account shareholder

5    feedback into whether to approve executive compensation.  With an inflated view of the

6    Company's corporate governance, the vast majority of shareholders voted to approve the executive

7    compensation plan.  This, in turn, gave the Board assurance to keep this compensation arrangement

8    for the executives, which was a target of $59 million for Cook, and $23 million for each of the

9    other four named executives, or $151 million for 2024.  The actual compensation for 2024 was

10    even higher: $74.6 million for Cook, and $27.2 million each for the other four named officers, or

11    $183.4 million in all.

12    655.    The 2025 Proxy was sent on behalf of the whole current Board, so all of the Director

13    Defendants are liable for the misstatements and material omissions in the 2025 Proxy.

14    **VII.    DAMAGES TO THE COMPANY**

15    656.    Apple has been fined a total of more than $2 billion in the EU for violating rules

16    and regulations that all relate to its anti-steering provisions.

17    657.    In August 2021, Apple settled a class action brought by small developers (i.e., with

18    revenues of $1 million or less) in this District Court for $100 million.  The settlement was finally

19    approved in June 2022.

20    658.    In October 2025, the Tribunal found that Apple is liable for charging an excessive

21    and unfair Commission, and while the specific damages are still being determined, it would likely

22    be over $1 billion.

23    659.    Furthermore, Apple has had to incur significant costs defending against antitrust

24    actions, as well as sanctions for violating this District Court's orders in the Epic Games Action,

25    including for discovery misconduct, and has incurred and will incur additional litigation,

26    enforcement, and compliance costs as a result of its antitrust violations, which continue to the

27    present.

28

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

## VIII.   DERIVATIVE ALLEGATIONS

660.    Plaintiff brings this action derivatively in the right of, and for the benefit of, Apple, to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

661.    Plaintiff will adequately and fairly represent the interests of Apple and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiff has retained counsel experienced in prosecuting this type of derivative action.  Plaintiff has continuously held Apple stock throughout the Relevant Period and will continue to hold Apple stock through the resolution of this action.

662.    Plaintiff has not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein, at minimum, permit the inference that the directors lack the requisite disinterest to determine fairly whether these claims should be pursued.

## IX.   DEMAND FUTILITY ALLEGATIONS

663.    A demand on the Board to bring the claims asserted herein would be a futile and useless act because there is a reasonable doubt that a majority of the current eight-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

664.    All eight members of the Board of Directors have failed to oversee antitrust compliance at the Company, as detailed above, and as a result violate their fiduciary duty of loyalty to the Company.  By breaching their fiduciary duties, all eight directors face a substantial likelihood of liability.  That substantial likelihood of liability, as a result, makes these eight directors interested and not independent in whether they can assess a demand for litigation against them or the Officer Defendants, who are alleged to have engaged in the same misconduct.  As a result, making a demand on these eight directors is futile.

665.    Four out of the eight directors—Levinson, Cook, Jung, and Sugar—were on the Board when the DOJ's anti-poaching settlement was reached with Apple, and when Apple was found liable for conspiring to raise e-book prices.  A fifth director, Wagner, was on the Board

1    when the follow-on anti-poaching civil suit was settled and when the e-book judgment was upheld

2    on appeal.  Thus, these five directors had direct knowledge that antitrust violations were being

3    directed by the CEO and other senior officers, yet the steady drumbeat of subsequent antitrust suits

4    and other findings of anticompetitive conduct have shown that these directors did nothing to

5    examine Apple's practices more broadly or to improve antitrust compliance.

6          666.    These five directors—Levinson, Cook, Jung, Sugar, and Wagner—were also on the

7    Board when the House Report was released.  The House Report detailed a wide variety of

8    anticompetitive practices at Apple, as well as regulatory actions taken both domestically and

9    overseas in response.  Furthermore, the House Report detailed the practices that Apple is now

10    facing liability for (such as anti-steering), yet another DOJ lawsuit (concerning its anticompetitive

11    practices locking up the performance smartphone market), and regulatory actions and civil liability

12    in the United Kingdom for its anticompetitive practices in iOS distribution and in tying IAP to app

13    distribution, in the amount of potentially billions of dollars.  Thus, a clear majority of the directors

14    knew that Congress found a significant pattern of antitrust misconduct at Apple, and have allowed

15    the misconduct to fester until the more recent lawsuit by the DOJ was filed.  Thus, these directors

16    have an even greater substantial possibility of personal liability, and therefore cannot

17    independently and disinterestedly consider a demand.  Thus, making a demand would be futile.

18          667.    In addition, at least half of the directors cannot assess liability claims against Cook,

19    because of their lack of independence from him.  Because the other Officer Defendants engaged

20    in some of the same misconduct as Cook, these directors also cannot independently assess liability

21    claims against them because finding them liable would also implicate Cook.

22          668.    Cook is not independent because he is the CEO and, before then, the COO.  His

23    long tenure and reliance on Apple for his employment renders him not independent.

24          669.    The four longest tenured non-employee directors—Levinson, Jung, Sugar, and

25    Wagner—are also not independent from Cook, owing to how he has materially increased their

26    wealth through his stock price-driven leadership that has led Apple's market capitalization or total

27    shareholder return to increase by between 1,500% to 1,900%.  Thus, what may at first appear to

28    be modest stock awards given to board directors each year are actually fantastically wealth

increasing if a director got in early.  In addition to six-figure cash retainers, each non-employee director also has an annual stock award, vesting on February 1 of the following year, that is purportedly worth $275,000, but—for the longer tenured directors who have benefited from the run up in stock price Cook has presided over—is actually worth a lot more cumulatively.  Thus, Cook is responsible for vastly increasing the wealth of the long-tenured Board members who have been at Apple since Cook's ascension to CEO—Jung, Levinson, Sugar, and Wagner.

670.    This increase in wealth is most evident in Levinson, who has sold almost $90 million of Apple stock in just the last two years: on August 28, 2025, he sold almost $21 million worth of stock; on November 17, 2024, he sold more than $45 million worth of stock; on May 30, 2024, he sold more than $14 million of stock; and on February 29, 2024, he sold over $18 million of stock.  Levinson's enormous stock holdings are a result of his long tenure and Apple's appreciation in market value, especially its 19-fold increase under Cook.  Levinson still holds more than 4 million shares of Apple stock, making him almost a billionaire based on his Apple stock holdings, which probably far exceed his wealth from his purported day job as the CEO of Calico (and before then, the CEO of Genentech).  Levinson, because of his long tenure on Apple's Board (since 2000), is Apple's largest individual shareholder.

671.    The five (including Cook) longest tenured directors have the largest stock holdings among Board directors, according to the 2025 Proxy.  As of January 2, 2025, Levinson had more than 4.2 million shares of Apple stock, followed by Cook at almost 3.3 million shares, then Sugar at more than 109,000 shares, Jung at more than 76,000 shares, and Wagner at more than 68,000 shares.  At today's price, these shares would be worth approximately $977 million (Levinson), $759 million (Cook), $25 million (Sugar), $17 million (Jung), and $16 million (Wagner).

672.    In addition to their equity awards, directors are compensated with $100,000 annual cash retainers, while the Chair and the standing committee chairs also have additional cash retainers.  It is no coincidence that these longer-tenured directors also lead Board committees or, in Levinson's case, the entire Board.  Levinson, as the Chair, has an additional retainer of $175,000 per year; Sugar, as the Chair of the Audit Committee, has an additional retainer of $45,000; Jung, as the People and Compensation Committee Chair, an additional cash retainer of $40,000; and

1  Wagner, as the chair of the Nominating Committee, has an additional cash retainer of $35,000.

2  Cook's role in dramatically increasing these directors' personal wealth renders them not

3  independent and thus they cannot consider a demand against him.

4  　　　673.　　The long-tenured directors are often described as Cook's "allies" or "loyalists."

5  The *New York Post* expressly called Levinson, Sugar, and Wagner Cook's "allies" on the Board.

6  A recent *Bloomberg* report also described Levinson, Sugar, and Wagner as "Cook loyalists" who

7  have "largely let him run the business without interference."  Even in recent times when Apple's

8  stock price has struggled (news reports from the summer only credit Cook with increasing Apple's

9  stock price by 1,500% rather than 1,900% in the 2025 Proxy), *Bloomberg* reported, "there's . . .

10  no question that the board still sees [Cook] as the only person capable of turning things around.

11  Put simply: No crisis is big enough to shake the board's faith in Cook."

12  　　　674.　　Long-tenured Board members even lavish public praise on Cook in SEC filings.

13  Jung, the Chair of the Compensation Committee, along with Levinson, as a Compensation

14  Committee member, have consistently praised Cook in the annual meeting proxies.  In the 2025

15  Proxy, the Compensation Committee's cover letter setting forth how they justified Cook's

16  compensation awards—the members of the Committee are Jung, the committee chair, Levinson,

17  the board chair, and Gorsky, who joined the Board in 2021—praised Cook for having "led Apple

18  through a time of unparalleled innovation, while making the Company's values central to all of its

19  work."  The letter continued to praise Cook for his "outstanding contributions to Apple, taking the

20  Company to new heights with his vision and remarkable leadership."  The cover letter in the

21  January 11, 2024 proxy concerning Cook's compensation (same committee members plus former

22  Vice President of the United States, Al Gore, a director from 2003 to 2024), similarly, praised

23  Cook for his "outstanding leadership [that] has been crucial to Apple's success and its enduring

24  track record of innovation" and described him as "a responsible, thoughtful, and visionary leader

25  guiding Apple."  The January 12, 2023 proxy's cover letter from the Compensation Committee

26  (Levinson, Jung, and Gore), similarly, praised Cook for his "extraordinary direction."

27  　　　675.　　Thus, between four to five directors lack the independence to assess liability claims,

28  and for that additional reason, demand is futile.

1    X.    **CLAIMS FOR RELIEF**

2    **COUNT I**
**Breach of Fiduciary Duty**
3    **Against All Individual Defendants**

4    676.    Plaintiff incorporates by reference and realleges each and every allegation set forth

5    above as if fully set forth herein.

6    677.    The Individual Defendants each owe (and owed) Apple and its shareholders

7    fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's

8    affairs.

9    678.    As detailed above, the Individual Defendants breached their fiduciary duties by

10    permitting Apple, its directors, and officers to violate federal and state antitrust laws, through

11    failing to conduct antitrust compliance oversight or by actively participating in the misconduct.

12    679.    As a direct and proximate result of the Individual Defendants' breaches of their

13    fiduciary duties, Apple has been damaged, not only monetarily, but also with regard to its corporate

14    image and goodwill, as well as the damages caused by continued violations of law.

15    680.    As a result, Plaintiff brings this claim on behalf of Apple to remedy Individual

16    Defendants' violations of law.

17    681.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

18    **COUNT II**
**Corporate Waste**
19    **Against the Individual Defendants**

20    682.    Plaintiff incorporates by reference and realleges each and every allegation set forth

21    above as if fully set forth herein.

22    683.    By rewarding themselves through the payment of outsized incentive compensation

23    while causing Apple to violate the law, the Individual Defendants have caused Apple to waste

24    valuable corporate assets.

25    684.    As a direct and proximate result of the Individual Defendants' breaches of their

26    fiduciary duties, Apple has been damaged, not only monetarily, but also with regard to its corporate

27    image and goodwill, as well as the damages caused by continued violations of law.

28    685.    As a result, Plaintiff brings this claim on behalf of Apple to remedy Individual

1  Defendants' violations of law.

2  686.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

3  **COUNT III**
**Unjust Enrichment**
4  **Against the Individual Defendants**

5  687.    Plaintiff incorporates by reference and realleges each and every allegation set forth

6  above as if fully set forth herein.

7  688.    As a result of the misconduct described herein, the Individual Defendants will be,

8  and have been, unjustly enriched at the expense of the Company and its shareholders.

9  689.    The Individual Defendants granted, authorized, approved, and/or received tens of

10  millions of dollars in outsized executive compensation while condoning the misconduct alleged

11  herein.  Further, Cook sold stock for a profit during the Relevant Period, misusing confidential,

12  non-public corporate information.  The Individual Defendants should be required to disgorge the

13  ill-gotten gains they have obtained, and/or will otherwise unjustly obtain, at the expense of Apple

14  and its shareholders.  A constructive trust for the benefit of the Company should be imposed

15  thereon.

16  690.    All incentive compensation payments and stock sale proceeds granted, authorized,

17  approved, and/or received by the Individual Defendants were at the expense of Apple.  The

18  Company was inadequately compensated for these payments and stock sale proceeds.

19  691.    As a direct and proximate result of the Individual Defendants' unjust enrichment,

20  Apple has been damaged, not only monetarily, but also with regard to its corporate image and

21  goodwill, as well as the damages caused by continued violations of law.

22  692.    As a result, Plaintiff brings this claim on behalf of Apple to remedy Individual

23  Defendants' violations of law.

24  693.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

25  **COUNT IV**
**Violation of §14(a) of the Exchange Act**
26  **Against All of the Director Defendants**

27  694.    Plaintiff incorporates by reference and realleges each and every allegation set forth

28  above as if fully set forth herein.

695.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. §240.14a-9(a).

696.    The Director Defendants exercised control over Apple and at least negligently caused Apple to disseminate the false and misleading statements in the 2025 Proxy. These proxy statements materially misrepresented Apple's compliance oversight, specifically, Apple's failure to oversee antitrust compliance. As a direct and proximate result of the Director Defendants' wrongful conduct, Apple misled or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Apple's recommendation to elect and re-elect individuals to the Board and approve executive compensation.

697.    As stated herein, these proxy statements contained untrue statements of material facts and omitted material facts necessary to make the statements that were made not false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links in the re-election of each of the directors, formed the basis of the Company's shareholders' "say-on-pay" vote, as well as the shareholders' approval of the Company's long-term incentive plan, and the continued mismanagement of Apple.

698.    The written communications made by the Individual Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

699.    At all relevant times to the dissemination of the materially false and/or misleading proxy statements, the Individual Defendants were aware of, and/or had access to, the facts concerning Apple's alleged anticompetitive practices in violation of federal and state antitrust

1  laws.

2      700.    Apple, as a result, has been injured by this conduct and is entitled to damages and

3  equitable relief.

4  

**COUNT V**
**Violation of §29(b) of the Exchange Act**
**Against All of the Director Defendants**

5  

6      701.    Plaintiff incorporates by reference and realleges each and every allegation set forth

7  above as if fully set forth herein.

8      702.    The Director Defendants each received incentive compensation and fees, including

9  stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Director

10  Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act

11  because these Defendants violated §14(a) by issuing false and misleading reports to Apple

12  shareholders regarding the nature of, and responsibility for, violations of federal law and

13  regulations.  All of the payments the Director Defendants received are therefore voidable by Apple

14  under §29(b) of the Exchange Act.

15      703.    Apple is in privity with the Director Defendants with respect to the incentive

16  compensation and fees provided by Apple to these Defendants.  The Director Defendants have

17  engaged in prohibited conduct in violation of the securities laws as alleged herein.

18      704.    Apple has been severely injured by the misconduct of the Director Defendants.

19  Accordingly, Apple is entitled to damages, i.e., rescission of the incentives, compensation, and

20  fees granted to the Director Defendants.

21  

**COUNT VI**
**Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against the Director Defendants, Cook, and Maestri**

22  

23      705.    Plaintiff incorporates by reference and realleges each and every allegation set forth

24  above as if fully set forth herein.

25      706.    During the Relevant Period, the Director Defendants, Cook, and Maestri (the 10(b)

26  Defendants) disseminated and/or approved false or misleading statements about Apple concerning

27  its antitrust compliance and omitting material information about how Apple's App Store did not

28  face competition because of Apple's anticompetitive conduct.

707.    The 10(b) Defendants knew, or recklessly disregarded, that those statements were false or misleading, and the statements were disseminated with knowing intent to deceive, manipulate, or defraud.  In doing so, the 10(b) Defendants aimed to artificially inflate the price of the Company's stock.

708.    While the Company's stock would have been inflated as a result of those false or misleading statements, the 10(b) Defendants caused the Company to repurchase at least $171 billion of Company stock at inflated prices.

709.    The 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Apple in connection with the Company's repurchases of its stock during the Relevant Period.

710.    The 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Apple stock, which were intended to, and did: (a) deceive Apple about its antitrust compliance, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Apple stock; and (c) cause Apple to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  The 10(b) Defendants were in possession of material, adverse nonpublic information regarding Apple's antitrust violations in the United States.

711.    The 10(b) Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or

1    misleading statements made during 2023 to 2024, as alleged above.

2          712.    As described above, Defendants acted with scienter throughout 2023 to 2024, in

3    that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.

4    The misstatements and omissions of material facts set forth in this complaint were either known

5    to Defendants or were so obvious that Defendants should have been aware of them.  Throughout

6    the Relevant Period, Defendants also had a duty to disclose new information that came to their

7    attention and rendered their prior statements to the market materially false or misleading.

8          713.    Defendants' false or misleading statements and omissions were made in connection

9    with the purchase or sale of the Company's stock.

10          714.    As a result of the 10(b) Defendants' misconduct, Apple has and will suffer damages

11    in that it paid artificially inflated prices for Apple common stock purchased as part of the

12    repurchase program and suffered losses when the previously undisclosed facts relating to the

13    Company's antitrust violations that were disclosed in March 2024 by the filing of the DOJ Action.

14    Indeed, the full extent of Apple's wrongdoing has not been revealed, since Apple continues to

15    deny and downplay its antitrust violation.  Apple would not have purchased these securities at the

16    prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the

17    10(b) Defendants' false or misleading statements.

18          715.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, the

19    Company suffered damages in connection with its purchase of Apple stock in 2023 and 2024.

20          716.    By reason of such conduct, the 10(b) Defendants are liable to the Company

21    pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

22          717.    Plaintiff brought this claim within two years of its discovery of the facts constituting

23    the violation and within five years of the violation.

24                                    **COUNT VII**
                            **Violation of §20(a) of the Exchange Act**
25                            <u>**Against the 10(b) Defendants**</u>

26          718.    Plaintiff incorporates by reference and realleges each and every allegation set forth

27    above as if fully set forth herein.

28          719.    During the Relevant Period, the 10(b) Defendants had direct power and control over

the Company, including the authority to cause the wrongful conduct alleged herein.

720.    As set forth above, the 10(b) Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by causing the dissemination of materially false and misleading statements or omitting to disclose material facts.

721.    The 10(b) Defendants, by reason of their positions as directors or officers of the Company, had the power and authority to control the Company's and its employees' actions, including the dissemination of the statements alleged to be false and misleading herein.

722.    By virtue of the foregoing, the 10(b) Defendants are liable to the Company as "control persons" under Section 20(a) of the Exchange Act for their violations of Section 10(b) and SEC Rule 10b-5.

723.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, the Company has suffered damages through paying inflated prices for its own stock during the Relevant Period.

724.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## XI.    PRAYER FOR RELIEF

725.    WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Apple and that Plaintiff is a proper and adequate representative of the Company.

B.    Declaring that the Individual Defendants have breached their fiduciary duties of care and loyalty to Apple.

C.    Determining and awarding to Apple the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally.

D.    Awarding to Apple restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by them; including all profits, special benefits, and unjust enrichment they have obtained as a result of their unlawful

conduct, payment of incentive compensation (whether in the form of cash bonuses, stock awards, or stock option grants), and common stock sale proceeds.

E.    Directing Apple to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its stockholders from a recurrence of the damaging events described herein, including, but not limited to, the following specific relief:

(i)    improving measures in the Company to prevent and remedy illegal anticompetitive practices in violation of federal and state antitrust laws;

(ii)    requiring the Company to implement additional audit, compliance, and internal control procedures; and

(iii)    requiring independent approval of the terms and timing of insider stock selling and stock option grants.

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

G.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

H.    Awarding pre- and post-judgment interest.

I.    Granting such other and further relief as the Court deems just and equitable.

**XII.    JURY DEMAND**

726.    Plaintiff demands a trial by jury.

Dated: February 27, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 _/s/_ Jing-Li Yu
Donald A. Broggi
Jing-Li Yu (CA 342985)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
E-mail: dbroggi@scott-scott.com
         jyu@scott-scott.com

Joseph A. Pettigrew (CA 236933)

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
E-mail: jpettigrew@scott-scott.com

Geoffrey M. Johnson (*Pro Hac Vice* forthcoming)
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: 216-229-6088
E-mail: gjohnson@scott-scott.com

*Counsel for Plaintiff City of Hollywood Police Officers' Retirement System*

VERIFIED STOCKHOLDER DERIVATIVE ACTION COMPLAINT

**<u>VERIFICATION</u>**

I, David Strauss, do hereby declare:

1.      I am the Chairman of the City of Hollywood Police Officers' Retirement System ("Hollywood"), located in Hollywood, Florida, and am duly authorized to act on behalf of Hollywood.

2.      Hollywood is a derivative plaintiff in the above-titled action.  I verify that I have reviewed the Verified Stockholder Derivative Action Complaint (the "Complaint"), to be filed in this action and that the facts stated in the Complaint, as they concern Hollywood, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.      Hollywood has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Hollywood; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 27th day of February, 2026.

_____
DAVID STRAUSS, CHAIRMAN
CITY OF HOLLYWOOD POLICE OFFICERS'
RETIREMENT SYSTEM
Hollywood, Florida